UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

IN RE: VALE S.A. SECURITIES LITIGATION

---------------------------------------------------------------- X

:
:
:
:
:
:
:
:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/23/17

1:15-cv-9539-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

In November 2015, the Fundão Dam, a repository of iron ore tailings located in the city of Mariana in the Brazilian state of Minas Gerais, collapsed, releasing a deluge of muddy waste onto the village of Bento Rodrigues below. The dam's failure caused nineteen people to lose their lives, destroyed hundreds of homes, and caused ecological damage so severe that this incident has often been described as the worst environmental disaster in Brazil's history.

The Fundão Dam was owned and operated by Samarco Mineração S.A., a mining company owned in equal parts by Brazilian mining company Vale S.A. and Australian mining company BHP Tilliton. The Plaintiffs in this putative securities class action, holders of Vale's American Depository Receipts, allege that various statements made by Vale and certain of its senior executives, both before and after the dam collapse, were false and misleading within the meaning of the American federal securities laws. Defendants now move to dismiss the complaint on several grounds. For the reasons stated below, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND

This case arises out of what the complaint characterizes as Brazil's worst-ever environmental disaster—the "catastrophic collapse" of the Fundão mining dam in the Brazilian state of Minas Gerais on November 5, 2015. This "Mariana mining disaster," as it is known, "unleashed millions

of tons of toxic mining waste" as a result of which nineteen people lost their lives, more than 600 people lost their homes and possessions, and numerous waterways were severely polluted.

Lead Plaintiffs, the Alameda County Employees' Retirement Association and Orange County Employees Retirement System ("Plaintiffs"), bring this lawsuit under §§ 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of themselves and a putative class of purchasers of the common or preferred stock American Depository Receipts ("ADRs") of Vale, S.A. ("Vale"), between November 7, 2013 and November 30, 2015 (the "Class Period"). Plaintiffs filed an amended complaint in this case on April 29, 2016 (Dkt. No. 58), which names as defendants Vale, Vale's Chief Executive Officer Murilo Pinto de Oliveira Ferreira, Vale's Chief Financial Officer Luciano Siani Pires, and Vale's Executive Director, Ferrous Minerals, Gerd Peter Poppinga. Defendants filed a motion to dismiss the complaint on July 25, 2016 (Dkt. No. 79), Plaintiffs filed an opposition on August 29, 2016 (Dkt. No. 88), and Defendants filed a reply on September 12, 2016 (Dkt. No. 91).

What follows is a summary of the factual allegations contained in the amended complaint, allegations which are accepted as true for the purposes of this motion. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

### A. Overview of Vale's Mining Business

Vale is a mining company incorporated and headquartered in Brazil, and is the world's largest producer of iron ore and iron ore pellets, and the second largest producer of nickel. Compl. ¶¶ 20, 25. In addition to mines it owns in Brazil, Vale operates mines through Samarco Mineração S.A. ("Samarco"), a privately held joint venture between Vale and an affiliate of BHP Billiton ("BHP"), an Australian mining conglomerate. *Id.* ¶ 26. In 2014 and 2015, Samarco accounted for 23% of Vale's total pellet production. *Id.* ¶ 45. Vale received more than $3 billion in dividends from Samarco in the five years before the dam collapse, and before the collapse, analysts projected that Samarco would contribute more than 5% of Vale's total EBITDA in 2015. *Id.* ¶ 46.

Samarco's board of directors is composed of four Vale executives and four BHP executives; there are no other board members. *Id.* ¶ 27.  During the Class Period, the following executives served as directors on Samarco's board:  Defendant Poppinga, Jose Carlos Martins (Poppinga's immediate predecessor as Vale's Executive Director, Ferrous Metals), Pedro José Rodrigues (Vale's Global Director of Mergers Acquisitions), Hélio Moreira Cabral, Marcelo Botelho Rodrigues, and Stephen Potter (Vale's Global Director of Strategy).  *Id.*[1]

Vale employees also served on various Samarco committees responsible for operating the mining business.  *Id.* ¶ 28.  During the Class Period, Vale's Global Director of Strategy, Stephen Potter, and its General Manager for Iron Ore Planning and Development, Paulo Bandeira, served on Samarco's Operations Committee, which was responsible for monitoring Samarco's operational improvements plan and evaluating and monitoring Samarco's operational performance related to health, safety, environment and community, sales, production, costs, and inventory.  *Id.*  The Operations Committee was also responsible for the "technical evaluation of new resources," and the evaluation and monitoring of capital projects.  *Id.*

Vale executives Stephen Potter, Helio Cabral, and Cleber Santiago, who were responsible for managing Vale's controlled companies, served on Samarco's Finance and Strategy Committee.  *Id.* ¶ 29.  Luiz Eduardo Lopes (Vale's Director of Budget and Capital Improvements), Mauricio Drumond (Vale's Director for Performance and Integration of Capital Projects), and Rodrigo Araujo served on Samarco's Project Management Committee.  *Id.*

Samarco's board met at least three times each year, and Vale employees, including Defendant Poppinga after he joined Samarco's board, attended every meeting.  *Id.* ¶ 30.  According to minutes of the various meetings, the topics discussed included "tailings storage and the ongoing risks associated with tailings storage," "needed operational and safety improvements," "the licensing of various mining operations and tailings storage facilities," "shareholder audit results," and "the

---

[1] Where corporate titles are not provided in this summary, it is because they were not alleged in the complaint.

status of various capital projects." *Id.* Vale also audited Samarco every year, and presented the results of those audits to Samarco's board each year. *Id.* ¶ 32.

Mining for iron generates an enormous amount of waste as the iron is separated from the ore. *Id.* ¶ 33. Once the ore is excavated, a mechanical or chemical process is used to extract the desired product from the ore. *Id.* This process, known as beneficiation, produces a waste stream known as tailings, a mixture of water, processing chemicals, and finely ground rock. *Id.* The most common way to store tailings is through the use of earthen dams known as "tailings dams," into which tailings are typically pumped as a slurry consisting of 60% water and 40% fine particles. *Id.* ¶ 34. The complaint alleges that tailings dams are "unprofitable, necessary evils of mining operations" and that "therefore, there is a tendency and inclination to cut corners when constructing and maintaining tailings dams." *Id.* ¶ 35.

Tailings dams are typically built in sequential "lifts" over several years that increase the size and height of the dam throughout the life of the particular mine(s) it services. *Id.* ¶ 36. Typically, a base or starter dam is constructed, and, as it fills with a mixture of tailings and water, is raised to accommodate additional waste. *Id.* Material used to raise the dam often includes the tailings themselves. *Id.*

Tailings dams are generally built using "upstream" or "downstream" design and construction. *Id.* ¶ 37. The upstream method is the least expensive way to build a tailings dam, and, according to a *Wall Street Journal* article cited in the complaint, was the method employed by Samarco. *Id.* ¶ 38. Upstream dams rely on the stability of the tailings themselves as a foundation for the construction; edification of these types of tailings dams involves letting the tailings closest to the dam dry out and then using those dry tailings as the foundation for new levels, raised by plowing earth or tailings into successive embankments. *Id.* ¶¶ 37-38. Upstream dams are less secure than downstream dams. *Id.* ¶ 37. In particular, upstream dams built on tailings are more susceptible to "liquefaction," a physical phenomenon in which the strength and stiffness of soil is reduced by

either dynamic forces (such as an earthquake) or static forces (such as slope instability or the buildup of water pressure). *Id.* ¶ 39.

Tailings dams are not designed to hold substantial amounts of water and indeed, "water is the number one enemy of tailings dams"—too much water makes the dams unstable and greatly increases the risk of collapse. *Id.* ¶ 40. Accordingly, tailings dams must not be raised too quickly to ensure that the tailings used to construct the "lifts" have sufficient time to dry out before additional lifts are added; if the tailings do not dry sufficiently, the risk of a collapse increases significantly. *Id.* Experts estimate that tailings dams fail at a rate ten times greater than conventional dams and, on average, between 2001 and 2011 there was one tailings dam failure every eight months. *Id.* ¶ 42.

In February 2013, iron ore traded at $154.64 per dry metric ton; by November 2015 (when the Fundão Dam collapsed), the price had decreased by more than 70%, to $46.16. *Id.* ¶ 54. The complaint alleges that, as iron ore prices decrease, "the pressure on mining companies to increase production and cut costs grows enormously." *Id.* ¶ 55. And "[o]ne way to increase production is to mine increasingly lower-grade ores," which "produces more waste." ¶ 41. This increase in the growth of waste "spawns the needs for larger and larger tailings dams," but "as the size of tailings dams increases, so too does the incidence and risk of catastrophic failures." *Id.* Vale was "not immune to these pressures," and between 2013 and the third quarter of 2015, Vale increased production 36%. *Id.* This "explosive growth in production led to an equally explosive growth in waste." *Id.* ¶ 56.

### B. The Fundão Dam

The Fundão Dam is one of three interconnected dams that Samarco and Vale used to store and hold tailings from their mining operations. *Id.* ¶ 47. The dam was built, in part, to receive tailings from Vale's Alegria plant. *Id.* ¶ 48. Waste arrived daily through pipelines linking the Alegria mine to the dam. *Id.* ¶ 49.

Under the terms of a contract with Samarco, referred to in the complaint as the "SAMITRI"

5

contract, Vale was permitted to dispose of tailings from its Alegria mine into Samarco's tailings dams.  *Id.* ¶ 52.  Vale dumped more than one million tons of waste into the Fundão Dam in 2014, 36% more than the contract allowed.  *Id.*

The contract also obligated Vale to share in the maintenance expenses of existing dams and the construction and maintenance of any new dams.  The relevant contractual provision provided that Vale

> [s]hall share in the maintenance expenses of the current dam and construction and maintenance of new dams, as well as any environmental costs derived from the use of the SAMARCO dams, in proportion to such degree of utilization as shall occur.

*Id.*  ¶ 53.  Because the Fundão Dam did not exist when Vale became a party to the contract with Samarco, Vale was required to share in the maintenance and construction of the Fundão Dam.  *Id.*

In connection with the increased production and concomitant increase in the growth of tailings described above, Samarco's board became focused on the issue of tailings disposal.  During its December 4, 2013 meeting, the board "acknowledged" that the disposal of tailings was "still a considerable concern, particularly regarding the future tailings storage capacity."  *Id.* ¶ 57.  When Samarco's CEO, Roberto Vescovi, "reiterated to the board the importance of investing in tailings disposal" at the September 19, 2014 board meeting, the board recommended that management "resolve the limitations for tailings disposal at dams and pumps, making that the Company's main priority."  *Id.* ¶ 58.  The minutes of a December 10, 2014 meeting also reflect that the board "reiterated" the "concern over the risk related to the tailings disposal and sanitary landfill projects, and the impacts of the amounts of capital needed on the results of the company."  *Id.*  The board, including Defendant Poppinga and Stephen Potter, authorized a project to "yet again" increase the size and elevation of the Fundão Dam at an April 15, 2015 meeting.  *Id.*

The complaint alleges that the Fundão Dam, originally constructed in 2007 and 2008, was "plagued" by "serious problems . . . from the beginning."  *Id.* ¶ 60.  In 2009, one of the dam's main

dikes "experienced severe drainage problems" but, instead of "moving the water downstream away from the tailings, the bottom drain damned the water, causing excessive pressure in the embankment near the Dam's foundation." *Id.* ¶ 61. As a result, the "original conceptual design," which "called for draining the Dam through permeable bottom drains, was abandoned," and "[u]nder the new design, the bottom drains were filled and a new method for draining water was implemented." *Id.* The Samarco board, including the Vale representatives on the board, "were informed of these problems and authorized the design change." *Id.*

Shortly thereafter, a deformation or "piping" was noted in the dam's main gallery spillway. *Id.* ¶ 62. A spillway is a passage or structure through which excess water is released. Piping occurs when water exiting a tailings impoundment picks up soil particles and moves them out of a dam's foundation or embankment; this continued removal of soil particles causes channels or "pipes" to develop in a dam's walls or foundation. *Id.* If these channels become big enough to connect to the free-standing water in the reservoir, "large flows can develop, leading to a complete dam failure." *Id.*

Although the complaint does not allege when this occurred, at some point, a "sinkhole occurred in the tailings beach, caused by a break in a concrete joint in the secondary gallery." *Id.* ¶ 63. A "specialized company [was] brought in to examine the problem," which proposed a solution that involved reinforcing the galleries. *Id.* However, "because that solution would have limited the height of the tailings that could be deposited in the reservoir, thereby reducing the Dam's capacity, it was not implemented." *Id.* Instead, the "galleries were plugged and deactivated so that the Dam could be raised yet again." *Id.*

Around the same time, Samarco wanted to expand the Fundão Dam to "occupy" the valley between the dam and the waste dump at Vale's adjacent New Factory Mine. ¶ 64. Joaquim Pimenta de Ávila, the dam's original engineer, recommended that "Vale assess the situation to determine whether the expansion would . . . interfere with drainage from its waste dump." *Id.* He also "reported concerns that surface flows from Vale's adjacent waste pond could negatively impact the

Dam." *Id.* "Notwithstanding Mr. Pimenta de Ávila's concerns, the expansion went forward and the axis and geometry of the Dam were changed significantly . . . ." *Id.* ¶ 65.

