**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Vale S.A. Securities Litigation | Case No. 15 Civ. 09539 (GHW)<br><br>Consolidated with Case No. 16 Civ. 00658 (GHW)<br><br><u>CLASS ACTION</u> |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT**
**<u>OF CLASS REPRESENTATIVES AND CLASS COUNSEL</u>**

BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP

Blair A. Nicholas (*Pro hac vice*)
Timothy A. DeLange (*Pro hac vice*)
Richard D. Gluck (*Pro hac vice)*
Jenny E. Barbosa (*Pro hac vice)*
Robert S. Trisotto
12481 High Bluff Drive, Suite 300
San Diego, CA 92130

        -and-

Gerald H. Silk
Avi Josefson
BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP
1251 Avenue of the Americas, 44th Fl.
New York, NY 10020

*Counsel for Lead Plaintiffs Alameda County*
*Employees' Retirement Association and*
*Orange County Employees Retirement*
*System and Lead Counsel for the Class*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION ..................................................................................................... 1

II.     FACTUAL BACKGROUND ..................................................................................... 3

        A.      Vale Misled The Class About Its Risk Mitigation Plans, Policies
                And Procedures, As Well As Its Responsibility For The Fundão
                Dam's Collapse And Ensuing Harm ................................................................ 3

        B.      The Proposed Class Representatives ............................................................... 5

III.    ARGUMENT .............................................................................................................. 5

        A.      Rule 23(a)'s Requirements Are Satisfied ....................................................... 7

                1.      Numerosity Is Established ................................................................... 7

                2.      Commonality Exists ............................................................................ 8

                3.      Typicality Is Satisfied ......................................................................... 9

                4.      Lead Plaintiffs Will Fairly And Adequately Protect The
                        Interests Of The Class ....................................................................... 10

        B.      Rule 23(b)(3)'s Requirements Are Satisfied ................................................. 12

                1.      Lead Plaintiffs And The Class Are Entitled To A
                        Presumption of Reliance Under Basic's Fraud-On-The-
                        Market Theory ................................................................................... 13

                        (a)      Tens Of Millions Of Vale ADRs Were Traded
                                Each Day During The Class Period ......................................... 14

                        (b)      Numerous Analysts Covered And Reported On
                                Vale During The Class Period ................................................. 15

                        (c)      Vale ADRs Traded On The New York Stock Exchange ........... 15

                        (d)      Vale Was Eligible To File Form F-3 Registration Statements ...... 16

                        (e)      Vale's ADR Prices Reacted To New Company-Specific
                                Information During The Class Period ..................................... 16

                        (f)      The *Krogman* Factors Further Support Market Efficiency ........... 18

                2.      Reliance Is Also Presumed Under *Affiliated Ute* ............................ 20

3.    Damages Will Be Calculated Using A Common
Methodology That Is Consistent With The Class-Wide
Theory Of Liability ................................................................................ 20

4.    A Class Action Is The Best Method For The Fair And
Efficient Adjudication Of This Case ...................................................... 21

IV.    CONCLUSION ............................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens of Utah v. United States,*
406 U.S. 128 (1972) ............................................................................................. 20

*In re Alstom SA Sec. Litig.,*
253 F.R.D. 266 (S.D.N.Y. 2008) ......................................................................... 17

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ............................................................................................. 12

*Amgen, Inc. v. Conn. Ret. Plan & Trust Funds,*
568 U.S. 455 (2013) .................................................................................... 2, 6, 7, 12

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.,*
281 F.R.D. 134 (S.D.N.Y. 2012) ........................................................................... 7

*In re Barrack Gold Sec. Litig.,*
314 F.R.D. 91 (S.D.N.Y. 2016) ........................................................................... 20

*Basic, Inc. v. Levinson,*
485 U.S. 224 (1988) ......................................................................................... 3, 13

*In re Beacon Assocs. Litig.,*
282 F.R.D. 315 (S.D.N.Y. 2012) ......................................................................... 21

*Billhofer v. Flamel Techs., S.A.,*
281 F.R.D. 150 (S.D.N.Y. 2012) ................................................................ 7, 18, 19

*Cammer v. Bloom,*
711 F. Supp. 1264 (D.N.J. 1989) ................................................................... passim

*Consol. Rail Corp. v. Town of Hyde Park,*
47 F.3d 473 (2d Cir. 1995) ..................................................................................... 7

*Dura Pharms., Inc. v. Broudo,*
544 U.S. 336 (2005) ............................................................................................. 12

*Erica P. John Fund, Inc. v. Halliburton Co.,*
563 U.S. 804 (2011) .................................................................................... 2, 7, 12

*In re EVCI Career Colls. Holding Corp. Sec. Litig.,*
2007 WL 2230177 (S.D.N.Y. July 27, 2007) ....................................................... 9

*In re Facebook, Inc. IPO Sec. and Derivative Litig.,*
312 F.R.D. 332 (S.D.N.Y. 2015) ..................................................................... 6, 12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   245 F.R.D. 147 (S.D.N.Y. 2007), *aff'd in relevant part*, 574 F.3d 29
   (2d Cir. 2009) ............................................................................................................9, 10

*Fogarazzo v. Lehman Bros. Inc.*,
   263 F.R.D. 90 (S.D.N.Y. 2009) .............................................................................7, 20

*Foley v. Transocean Ltd.*,
   272 F.R.D. 126 (S.D.N.Y. 2011) ...............................................................................10

*In re Gaming Lottery Sec. Litig.*,
   2001 WL 204219 (S.D.N.Y. Mar. 1, 2001) ...............................................................19

*In re Globalstar Sec. Litig.*,
   2004 WL 2754674 (S.D.N.Y. Dec. 1, 2004) ................................................................8

*Goldstein v. Puda Cola, Inc.*,
   827 F. Supp. 2d 348 (S.D.N.Y. 2011) .........................................................................9