In order to address the ongoing "piping" and drainage issues, a recess was built into the dam's left abutment, which was in the process of being raised. *Id.* ¶ 66. No license was obtained for construction of the recess, and there was no provision for the recess in the environmental permit for raising the dam. *Id.* The dam's geometry was changed without revisiting a stability analysis contained in the dam's original operating manual. *Id.* ¶ 67.

In 2013, there were "water upsurges in the embankment near the left shoulder" of the dam, and in 2014, there were "upsurges in the embankment near the right shoulder." *Id.* ¶ 68. Upsurges can cause "significant saturation in the embankments, which in turn can lead to liquefaction and collapse." *Id.*

Mr. Pimenta de Ávila, whose contract was not renewed when it expired in 2012, was brought back as a consultant in November 2013, and in September 2014, he performed six inspections of the Fundão Dam which "identified several serious risks." *Id.* ¶ 69. The "most significant risk" he identified involved the beginning of a break in one of the dam's retreat dikes; he identified several extended cracks running parallel to the crest of the dike, as well as signs of movement at the foot of the slope. *Id.* The nature of the cracks and movement were typical of "sliding," which he believed was probably caused by "liquefaction of the foundation tailings from the retreat dikes." *Id.*

Mr. Pimenta de Ávila recommended that several measures be implemented to monitor the stability of the dam, but when he later inquired about the results of the recommended tests, he was told "the results had been lost because the 'computer's hard drive had burned up.'" *Id.* ¶¶ 69-70. In response, he "reemphasized the importance of performing the tests, and urged that the tests be made a priority." *Id.* ¶ 70.

The complaint alleges that no "adequate emergency action plan ('EAP') was ever implemented at the Fundão Dam." *Id.* ¶ 71. According to Paulo Sergio Machado Ribeiro Filho, a

member of the accident response team for dams at the Germano complex—where Samarco principally conducts its operations, including the Fundão Dam—the dam had no audible alarm system. *Id.* In addition, the only training he received on how to respond to an accident at the dam was to "consult the emergency action plan, and to take the actions that were the responsibility of the environment team in it," and the day the dam collapsed, he "had not been activated to take any action or to perform the duties inherent to the deputy in the environment unit." *Id.* He "never participated in any drill for a situation in which the dam ruptures" either. *Id.*

The EAP had no mechanism for notifying residents in the town directly below the Fundão Dam in the event of an emergency. *Id.* ¶ 72. According to Gleison Alexandrino Souza, a contractor who worked at the dam and lived in Bento Rodrigues when the dam collapsed, Samarco "never conducted any training with the community for emergency situations" and "did not issue any statements or warnings to the community near the rupture." *Id.*

In 2009, Samarco retained Rescue Training International ("RTI") and its director, Randal Fonseca, to create an emergency action plan for its mining units, including the Germano complex and the Fundão Dam and other tailings dams. *Id.* ¶ 73. In interviews with journalists, Mr. Fonseca explained that "he was hired because an independent audit of Samarco's existing emergency action plan had concluded that the plan did not conform to international technical rules of safety." *Id.* "Among other failings, the plan provided no audible alarms or other viable warnings system to alert residents of the towns that were immediately downhill" from the Fundão Dam. *Id.* Mr. Fonseca designed a new plan to "address these and other deficiencies," which he presented to Samarco after "the auditors approved" it. *Id.*

While performing other work for Samarco three years later, Mr. Fonseca "noticed that the measures he had included in the EAP he created three years earlier had not been implemented." *Id.* ¶ 74. He questioned Samarco's officers about this, and was told that Samarco "decided to use the simpler plan that the auditors had rejected." *Id.* Mr. Fonseca opined, in an interview with a

Brazilian newspaper, that "the reason for the decision not to implement the plan he recommended was an unwillingness to spend money on security given the tough economic climate at that time." *Id.*

In 2013, in connection with an application to expand the Fundão Dam, the Minas Gerais State Prosecutor's office retained the Instituto Pristino, a not-for-profit environmental and geotechnical modelling institute affiliated with the University of Minas Gerais, to study the dam and prepare a report on its condition and whether the license should be renewed. *Id.* ¶ 75. The "four experts who prepared the Pristino Report warned of serious risks at the Dam, and recommended that the license not be renewed unless a number of conditions were met." *Id.*

The Pristino Report "warned that the Dam's proximity to an adjacent Vale tailings pond posed serious risks that rising water levels, resulting from the natural flow of surface water, could cause several collapses in the Dam's walls, creating a massive flow of waste." *Id.* ¶ 76. The authors concluded that the "structures never should have been adjacent to each other because of their different physical characteristics," and the Pristino Report "stated that these design defects had been noted in previous technical reports, and should have been included in the application for renewal." *Id.* The complaint alleges that "[t]hese were the same concerns that Mr. Pimenta de Ávila noted in his September 2011 Technical Report." *Id.* And like Mr. Pimenta de Ávila's report, the "Pristino Report also recommended that studies on the possible impact of contact between the structures be undertaken." *Id.*

The Pristino Report specifically recommended that the following conditions be placed on renewing the license:

- More frequent (less than one year between tests) geotechnical and structural testing and monitoring of the Dam and adjacent dikes.

- Creation and presentation of a contingency plan for hazards or accidents that may occur, including evidence of the effectiveness of the contingency plan.

- Performance of a break analysis of the Dam, which was supposed to have been delivered to regulators six years earlier.  The report noted that this condition was of "extreme importance to ensure the security and integrity of the environment."

*Id.* ¶ 77.  Ultimately, however, these conditions were not imposed on the license renewal and the recommended steps were not taken, causing the state prosecutor to abstain from the vote approving renewal of the license.  *Id.*

In September 2014, Mr. Pimenta de Ávila "warned about 'severe' structural problems in the Fundão Dam" and "urged the company to step up monitoring of water pressure and levels and to reinforce the Dam with a buttress."  *Id.* ¶ 78.  "After seeing cracks and sliding in the Dam that he believed were the beginning of a rupture, Mr. Pimenta de Ávila prepared a written report in which he noted that the 'geometry of the cracks characterized a vast area with movement typical of sliding which very probably would have been caused by the occurrence of liquefaction involving the foundation tailings from the retreat dikes.'"  *Id.*  To protect against liquefaction, he "urged the installation of additional sensors to monitor water levels in the Dam, to monitor the readings daily, and to drill wells and pump out excess water if the readings indicated excessive water."  *Id.*

Mr. Pimenta de Ávila also recommended the installation of a buttress at the base of the dam "to prevent the kind of collapse that eventually occurred."  *Id.* ¶ 79.  He "attributes the failure to follow his recommendations to a mistaken belief that a collapse would not happen."  *Id.*

Gleison Alexandrino Souza, who worked for the company that performed the work to expand the dam (described above), saw a crack in a "corner" of the dam out of which "water was flowing" while working there in 2014.  *Id.* ¶ 80.  According to Mr. Souza, "everybody knew that the crack was there, and the company removed all of the machines from the area and began to repair the cracked spot."  *Id.*

According to Brazilian federal prosecutor José Adércio Leite Sampaio, the "Dam had undergone a rapid expansion in the years leading up to the collapse, with the volume of tailings

growing by 1100% between 2012 and 2015, from 5 million cubic meters to 55 million cubic meters."
*Id.* ¶ 81.  However, "according to Brazilian police investigating the collapse, as the volume of waste
exploded in 2014 and 2015, the volume of water drained from the dam actually decreased, a recipe
for the kind of disaster that ensued."  *Id.*

According to an article in the *Wall Street Journal* dated November 24, 2015, prosecutor
Sampaio "said that several of the 50 piezometers," instruments bored into the dam's walls that
measure water pressure and saturation of the soils that comprised the walls, "indicated 'emergency'
levels of pressure and stress before the Dam collapsed."  *Id.* ¶ 82.

According to Wagner Alves, Samarco's General Manager for Mining Operations, one of the
piezometers "continuously indicated an emergency situation in 2014 and 2015."  *Id.* ¶ 83.  A July
2015 stability report "likewise reported that several piezometers and other instruments recorded
emergency levels of water and water pressure in 2014 and 2015, including one that continuously
recorded 'emergency' levels between August 2014 and July 2015 and another between March and
May 2015."  *Id.*  Data from the piezometers was collected weekly, not daily as Mr. Pimenta de Ávila
had urged.  *Id.*

On November 5, 2015, the Fundão Dam "began to leak."  *Id.* ¶ 84.  While employees
"futilely" tried to reduce the volume of water in the dam, the dam burst, "unleashing a colossal
torrent of mud and debris hurtling toward the villages below."  *Id.*  As a result of the dam's collapse,
"19 people lost their lives, and hundreds lost their homes and all of their possessions."  *Id.*  The
collapse "destroy[ed] Bento Rodrigues and seriously damage[ed] several other nearby towns," and
the "mudflow flooded the Rio Doce, killing fish and wildlife and polluting the water all the way to
the Atlantic Ocean 400 miles away."  *Id.*

### C.  Aftermath of the Fundão Dam Collapse

The complaint alleges that in "the days and weeks after the collapse, Defendants made
numerous public statements disclaiming any responsibility for the collapse or the harm it caused."

*Id.* ¶ 85.

On a November 16, 2015 conference call with investors and analysts to discuss the dam collapse, Defendant Pires "claimed that Brazilian and international law prohibited Vale from directly interfering in Samarco's management" and that "Vale and Samarco were completely independent and shared no resources, systems, or support functions" as follows:

> And unlike others sometimes, other affiliates, there were no resources shared between Vale and Samarco or BHP and Samarco whatsoever. So we did not share systems. We did not share support functions. We did not share, not even in Mariana, where Vale and Samarco were neighbors, we did not share any type of operations crews, or let's say, safety technicians or communications people or community relations people.

*Id.*

On November 27, 2015, Brazilian prosecutors announced that they were going to sue Vale, BHP, and Samarco for $5.2 billion to "pay for the environmental damage they had caused and to compensate victims of the tragedy." *Id.* ¶ 86. On December 18, 2015, a Brazilian court "ordered Vale (along with BHP and Samarco) to fund a comprehensive recovery plan to remediate the environmental and societal harm the collapse caused, and froze Vale's Brazilian mining assets to ensure that it complied with its obligations." *Id.* In doing so, the "Brazilian court found that there was sufficient evidence to support the probability that Vale was responsible" as a "direct polluter" "inasmuch as the tailings from its mining operations comprised the mass of mud and tailings that caused the environmental disaster," and as an "indirect polluter," because it was not only a "beneficiar[y]" of Samarco's mining activities, but was "also co-responsible for the decisions made by" Samarco." *Id.* Shortly thereafter, the three companies agreed to pay an estimated $6 billion for these purposes. *Id.*

### D. Defendants' Allegedly Materially False and Misleading Statements

The complaint alleges that during the Class Period

> in regular press releases, conference calls, public filings and filings with the SEC, Defendants repeatedly made materially false and misleading statements and

omissions concerning: (1) the Company's dedication and commitment to health, safety, and the environment; (2) the Company's risk mitigation plans, policies, and procedures; (3) the Company's control over Samarco's operations and its responsibility for the devastating harm the Fundão Dam collapse caused; (4) the Company's purported cost cuts and capital expenditure reductions; and (5) the accuracy and completeness of the Company's 2013 and 2014 Annual Reports.

*Id.* ¶ 87.  Each category of allegedly false and misleading statements is summarized below.

### 1.  *Statements Regarding Vale's Commitment to Health, Safety and the Environment*

According to the complaint, "[t]hrougout the Class Period, Defendants repeatedly touted to investors the Company's focus on the health and safety of employees and the communities in which the Company operates," but these statements were "false and misleading."  *Id.* ¶ 88.

First, the complaint alleges that during Vale's Capital Markets Day conference, which was held in New York on December 2, 2014, Defendant Ferreira stated:  "I would like to assure you that we are striving to build a company of solid values," including "respect [for] the environment [and] genuine care for the safety and well-being of fellow colleagues and respect [for] the communities in which our company operates."  *Id.* ¶ 89.  Vania Somavilla, Vale's Executive Director of Human Resources, Health and Safety, Sustainability and Energy, further stated that "[w]e seek nothing less than zero harm[.]  [W]e work together with governments and civil society to help build a better regulatory framework[.]"  *Id.*  She also stated that Vale's "commitment to promoting a zero harm culture has paid off . . . and we want to do more by reinforcing genuine care, improving safety training, improving risk management and control, and encourag[ing] deviation report[ing] and to improve continuously."  *Id.*  Finally, Somavilla stated that Vale "not only mitigate[s] the impact of our presence, but also leave more than we take then we arrive."  *Id.*

The complaint alleges that each of the three individual Defendants was present when Somavilla made these statements, and that Somavilla's statements were "materially false and misleading when made because, among other things, Vale did not respect the environment or the communities in which it operates, did not promote a zero harm culture, did not mitigate the impact

of the Company's presence, was not focused on safety, and did not work together with governments and civil society to help build a better regulatory framework." *Id.* ¶ 90.

In Vale's 2013 Sustainability Report, which was publicly released in April 2014, Defendants "reaffirmed the Company's commitment to 'focusing on health and safety . . . building a positive legacy for communities close to areas where we operate, and adopting best practices in social and environmental management.'" *Id.* ¶ 91. The 2013 Sustainability Report reports information regarding certain companies, including Samarco, under a category called "Disclosures on Management Approach," which "includes companies or entities over which Vale has significant influence" including "affiliates, of which Vale owns 20% to 50% of the voting capital, either directly or indirectly, and companies or entities over which Vale exercises shared control."[2] This report was also "referenced in a press release that was filed with the SEC on May 8, 2014 on Form 6-K." Compl. ¶ 91.