*Green v. Wolf Corp.*,
   406 F.2d 291 (2d Cir. 1968) .................................................................................6, 21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) ..............................................................................................13

*Hom v. Vale, S.A.*,
   2016 WL 880201 (S.D.N.Y. Mar. 7, 2016) (Woods, J.) ............................... passim

*In re IndyMac Mortgage-Backed Sec. Litig.*,
   286 F.R.D. 226 (S.D.N.Y. 2012) ................................................................................8

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ..........................................................................................7

*In re JPMorgan Chase & Co. Sec. Litig.*,
   2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015) ...................................................15, 18

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) .........................................................................18, 19

*Lapin v. Goldman Sachs & Co.*,
   254 F.R.D. 168 (S.D.N.Y. 2008) .........................................................................11, 22

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
   967 F.2d 742 (2d Cir. 1992) ......................................................................................20

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .............................................................8

*Maywalt v. Parker & Parsley Petroleum Co.*,
　　147 F.R.D. 51 (S.D.N.Y. 1993) ................................................................6

*Mazzei v. The Money Store*,
　　829 F.3d 260 (2d Cir. 2016)..................................................................12

*McIntire v. China MediaExpress Holdings, Inc.*,
　　38 F. Supp. 3d 415 (S.D.N.Y. 2014)............................................. passim

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
　　310 F.R.D. 230 (S.D.N.Y. 2015) ...........................................................21

*In re NYSE Specialists Sec. Litig.*,
　　260 F.R.D. 55 (S.D.N.Y. 2009) .............................................................10

*In re Parmalat Sec. Litig.*,
　　2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ................................13, 20

*In re Petrobras Sec. Litig.*,
　　862 F.3d 250 (2d Cir. 2017)......................................................... passim

*In re Pfizer Inc. Sec. Litig.*,
　　282 F.R.D. 38 (S.D.N.Y. 2012) .......................................................11, 13

*Robidoux v. Celani*,
　　987 F.2d 931 (2d Cir. 1993)..................................................................10

*Royal Park Invs. SA/NV v. The Bank of N.Y. Mellon*,
　　2017 WL 3835339 (S.D.N.Y. Aug. 30, 2017) (Woods, J.) ......................6

*In re SCOR Holding (Switz.) AG Litig.*,
　　537 F. Supp. 2d 556 (S.D.N.Y. 2008)....................................................22

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier*,
　　546 F.3d 196 (2d Cir. 2008)..................................................................15

*In re: Vale S.A. Sec. Litig.*,
　　2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ......................................8, 9

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
　　2017 WL 2062985 (S.D.N.Y. May 15, 2017) ...........................................5

*In re Vivendi Universal, S.A. Sec. Litig.*,
　　242 F.R.D. 76 (S.D.N.Y. 2007) ...........................................................2, 5

*Wagner v. Barrick Gold Corp.*,
　　251 F.R.D. 112 (S.D.N.Y. 2008) ...........................................................15

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) ..................................................................................8, 9

*Wallace v. IntraLinks,*
   302 F.R.D. 310 (S.D.N.Y. 2014) ...........................................................20, 21

*In re Winstar Commc'ns Sec. Litig.,*
   290 F.R.D. 437 (S.D.N.Y. 2013) .......................................6, 14, 15, 16

*In re WorldCom, Inc. Sec. Litig.,*
   219 F.R.D. 267 (S.D.N.Y. 2003) ..............................................................11

**STATUTES, RULES & REGULATIONS**

17 C.F.R.
   § 239.13 ...................................................................................................16

Federal Rules of Civil Procedure
   Rule 23(a)(1) ...........................................................................................7
   Rule 23(a)(2) ...........................................................................................8
   Rule 23(a)(4) .........................................................................................10

Lead Plaintiffs Alameda County Employees' Retirement Association ("ACERA") and Orange County Employees Retirement System ("OCERS") seek an order (i) certifying a class of investors who purchased or otherwise acquired Defendant Vale S.A.'s common or preferred American Depository Receipts ("ADRs") during the Class Period, (ii) appointing Lead Plaintiffs as Class Representatives, and (iii) appointing Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") as Class Counsel.

## I.  INTRODUCTION

This securities class action centers on the worst environmental disaster in Brazil's history – the collapse of the Fundão Dam.  Defendants told investors during the Class Period both that (i) Vale had appropriate risk mitigation plans, policies and procedures in place to protect against the type of catastrophe that occurred, and (ii) Vale bore no responsibility for the Dam's collapse or the harm it caused.  Unfortunately for investors, those statements were false. In reality, Vale ignored known structural problems at the Dam and not only controlled the Dam, it actively deposited its own wastes into the Dam before the collapse.  When the truth was finally revealed, the price of Vale ADRs plummeted over 20%, wiping out over a billion dollars in market capitalization and causing hundreds of millions of dollars in investor losses.

Based on the facts summarized herein and alleged in the Complaint, the Court sustained claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Lead Plaintiffs now seek certification of the following class (the "Class"):

> All persons or entities who purchased or otherwise acquired Defendant Vale S.A. ("Vale") common or preferred American Depository Receipts ("ADRs") between May 8, 2014 and November 27, 2015, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are (i) Defendants, (ii) members of the immediate families of Defendants, (iii) any directors and officers of Defendants during the Class Period and members of their immediate families, (iv) the subsidiaries, parents and affiliates of Vale S.A., (v) any firm, trust, corporation or other entity in which

any Defendant has or had a controlling interest, and (vi) the legal
representatives, heirs, successors and assigns of any such excluded
party.[1]

It is well established that securities fraud cases are particularly well suited for class

treatment. *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 91 (S.D.N.Y. 2007) ("As courts

have frequently noted, class action treatment is particularly appropriate when plaintiffs seek

redress for violations under the securities laws."). As in most such cases, and as detailed below,

Rule 23's numerosity, typicality, and adequacy elements are easily satisfied here.