Vale's 2014 Sustainability Report, which was referenced in a press release filed with the SEC on June 1, 2015 on Form 6-K, "contained nearly identical statements." *Id.* ¶ 92. Like Vale's 2013 Sustainability Report, Vale's 2014 Sustainability Report provides information regarding Samarco under a category called "Management Approach," which "includes companies or entities over which Vale has significant influence" including "affiliates, of which Vale owns 20% to 50% of the voting capital, either directly or indirectly, and companies or entities in which Vale exercises significant control." The complaint alleges that the statements in the Sustainability Reports were "false and misleading because, among other things, Vale was not focused on health and safety, had not adopted best practices in social and environmental management, and caring for health and safety was not a priority for the Company." Compl. ¶ 93.

---

[2] The Court has made an effort in this opinion to clearly delineate the extent to which statements described in the complaint were made by Vale on behalf of Vale alone, and the extent to which any of the statements arguably included representations on behalf of Samarco as well. The Court notes that the complaint does not acknowledge or address the limitations engendered with respect to the context in which any of the subject representations were made.

The complaint alleges that Defendants also made "other, substantially similar statements concerning Vale's focus on health and safety, as well as the environment." *Id.* ¶ 94. For example, on December 2, 2013, during a conference call with analysts and investors, Defendants Ferreira, Pires, and Poppinga used slides during the presentation, which were also filed with the SEC on Form 6-K, that "emphasized the Company's 'culture of genuine care delivering operational excellence,' the 'implementation of the health and safety management system,' and Vale's focus on '[r]isk reduction through technical improvements.'" *Id.* ¶ 94. The "slides also assured investors that Vale would deliver value to shareholders through a focus on '[s]afety, sustainability and [the] environment.'" *Id.*

During an April 30, 2014 conference call with analysts, Defendant Pires stated that "we within Vale want to take this opportunity to repeat that all of the executive officers and our CEO are committed to achieving the highest possible health and safety standards in our operations." *Id.* During an April 30, 2015 conference call with analysts, Defendant Poppinga stated that "[y]ou will see a different Vale in the next few months, quarters and years, very focused on . . . health and safety, more and more." *Id.* The complaint alleges that these statements were "materially false and misleading" because Vale "was not focused on health and safety, had not adopted best practices in social and environmental management, and caring for health and safety was not a priority for the Company." *Id.* ¶¶ 95, 93.

Finally, with respect to Defendants' allegedly false and misleading statements concerning Vale's commitment to health, safety, and the environment, the complaint alleges that Vale's Code of Ethics and Conduct, which is publicly available on Vale's website and referenced in SEC filings, provides, in part:

> Vale's mission is to transform natural resources into prosperity and sustainable development, aiming to be the number one global natural resources company in creating long term value, through excellence and passion for people and the planet. Therefore, Vale conducts its business activities guided by a set of values that reflect high ethical and moral standards, aimed at assuring credibility and

> preserving the company's image in the markets in which it regularly operates, in the short and long term.  The company's positive reputation and image are an asset of its shareholders, management and employees[.]

*Id.* ¶ 96.  The complaint alleges that these statements were "materially false and misleading because . . . Vale did not conduct its business activities, in particular its tailings dam management, with high ethical and moral standards."  *Id.* ¶ 97.

### 2.  *Statements Regarding Vale's Mitigation Plans, Policies, and Procedures*

The complaint alleges that "[d]uring the Class Period, Defendants repeatedly represented to investors that the Company had risk mitigation plans and procedures in place to address health and safety risks, as well as environmental risks."  *Id.* ¶ 98.

On March 27, 2014, Vale filed with the SEC its annual report on Form 20-F for the fiscal year ended December 31, 2013.  *Id.* ¶ 99.  The 2013 annual report stated that Vale has a "relentless focus on health and safety," as "[h]ealth and safety [are] . . . critical to [its] long-term competitiveness."  *Id.*  The annual report further stated that "[w]e remain focused on achieving a record of zero harm in our operations" and that "[w]e have 'health, safety and environmental standards and risk management systems and processes in place to mitigate the risk of' environmental, health, and safety incidents."  *Id.*  The 2013 annual report also stated that the "[w]e mitigate operational risk with new controls and improvement of existing ones," and "[a]s a result, the Company seeks to have a clear view of its major risks, the cost-benefit on mitigation plans and the controls in place to monitor the impact of operational risk closely. . . ."  *Id.*

Vale's 2013 annual report defines "Vale" as referring to "Vale S.A.," and "we," "us," or the "Company" as referring to "Vale and, except where the context otherwise requires, its consolidated operating subsidiaries."  The annual report also distinguishes between Vale's subsidiaries and its joint ventures, and the list of "principal consolidated operating subsidiaries" provided in the annual report does not include Samarco.  Rather, Samarco is defined separately as a "joint venture with

BHP Billiton plc in which we have a 50% equity stake."

The complaint alleges that the statements in paragraph 99 were "materially false and misleading when made because Defendants knew or recklessly disregarded that Vale was not focused on health and safety, did not have health, safety and environmental standards and risk management systems and process in place to mitigate risks, and did not mitigate operational risks with new controls and improvement of existing ones."  Compl. ¶ 100.

Vale's 2013 Sustainability Report stated that Vale "implements actions and measure to prevent, control or compensate for [environmental] impacts," and that it has "policies, systematic requirements and procedures designed to prevent and minimize risks and protect lives."  *Id.* ¶ 101 (brackets in complaint).  The report also stated that Vale had developed "technical and operational procedures, control devices, qualified teams, specialist consultancies and period audits in order to identify, control and minimize the risks of its operations, and maintain tolerable levels" and that Vale's "[o]perations are planned and conducted so as to cause the least possible environmental impact[.]"  *Id.*

With respect to iron ore operations specifically, the 2013 Sustainability Report stated that Vale's "commitment to environmental and social issues is also reflected in the way [it] manage[s] the specific kinds of waste in the production process," and that as far as tailings dams are concerned, Vale takes steps to "ensure that such structures are stable in order to control the risks of impacts."  *Id.*  The report further stated that Vale had "invested in processes, systems and tools for the automation of dams monitoring" and that "Vale dams are constructed and operated following strict safety standards and audited periodically to monitor and reduce all potential risks, including structural failures."  *Id.*

The complaint alleges that these statements from the 2013 Sustainability Report were "materially false and misleading because, among other things, the Fundão Dam did not follow strict safety standards; Vale did not have policies, systematic requirements and procedures to prevent and

minimize risk and protect lives; and did not implement actions and measure so as to cause the least possible environmental impact." *Id.* ¶ 102.

The complaint alleges that Defendants made "similar statements" in Vale's annual report for the fiscal year ended December 31, 2014, which was filed with the SEC on March 20, 2015 on Form 20-F, and that these statements were materially false and misleading for the same reasons. *Id.* ¶¶ 103-04. Vale's 2014 annual report contains the same definitional limitations as those just discussed with respect to the 2013 annual report. And like the 2013 annual report, the 2014 annual report makes a distinction between Vale's subsidiaries and its joint ventures, with Samarco being defined as "a joint venture with an affiliate of BHP Billiton plc in which we have a 50% equity stake."

### 3. Statements Regarding Control over Samarco's Operations and Regarding Responsibility for the Harm Caused by the Dam Collapse

The complaint alleges that, in the immediate aftermath of the Fundão Dam collapse, Defendants "publicly disclaimed any responsibility for the collapse or the harm that ensued." *Id.* ¶ 106.

On November 11, 2015, the *Wall Street Journal* published an article titled "Samarco May Not Shield BHP, Vale From Brazil Dam-Breach Repercussions." In the article, an unnamed employee of Vale was quoted as stating that Samarco had "a management team that's completely independent from its shareholders and responsible for technical and financial matters." *Id.* ¶ 107. That same employee also stated that, under Brazilian law, "Vale doesn't have any responsibility for the occurrence of the unfortunate and sad accident." *Id.*

On November 16, 2015, Vale held its first conference call with analysts and investors to discuss the financial impact of the Fundão Dam collapse on Vale's business, during which Defendant Pires stated:

> With regards to the relationship between Vale . . . and Samarco, let's remember that Vale . . . compete[s] with Samarco.  So, in compliance with applicable

> Brazilian and international competition regulations, we are prohibited to directly interfere in Samarco's management . . . .
>
> So therefore, Samarco had an independent management.  And unlike other . . . affiliates, there were no resources shared between Vale and Samarco . . . whatsoever.  So we did not share systems.  We did not share support functions.  We did not share, not even in Mariana, where Vale and Samarco were neighbors, we did not share any type of operations crews, or let's say, safety technicians or communications people or community relations people.  No, they were all completely independent.

*Id.* ¶ 108.  These statements were materially false and misleading, according to the complaint, for a number of reasons:  Defendants knew or recklessly disregarded that Vale was contractually obligated to share in the maintenance and environmental costs associated with the Fundão Dam; Vale is a controlling shareholder of Samarco; Vale received hundreds of millions of dollars in dividends from Samarco each year during the Class Period; Samarco's pellet production accounted for 23% of Vale's total pellet production in 2014 and 2015; Vale conducted annual audits of Samarco's business and operations; and Vale and Samarco shared the use of the Fundão Dam.  *Id.* ¶ 109.

During the November 16, 2015 conference call, Defendant Pires stated that the "practices that [Vale] adopts in [its] tailings dams' management systems are state of the art, as also they were in Samarco," and that "if we learn something from the investigation, we are to open adopt further security measures that may be found necessary after those causes are identified."  *Id.* ¶ 111.  These statements were materially false and misleading, it is alleged, because "the management systems that Vale and Samarco adopted at the Fundão Dam were not state of the art."  *Id.* ¶ 112.

On November 24, 2015, the *Wall Street Journal* published an article titled "Brazilian Judge Rules Vale Shares Responsibility for Catastrophic Dam Break."  In the article, an unnamed Vale employee was quoted as stating that the waste Vale disposes of at the Fundão Dam accounts for "less than 5%" of the tailings deposited in the dam each year.  *Id.* ¶ 113.  Similarly, in a December 10, 2015 press release published on its website, Vale stated that in 2014, it sent an amount of waste

to the Fundão Dam that represented 4.4722% of the total amount deposited in the dam between January 2014 and December 2014. *Id.* The complaint alleges that these statements were materially false and misleading because, among other things, "Defendants knew or recklessly disregarded that the waste Vale contributed actually accounted for much more than 4.47% of the total volume deposited in the Dam." *Id.* ¶ 114. On this point, the complaint cites a number of publicly available sources indicating that Vale actually contributed 28% of the waste deposited in the Fundão Dam in 2014. *See id.*

The complaint also makes allegations regarding Defendants' statements about the "nature of the refuse" from the Fundão Dam collapse. During the November 16, 2015 conference call, Defendant Pires stated that "all the reports from the quality of the material that was deposited in the former Fundão Dam made in 2013 and 2014 classified the tailings as class 2B, which means they are not dangerous . . . ." *Id.* ¶ 115. Vale's website also contained the following statement:

> The waste at the dam sites is inert, it has no toxic components. It is mainly composed of silica (sand) from the iron ore processing and contains no chemicals that pose a risk to health. The results of the [November 8, 2015] analysis requested by Samarco . . . attests that the waste from the Fundão Dam offers no harm to people or the environment.

*Id.* ¶ 116. These statements were materially false and misleading, according to the complaint, because "Defendants knew or should have known that the waste spilled from the Fundão Dam contained levels of toxic substances, including arsenic, lead, aluminum, chromium, nickel, and cadmium many times higher than the legal limits." *Id.* ¶ 117.

Less than two weeks after the November 16, 2015 conference call, the United Nations Commissioner for Human Rights stated that the refuse released from the dam "contained high levels of toxic chemicals," and that "tests had revealed levels of arsenic, lead, aluminum, chromium, nickel, and cadmium many times higher than the legal limits." *Id.* Additionally, a Rio Doce Surface Water Quality Monitoring Report dated November 17, 2015 found that, as of November 12, 2015, "the aluminum values still remain[ed] above the legal limit at all of the Rio Doce channel sites" and

that "the arsenic, cadmium, lead, chromium, and nickel at the monitoring sites . . . behaved in a similar manner; showing higher levels on the date the peak of the waste plume reached the municipalities and a posterior decrease over the following days." *Id.* ¶ 118.

### 4. Statements Regarding Vale's Cost and Capital Expenditure Reductions

The complaint alleges that, throughout the Class Period, "Defendants repeatedly reassured investors that the Company was committed to reducing costs and expenses while still delivering strong operational performance" and that "Defendants repeatedly touted the Company's ability to operate at the bottom of the cost curve and even forecast room for additional reductions." *Id.*

On November 6, 2013, Vale issued a press release, which was filed with the SEC on Form 6-K, in which it stated that Vale was taking steps to "build a lean organization," in part, by "minimizing operating costs and expenses." *Id.* ¶ 119. Vale "touted $2 billion in savings, which it attributed, in significant part, to decreasing operating costs by $1.126 billion." *Id.* Each quarter during the Class Period, "Defendants made nearly identical statements in press releases and SEC filings touting the Company's record cost reductions and decrease in capital expenditures." *Id.* ¶ 120. This press release notes, in a section titled "Performance of the Business Segments," that Samarco was "a non-consolidated 50% joint venture."