Lead Plaintiffs' claims also present numerous common questions of law and fact that

predominate over any questions affecting only individual Class Members. For example, the

question of whether Defendants made materially false and misleading statements or omissions is

a prototypically common one. *See Amgen, Inc. v. Conn. Ret. Plan & Trust Funds*, 568 U.S. 455,

475 (2013) ("This Court has held that . . . the falsity or misleading nature of the defendant's alleged

statements or omissions [is a] common question[]."). The Supreme Court also has held that

materiality and loss causation are common issues to be adjudicated on a class-wide basis. *See*

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*") (no

requirement to "show loss causation as a condition of obtaining class certification"); *Amgen*, 568

U.S. at 470 ("the question of materiality is common to the class").

Reliance also is a common issue because a class-wide presumption of reliance applies to

Lead Plaintiffs' Exchange Act claims under the fraud-on-the-market theory. Vale's common and

preferred ADRs were widely held and actively traded on the New York Stock Exchange. As

---

[1] This proposed Class is consistent with the Court's Order on Defendants' motion to dismiss. In that Order, the Court found that the first actionable false statements were contained in Vale's 2013 Sustainability Report. That report was first published on May 8, 2014, according to an SEC Form 6-K that Vale filed on that date. *See* Tabak Rpt. ¶1.

demonstrated in the accompanying Expert Report of David I. Tabak, Ph.D.,[2] a renowned and widely respected expert, Vale's ADRs traded in an efficient market during the Class Period. Accordingly, a presumption of reliance applies. *See Basic, Inc. v. Levinson*, 485 U.S. 224 (1988); *In re Petrobras Sec. Litig.*, 862 F.3d 250, 277 (2d Cir. 2017) (market efficiency to be viewed as part of a "holistic analysis based on the totality of the evidence presented").

Finally, proceeding as a class action is superior to other available methods for fairly and efficiently adjudicating Class Members' claims.

## II.    FACTUAL BACKGROUND

### A.    Vale Misled The Class About Its Risk Mitigation Plans, Policies And Procedures, As Well As Its Responsibility For The Fundão Dam's Collapse And Ensuing Harm

Vale is the world's largest producer of iron ore and operates mines throughout Brazil, both in its own name and through controlled entities and joint ventures.  ¶25.[3]  Samarco is one of those controlled entities and operates as a Vale joint venture with partner BHP Billiton.  ¶26.  The Fundão Dam was one of three interconnected tailings dams that Vale and Samarco used to store wastes (known as tailings) from their mining operations. ¶47.

During the Class Period, Defendants repeatedly assured investors that the dams Vale used to dispose of its mining wastes, including the Fundão Dam, were constructed and operated following strict safety standards, and were audited and monitored to reduce potential risks, including structural failures.  ¶101.  Specifically, Defendants represented that Vale had "policies, systematic requirements and procedures designed to *prevent* and *minimize* risks and protect lives," such as "technical and operational procedures, control devices, qualified teams, specialist

---

[2] The Tabak Report is attached as Exhibit 1 to the accompanying Declaration of Timothy A. DeLange ("DeLange Decl."), dated September 15, 2017.

[3] Citations to "¶" refer to the Consolidated Amended Class Action Complaint (the "Complaint") (ECF No. 58), unless otherwise noted.

consultancies and periodic audits in order to identify, control, and minimize the risks of its operations, and maintain tolerable levels." *Id.* (emphasis added).

In truth, Defendants ignored known structural problems with the Fundão Dam, while dramatically increasing production and use of the Dam. ¶¶54-70. Vale and its senior executives approved expanding the Dam in a manner inconsistent with expert recommendations, even after sensors indicated "emergency" levels of pressure and stress. ¶¶78, 82-83. Defendants failed to implement an emergency action plan, install alarms or sirens to warn people in the surrounding communities in the event of an emergency, and ignored expert recommendations calling for a contingency plan in case of accidents. ¶¶71-74, 77. In short, holders of Vale ADRs were falsely comforted about purported safety plans and procedures, even though no such plans existed.

On November 5, 2015, the Fundão Dam burst, unleashing a colossal torrent of mud and debris toward the villages below. ¶84. Within minutes, the deluge swamped the town of Bento Rodrigues, destroying virtually everything in its path. *Id.* With no warning system in place, residents had little time to flee, and in the end, 19 people lost their lives, and hundreds lost their homes and all of their possessions. *Id.* The prices of both common and preferred Vale ADRs fell immediately.

As local communities and residents dealt with the devastation, Defendants falsely claimed that Vale and Samarco were completely separate companies that did not share systems, resources, or support functions. ¶85. Vale and Samarco did, however, share systems and resources, including the use of and responsibility for the construction and maintenance of the Fundão Dam. ¶109. Eventually, a Brazilian court found it likely that Vale's use of the Dam and control of Samarco made it responsible for the unprecedented environmental damage as both a "direct polluter" and

as an "indirect polluter."  ¶86.  Vale's common and preferred ADRs plummeted further, inflicting

additional losses on investors.  ¶144.

### B.    The Proposed Class Representatives

As demonstrated in the Joint Declaration they previously filed in connection with their

motion to be appointed Lead Plaintiffs (DeLange Decl., Ex. 2), ACERA and OCERS are large and

sophisticated public pension funds that invest retirement funds for the benefit of plan participants,

and provide retirement benefits to plan participants.  As detailed in their PSLRA Certifications

(ECF Nos. 33-1, 33-2), Lead Plaintiffs purchased Vale common and preferred ADRs during the

Class Period, and have been damaged as a result of Defendants' false and misleading statements.

The Court appointed ACERA and OCERS as Lead Plaintiffs on March 7, 2016.  *Hom v. Vale, S.A.*

("*Vale I*"), 2016 WL 880201 (S.D.N.Y. Mar. 7, 2016) (Woods, J.).