Vale's 2013 annual report stated that "[w]e delivered a strong operational performance in 2013, with solid results across all of our lines of business," and attributed this performance to "cost-cutting efforts [and] discipline in capital expenditures[.]" *Id.* ¶ 121. The annual report also stated that "[e]ven as [Vale's] sales and volumes increased, [it] achieved substantial reductions in costs and expenses[.]" *Id.*

Vale's 2013 Sustainability Report "identified Vale's 'cost-cutting efforts [and] discipline in investments' as 'one of [its] strengths in the market.'" *Id.* ¶ 122. The 2013 Sustainability Report "further touted its ability to reduce costs, stating that '[i]n 2013, there was a substantial reduction in

costs and expenses compared to 2012, even with increased volume of sales.'" *Id.*

During the April 30, 2014 conference call with analysts and investors, Defendant Pires stated that "[i]t was the best performance for a first quarter since 2008 for iron ore in terms of production" and that Vale had "reduced costs and expenditures net of depreciation . . . by $218 million in comparison to first quarter." *Id.* ¶ 123.  Defendant Pires explained that this reduction "was due to [Vale's] continued cost cutting effort throughout the company," and he further stated that in April, "Moody's . . . changed [Vale's] rating outlook from neutral to positive with several nice comments about the way the company is being managed and giving us more confidence that we are on the right track." *Id.*  Defendant Pires made "substantially similar statements on a quarterly conference call with analysts and investors on July 31, 2014." *Id.* ¶ 124.

During the July 31, 2014 conference call with analysts and investors, Defendant Ferreira "emphasized the Company's ability to reduce costs and capital expenditures, commenting that '[t]his first half of the year we continue to achieve savings in cost and expenses amounting to close to $250 million compared with the first half last year.'" *Id.* ¶ 125.  Defendant Ferreira also stated that Vale "continues to 'focus on productivity and continue[s] to ramp[] up important operations and reduce cost expenses and capital expenditure in order to achieve our goal of sustainable shareholder value.'" *Id.*  He further explained that "[i]n the first half of 2014 Vale's capital expenditure amounted [to] over $5.1 billion, representing a decrease of $2.1 billion when compared to the $7.2 billion spent in the first half of 2013." *Id.*  Defendant Ferreira made "substantially similar statements on quarterly conference calls with analysts and investors" on April 30, 2014; October 30, 2014; February 26, 2015; April 30; 2015, July 30; 2015; and October 22, 2015. *Id.* ¶ 126.

During the Capital Markets Day on December 2, 2014, Defendant Ferreira stated:

> We have seen market turbulence and ever growing concerns and pressures about sustainability on a global scale.  And so we have to be ever more diligent.  So this year we have focused even more [on] ensuring the delivery of a big operational improvement . . . .  Overall, we expect to increase our EBITDA margin in iron ore, by $10 per ton.  Of this 10 per ton, $4 will come from cost reduction.  $1.5

from reduction in expenses[.]

*Id.* ¶ 127.  Defendant Poppinga added that "the $1.5 expense reduction will mainly come from really cost cutting" and that "there are several other initiatives on the way to increase productivity and to reduce cost and control risks."  *Id.*  Defendant Pires commented that the figures "show[] our commitment to continue making the company more lean.  The CapEx reductions as well, they're noticeable . . . .  And pre-operating and stoppage expenses [are] also important reduction[s], and hopefully this will reduce even further next year[.]"  *Id.*

Vale's 2014 annual report highlighted the company's "sound financial performance, despite the decline of commodity prices in the international market," and attributed such performance to "cost-cutting efforts and discipline in capital expenditures."  *Id.* ¶ 128.  The 2014 annual report also stated that "[i]n 2014, we reduced our expenses by more than US$1.2 billion, building on the significant reduction in costs and expenses we had achieved in 2013 . . . .  We reduced capital expenditures for the fourth consecutive year, from US$14.2 billion to US$12.0 billion in 2014."  *Id.*

In Vale's 2014 Sustainability Report, Defendant Ferreira stated that the "efficient management of Vale's business requires simplification, discipline and the elimination of waste," and that Vale has been able to "reduce [it]s annual expenditure by US$1.2 billion[.]"  *Id.* ¶ 129.

During the April 30, 2015 conference call with analysts and investors, Defendant Poppinga "assured investors of the Company's dedication to reducing expenses, stating that '[y]ou will see a different Vale in the next months, quarters and years, very focused on productivity and cost-cutting[.]'"  *Id.* ¶ 130.

The complaint alleges that the above statements were "materially false and misleading and omitted material information when made because, among other things, Defendants knew or recklessly disregarded that Vale's purported cost-cutting and reduction in capital expenditures was due, in part, to the failure to expend the capital measures to ensure the safety of its mining operations, including the Fundão Dam."  *Id.* ¶ 131.  In an "effort to reduce costs," Defendants

"increased the size and elevation of the already unstable Fundão Dam rather than expend the capital to build additional tailings storage facilities." *Id.*

### 5. Statements Regarding Accuracy and Completeness of the Company's Annual Reports

In the annual reports filed with the SEC on Form 20-F on March 27, 2014 and March 20, 2015, Defendants Ferreira and Pires signed Sarbanes-Oxley certifications which provided, in part:

(1)   Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(2)   The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15-d- 15(f) for the company and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(3)   The Annual Report on Form 20-F . . . of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(4)   [The] information contained in the Form 20-F fairly presents, in all material respects, the financial condition and results of operations of the Company.

*Id.* ¶¶ 132-33. The complaint alleges that these certifications were "materially false and misleading when made because, among other things, Ferreira and Pires knew and/or recklessly disregarded that the respective Annual Reports they signed contained materially false and misleading statements and omissions . . . ." *Id.* ¶ 134.

### E.  Allegations Regarding Loss Causation

The complaint alleges that throughout the Class Period, the price of Vale's common and preferred ADRs were "artificially inflated as a result of Defendants' materially false and misleading

statements and omissions" alleged in the complaint. *Id.* ¶ 135. The "truth behind Defendants' various false statements and omissions was gradually revealed to the market in a series of corrective disclosures, causing investors to suffer significant losses during the Class Period." *Id.* The complaint alleges a number of such alleged "corrective disclosures" in response to which "the price of Vale's ADRs fell sharply," causing economic loss to members of the proposed class. Each such disclosure is outlined below, along with the alleged impact that each disclosure had on the price of Vale's ADRs, according to the complaint.

- On May 12, 2015, Moody's issued a negative outlook for Vale and warned that the ratings outlook could worsen if Vale "is not able to make meaningful progress in cost reduction." *Id.* ¶ 136. The next trading day, the price of Vale's common stock ADRs declined 3.39% and Vale's preferred stock ADRs declined 3.25%, "erasing almost $375 in market capitalization." *Id.* ¶ 136.

- On November 6, 2015, the day after the Fundão Dam collapsed, an HSBC analyst report "commented that the collapse would 'hurt Vale's results,' negatively impacting pellet production and the likelihood that the Company would continue to receive dividends." *Id.* ¶ 137. The next trading day, the price of Vale's common stock ADRs lost 5.7% of their value and Vale's preferred stock ADRs declined 4.1%, "eras[ing]" "over $345 million in market capitalization." *Id.*

- On November 7, 2015, the *Wall Street Journal* reported that Brazilian prosecutors had opened an investigation into Samarco's compliance with the technical requirements contained in its license to operate the Fundão Dam. *Id.* ¶ 138. The article highlighted certain conclusions of the Pristino Report, including a warning regarding the "possibility of destabilization" and the likelihood that a dam collapse would "cause[e] a great mass of waste to flow downstream." *Id.* The article also reported that in the wake of the dam collapse, prosecutors launched an investigation into whether Samarco had followed certain recommendations in the Pristino Report. *Id.* On November 9, 2015, the price of Vale common stock ADRs lost 2.17% of their value and the preferred stock ADRs lost 2.58% of their value, "erasing almost $158 in market capitalization in a single day." *Id.*

- On November 10, 2015, after the market closed, the *Wall Street Journal* reported that Vale "was dumping debris from its own nearby iron-ore mines – not just those operated by Samarco – directly into the Fundão Dam, further pressuring the dam system." *Id.* ¶ 139. On the next trading day, the price of Vale common stock ADRs fell 1.70% and the preferred stock ADRs fell 0.30%, "causing a $67 million market capitalization drop." *Id.*

- On November 24, 2015, after the market closed, the *Wall Street Journal* reported that between 2012 and 2015, the volume of tailings deposited in the Fundão Dam grew 1100%, and that "several of the roughly 50 instruments for monitoring Dam stability bored into the Dam's surface indicated 'emergency' levels of pressure and stress prior to its collapse." *Id.* ¶ 140.

The article also "raised questions about the amount of waste Vale was actually contributing, and whether the contract that allowed Vale to dump this waste from its nearby iron-ore mine into the Fundão Dam was properly licensed and monitored." *Id.* The next trading day, Vale's common stock ADRs fell 4.11% and the preferred stock ADRs fell 4.01%, "erasing almost $253 million in market capitalization." *Id.*

- On November 25, 2015, after the market closed, the Office of the United Nations High Commissioner for Human Rights "revealed that it received new evidence showing that, contrary to prior assertions that the waste was 'not dangerous,' the tailings Dam contained high level of toxic heavy metals and other toxic chemicals, which flowed into the Rio Doce and ultimately spilled into the Atlantic Ocean." *Id.* ¶ 141. On November 27, 2015, Vale cited a report by the Brazilian Institute of Water Management, which found that the levels of arsenic, lead aluminum, chromium, nickel, and cadmium in samples taken from the Rio Doce between November 7, 2015 and November 12, 2015 "were many times higher than the legal limits," following which the Brazilian government stated its intent to sue Vale and Samarco in connection with the dam collapse. *Id.* That day, the value of Vale common stock ADRs fell 4.29% and the preferred stock ADRs fell 4.82%, "erasing over $271 million in market capitalization." *Id.*

- On November 30, 2015, the Brazilian government filed a lawsuit against Vale and Samarco seeking $5.2 billion in damages and a "plan to clean up" from the Fundão Dam collapse. *Id.* ¶ 142. In response to this disclosure which "revealed, among other things, that contrary to Vale's statements disclaiming any involvement or responsibility, Vale was likely responsible as both a controlling shareholder and a director contributor of tailings," the price of Vale common stock ADRs fell 5.6% and the preferred stock ADRs fell 9.46%, "eras[ing] almost $425 million in market capitalization." *Id.*

- On Friday December 18, 2015, after the close of the New York markets, a Brazilian federal judge issued an order freezing Vale's Brazilian mining assets and "finding Vale responsible for the harm the collapse caused." *Id.* ¶ 143. The judge found Vale responsible for the harm both as a "direct polluter" and by virtue of its joint responsibility for the decisions made by Samarco. *Id.* Several news outlets reported on the judge's order during that weekend, and on Monday, December 21, 2015, the price of Vale common stock ADRs fell 4.06% and the preferred stock ADRs fell 3.57%, "erasing almost $191 million in market capitalization." *Id.*

## F.  "Additional Allegations of Scienter"

The complaint alleges that, in addition to the allegations of scienter accompanying the factual allegations already recited, "numerous additional facts raise a strong inference that Defendants knew or were reckless when making the false or misleading statements alleged above." *Id.* ¶ 146.

By virtue of the fact that numerous Vale executives serve on Samarco's board, on various committees, or on both the board and on committees, "Defendants were responsible for and

involved in virtually all aspects of Samarco's business." *Id.* ¶ 147.  As a result, they "received or had access to the numerous warnings before and during the Class Period about the dangerous condition of the Fundão Dam and the lack of an adequate emergency action plan in the event of an accident or collapse including the warnings from the Instituto Pristino, Randal Fonseca and Joaquim Pimenta de Ávila." *Id.*

Vale was also contractually obligated to share in the construction and maintenance of any new dams, meaning that "each time the Dam experienced one of the many drainage or other problems" described in the complaint, Vale was required to share in the cost of repairs and maintenance necessary to address those problems. *Id.* ¶ 148.  The complaint further alleges that "Defendants knew that Vale had been dumping its own mining wastes in the Fundão Dam for years and bore responsibility for maintaining the dam" pursuant to its contractual obligations; Defendant Poppinga, as the Vale executive in charge of the company's entire iron ore business and as a member of Samarco's board, "knew that Vale was dumping tailings from its mining operations in the Fundão Dam." *Id.* ¶ 149.

The complaint also alleges that "Defendant Pires implicitly admitted that Defendants were aware of the Pristino Report before the Dam collapsed" because during the November 16, 2015 conference call with analysts and investors, he discussed a "report that's been referred to in the press in 2013." *Id.* ¶ 150.  Defendant Pires "did not dispute any of the findings in the Pristino Report and did not deny Vale's awareness of the Report before the Dam collapsed." *Id.*  Given the Samarco's board's "demonstrated focus on tailings damages and licensing issues, Vale knew, or was reckless in not knowing, about the Pristino Report and the concerns expressed therein." *Id.* ¶ 151.

Defendants "either received or had access to" the Pristino Report and Mr. Pimenta de Ávila's 2011 Technical Report. *Id.* ¶ 152.  Similarly, "[g]iven the Dam's importance to Vale and Samarco, the long history of serious problems with the Dam, the impact that those problems had directly on Vale, and Vale's obligation to share in the maintenance and construction of the Fundão

Dam, Defendants knew or were reckless in not knowing about" Mr. Pimenta de Ávila's "warnings" to Samarco in September 2014 or about the July 2015 stability report and monthly monitoring reports described above.  *Id.* ¶¶ 153-54.