Lead Plaintiffs understand well the duties and responsibilities of serving as Class

Representatives.  Before and since commencing this Action, Lead Plaintiffs have participated in

formulating strategy, making important decisions about the litigation, and reviewing pleadings and

Court orders.  *See* DeLange Decl. ¶2.  Lead Plaintiffs successfully defeated a motion to dismiss

and a motion for reconsideration.  Lead Plaintiffs are actively involved in discovery, exchanging

discovery demands and responses and producing documents.  *Id.* ¶3.  Lead Plaintiffs anticipate

testifying at deposition within the next several weeks.  *Id.*

## III.   ARGUMENT

Class actions are a particularly appropriate way to resolve claims under the federal

securities laws.  *See In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y.

May 15, 2017) ("'Generally, claims alleging violations of Section[] 10(b) . . . of the Exchange Act

are especially amenable to class certification.'") (citation omitted and ellipsis in original); *Vivendi*,

242 F.R.D. at 91 ("As courts have frequently noted, class action treatment is particularly

appropriate when plaintiffs seek redress for violations under the securities laws.").  Indeed, the Second Circuit "has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country." *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993).  The Second Circuit recently affirmed a district court's order certifying a securities class action involving a Brazilian company's ADRs traded on the New York Stock Exchange.  *See Petrobras*, 862 F.3d at 258.

To obtain class certification, Lead Plaintiffs must satisfy Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.  *Amgen*, 568 U.S. at 459; *see also Royal Park Invs. SA/NV v. The Bank of N.Y. Mellon*, 2017 WL 3835339, at *2 (S.D.N.Y. Aug. 30, 2017) (Woods, J.).  In addition, Lead Plaintiffs must satisfy Rule 23(b)'s predominance and superiority requirements by showing that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Amgen*, 568 U.S. at 460; *Royal Park*, 2017 WL 3835339, at *2.  Rule 23's requirements should be interpreted liberally, with doubts resolved in favor of granting class certification.  *See In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 312 F.R.D. 332, 340 (S.D.N.Y. 2015) ("'[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action'") (citing *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968)).

Although the analysis of Rule 23's requirements may entail some overlap with the merits of the plaintiff's claim, courts must not engage in "free-ranging merits inquiries at the certification stage."  *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 442 (S.D.N.Y. 2013) (citing *Amgen*, 568 U.S. at 466).  Rather, the district court should consider the merits of the claim only to

the extent it is relevant to determining whether Rule 23's requirements are satisfied.  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006).  Consistent with these principles, the plaintiff is not required to prove either loss causation or materiality at the class certification stage.  *See Halliburton I*, 563 U.S. at 810-11; *Amgen*, 568 U.S. at 457.

### A.    Rule 23(a)'s Requirements Are Satisfied

#### 1.    Numerosity Is Established

To satisfy Rule 23(a)'s numerosity requirement, the proposed Class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 156 (S.D.N.Y. 2012).  "Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims."  *Fogarazzo v. Lehman Bros. Inc.*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009).  In the Second Circuit, the numerosity requirement is presumptively satisfied where there are 40 or more class members.  *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  Numerosity also may be satisfied "by showing that a large number of shares were outstanding and traded during the relevant period."  *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012).

Here, the proposed Class easily satisfies the numerosity requirement.  The number of institutional investors that held common ADRs at quarter-ends encompassing the Class Period ranged from 401 to 566, while the number of institutional investors that held preferred ADRs was between 216 and 277.  Tabak Rpt., Exs. 5a & 5b.  Since institutional investors on average held roughly 75% of the common ADRs outstanding and 94% of the preferred ADRs, there also were a significant number of individual investors that held Vale ADRs during the Class Period.  *Id.*

The large number of outstanding shares that traded during the Class Period further demonstrates numerosity.  Common ADRs outstanding during the Class Period ranged from 730

million to 845 million at quarter-end, while the number of preferred ADRs outstanding was between 602 million and 664 million.  Tabak Rpt., Exs. 3a & 3b.  Both before and throughout the Class Period, the common and preferred ADRs were traded actively on the New York Stock Exchange (ticker VALE and VALE.P), with an average weekly trading volume of 15.81% of common ADRs outstanding and 8.39% of preferred ADRs outstanding.  *Id.* ¶18.  These high volumes demonstrate numerosity.  *See In re Globalstar Sec. Litig.*, 2004 WL 2754674, at *3-4 (S.D.N.Y. Dec. 1, 2004) (class was numerous where there were approximately 108 million outstanding shares of common stock).

### 2.    Commonality Exists

The commonality requirement looks to whether "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Courts in this District have characterized this requirement as "a low hurdle."  *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014); *see also In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009) ("The commonality requirement, particularly in securities fraud litigation, is generally considered a low hurdle easily surmounted.").  In fact, courts in this District liberally construe the commonality requirement to be satisfied even if a single common issue exists.  *See In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 233 n.50 (S.D.N.Y. 2012) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("We quite agree that for purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do.")).

Here, commonality is easily satisfied.  In denying Defendants' motion to dismiss, the Court found that Lead Plaintiffs pleaded actionable misstatements for (i) statements made in Vale's 2013 Sustainability Report concerning its risk mitigation plans, policies and procedures that were implicated at the Fundão Dam's collapse, and (ii) Defendant Pires' statement on the November 16, 2015 conference call disclaiming Vale's responsibility for the Fundão Dam's collapse.  *In re: Vale*

*S.A. Sec. Litig.*, 2017 WL 1102666, at *35 (S.D.N.Y. Mar. 23, 2017).   These sustained misstatements present numerous common questions of law and fact, including:

- Whether Defendants' statements were false and misleading;

- Whether Defendants omitted material facts necessary to make their statements not misleading;

- Whether Defendants' statements were made with the requisite scienter;

- Whether the members of the Class sustained damages when the artificial inflation in Vale ADRs was eliminated; and

- Whether Defendants violated the federal securities laws.