With respect to the alleged "lack of an adequate emergency action plan" at the Fundão Dam, the complaint alleges that "[g]iven Vale's ownership and control of Samarco, and its positions on Samarco's board, Vale was responsible for assuring Samarco's compliance with legal and statutory requirements," with one such requirement being "an effective emergency action plan at the Fundão Dam."  *Id.* ¶¶ 155-56.  By virtue of Vale's positions on Samarco's Operations Committee, Vale was also responsible for "evaluating and monitoring Samarco's operational performance related to, among other things, health and safety and the environment and community."  *Id.* ¶ 156.  Because the "lack of an appropriate emergency action plan at the Fundão Dam directly impacted health and safety and the environment and community," Vale "either knew or was reckless in not knowing of the deficiencies in the emergency action plan."  *Id.*

With regard to Defendants' alleged post-accident misstatements, the complaint alleges that when Defendant Pires made statements disclaiming involvement in Samarco's management during the November 16, 2015 conference call, he "knew or recklessly disregarded" certain facts "necessary to make his statements not misleading given the circumstances under which they were made."  *Id.* ¶ 157.  Those facts, according to the complaint, were as follows:  "(1) Vale and Samarco shared the use of the Fundão Dam and other tailings dams at the Germano mining complex; (2) Vale and Samarco shared in the maintenance and construction of the Fundão Dam and in the maintenance of other tailings dams in the Germano complex; (3) Vale actively managed Samarco's operations through Vale executives on Samarco's board and Operations Committee; (4) Vale and Samarco shared employees and participated in joint training programs; and (5) Vale conducted annual audits of Samarco's operations and business."  *Id.*

Also during the November 16, 2015 conference call, Defendant Pires "represented to

investors that he had knowledge about Samarco's practices and management systems governing its tailings dams and structures" inasmuch as he stated that "Vale's and Samarco's tailings dam management systems were 'state of the art.'" *Id.* ¶ 158.  On this issue, Defendant Pires stated, during that call, that "[t]he practices that we adopt in our tailings dams' management systems are state of the art, as also they were in Samarco." *Id.*  He repeated these statements at the December 4, 2015 Vale Investor Day Conference, when he stated that "Samarco has always had best practices in terms of their structures and dams." *Id.*[3]

    With respect to post-accident statements, the complaint further alleges that "Defendants knew or had access to information showing that the collapse caused the Rio Doce to be flooded with toxic heavy metals." *Id.* ¶ 159.  Shortly after the Fundão Dam collapsed, "Defendants attempted to refute reports that the release of toxic wastes would have long-term environmental impacts by claiming that the substances stored in the Dam were not 'dangerous,'" but these statements were made "before any testing on the toxicity of the wastes was completed," and a UN report and a Rio Doce Surface Water Quality Monitoring report issued after the dam collapse found high levels of arsenic, lead, cadmium, chromium, and nickel.  *Id.*  Moreover, "tailings, by their very nature, include numerous substances, many of them toxic, and thus dangerous, at levels above legal limits."  *Id.*

    The complaint also contains a number of "additional allegations of scienter" based upon the notion that "Samarco and the Fundão Dam were critical to Vale's business."  With respect to Samarco's contribution to Vale's financial performance, "Samarco's pellet production accounted for 23% of Vale's total pellet production in 2014 and 2015," and Samarco "contributed more than $400 million to Vale's total EBITDA in 2014, 3% of Vale's total EBITDA."  *Id.* ¶ 160.  Before the Fundão Dam collapsed, Samarco was "projected to contribute $500 million to Vale's 2015

---

[3] The Court notes that the complaint does not separately allege that this is a false and misleading statement for which Defendants are liable.

EBITDA, more than 5% of Vale's total EBITDA in 2015." *Id.*

According to the complaint, "Samarco's tailings dams, including the Fundão Dam . . . were an important component of Vale's mining operations in Mariana." *Id.* ¶ 161.  For example, records from Brazil's federal mining agency provided to Brazilian prosecutors "show[ed] that Vale's wastes accounted for up to 28% of the Dam's total volume," *id.*, and Vale's "ability to dispose of its wastes at the Fundão Dam was critical to the Company's iron-ore production," *id.* ¶ 162.  And according to figures Vale released after the Fundão Dam collapse, production at Vale's Mariana mining hub, a complex that accounted for more than 10% of Vale's total iron ore output in 2014 and 2015, "decreased almost 40% as a result" of the collapse. *Id.* ¶ 163.  Analysts estimated that "disruption at the Mariana complex caused by the Fundão Dam's collapse could lead to a $1.25 billion decrease in Vale's revenues, and a $540 million decrease in EBITDA." *Id.*

Finally, the complaint alleges that "Samarco's board, including Defendant Poppinga and the other Vale executives on the board," were "intently focused on tailings disposal," with tailings and tailings dams being "frequent topic[s] at Samarco board meetings."  *Id.* ¶ 164.  Minutes from a December 7, 2012 Samarco board meeting reflect that Kleber Terra, Samarco's operations manager, "presented a comprehensive overview of the tailings dams," including:  "area of operations, disposal system, dam management model, dam management governance, dam management and risk control, analysis of the stability of the geotechnical structures."  *Id.*  The Samarco board also "regularly received updates regarding ongoing capital projects and project scheduling."  *Id.* ¶ 165.  For example, minutes of an April 2, 2014 meeting reflect "such a discussion," and "stress" that "most of the planned investments refer to tailings disposal projects."  *Id.*  These minutes also reflect a discussion "about the status of the issuance of a license to operate a different dam, as well as the board's request that the licensing matter 'be included in the regular updates provided in future board meetings.'"  *Id.*

The complaint also refers to a 2011 report that Mr. Pimenta de Ávila prepared in connection

with the proposed geometry change to the Fundão Dam, in which "he specifically recommended that Vale study the impact the changed geometry might have on Vale's adjacent tailings storage facility at its New Factory Mine because of 'possible interference' with the internal draining system of Vale's facility." *Id.* ¶ 164.  This "possible interference" and "direct negative impact on Vale's operations," along with "Vale's responsibility for maintaining and constructing the Fundão Dam," "creates a strong inference that Vale knew, or was reckless in not knowing, about the proposed changes." *Id.*

## II.  LEGAL STANDARDS

### A.  Rule 12(b)(6) Motions to Dismiss

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), plaintiffs must allege in their complaint facts that, if accepted as true, "state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this plausibility standard, plaintiffs must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged."  *Id.*

Legal conclusions need not be accepted as true, thus "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  To avoid dismissal, plaintiffs must "nudge[ ] their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

"When considering a motion to dismiss pursuant to Rule 12(b)(6), the district court . . . is required to . . . consider [the facts alleged in the complaint] in the light most favorable to the plaintiff . . . ." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015). A court must also "draw inferences from those allegations in the light most favorable to the plaintiff." *Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015).

In ruling on a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

### B. Private Securities Fraud Actions

The complaint asserts claims under § 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder, as well as a claim for control person liability against the individual Defendants only under Exchange Act § 20(a).

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 250.10b-5(b). "To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (citation and internal quotation

marks omitted); *accord GAMCO Investors, Inc. v. Vivendi Universal S.A.*, 838 F.3d 214, 217 (2d Cir. 2016).

Section 20(a) of the Securities Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010). "To state a claim of control person liability under § 20(a), 'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108).

A complaint alleging securities fraud must not only satisfy Fed. R. Civ. P. 9(b), but it "must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ('PSLRA'), 15 U.S.C. § 78u–4(b)(1)–(2) . . . ." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 92 (2d Cir. 2016); *accord ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) . . . .").

Under the PSLRA, the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u–4(b)(1), (2). Therefore, "'[w]hile [courts] normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more

stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA*, 553 F.3d at 196 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).

## III.   DISCUSSION

Defendants assert a number of bases for dismissal of the complaint.  In particular, they argue that the various categories of alleged misstatements described in the complaint are not actionable, that the complaint must be dismissed because it also fails to allege a strong inference of scienter, and that the claims based upon the challenged post-accident statements fail to adequately plead loss causation or materiality.[4]

### A.   Arguments Regarding Actionability of Alleged Pre-Accident Misstatements

#### 1.   *Statements Concerning Cost Reductions*

Defendants argue that the complaint's allegations concerning Vale's "cost-cutting efforts and discipline in capital expenditures" (Compl. ¶¶ 118-131) cannot form the basis of liability because "[o]missions are only actionable under Section 10(b) when a corporation has a duty to disclose allegedly omitted information."  Defendants' Memorandum of Law (Dkt. No. 80) ("Def. Mem.") at 13.  Plaintiffs agree that "[o]missions are actionable when the defendant is subject to a duty to disclose the omitted facts," but take the position that "[b]y touting the Company's purported cost-cutting and expenditure of capital resources, Defendants had a duty to disclose to investors that such cost-cutting was due, in part to the failure to expend necessary capital and expenses to ensure the safety of the Fundão Dam."  *Id.* at 18.

"In general, there is no duty to disclose a fact . . . 'merely because a reasonable investor would very much like to know that fact.'"  *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d

---

[4] Defendants also argue that the complaint should be dismissed because Plaintiffs attempt to "recast a federal securities claims allegations that the Company breached contractual or fiduciary duties relating to the operation of a dam in Brazil."  Def. Mem. at 9.  The Court declines to dismiss the complaint on this basis.  As explained below, Plaintiffs have adequately pleaded the elements of federal securities claims sufficient to withstand, in part, Defendants' motion to dismiss.

Cir. 2014) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)). "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information" and "[d]isclosure is required under these provisions only when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (citation and internal quotation marks omitted); *accord Meyer*, 761 F.3d at 250. However, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer*, 761 F.3d at 250. "Even then, a defendant must reveal only those facts, 'if any, that are needed so that what was revealed would not be so incomplete as to mislead.'" *Lipow v. Net1 UEPS Tech., Inc.*, 131 F. Supp. 3d 144, 169 (S.D.N.Y. 2015) (quoting *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 (S.D.N.Y. 2012)).

In this case, Plaintiffs contend that Defendants' representations concerning Vale's cost-cutting efforts were rendered misleading because Defendants declined to simultaneously disclose the "means by which it was cost-cutting." Plaintiffs' Memorandum of Law (Dkt. No. 88) ("Pl. Mem.") at 19. Plaintiffs do not allege that statements representing that Vale was engaged in cost-cutting were themselves false or misleading; rather, the essence of Plaintiffs' contentions is that that Defendants' very general—and accurate—statements concerning cost reductions were misleading because they were not accompanied by statements indicating that Defendants opted not to construct additional tailings storage facilities to ease the burden on the Fundão Dam in particular.

These allegations fail to state a claim under § 10(b) or Rule 10b-5. The Court cannot conclude that a reasonable investor would have been misled by Defendants' omission from the headline statements about cost reductions the precise ways in which cost reductions would be implemented. This is particularly true with respect to the alleged omissions here – cost reductions affecting a particular tailings dam owned and operated by a joint venture that, according to the complaint, accounted for only 3% of Vale's total EBITDA in 2014. *See compl.* ¶ 160. Defendants therefore did not fail to "tell the whole truth" in making this category of statements, *see Meyer*, 761

F.3d at 250, or fail to disclose facts rendering their affirmative statements "so incomplete as to mislead." *Lipow*, 131 F. Supp. 3d at 169.

Furthermore, to the extent Plaintiffs' position is based upon the contention that Defendants were required to "disclose to investors that such cost-cutting was due, in part, to the failure to expend necessary capital and expenses to ensure the safety of the Fundão Dam," Pl. Mem. at 18, that position must be rejected inasmuch as "the federal securities laws do not require a company to accuse itself of wrongdoing." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (citations omitted); *see also GAF Corp. v. Heyman*, 724 F.2d 727, 740 (2d Cir. 1983) (stating, in a case involving alleged violations of Exchange Act § 14(a) and SEC Rule 14a-9(a) through allegedly material omissions, that the "proxy rules simply do not require management to accuse itself of antisocial or illegal policies").

Plaintiffs have not adequately alleged that the allegedly material omitted information was of such a nature that its disclosure was necessary to render Defendants' affirmative statements regarding cost-cutting not misleading.  The allegations based upon this category of statements are dismissed.

### 2. Statements Concerning Vale's Values and Commitment to Health, Safety, and the Environment

Defendants next argue that the alleged misstatements concerning Vale's "values and commitment to health, safety, and the environment" (Compl. ¶¶ 88-97) are "inactionable puffery," and are also inactionable because they "lack objective criteria on which to judge their accuracy." Def. Mem. at 15.  Plaintiffs oppose these arguments on the grounds that a "reasonable investor in a company in the mining industry – an industry in which health, safety and environmental risk management are essential – would undoubtedly find Defendants' true practices to be disconcerting." Pl. Mem. at 16.  Plaintiffs also argue that "statements of optimism and aspiration" are actionable when they are anchored in "misrepresentation of existing facts," and that the challenged statements

are "grounded in present fact, the falsity of which can be determined." *Id.*

"It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (quoting *ECA*, 553 F.3d at 206). This is "particularly true" where the statements are "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *Id.*

Upon review of this category of alleged misstatements, the Court has little trouble concluding that the challenged statements are a set of aspirational generalizations which are "too general to cause a reasonable investor to rely upon them" and which are "precisely the type of 'puffery'" that the Second Circuit has "consistently held to be inactionable." *ECA*, 553 F.3d at 206 (citation and internal quotation marks omitted). Furthermore, all of the challenged statements are accompanied by the types of qualifiers which render the statements even more in the nature of puffery—they concern what Vale is "seeking" to do, what it is "committed" to doing, what it is "focused on," what it is "aiming" to do, and what its "priorities" are.