Each of these questions will "generate common *answers* apt to drive the resolution of the litigation."   *Wal-Mart*, 564 U.S. at 350 (emphasis in original).   *See, e.g.*, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 158 (S.D.N.Y. 2007), *aff'd in relevant part*, 574 F.3d 29 (2d Cir. 2009) (common issues as to violations of federal securities laws, misrepresentations and omissions of material fact, scienter and damages satisfy commonality requirements); *China MediaExpress*, 38 F. Supp. 3d at 424 (common questions include "whether the federal securities laws were violated . . . and whether statements made . . . to the investing public during the Class Period misrepresented material facts about the business operations").

### 3.   Typicality Is Satisfied

Courts in this District "have emphasized that the typicality requirement is not demanding." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *13 (S.D.N.Y. July 27, 2007).   "'The typicality threshold is satisfied where the claims arise from the same conduct from which the other class members' claims and injuries arise.'"   *Vale I*, 2016 WL 880201 (citing *Goldstein v. Puda Cola, Inc.*, 827 F. Supp. 2d 348, 354 (S.D.N.Y. 2011)).   "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought

to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

Here, Lead Plaintiffs' claims are typical of the claims of absent Class Members.  Lead Plaintiffs allege that Defendants violated the Exchange Act by issuing public statements that misrepresented or omitted material facts to all investors.  Lead Plaintiffs also allege that they, like all other members of the Class, purchased their ADRs at artificially inflated prices. *See Vale I*, 2016 WL 880201, at *6 ("ACERA/OCERS and other putative class members allege that they purchased Vale shares at artificially inflated prices during the class period, and were injured by the false and misleading statements and omissions made by defendants in violation of federal securities laws. Thus, the typicality requirement is satisfied."); *see also In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 72-73 (S.D.N.Y. 2009) (typicality satisfied where defendants presented no evidence that named plaintiffs allege different wrongful conduct or are subject to unique defenses that render them atypical of other class members).

### 4.    Lead Plaintiffs Will Fairly And Adequately Protect The Interests Of The Class

Rule 23(a) requires a plaintiff to show that it "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  To satisfy this requirement, Lead Plaintiffs must show that: "'(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy.'" *Vale I*, 2016 WL 880201, at *6 (citing *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 131 (S.D.N.Y. 2011)).  This inquiry focuses "on uncovering 'conflicts of interest between named parties and the class they seek to represent.'" *Flag Telecom*, 574 F.3d at 35 (citation omitted).

Here, no conflicts exist between Lead Plaintiffs and the Class.  Lead Plaintiffs' interests are directly aligned with the interests of absent Class Members.  Lead Plaintiffs are large, sophisticated public pension funds that purchased Vale common and preferred ADRs during the Class Period and suffered the same type of injury as other Class Members.  *See In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003) ("[N]amed plaintiffs' interests are directly aligned with those of the absent class members: they are purchasers of WorldCom equity and debt securities who suffered significant losses as a result of the investments.").  Indeed, Lead Plaintiffs "have a significant financial interest in the outcome of the case, suggesting that they will advocate vigorously on behalf of the class."  *Vale I*, 2016 WL 880201, at *6.

Since the Court appointed ACERA and OCERS as Lead Plaintiffs, ACERA and OCERS have faithfully performed their role and obligations as class representatives and have protected and continue to protect absent Class Members' interests.  Through their experienced counsel, Lead Plaintiffs investigated and filed a consolidated class action complaint; successfully opposed Defendants' motions to dismiss and motion for reconsideration; searched for, collected and produced documents in response to Defendants' discovery requests; and will sit for depositions. DeLange Decl. ¶¶2-3.  Lead Plaintiffs' interests and actions support a finding of adequacy.  *See In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 48-49 (S.D.N.Y. 2012) (finding that similar facts supported a finding of adequacy); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 176-77 (S.D.N.Y. 2008) (same).

Finally, Lead Plaintiffs have protected the interests of the Class by retaining BLB&G as Class Counsel.  BLB&G is one of the most experienced and respected securities class action firms in the country, having recovered more than $30 billion for investors in the last 33 years.  *See* DeLange Decl., Ex. 3 (BLB&G Firm Resume).  As the Court recognized in *Vale I*, BLB&G "is

qualified to serve as lead counsel and conduct the litigation." 2016 WL 880201, at *6. For these reasons, and because BLB&G has devoted substantial time and resources to the litigation and will continue to do so, BLB&G satisfies the considerations of Rule 23(g) and should be appointed as Class Counsel.

### B.   Rule 23(b)(3)'s Requirements Are Satisfied

Federal Rule of Civil Procedure 23(b)(3) permits a district court to certify a class where "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance requirement is satisfied if: "(1) resolution of any material 'legal or factual questions . . . can be achieved through generalized proof,' and (2) 'these [common] issues are more substantial than the issues subject only to individualized proof.'" *Petrobras*, 862 F.3d at 270 (citing *Mazzei v. The Money Store*, 829 F.3d 260, 272 (2d Cir. 2016)). The Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud[.]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Class-wide issues predominate if some of the legal or factual issues can be determined using generalized proof, and those issues are more substantial than the issues subject only to individualized proof. *Facebook*, 312 F.R.D. at 346. In this case, issues of both law and fact predominate over any individual issues.

To recover under Section 10(b) of the Exchange Act, Lead Plaintiffs and Class Members must establish: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). The Supreme Court has held that materiality and loss causation are common issues that need not be proven at class certification. *See Amgen*, 568 U.S. at 461-62 (materiality); *Halliburton I*, 563 U.S. at 811-12 (loss causation). Furthermore, economic loss for each Class Member is measurable on a Class-wide basis. *See infra*

-12-

Section III.B.3.  Thus, as in most securities class actions, the only real question is whether reliance can be proven on a Class-wide basis.  *See Pfizer*, 282 F.R.D. at 52 ("All of [Section 10(b)'s] elements, other than reliance in cases that are not premised on fraud-on-the-market, are subject to class wide proof in securities litigation such as this."); *In re Parmalat Sec. Litig.,* 2008 WL 3895539, at *7-8 (S.D.N.Y. Aug. 21, 2008) (same).  Because this case is premised on *Basic*'s fraud-on-the-market presumption, the answer indisputably is yes.