Plaintiffs attempt to find support in *Bricklayers and Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223 (S.D.N.Y. 2012), but that case is distinguishable. In that case, a deepwater drilling company represented that it "conducted 'extensive' training and safety programs," and the court rejected Defendants' contention that this statement amounted to puffery. *Id.* at 243-244. The statement at issue in *Bricklayers* conveyed a statement of measurable fact—that the defendant maintained actual, extensive safety and training measures. The half-truth found by the court in *Bricklayers* differed in kind from the broad, non-specific statements regarding Vale's commitment to safety generally.

Plaintiffs also maintain that, while "Defendants claimed to be 'committed to achieving the highest possible health and safety standards in [Vale's] operations,'" Pl. Mem. at 16 (quoting Compl.

¶ 94), "Defendants' health, safety and environmental practices at the time of that statements were nowhere near the highest of such standards, throughout the Class Period, Defendants repeatedly ignored known structural problems with the Dam, ignored expert recommendations to stabilize the Dam, and failed to implement and EAP due to cost concerns." *Id.* Plaintiffs argue that this statement is actionable because is "anchored" in "misrepresentations of existing facts." *Id.* Plaintiffs cite *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) in support of their argument, in which the court concluded that certain statements were actionable because defendants made the statements "while they allegedly knew that the contrary was true." *Id.* at 315. In that case, defendants represented that the company's inventories were "under control" and "in good shape," whereas in reality, it was alleged, defendants had "fail[ed] to properly account for millions of dollars of inventory." *Id.* at 304.

Plaintiffs' attempt to liken the statement identified in paragraph 94 of the complaint to those in *Novak* falls short. In *Novak,* the defendants made concrete statements that they allegedly knew to be false at the time they were made. Here, by contrast, the statement identified by Plaintiffs is a general, airy statement of commitment routinely found to constitute non-actionable puffery. *See, e.g., Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (company did not "certify that [it] would not suffer losses when it touted its 'commitment to create earnings opportunities'" and this statement was merely inactionable "puffery"); *In re SAIC, Inc. Sec. Litig.*, No. 12-cv-1353 (DAB), 2013 WL 5462289, at *13 (S.D.N.Y. Sept. 30, 2013) (statements regarding company's "commitment to ethics" amounted to inactionable "puffery"); *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 434-35 (S.D.N.Y. 2010) (statement by officers of financial services holding company concerning "commitment to risk management and conservative lending practices" deemed "nothing more than a general platitude that accompanies nearly every press release or public statement issued by a financial institution" that "defined the term 'puffery'"). The claims based upon this set of challenged statements are dismissed.

### 3. *Statements Concerning Vale's Risk Mitigation Plans, Policies, and Procedures*

With respect to the final category of alleged pre-accident misstatements described in the complaint, Defendants seek dismissal of the allegations related to Vale's safety-related plans, policies, and procedures (Compl. ¶¶ 98-104) on the ground that these are "forward-looking statements" which were "accompanied by meaningful cautionary language," and that as a result, dismissal of these allegations is appropriate under the PSLRA's safe harbor provision and the judicially created "bespeaks caution" doctrine. Def. Mem. at 16. Plaintiffs counter that the bespeaks caution doctrine "protects only forward-looking" statements, and that the challenged statements are not forward-looking because "Defendants misrepresented that Vale *had* implemented measures to monitor the safety and stability of the facilities in which it stored its mining wastes, and to prevent and mitigate against the risk of environmental incidents at those facilities." Pl. Mem. at 13. Accordingly, Plaintiffs assert, the challenged statements "are statements of then-current or historical fact." *Id.* Plaintiffs further argue that, even if the Court were to find the challenged statements forward-looking, the risk disclosures cited by Defendants is "too vague and boilerplate to constitute meaningful cautionary language." *Id.* at 13-14.

As an initial matter, while neither Plaintiffs nor Defendants address the issue expressly, the alleged misstatements which come from Vale's 2013 and 2014 annual reports (Compl. ¶¶ 99, 103) cannot form the basis of liability. As has been discussed in this opinion, Vale's 2013 and 2014 annual reports define "Vale" as referring to "Vale S.A.," and "we," "us," or the "Company" as referring to "Vale and, except where the context otherwise requires, its consolidated subsidiaries." Vale's annual reports clearly distinguish between the Company's subsidiaries and its joint ventures. The list of "principal consolidated operating subsidiaries" provided in the annual reports does not include Samarco. Instead, Samarco is defined separately in both reports as a "joint venture with BHP Billiton plc in which we have a 50% equity stake." The representations in Vale's 2013 and

2014 annual reports asserted as the basis for liability do not speak about Samarco, and therefore could not mislead the market regarding the actions and omissions of Samarco. The drafters of the annual reports expressly limited their statements to Vale and its subsidiaries; market participants can be expected to read the reports as drafted. The Sustainability Reports were not so carefully drafted to exclude Samarco from their representations, however. Therefore, the Court proceeds to examine the representations contained in those reports.

The judicially-created "bespeaks caution" is a "corollary of 'the well-established principle that a statement or omission must be considered in context.'" *Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir. 1996)). The doctrine provides that a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Id.*; *accord Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006) ("Pursuant to the judicially-created 'bespeaks caution' doctrine, certain alleged misrepresentations, which are accompanied by meaningful cautionary statements, are considered immaterial as a matter of law."). "It is settled that the bespeaks-caution doctrine applies only to statements that are forward-looking." *Id.* at 142.

"The PSLRA contains a safe harbor provision that is 'closely related' to the bespeaks caution doctrine." *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) (quoting *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 385 (S.D.N.Y. 2012)). The PSLRA's safe harbor includes "plans and objectives of management for future operations" (the provision relied upon by Defendants in their memorandum of law) as long as such statements are "identified as forward-looking statement[s], and [are] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement" or the statements are "immaterial." 15 U.S.C. § 78u-5(c).

A threshold issue in determining the applicability of either the bespeaks caution doctrine or

the PSLRA's safe harbor is a determination of whether the challenged statements are forward-looking in nature. Under either doctrine, "[a]s a general rule, statements whose truth cannot be ascertained until some time after they are made are 'forward-looking statements.'" *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 493 (S.D.N.Y. 2011) (citation omitted). In discussing the bespeaks caution doctrine in particular, the Second Circuit has contrasted "forward-looking" statements with statements of "present or historical facts," in other words, statements regarding "facts [that] exist and are known." *P. Stolz Family P'Ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004). Courts also apply this distinction in the context of the PSLRA's safe harbor for forward-looking statements. *See, e.g.*, *City of Providence v. Aeropostale, Inc.*, No. 11-cv-7132 (CM) (THK), 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) (PSLRA safe harbor does not "apply to statements of current or historical fact"); *In re Gen. Elec.*, 857 F. Supp. 2d at 385 ("[T]he [PSLRA] safe harbor and the closely related 'bespeaks caution' doctrine [ ] do not apply to statements of present or historical facts."); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) (concluding that PSLRA safe harbor was inapplicable because statements at issue "state[d] a present or historical fact or incorporate[d] forward-looking aspects into statements of present or historical fact").

After a review of the complaint and the public filings from which the statements described in the complaint are found, the Court concludes that some of the challenged statements are forward-looking while others are not. The Court concludes that the following statements, which are summarized from the relevant public filings in ¶¶ 99 and 101 of the complaint, are not forward-looking in nature, but rather, representations of present or historical facts:

- "We have health, safety and environmental standards and risk management systems and processes in place to mitigate the risk of [environmental, health and safety] incidents."

- "We mitigate operational risk with new controls and improvement of existing ones."

- "[T]he company implements actions and measures to prevent, control or compensate for impacts."

- "[W]e have a set of policies, systemic requirements and procedures designed to prevent and minimize risks and protect lives."

- "In its management of environmental risks, Vale uses technical and operational procedures, control devices, qualified teams, specialist consultancies and periodic audits in order to identify, control and minimize the risks of its operations, and maintain tolerable levels . . . ."

- "Operations are planned and conducted so as to cause the lease possible environmental impact."

- "Our commitment to environmental and social issues is . . . reflected in the way we manage specific kinds of waste in the production process."

- "Vale has . . . invested in processes, systems and tools for the automation of dams monitoring . . . ."

- "Vale dams are constructed and operated following strict safety standards and audited periodically to monitor and reduce all potential risks, including structural failures."

Accordingly, these allegations survive Defendant's challenge under the bespeaks caution doctrine and the PSLRA's safe harbor.

The next question for the Court is whether statements that are forward-looking in nature— *i.e.*, the remainder of the alleged misstatements described in ¶¶ 98-104 of the complaint that are not included in the bulleted list just above—were accompanied by sufficient cautionary language. In this case, Defendants cite a number of risk disclosures from Vale's 2012-14 annual reports which, in their view, constitute sufficient cautionary language under the bespeaks caution doctrine and the PSLRA's safe harbor:

- "[T]he mining industry is generally subject to significant risks and hazards, including . . . escape of polluting substances or other hazardous materials . . . . This could occur by accident or by a breach of operating standards, and could result in a significant incident, including damage to or destruction of . . . production facilities, personal in jury or death, environmental damage . . . monetary losses and possible legal liability."

- "Our business is subject to a number of operational risks that may

43

adversely affect our results of operations, such as: . . . [a]ccidents or incidents involving our mines . . . ."

- "Operational problems could materially and adversely affect our business and financial performance . . . .  Operational breakdowns could entail failure of critical plant[s] and machinery.  There can be no assurance  that ineffective project management or other operational problems will not occur."

- "Notwithstanding our standards, policies and controls, our operations remain subject to incidents or accidents that could adversely affect our business or reputation."

- "[S]ome of our assets may be controlled and managed by joint venture partners that may not fully comply with our standards, controls and procedures, including our health, safety, environment and community standards.  Failure by any of our partners to adopt standards, controls and procedures equivalent to ours could lead to . . . environmental, health and safety incidents or accidents, which could adversely affect our results and reputation."

Separate and apart from whether these risk disclosures constitute sufficient cautionary language as a substantive matter is the issue of whether the challenged forward-looking statements were "accompanied by" these risk disclosures.  Plaintiffs' and Defendants' briefs ignore the fact that the challenged statements come from Vale's 2013 and 2014 Sustainability Reports, while the risk disclosures at issue are found in Vale's 2012-2014 annual reports.  Both the bespeaks caution doctrine and the PSLRA safe harbor require that the forward-looking statements be "accompanied by" the cautionary language.  However, given that the risk disclosures are found in entirely different, unrelated documents from the forward-looking statements, those forward-looking statements were not "accompanied by" the purported cautionary language.  And Defendants make no suggestion that the risk factors in Vale's annual reports were in any way associated with the statements made in the Sustainability Reports.  *Cf. Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the *same offering*.") (emphasis added).

As a result, to the extent that some of the challenged statements in ¶¶ 98-104 of the

complaint can be deemed forward-looking, they are nevertheless not entitled to be shielded under either the bespeaks caution doctrine or the PSLRA's safe harbor, because they were not accompanied by sufficient cautionary language. These allegations, therefore, also survive Defendants' motion to dismiss on these particular bases.

### B. Arguments Regarding Alleged Post-Accident Misstatements

Defendants assert that the complaint fails to plead loss causation or materiality for the alleged post-accident misstatements described in the complaint (Compl. ¶¶ 105-17).

#### 1. *Loss causation*

Defendants first assert that Plaintiffs have failed to adequately plead loss causation with respect to the alleged misstatements regarding Vale's responsibility for the Fundão Dam collapse (Compl. ¶¶ 105-12). Def. Mem. at 20-21. They also argue that Plaintiffs have failed to adequately plead loss causation with respect to the alleged misstatements regarding the amount of Vale's tailings deposited into the Fundão Dam (Compl. ¶¶ 113-14) and the composition of the materials released as a result of the dam's collapse (Compl. ¶¶ 115-17). *Id.* at 22. Defendants' arguments are premised on the contention that Plaintiffs have failed to plead any cognizable "corrective disclosures" establishing a causal nexus between the alleged misrepresentations and Plaintiffs' claimed losses. Def. Mem. at 20-22.

"Loss causation" in the context of a private securities fraud action refers to a "causal connection between the material misrepresentation and the loss." *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (citing 15 U.S.C. § 78u-4(b)(4)). A plaintiff is required to plead "some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347; *accord Loreley Financing (Jersey) No. 3 Ltd. v. Wells Faro Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (burden of pleading loss causation is "not a heavy one" and complaint "must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations") (quoting *Dura*, 544 U.S. at 347).

"To plead loss causation, plaintiffs must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Barclays*, 750 F.3d at 232 (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)). "They may do so *either* by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) that 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Id.* (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (internal quotation marks omitted)). In this case, Plaintiffs pursue the corrective disclosure theory.