       1.       **Lead Plaintiffs And The Class Are
Entitled To A Presumption of Reliance
<u>Under Basic's Fraud-On-The-Market Theory</u>**

The Supreme Court has confirmed that the fraud-on-the-market presumption of reliance, as originally articulated in *Basic Inc. v. Levinson*, 485 U.S. 224, 241-47 (1988), applies in securities class actions and renders the element of reliance subject to class-wide proof.  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) ("*Halliburton II*").  The presumption applies if:  "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Id.* at 2413.[4]  Here, each of these prerequisites is satisfied.

*First*, the alleged misrepresentations were public statements addressed to investors and the marketplace.  *Second*, Lead Plaintiffs purchased both common and preferred Vale ADRs between the time when at least one of these misrepresentations was made and November 27, 2015, the end of the Class Period.  *Finally*, Vale ADRs traded in an efficient market.

---

[4] Lead Plaintiffs are not required at the class certification stage to prove that the alleged misrepresentations had an impact on the stock price.  *See Halliburton II*, 134 S. Ct. at 2414.  Rather, it is Defendants' burden to demonstrate that the alleged misrepresentations had <u>***no***</u> impact on Vale's ADR prices.  *See China MediaExpress*, 38 F. Supp. 3d at 434 (Defendant bears the burden to prove a lack of price impact).

The Second Circuit recently affirmed that it "'has not adopted a test for the market efficiency of stocks or bonds.'" *Petrobras*, 862 F.3d at 276 (citation omitted). The *Petrobras* court noted, however, that courts in this District and elsewhere routinely apply the so-called "*Cammer* factors" in analyzing whether the market for a company's securities is efficient.[5] *Id.* Those factors are: (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases. *See Cammer*, 711 F. Supp. at 1286-87. These factors should be considered together as part of a "holistic analysis based on the totality of the evidence presented." *Petrobras*, 862 F.3d at 277. Here, Dr. Tabak's Report shows that all of the *Cammer* factors are satisfied, confirming Vale's ADRs traded on an efficient market throughout the Class Period.

(a) **Tens Of Millions Of Vale ADRs Were**
**Traded Each Day During The Class Period**

"Average weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security." *Winstar*, 290 F.R.D. at 447 (citation omitted). During the Class Period, the number of Vale common ADRs outstanding ranged between 730 million and 845 million shares and the number of Vale preferred ADRs outstanding ranged between 602 million and 664 million shares. Tabak Rpt., Exs. 3a & 3b. The average weekly trading volume was 15.81% for Vale's common ADRs and 8.39% for preferred ADRs. *Id.* ¶18. This heavy trading volume strongly supports the market efficiency of Vale ADRs during the Class Period.

---

[5] Those factors were first announced in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).

**(b)     Numerous Analysts Covered And
Reported On Vale During The Class Period**

"The existence of a number of analysts who report on a security supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." *Winstar*, 290 F.R.D. at 446 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier*, 546 F.3d 196, 205 (2d Cir. 2008)). One way to analyze the extent to which analysts followed a company's stock is to identify the number of analysts who provided earnings estimates each quarter. Tabak Rpt. ¶21. In Vale's case, on average 11 separate analysts provided earnings estimates each quarter during the Class Period. *Id.* And prominent investment firms such as Bank of America Merrill Lynch, Barclays, Citi, Credit Suisse, Deutsche Bank, JP Morgan, Morgan Stanley, and UBS issued hundreds of separate analyst reports on Vale during the Class Period. *Id.* ¶22 & n.16. This extensive coverage supports the conclusion that the market for Vale ADRs was efficient.

**(c)     Vale ADRs Traded On The New York Stock Exchange**

The third *Cammer* factor concerns the number of market makers and arbitrageurs who can react quickly to news and facilitate trading. *Cammer*, 711 F. Supp. at 1286-87. Vale's ADRs traded on the New York Stock Exchange, in which there is a single "designated market maker" that performs the function of numerous market makers on other trading markets. Tabak Rpt. ¶23. The fact that Vale ADRs traded on the NYSE is itself a strong indication that the market for the ADRs was efficient. *See In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *7 (S.D.N.Y. Sept. 29, 2015) ("[m]ost courts to consider the issue have concluded that a stock's listing on the New York Stock Exchange is a strong indication that the market for the stock is efficient."); *see also Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008) (noting that if a

security is listed on the NYSE or similar national market, the market for that security is presumed to be efficient).

In addition, arbitrage activity – the process of taking advantage of pricing discrepancies – promotes market efficiency by incentivizing investors to take advantage of such discrepancies, thereby ensuring that market prices will quickly reflect public information.  *Id*. ¶24.  Dr. Tabak examined two types of arbitrageurs:  long and short. He found that both long and short arbitrageurs changed their positions throughout the Class Period, supporting efficiency of the market for Vale ADRs.  *Id.* ¶¶27-28.

### (d)   Vale Was Eligible To File<br>Form F-3 Registration Statements

Eligibility to file a Form S-3 registration statement with the Securities and Exchange Commission ("SEC") is "an important factor weighing in favor of a finding that a market is efficient," *China MediaExpress,* 38 F. Supp. 3d at 431 (quoting *Cammer*, 711 F. Supp. at 1285), because S-3 status is "predicated on the Commission's belief that the market operates efficiently for these companies."  SEC Securities Act Release No. 6331 (Aug. 13, 1981).  A Form F-3 is the equivalent of a Form S-3 for foreign companies.  *Petrobras*, 312 F.R.D. at 365.  A company is eligible to file an S-3 (domestic) or F-3 (foreign) if it has timely filed required SEC reports for three years and has a "float" of at least $75 million.  *See* 17 C.F.R. § 239.13.  "The ability to file this form indicates that the company is easily able to issue new securities."  *Winstar*, 290 F.R.D. at 447.  Vale satisfied the conditions for F-3 registration eligibility throughout the Class Period. Tabak Rpt. ¶¶29-30.