"In order to plead corrective disclosures, plaintiffs must plausibly allege a disclosure of the fraud by which 'the available public information regarding the company's financial condition [was] corrected . . . and that the market reacted negatively to the corrective disclosure." *Id.* (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005) (internal citation omitted)). "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for the decline in the stock price." *Barclays*, 750 F.3d at 233. Rather, if the complaint plausibly alleges that the alleged misrepresentations caused the plaintiffs' losses, the issue of whether "the loss was caused by an intervening event . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

### a.  Statements Regarding Vale's Responsibility for the Fundão Dam Collapse

In the complaint, Plaintiffs cite a November 11, 2015 *Wall Street Journal* article which quoted an unidentified Vale employee as stating that Samarco has "a management team that's completely independent from its shareholders and responsible for technical and financial matters" and that "Vale really doesn't have any responsibility for the occurrence of the unfortunate and sad accident." Compl. ¶ 107. Plaintiffs also rely upon a November 16, 2015 conference call in which Defendant

Pires stated that Vale and Samarco were competitors, that Vale is "prohibited to directly interfere in Samarco's management," and that Vale and Samarco had "completely independent" management. *Id.* ¶ 108.  Plaintiffs then point to the Brazilian court's decision on Friday December 18, 2015 freezing Vale's Brazilian mining assets in connection with its conclusion that Vale was likely responsible as a polluter, news articles focused on the Brazilian court's ruling during the following weekend, and a December 21, 2015 decline in the price of Vale's ADRs.  Pl. Mem. at 32-33 (citing Compl. ¶¶ 143-44).

Defendants first argue, in the context of larger arguments regarding loss causation, that to the extent the complaint relies on "unattributed" statements in the *Wall Street Journal*, the relevant allegations must be dismissed for failure to satisfy the Fed. R. Civ. P. 9(b) pleading standard.  Def. Mem. at 21, n.14.  Having reviewed the *Wall Street Journal* article at issue, *see* Ex. 10 to Declaration of Mark A. Kirsch (Dkt. No. 81) ("Kirsch Decl."), the Court agrees.  The statements in this article cited in the complaint are attributed to "Vale," but no further information as to the source of the statements is provided in the article, and no further information about the source is alleged in the complaint.

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or malice shall be stated with particularity," a pleading requirement which the Second Circuit has interpreted to require, "at a minimum, that the plaintiff identify the speaker of the allegedly fraudulent statements."  *In re Time Warner*, 9 F.3d at 265; *accord In re Crude Oil Commodity Litig.*, No. 06-cv-6677 (NRB), 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007) ("It is clear that the pleading of fraud through completely unattributed statements and representations is insufficient to meet the dictates of Rule 9(b), even when a plaintiff alleges on information and belief that the statements were made by agents of the defendants.").  Because the speaker of the statements quoted in the *Wall Street Journal* is not identified, these allegations must be dismissed, before even arriving at Defendants' loss causation arguments on this point.

Next, Defendants contest the characterization of the Brazilian court's ruling as a "corrective disclosure" on the grounds that Plaintiffs "cite information that was publicly disseminated before Vale made the challenged statements." Def. Mem. at 20. Plaintiffs, on the other hand, argue that the disclosures to the market associated with the Brazilian court's ruling "revealed new information directly contrary to Defendants' . . . statements regarding Vale's use of the Dam and the Company's likely responsibility for the disaster," and maintain that "the filing of the Brazilian lawsuit and the Brazilian court's order freezing Vale's assets was the first time the markets learned the full nature of Vale's involvement with the Fundão Dam and the Company's likely massive liability for the disaster." Pl. Mem. at 33.

Defendants are right that a disclosure is not "corrective" if the disclosure at issue did not "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint . . . ." *In re Omnicom*, 597 F.3d at 511. But that is not the case here. Defendants argue that the complaint itself cites facts previously disclosed in Vale's 2012 annual report concerning "Vale's ownership interest in Samarco; Vale's participation on Samarco's board and advisory committees; dividends received by Vale from Samarco; and Samarco's contributions to Vale's overall mining production." Def. Mem. at 21. None of these disclosures, however, said anything to the market about Vale's potential financial liability for the failure of a Samarco-owned dam, so it is not the case that the potential degree of Vale's liability was already known to the market.

Similarly, Defendants maintain that a November 8, 2015 Jefferies analyst report cited in the complaint (Compl. ¶ 105) indicated that "Vale would be negatively impacted by the Fundão Dam accident for several reasons, including lost cash flow, cleanup and legal costs, and reputational damage." Def. Mem. at 21. As noted above, the Court must draw inferences from the facts alleged in the complaint in the light most favorable to the plaintiff, and, in light of this mandate, the Court cannot conclude that the Jefferies report alone put the market on notice of the critical facts underlying the disclosure of the Brazilian court's ruling—namely that Vale would likely be held

financially responsible for the human and environmental damage caused by the Fundão Dam collapse—prior to the disclosure of the Brazilian court's ruling, sufficient to conclude as a matter of law that this disclosure was not corrective.

Defendants cite *Cent. States, Se. and Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013) in support of their argument. But that case is unpersuasive on this issue. The court there held that the plaintiffs had not alleged a corrective disclosure that "reveal[ed] some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint," and reasoned that third-party new reports that "expressed negative opinions . . . based on information that was already publicly available" were not "corrective" for purposes of pleading loss causation. *Id.* at 75. In this case, by contrast, while the Jefferies report may have suggested that Vale would incur some "cleanup and legal costs," it certainly did not indicate to the market the extent to which Vale would be held responsible for the costs associated with the collapse of the Fundão Dam. Accordingly, Plaintiffs have adequately pleaded loss causation with respect to Defendants' post-accident statements regarding Vale's responsibility for the Fundão Dam collapse.

### b. Statement Regarding Amount of Vale Tailings Deposited into Fundão Dam

The complaint alleges that Vale made a statement, reported in a November 24, 2015 *Wall Street Journal* article, that the waste it disposes of at the Fundão Dam accounts for "less than 5%" of the tailings deposited in the dam each year. Compl. ¶ 113. The corrective disclosures on which the complaint relies, in pleading that this alleged misrepresentation caused Plaintiffs to suffer losses, is a December 4, 2015 *Folha de S. Paulo* article indicating that Vale actually accounted for 28% of the total volume of waste deposited in the dam, as well as a December 21, 2015 *Wall Street Journal* article that reported "[t]he same details." *Id.*

This statement cannot form the basis of liability for the same reasons that the Court discussed above with respect to the unattributed statements in the November 11, 2015 *Wall Street*

*Journal* article.  This allegation fails to satisfy Rule 9(b) given that the speaker of this statement is not

identified.  Plaintiffs have also failed to plead loss causation with respect to this alleged

misstatement, because the complaint fails to allege a negative market reaction to the purported

disclosure of the fact that Defendants' statement about the amount of waste Vale deposited in the

Fundão Dam was false.  As a result, this alleged misstatement cannot form the basis of liability, and

these allegations are dismissed.

### c.  Statements Regarding Toxicity of the Tailings Released from the Fundão Dam

The final category of statements that the complaint alleges to have been false and misleading

are post-accident statements regarding the toxicity of the materials released when the Fundão Dam

collapsed (Compl. ¶¶ 115-17).  The complaint alleges that during the November 16, 2015 conference

call with analysts and investors, Defendant Pires represented that "all the reports from the quality of

the material that was deposited in the former Fundão Dam made in 2013 and 2014 classified the

tailings as class 2B, which means that they are not dangerous . . . ."  Compl. ¶ 115.  The complaint

also alleges that Vale's website made statements regarding the composition of the materials,

although the complaint does not allege when the statement was posted, as follows:

> The waste at the dam sites is inert, it has no toxic components.  It is mainly
> composed of silica (sand) from the iron ore processing and contains no chemicals
> that pose a risk to health. The results of the [November 8, 2015] analysis
> requested by Samarco . . . attests that the waste from the Fundão Dam offers no
> harm to people or the environment.

*Id.* ¶ 116.

The corrective disclosures on which Plaintiff relies in alleging that these statements caused

their losses is a November 25, 2015 report from the United Nations High Commissioner for Human

Rights and a November 17, 2015 report from the Brazilian Institute for Water Management, which

Vale "cited" on November 27, 2015.  The UN report stated that "tailings Dam contained high level

of toxic chemicals, which were unleashed in to the Rio Doce . . . [including] levels of arsenic, lead,

aluminum, chromium, nickel, and cadmium many times higher than the legal limit." *Id.* ¶ 117; Pl.

Mem. at 34.  The report from the Brazilian Institute of Water Management found that, as of

November 12, 2015, "the aluminum values still remain[ed] above the legal limit at all of the Rio

Doce channel sites" and that "the arsenic, cadmium, lead, chromium, and nickel at the monitoring

sites . . . behaved in a similar manner; showing higher levels on the date the peak of the waste plume

reached the municipalities and a posterior decrease over the following days."  Compl. ¶ 117.

The complaint alleges that the UN report was issued after the market closed on Wednesday,

November 25, 2015, the night before Thanksgiving, and that on the first trading day after the

holiday, which was also the date on which Vale "cited" the report from the Brazilian Institute of

Water Management, the price of Vale's ADRs decreased.   *Id.* ¶ 141.

Defendants do not mount much of a challenge to Plaintiffs' allegations of loss causation

regarding this category of alleged misstatements, merely asserting that the complaint "offers no

'corrective disclosure' at all, but instead simply cites contemporaneous reports concerning levels of

various metallic elements measured in the Rio Doce."  Def. Mem. at 22.  Construing Defendants'

argument as challenging the cited corrective disclosures as too non-specific, it is rejected.

"[O]rdinary pleading rules" under Fed. R. Civ. P. 8(a)(2), which apply to allegations of loss

causation, "are not meant to impose a great burden upon a plaintiff."  *Dura*, 544 U.S. at 347; *see also*

*Loreley*, 797 F.3d at 187 (a plaintiff's burden to plead loss causation "is not a heavy one").

In light of the applicable pleading standard, "there is no requirement that the [corrective]

disclosure take a particular form or be of a particular quality," *In re Initial Pub. Offering Sec. Litig.*, 544

F. Supp. 2d 277, 289 (S.D.N.Y. 2008) (citation and internal quotation marks omitted), and a

corrective disclosure need not be a "'mirror image' tantamount to a confession of fraud."

*Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 171, 202 (S.D.N.Y. 2010); *see also Van Dongen v.

CNinsure Inc.*, 951 F. Supp. 2d 457, 477 (S.D.N.Y. 2013) (a corrective disclosure need not disclose

the alleged fraud "in flashing neon lights").  Moreover, the complaint adequately alleges that the

disclosures "changed the available public information" on the issue of toxicity and that "the market reacted negatively," *see Barclays*, 650 F.3d at 232, and these disclosures are as a result "corrective" within the meaning of governing law.   Defendants' motion to dismiss the allegations based on these statements for failure to plead loss causation is denied.

### 2.  Materiality

Defendants also challenge the materiality of the alleged post-accident misstatements.  As just discussed, the Court has concluded that the post-accident statements concerning the amount of tailings Vale deposited into the Fundão Dam must be dismissed for failure to plead loss causation with respect to those statements; accordingly, the discussion of materiality that follows is confined to the alleged post-accident misstatements concerning Vale's responsibility for the harm caused by the dam collapse and the toxicity of the tailings released from the collapsed dam.

"A statement or omission is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.'"  *IBEW Local Union No. 58 Pension Tr. Fund and Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (quoting *ECA*, 553 F.3d at 197).  "In other words, in order for the misstatement to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" or information made available.'"  *ECA*, 553 F.3d at 197 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

"[Q]uestions of materiality are 'inherently fact specific.'"  *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 126 (2d Cir. 2013) (quoting *Basic*, 485 U.S. at 236). As a result, "[o]n a motion to dismiss, a complaint may not be properly dismissed unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *IBEW*, 783 F.3d at 390 (citation and internal quotation marks omitted).

### a. Statements Regarding Vale's Responsibility for the Fundão Dam Collapse

Defendants argue that the surviving post-accident statements regarding Vale's responsibility for the Fundão Dam collapse were immaterial. They maintain that during the November 16, 2015 conference call cited by Plaintiffs, Vale "warned that 'there is no doubt that [formal notification of government-imposed fines is] on its way'" and "pledged to 'provide all the support required for Samarco to reinstate itself and to be able to face all the cost and indemnities and fines and the reclaiming cost for the environment and the makeover for the communities and the people affected.'" Def. Mem. at 24 (quoting Ex. 6 to Kirsch Decl. at 3, 8). In opposition to Defendants' arguments regarding the materiality of this set of challenged statements, Plaintiffs argue that it is "difficult to envision a more material fact" than Vale's statements "disclaiming responsibility" for the "worst environmental disaster in Brazil's history." Pl. Mem. at 35.

Defendants' argument is easily disposed of. As noted above, a court should not grant a Rule 12(b)(6) motion to dismiss "unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *IBEW*, 783 F.3d at 390 (citation and internal quotation marks omitted). The challenged statements are not of such a nature. Rather, there is a substantial likelihood that a reasonable Vale shareholder, following a catastrophe of the magnitude of the Fundão Dam collapse, would find Vale's potential responsibility for the collapse—whether in terms of responsibility for Samarco's management and operations, or responsibility for the ensuing harm—to be important in deciding how to act. This conclusion is bolstered by the fact that the SAMITRI contract required Vale to "share in . . . environmental costs derived from the use of [Samarco] dams, in proportion to such degree of utilization as shall occur." As a result, this set of challenged statements survives Defendants' materiality challenge.