### (e)   Vale's ADR Prices Reacted To New<br>Company-Specific Information During The Class Period

The fifth *Cammer* factor, evidence of a cause-and-effect relationship between unexpected company news and resulting stock price movement, is "one of the most convincing ways to

demonstrate efficiency." *Cammer*, 711 F. Supp. at 1291.   As detailed in his expert report, Dr. Tabak conducted statistical analyses using event studies to measure how the price of Vale ADRs reacted to material, new unexpected Company-specific information.   Tabak Rpt. ¶¶31-45.

Dr. Tabak's event study first measured the movement in the price of Vale ADRs after removing the influence of general market or industry effects.   ¶32.   He then compared the remaining price movements to a "control period" of similar market-adjusted price movements to determine if they were "unusual" or statistically significant.   *Id.*   Evidence of statistically significant price movements in response to material, Company-specific new information supports an inference that the market for the Company's securities is efficient.   *Id.*

Here, Dr. Tabak examined price movements of Vale ADRs on two sets of dates:  those with news and those without news.   *Id.* ¶33.   As there are various ways to define news, for sake of robustness, Dr. Tabak defined a news day as any day in which Vale had an earnings release or in which Vale was mentioned in either a headline or lead paragraph on the Dow Jones Newswires. *Id.* ¶35.   He compared the results of those analyses to determine whether the price of Vale ADRs was more likely to exhibit a statistically significant response on days with news than days without news.   *Id.* ¶36.   Several courts have endorsed this type of analysis.   *See, e.g., ChinaMedia Express,* 38 F. Supp. 3d at 433; *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (citing with affirmation a paper co-authored by Dr. Tabak on this methodology).

Dr. Tabak found that the prices of both Vale common and preferred ADRs were far more likely to exhibit a statistically significant response on days with new, unexpected news.   *Id.* ¶38. For example, on days where Vale announced earnings results, both common and preferred ADR prices were three times as likely to exhibit a statistically significant return as on non-news days. *Id.*   Dr. Tabak further found that the absolute value of Vale's market-adjusted ADR price

movements was greater on news days than on non-news days. *Id.* ¶39. This analysis shows that Vale's ADR prices responded to new information during the Class Period and supports a finding of market efficiency. *See Petrobras*, 862 F.3d at 278 ("'[a]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship.'"); *China MediaExpress*, 38 F. Supp. 3d at 433; *Billhofer*, 281 F.R.D. at 162-63; *JPMorgan*, 2015 WL 10433433, at *6.

### (f)        The *Krogman* Factors Further Support Market Efficiency

The court in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001), identified three additional factors relevant to determining market efficiency: (1) the company's market capitalization; (2) the bid-ask spread for stock sales; and (3) the public float. Courts in this Circuit utilize the *Krogman* factors as well as the *Cammer* factors in assessing market efficiency. *See Petrobras*, 862 F.3d at 276 (noting that courts commonly include the three additional *Krogman* factors). Each of these factors supports the conclusion that Vale ADRs traded in an efficient market.

*Market Capitalization*[6] – The market capitalization for Vale common ADRs during the Class Period ranged from a high of $10.9 billion to a low of $3.02 billion, while the market capitalization for the preferred ADRs ranged from $7.9 billion to $1.96 billion. Tabak Rpt., Exs. 7a & 7b. This large market capitalization provided opportunities for investors to earn large profits from any apparent mispricing, and gave investors strong incentive to scrutinize Vale news and information. Those incentives fostered the efficiency of the market for Vale ADRs. *Id.*; *see*

---

[6] Market capitalization is viewed as an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations, and larger companies tend to be more prominent, well-known, and closely followed. *See Krogman*, 202 F.R.D. at 478; Tabak Rpt. ¶47.

*China MediaExpress*, 38 F. Supp. 3d at 433 (market capitalization of $585 million supported market efficiency).

*Bid-Ask Spread*[7] – A narrow bid-ask spread is a potential indicator of market efficiency because it indicates a lower cost of arbitrage. Tabak Rpt. ¶48. The average bid-ask spread over the Class Period was 0.14% for Vale common ADRs and 0.17% for Vale preferred ADRs. *Id.* ¶49. Thus, an arbitrageur would have an incentive to trade in Vale ADRs so long as it felt that they were mispriced by as little as 0.17%. These low numbers support a finding of market efficiency because investors would have a strong incentive to trade on any degree of mispricing, thereby leading to the ADRs trading efficiently. *Id.*

*Public Float*[8] – Courts have noted that a large public float is an indicator of efficiency of the market for a company's stock. Here, there is no evidence that insiders held any of Vale's ADRs. Tabak Rpt. ¶50. The fact that the public held 100% of the common and preferred ADRs during the Class Period is another indicator of the efficiency of the market for Vale ADRs. *See China MediaExpress*, 38 F. Supp. 3d at 433 (finding insider holdings between 57% and 69% of the total shares outstanding to be consistent with market efficiency).[9]

---

[7] The bid-ask spread is the difference between the prices at which investors are willing to buy shares and current stockholders are willing to sell, with a low bid-ask spread indicating a more efficient market. *See Krogman*, 202 F.R.D. at 478; Tabak Rpt. ¶¶48-49.

[8] A stock's public float is the percentage of shares outstanding held by the public rather than insiders and affiliated corporate entities. A higher float indicates greater market efficiency. *See Krogman*, 202 F.R.D. at 478; Tabak Rpt. ¶50.