### b. Statements Regarding Toxicity of the Tailings Released from the Fundão Dam

Defendants' memorandum of law suggests that they are contesting the materiality of their post-accident statements concerning the toxicity of the material released when the Fundão Dam collapsed, *see* Def. Mem. at 24, but they advance no substantive arguments in support of this position.  In any event, the Court has little trouble concluding that statements regarding whether the material released from the dam was toxic would be important to a reasonable investor, especially in light of Vale's obligations under the SAMITRI contract.  This category of challenged statements also survives Defendants' materiality challenge.

### C. Arguments Regarding Scienter

Defendants argue that Plaintiffs have failed to plead a strong inference of scienter, as is required in private securities fraud actions.  Def. Mem. at 25-28.

"Scienter," an element of a claim under § 10(b) and Rule 10b-5, is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)).  "In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud in this circuit." *ECA*, 553 F.3d at 198.  "In the securities fraud context," the Second Circuit has "typically found it sufficient to state a claim based on recklessness the complaint 'specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements.'" *Loreley*, 797 F.3d at 177 (quoting *Novak*, 216 F.3d at 308).

A plaintiff adequately alleges a strong inference of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference on could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  "In determining whether this inference can be reasonably drawn, courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA*, 553 F.3d

at 198.  "Therefore, the court must ask, 'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'"  *Id.* (quoting *Tellabs*, 551 U.S. at 326).

"At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'"  *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311); *accord Teamsters*, 531 F.3d at 194 (same).

"Where the defendant at issue is a corporation, it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading."  *Loreley*, 797 F.3d at 177 (quoting *Teamsters*, 531 F.3d at 195-96).

As discussed above, the statements which have survived Defendants' arguments for dismissal thus far are the pre-accident statements regarding risks mitigation plans, policies, and procedures in the 2013 and 2014 Sustainability Reports, the post-accident statements regarding Vale's responsibility for the Fundão Dam collapse, and the post-accident statements regarding the toxicity of the material released from the dam when it collapsed.

### 1. Pre-Accident Statements Regarding Risk Mitigation Plans, Policies, and Procedures

Based upon allegations in the complaint, the only individual Defendant who could have made these statements with the required scienter is Defendant Poppinga, as a Vale executive who, it is alleged, served on Samarco's board throughout the Class Period.  The complaint lacks any specific allegations of Defendant Pires or Ferreira's actual knowledge that statements regarding these issues

were false or misleading at the time they were made, nor does it provide a basis to conclude that they acted recklessly.  With respect to Defendant Poppinga, however, the complaint alleges that he, in his capacity as a Samarco board member, dealt with issues concerning the Fundão Dam, and that as a board member, he had access to information contradicting this set of statements, including the Pristino Report, the 2011 Technical Report, and Mr. Fonseca's troubling conclusions about the dam's emergency action plan.  *See, e.g.*, Compl. ¶¶ 23, 27, 30, 58, 147, 150-55, 164-65.[5]  The complaint adequately alleges scienter on the part of Defendant Poppinga.  *See Loreley*, 797 F.3d at 177 ("In the securities fraud context, [the Second Circuit] ha[s] typically found it sufficient to state a claim based on recklessness if the complaint specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements."); *ECA*, 533 F.3d at 199 (strong inference of scienter can be inferred where defendants "knew facts or had access to information suggesting that their public statements were not accurate").

The complaint provides no basis, however, to attribute Defendant Poppinga's scienter to Defendants Pires or Ferreira, however, inasmuch as scienter may not be alleged based upon the kind of "group pleading" employed in the complaint.  *See* Compl. ¶¶ 150-155 (alleging that "Defendants" knew or were reckless in not knowing about problems at the Fundão Dam).  Rather, Rule 9(b) requires that "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible."  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009); *see also DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281-82 (S.D.N.Y. 2014) ("[Plaintiff] improperly attempts to group-plead the scienter requirement."); *The Penn. Ave. Funds v. Inyx Inc.*, No. 08-cv-6857 (PKC), 2010 WL 743562, at *12 (S.D.N.Y. Mar. 1, 2010) ("'[G]roup pleading' of scienter . . . runs afoul of the PSLRA's requirement that a plaintiff 'state with particularity facts giving rise to a strong inference that *the*

---

[5] Defendants do not challenge the notion that Mr. Poppinga had access to reports prepared, or conclusions reached, prior to the time he joined the Samarco board.

*defendant* acted with the required state of mind.'") (citation omitted).

There remains the question of whether Defendant Poppinga was the "maker" of the statements in Vale's 2013 and 2014 Sustainability Reports, as is required by binding authority. In *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the Supreme Court held that the "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142; *accord In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 656-66 (2d Cir. 2016).

The complaint alleges that the "Individual Defendants, because of their positions with Vale, possessed the power and authority to control the contents of the Company's reports to the SEC" and "press releases," and that "[e]ach of the individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading . . . and had the ability and opportunity to prevent their issuance or cause them to be corrected." Compl. ¶ 24.

Defendants take the position that Defendant Poppinga cannot be liable for the alleged misstatements concerning Vale's risk mitigation plans, policies, and procedures because he did not "make" these statements, which are contained in Vale's 2013 and 2014 Sustainability Reports. Def. Mem. at 29, n.21. This argument appears to be premised on the fact that Defendant Poppinga did not sign the Sustainability Reports. Plaintiffs, on the other hand, maintain that the allegations in the complaint are sufficient for the Court to infer that Defendant Poppinga was the maker of the statements in these reports. Pl. Mem. at 8, n.3 (citing Compl. ¶¶ 21-24). In their reply brief, Defendants argue that Plaintiffs rely on the "group pleading" doctrine, which is no longer viable in light of the Supreme Court's decision in *Janus*. Defendants' Reply Memorandum of Law (Dkt. No. 91) at 15.

The Supreme Court's decision in *Janus* has called into question the permissibility of "group pleading" to allege that a particular defendant "made" a statement. *See, e.g., In re ShengdaTech, Inc. Sec. Litig.*, No. 11-cv-1918 (LGS), 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) (discussing

uncertainty surrounding whether group pleading doctrine survives *Janus*). The group pleading doctrine "allows a plaintiff to rely on a presumption that written statements that are 'group-published,' *e.g.*, SEC filings and press releases, are statements made by all individuals 'with direct involvement in the everyday business of the company.'" *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 373 (S.D.N.Y. 2012) (quoting *Camofi Master LDC v. Riptide Worldwide, Inc.*, No. 10-cv-4020 (CM), 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011)).

Defendants categorize Plaintiffs' position as one that depends on the group pleading doctrine, but Plaintiffs do not rely on that doctrine alone. While the complaint does first allege that the individual Defendants "possessed the power and authority to control the contents of the Company's reports to the SEC" "because of their positions within Vale," which suggests reliance on the group pleading doctrine, the complaint also specifically alleges that "[e]ach of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected." Compl. ¶ 24. Accepted as true—as it must be at the pleading stage—this second allegation, together with the other allegations in the complaint, especially those concerning Defendant Poppinga's responsibilities at Vale, permits the plausible inference that Defendant Poppinga had "ultimate authority" over the statements in the Sustainability Reports as required by *Janus*. As the Court in *In re Barrick Gold Sec. Litig.*, No. 13-cv-3851 (SAS), 2015 WL 3486045 (S.D.N.Y. June 2, 2015) noted, however, "at trial or summary judgment, plaintiffs will need to provide proof that the individual defendant[] did in fact have ultimate authority over the statements in order to hold them liable." *Id.* at *2.

### 2. Statements Regarding Vale's Responsibility for the Fundão Dam Collapse

Plaintiffs adequately allege the scienter of Defendant Pires with respect to the statements he made about Vale's responsibility for the Fundão Dam collapse during the November 16, 2015

conference call.  As has been discussed, the SAMITRI contract between Vale and Samarco required Vale to "share in . . . any environmental costs derived from the use of [Samarco] dams."  The inference that Defendant Pires knew of this source of financial liability at the time he made the statements during the November 16, 2015 conference call, is surely as strong as any opposing inference.  Indeed, an opposing inference rests on the illogical premise that Vale's chief financial officer was unaware of a key provision in the contract governing Vale's use of Samarco's tailings dams for the disposal of waste from Vale's Alegria mine, in advance of a conference call with analysts and investors that was held for the purpose of discussing the Fundão Dam collapse.  This alternative inference is less persuasive on its face.  Notably, Defendants do not make any arguments in opposition.

### 3. Statements Regarding Toxicity of the Tailings Released from the Fundão Dam

Plaintiffs have not adequately alleged the scienter of Defendant Pires or of Vale with respect to statements regarding the toxicity of the tailings released from the Fundão Dam.  Although it is difficult to escape the commonsense notion that the material released from the dam would be something other than "not dangerous" or was composed of "no toxic components," as Defendants represented, this does not suffice to allege a strong inference of scienter, as is required by the PSLRA.

Plaintiffs have taken the position that Defendants' statements were "proven false" by the UN report and the Rio Doce Surface Water Quality Monitoring report, but this argument falls short of what is required by the PSLRA.  The scienter inquiry asks whether Defendants had knowledge of facts or access to information contradicting their statements at the time they were made, and not merely whether the statements were later proven to be false.  *See, e.g.*, *Boritzer v. Calloway*, No. 10-cv-6264 (JPO), 2013 WL 311013, at *7 (S.D.N.Y. Jan. 24, 2013) ("[A]llegations of scienter must be supported by facts giving rise to a strong inference that the defendant knew the statements to be

false and intended to defraud the plaintiff at the time they were made."); *Waxman v. Envipco Pick Up & Processing Servs., Inc.*, No. 02-cv-10132 (GEL), 2003 WL 22439796, at *5 (S.D.N.Y. Oct. 28, 2003) ("Analysis of [plaintiff's] complaint fails to give rise to a strong inference of scienter.  In fact, many of its allegations do not even clearly allege that the purported misrepresentations were . . . known to be false at the time they were made.").

Furthermore, while the complaint alleges that Vale "cited" the report that tested water samples taken from the Rio Doce between November 7 and November 12, 2015 after the November 16, 2015 conference call, on November 27, 2015, there is a conspicuous absence of any allegation that anybody at Vale had received or reviewed that report prior to November 16.  As a result, these statements cannot form the basis of liability, and these allegations are dismissed.

### 4. Imputation of Scienter to Vale

"Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority."  *Penn. Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y July 11, 2012) (quoting *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 265 (S.D.N.Y. 2010)); *see also In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("[C]ourts have readily attributed the scienter of management-level employees to corporate defendants.").  The Court concludes, therefore, that the scienter of Defendants Poppinga and Pires, as senior officers of Vale, should be imputed to Vale as a corporate entity with respect to the pre-accident statements regarding Vale's risk mitigation plans, policies, and procedures and the post-accident statements regarding Vale's responsibility for the Fundão Dam collapse.

### D. Claims Against Individual Defendants

Defendants argue that, because the complaint does not adequately plead a "primary violation of Section 10(b) of the Exchange Act," the Court should also dismiss Plaintiffs' claims under Section 20(a) against the individual Defendants.  Def. Mem. at 28.

As discussed, the requirements for pleading control person liability under § 20(a) are "(1) a

primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Barclays*, 750 F.3d at 236. "Control over a primary violator may be established by showing that the defendant possess 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996) (quoting 17 C.F.R. § 250.12b-2).

"It remains unsettled in this District whether control person liability is premised on fraud, and thus whether culpable participation requires proof of scienter." *In re Barrick*, 2015 WL 3486045, at *3. The "majority of district courts in this Circuit," however, "have required Section 20(a) plaintiffs to allege that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014) (collecting cases).

Plaintiffs have pleaded primary violations of the securities laws against Vale and Defendants Poppinga and Pires. And "a party may not ultimately be held liable under both Section 10(b) and Section 20(a) for the same underlying conduct." *In re Alstom SA*, 454 F. Supp. 2d 187, 210-11 (S.D.N.Y. 2006). The question, therefore, is whether they have adequately pleaded a claim of control person liability against Defendant Ferreira. The complaint does allege facts strongly suggesting that Defendant Ferreira exercised "control" over Vale within the meaning of binding authority. However, even assuming that "culpable participation" is a less stringent standard than scienter, Plaintiffs simply do not allege facts showing that Defendant Ferreira acted with any culpability in connection with the dissemination of the statements that survive, on a primary violation basis, Defendants' motion to dismiss. Nor do Plaintiffs address this claim or its pleading in their opposition papers, beyond noting in a footnote that "the Complaint adequately alleges a primary violation of Section 10(b)" and that "[t]hus, Plaintiffs' Section 20(a) claims must be

sustained." Pl. Mem. at 36, n.14.  Plaintiffs' § 20(a) claim is dismissed.

## IV.    CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.  Plaintiffs have pleaded a claim under § 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder against Defendants Poppinga and Pires, and against Vale, based upon the pre-accident statements about Vale's risk mitigation plans, policies, and procedures in Vale's 2013 and 2014 Sustainability Reports, and Defendant Pires' post-accident statements about Vale's responsibility for the Fundão Dam collapse during the November 16, 2015 conference call. In all other respects, Defendants' motion to dismiss is granted.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 79.

SO ORDERED.

Dated:  March 23, 2017
New York, New York

_____
GREGORY H. WOODS
United States District Judge