[9] Another factor some courts consider in assessing market efficiency is whether the security exhibits autocorrelation. Autocorrelation is a statistical property testing whether and to what degree a future price movement can be systematically predicted with a reasonable degree of statistical certainty based solely on observed historical price movement. In other words, can tomorrow's price reliably be predicted based solely on today's return? *Billhofer*, 281 F.R.D. at 160. Using two types of tests of autocorrelation, Dr. Tabak found no statistically significant degree of autocorrelation during the Class Period for either the common or preferred ADRs. *Id.* ¶¶51-56. The lack of autocorrelation further supports the efficiency of the market for Vale ADRs. *See In re Gaming Lottery Sec. Litig.*, 2001 WL 204219, at *17 (S.D.N.Y. Mar. 1, 2001) (market efficiency supported by fact that stock "did not exhibit autocorrelation").

### 2.    Reliance Is Also Presumed Under *Affiliated Ute*

In *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), the Supreme Court held that reliance is presumed where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992). In such circumstances, individual reliance need not be proven. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131.

Here, Plaintiffs' claims are based, at least in part, on Defendants' omissions of material information concerning, among other things, (1) the condition of the Fundão Dam and warnings they had received about that condition, (2) Vale's use of and responsibility for maintaining the Fundão Dam, and (3) Vale's reliance on the Fundão Dam for its nearby mining operations and its contribution to the deteriorating condition of the Dam that led to its catastrophic collapse. *See Parmalat*, 2008 WL 3895539, at *8 (applying *Affiliated Ute* presumption where defendants "fail[ed] to disclose material facts that made the reporting of certain information and transactions, although perhaps not deceptive in themselves, otherwise misleading"); *Fogarazzo*, 263 F.R.D. at 106 (applying *Affiliated Ute* presumption to claim premised on representations and omissions).

### 3.    Damages Will Be Calculated Using A Common Methodology That Is Consistent With The Class-Wide Theory Of Liability

Courts routinely find that damages issues in securities cases are common to all class members because they can be calculated on a class-wide basis using an event study that measures the price impact of company-specific information alleged to be a corrective disclosure. *See In re Barrack Gold Sec. Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016) (finding that damages issues did not defeat predominance because calculation of damages called for the application of a damages model across the entire class); *Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014) (fact

that class members who purchased and sold at different times would be entitled to different recoveries does not defeat predominance because "[p]laintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis."); *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012) (Common issues predominate even though calculation of each class member's damages will be somewhat individualized because both the methodology and evidence used to calculate damages will be common to the class).

Here, damages can be readily calculated on a Class-wide basis. Tabak Rpt. ¶¶59-64. Using a well-accepted event study, the artificial inflation can be measured on a Class-wide basis by analyzing the change in the stock price caused by a corrective disclosure. *Id.* ¶61. Once the levels of price inflation have been calculated throughout the Class Period, a Class Member's actual trading activity in the security can be used to mechanically calculate damages on an individual basis. This methodology is consistent with the class-wide theory of liability and allows for measurement of damages on a class-wide basis. *See Wallace*, 302 F.R.D. at 318 ("Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability, thus meeting the requirements of Comcast[.]").

### 4.     A Class Action Is The Best Method For The Fair And Efficient Adjudication Of This Case

"Securities suits easily satisfy the Superiority Requirement of Rule 23(b)(3) because 'the alternatives are either no recourse for thousands of stockholders' or 'a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'" *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015) (quoting *Green*, 406 F.2d at 301). Rule 23(b)(3) identifies four factors pertinent to determining whether a class action is

superior to other methods of adjudication: (1) the interests of members of the class in "individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3).  Here, each of these factors demonstrates that a class action is the superior method to adjudicate the Class's claims.

First, Lead Plaintiffs seek to represent a Class consisting of a large number of geographically dispersed Vale ADR purchasers whose individual damages are likely small enough to render individual litigation prohibitively expensive.  Given these circumstances, the Class Members have little interest in asserting separate claims. *See Lapin*, 254 F.R.D. at 187 (Here, the "number of potential plaintiffs [is] high, but the amount of potential recovery per plaintiff [is] not so high as to ensure that each plaintiff could or would bring an action individually.").  Second, there are no other actions involving the same controversy brought by or against Class Members that have not already been consolidated in this Action.  Third, concentrating this litigation in a single forum has numerous benefits, including eliminating the risk of inconsistent adjudications and promoting the fair and efficient use of the judicial system.  Multiple lawsuits, on the other hand, would be costly and inefficient. *See id.*  Finally, managing this case as a class action presents no unusual difficulties that would preclude certification. Indeed, litigating each claim separately would be wasteful and effectively preclude numerous investors from obtaining redress. *See In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008).

IV.     __CONCLUSION__

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court (a) certify the

Action as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(3); (2) appoint Lead

Plaintiffs as Class Representatives; and (3) appoint BLB&G as Class Counsel.

Dated:  September 15, 2017                          Respectfully submitted,

                                                   BERNSTEIN LITOWITZ BERGER
                                                     & GROSSMANN LLP

                                                   */s/ Timothy A. DeLange*

                                                   Blair A. Nicholas (*Pro hac vice*)
                                                   Timothy A. DeLange (*Pro hac vice*)
                                                   Richard D. Gluck (*Pro hac vice*)
                                                   Jenny E. Barbosa (*Pro hac vice*)
                                                   Robert S. Trisotto
                                                   12481 High Bluff Drive, Suite 300
                                                   San Diego, CA 92130
                                                   Telephone: (858) 793-0070
                                                   Facsimile: (858) 793-0323

                                                        -and-

                                                   Gerald H. Silk
                                                   Avi Josefson
                                                   BERNSTEIN LITOWITZ BERGER
                                                     & GROSSMANN LLP
                                                   1251 Avenue of the Americas, 44th Fl.
                                                   New York, NY 10020
                                                   Telephone: (212) 554-1400
                                                   Facsimile: (212) 554-1444
                                                   jerry@blbglaw.com
                                                   avi@blbglaw.com

                                                   *Counsel for Lead Plaintiffs Alameda County
                                                   Employees' Retirement Association and
                                                   Orange County Employees Retirement
                                                   System and Lead Counsel for the Class*