UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Vale S.A. Securities Litigation | Case No. 15 Civ. 09539 (GHW)<br><br>Consolidated with Case No. 16 Civ. 00658 (GHW)<br><br>CLASS ACTION |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND
APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP

Blair A. Nicholas (*Pro hac vice*)
Timothy A. DeLange (*Pro hac vice*)
Richard D. Gluck (*Pro hac vice*)
Jenny E. Barbosa (*Pro hac vice*)
Robert S. Trisotto
12481 High Bluff Drive, Suite 300
San Diego, CA 92130

     -and-

Gerald H. Silk
Avi Josefson
BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
1251 Avenue of the Americas, 44th Fl.
New York, NY 10020

*Counsel for Lead Plaintiffs Alameda County Employees' Retirement Association and Orange County Employees Retirement System and Lead Counsel for the Class*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

I. INTRODUCTION ........................................................................................................... 1

II. THE ACTION SATISFIES THE REQUIREMENTS OF RULE 23(a) ............................ 2

    A. Lead Plaintiffs Meet The Adequacy And Typicality Requirements ....................... 2

    B. Defendants' False Statements Present A Common Question ................................ 6

III. THE ACTION SATISFIES THE REQUIREMENTS OF RULE 23(b)(3) ........................ 7

    A. The *Basic* Presumption Of Reliance Applies .......................................................... 7

    B. Damages Can And Will Be Calculated Using A Common Methodology ................................................................................................. 9

# **TABLE OF AUTHORITIES**

**Case(s)**                                                                  **Page(s)**

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) .................................................................................4, 7

*Amgen, Inc. v. Conn. Ret. Plan & Tr. Funds*,
    568 U.S. 455 (2013) ......................................................................................................5, 6

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (2016) .......................................................................................................10

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ........................................................................................................10

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ............................................................................................................2

*In re Countrywide Fin. Corp. Sec. Litig.*,
    273 F.R.D. 586 (C.D. Cal. 2009) ....................................................................................10

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ..............................................................................................3

*In re Digital Music Antitrust Litig.*,
    2017 WL 3037577 (S.D.N.Y. July 18, 2017) ...................................................................3

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    312 F.R.D. 332 (S.D.N.Y. 2015) ......................................................................................4

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    245 F.R.D. 147 (S.D.N.Y. 2007) ......................................................................................7

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) ..................................................................................................1, 8

*In re J.P. Morgan Stable Value Fund ERISA Litig.*,
    2017 WL 1273963 (S.D.N.Y. Mar. 31, 2017) ..................................................................4

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ................................................................................6

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) ......................................................................................5

*Nicholas v. Poughkeepsie Savings Bank/FSB*,
    1990 WL 145154 (S.D.N.Y. Sept. 27, 1990) ...................................................................4

*In re Petrobras Sec. Litig.*,
  312 F.R.D. 354 (S.D.N.Y. 2016) ...........................................................................................3, 9

*In re Petrobras Sec. Litig.*,
  862 F. 3d 250 (2d Cir. 2017) ..................................................................................................1, 8

*In re Pfizer Inc. Sec. Litig.*,
  282 F.R.D. 38 (S.D.N.Y. 2012) .............................................................................................5, 6

*Pub. Emps' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
  277 F.R.D. 97 (S.D.N.Y. 2011) ................................................................................................7

*Robbins v. Moore Med. Corp.*,
  788 F. Supp. 179 (S.D.N.Y. 1992) ............................................................................................3

*In re Vivendi Universal, S.A. Sec. Litig.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) .............................................................................................2, 3

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) .......................................................................................5

*Waggoner v. Barclays PLC*,
  --- F.3d ----, 2017 WL 5077355 (2d Cir. Nov. 6, 2017) ................................................ *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................................................6, 7

*In re WorldCom, Inc. Sec. Litig.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) .............................................................................................10

I.  **INTRODUCTION**

Lead Plaintiffs' opening brief demonstrates that this case is perfectly suited for class treatment.  Lead Plaintiffs, who have litigated this case for almost two years, are adequate representatives, have interests aligned with the Class, raise numerous questions common to the Class, and traded Vale ADRs in efficient markets.  The Second Circuit has routinely, and recently, affirmed certification of securities-fraud class actions in circumstances like those presented here. *See, e.g., Waggoner v. Barclays PLC*, --- F.3d ----, 2017 WL 5077355 (2d Cir. Nov. 6, 2017); *In re Petrobras Sec. Litig.*, 862 F. 3d 250 (2d Cir. 2017).

Defendants' opposition attempts to raise fact-intensive and premature merits issues such as falsity, materiality, and loss causation.  Defendants' contentions fail.  Principally, Defendants attempt to rewrite Lead Plaintiffs' Complaint in an effort to create an artificial (and theoretical) conflict between Lead Plaintiffs and absent class members and to suggest that no common issues exist.  But this is a single fraud, centered on false statements regarding Vale's plans, policies, and procedures in place to ensure the safety of its tailings facilities, and Vale's ultimate financial responsibility following the catastrophic collapse of the Fundão Dam.  The facts and legal issues are inherently interwoven and Lead Plaintiffs' claims, and those of absent class members, will be proven with common evidence.

The market for Vale ADRs was efficient throughout the Class Period and, accordingly, the fraud-on-the-market presumption of reliance applies.  Defendants' expert Dr. Torous conducted no independent analysis, performed no "event study," and utterly fails to rebut the presumption with a preponderance of the evidence.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) ("*Halliburton II*").  Defendants concede that nine of the ten relevant factors that Lead Plaintiffs' expert Dr. Tabak analyzed support market efficiency.  Defendants challenge only Dr. Tabak's analysis of *Cammer* factor 5, the extent to which Vale ADR prices reacted to

new material information. Not only are Defendants wrong, but the Second Circuit recently held that "direct evidence of price impact under *Cammer* 5 is not always necessary to establish market efficiency" when the other factors overwhelmingly demonstrate efficiency. *Barclays*, 2017 WL 5077355, at *12.

Finally, Lead Plaintiffs' class-wide damages model complies with *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Specifically, Dr. Tabak's class-wide model is consistent with Lead Plaintiffs' theory of liability and will measure only damages resulting from Defendants' alleged false statements using event studies to isolate price movements in Vale ADRs on the dates of alleged corrective disclosures to determine the inflation Defendants' false statements caused. Tabak Rpt. ¶59. This methodology is virtually identical to methodologies the Second Circuit and courts in this District have repeatedly approved at the class certification stage. *See Barclays*, 2017 WL 5077355, at *19.

## II. THE ACTION SATISFIES THE REQUIREMENTS OF RULE 23(a)

### A. Lead Plaintiffs Meet The Adequacy And Typicality Requirements

Lead Plaintiffs established that their claims are typical of absent class members. *See* Mem. 9-10. Defendants' contention (Opp. 7) that Lead Plaintiffs are atypical because they did not purchase Vale ADRs between the Fundão Dam's collapse and the end of the Class Period is wrong. *See In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 87 (S.D.N.Y. 2007) (typicality satisfied even though class representative did not purchase shares after each false statement and through the end of the class period). OCERS continued to hold both Common and Preferred ADRs, and ACERA continued to hold Preferred ADRs, following the collapse of the Fundão Dam

and through the final alleged disclosure.[1]  Thus, both Lead Plaintiffs suffered significant losses following each of the alleged corrective disclosures.

Lead Plaintiffs' opening brief further demonstrated that their interests are directly aligned with those of absent class members.  In opposition, Defendants attempt to manufacture conflicts between Lead Plaintiffs and absent class members.  But those theoretical conflicts are not the type of "fundamental" conflicts that defeat class certification.  *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) ("[a] conflict or potential conflict alone will not … necessarily defeat class certification – the conflict must be 'fundamental.'"); *In re Digital Music Antitrust Litig.*, 2017 WL 3037577, at *18 (S.D.N.Y. July 18, 2017) (conflict must be fundamental; "speculative conflict should be disregarded at the class certification stage.").

Defendants suggest (without any authority) that Lead Plaintiffs have a conflict with absent class members because they did not transact in Vale ADRs after the last false statement.  Opp. 9.  Courts repeatedly reject this argument.  *See Vivendi*, 242 F.R.D. at 87 (class representative who purchased stock prior to subsequent false statements can represent subsequent purchasers because "plaintiffs allege that their losses were the result of a sustained course of conduct that propped up defendant's stock price throughout the class period."); *Robbins v. Moore Med. Corp.*, 788 F. Supp. 179, 187 (S.D.N.Y. 1992) ("courts have ruled that class representatives are entitled to assert § 10(b) claims arising from statements made both before and after the purchase date if the

---

[1] Defendants argue that ACERA cannot serve as a class representative for investors in Vale Common ADRs because it sold its position before the first corrective disclosure.  But the law is clear that holders of one type of security may represent holders of other securities if the same alleged misconduct drives the claims.  *See In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 361 (S.D.N.Y. 2016), *aff'd in part vacated in part*, 862 F.3d 250 (2d Cir. 2017) ("Because the same alleged misconduct drives plaintiffs' claims, regardless of whether they arise from purchases of Notes, common ADS, or preferred ADS, the interests of all members of the Exchange Act Class are aligned.").  Here, not only does the same misconduct drive Plaintiffs' claims, but Vale Preferred and Common ADRs responded in similar patterns to publicly available information.  *See* Tabak Rbtl. ¶57.

statements allegedly were made in the furtherance of a common scheme to defraud.") (citing *Nicholas v. Poughkeepsie Savings Bank/FSB*, 1990 WL 145154, at *5 (S.D.N.Y. Sept. 27, 1990)).

According to Defendants' "theory," Lead Plaintiffs may seek to maximize the price inflation attributable to the earlier misstatements because they did not purchase following Defendant Pires' misstatements on November 16. This theoretical conflict, inherent in any case involving multiple false statements and corrective disclosures, is not a fundamental conflict that defeats class certification. *See In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2017 WL 1273963, at *10 (S.D.N.Y. Mar. 31, 2017) (rejecting argument that class representation inadequate because intra-class conflicts exist regarding the periods that optimize alleged damages); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 277 (S.D.N.Y. 2008) (putative intra-class conflicts over the timing of purchases and potential motivation to argue that "the securities were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class certification"); *see also In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 344 (S.D.N.Y. 2015) (conflict speculative where defendant argued that plaintiffs' "interests are antagonistic because some purchased shares before May 18 media reports about Facebook's revised revenue projections, and some after.").

Lastly, Defendants erroneously contend that Lead Plaintiffs are inadequate because their investment advisor's personal views supposedly refute their legal theories. First, Defendants are factually wrong. The advisor's views – reflected in three cherry-picked reports – either support or have nothing to do with any of the claims in this action. The advisor did not, as Defendants misleadingly contend, opine that Vale would not be held responsible for the collapse. Rather, the report parrots Pires' false statement: "**Vale foresees no liability to themselves in regards to the accident.** Vale and BHP have never been directly involved in Samarco's operations; condition

imposed by the European Commission to approve Vale buying into Samarco back in 2001." Joralemon Decl., Ex. 9 at 6873.

Nor does the advisor opine on the causes of the large drops in Vale ADR prices following the alleged corrective disclosures. Rather, the advisor provides broad views on the overall performance of Vale ADRs during 2014 and 2015. But the relevant question is what caused the significant price declines on the corrective disclosure dates, not the overall class-period performance. Moreover, securities' prices can decline for more than one reason. Thus, Defendants' implicit assumption that the advisor's cited reason for the overall class-period price declines somehow precludes any additional reasons is baseless. Indeed, in discussing the ADRs' performance, the advisor specifically noted that the Fundão Dam collapse was "unhelpful," consistent with Lead Plaintiffs' case. That the advisor continued to believe that Vale ADRs were a good investment likewise has no bearing on Lead Plaintiffs' adequacy. *See In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 488 (S.D.N.Y. 2011) (rejecting argument that plaintiff was inadequate class representative because it purchased shares after the fraud was revealed).

Finally, challenges to loss causation are inappropriate at the class certification stage because such challenges pose common questions applicable to all class members. *See Amgen, Inc. v. Conn. Ret. Plan & Tr. Funds*, 568 U.S. 455, 475 (2013) (loss causation "need not be adjudicated before a class is certified."). Ultimately, loss causation will be determined through expert analysis of the market reaction to news, not on the subjective belief of any single analyst. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011) (loss causation is proven "by the reaction of the market to a 'corrective disclosure' which reveals a prior misleading statement"). The advisor's subjective beliefs therefore do not create a defense unique to Lead Plaintiffs that will threaten to become the focus of the litigation. *See In re Pfizer Inc. Sec. Litig.*,

282 F.R.D. 38, 45 (S.D.N.Y. 2012) (subjective beliefs of plaintiffs' investment advisors did not raise unique defense that threatened to become focus of litigation).

### B.  Defendants' False Statements Present A Common Question

Lead Plaintiffs' opening brief sets forth at least five common questions of law and fact. Mem. 8-9. Defendants do not dispute that common questions exist as to four of the five questions. This alone satisfies commonality. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("for purposes of Rule 23(a)(2), '[e]ven a single [common] question' will do.) Defendants nonetheless argue that the question of whether their statements were false is not a common question. Defendants are wrong. The falsity of Defendants' statements is a quintessentially common question. *See Amgen*, 568 U.S. at 475 ("This Court has held that … the falsity or misleading nature of the defendant's alleged statements or omissions [is a] common question[]."); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014) ("Where plaintiffs allege that class members have been injured by similar material misrepresentations and omissions, the Commonality Requirement is satisfied.").

Defendants' unfounded speculation that whether their statements were false and misleading may not lead to common answers is based on the flawed premise that Lead Plaintiffs allege two distinct, conflicting theories. Not so. Defendants' statements that Vale had plans, policies and procedures in place to ensure the safety of its tailings facilities, and did not share resources and systems with Samarco, were part of a common scheme to mislead investors and will be proven false using common evidence that will generate common answers. Specifically, falsity will be proven through such common evidence as Vale's knowledge of and disregard for the severe structural and drainage problems plaguing the Dam (Compl. ¶¶75-83), Vale's failure to implement an emergency action plan (*id.* ¶¶71-74), Vale's contractual obligations to share in the construction and maintenance of the Dam (*id.* ¶52), and Vale's use of the Dam to transport and store wastes

-6-

from its mining operations in Minas Gerais (*id.* ¶48). Thus, even under Defendants' misguided theory of the case, courts still find common questions exist. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 158 (S.D.N.Y. 2007) (commonality satisfied where plaintiff asserted two separate causes of action based upon separate and distinct categories of false statements); *Alstom*, 253 F.R.D. at 275-76 (commonality satisfied where two separate frauds alleged because they shared numerous common factual and legal questions).

*Wal-Mart,* a discrimination case and the only one Defendants cite, has "little to no bearing" here. *See Pub. Emps' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 106 (S.D.N.Y. 2011). There, Wal-Mart had a corporate policy of giving discretion to local supervisors over employment decisions. *Wal-Mart*, 564 U.S. at 355. The Supreme Court concluded that this was "the opposite of a uniform employment practice that would provide the commonality needed for a class action; it [wa]s a policy *against having* uniform employment practices." *Id.* (emphasis in original).

### III.    THE ACTION SATISFIES THE REQUIREMENTS OF RULE 23(b)(3)

#### A.    The *Basic* Presumption Of Reliance Applies

Dr. Tabak analyzed ten factors courts within this District employ to analyze market efficiency. All ten strongly support market efficiency for Vale ADRs. Tabak Rpt. ¶58. Defendants do not challenge Dr. Tabak's conclusions for nine of the ten factors. Standing alone, this is sufficient to meet Lead Plaintiffs' burden. *See Barclays*, 2017 WL 5077355, at *19 (unnecessary to reach a conclusion on *Cammer* factor 5 because all of the other factors weigh so clearly in favor of market efficiency that defendants did not even challenge them).

Nevertheless, Dr. Tabak performed an event study and found that Vale ADRs reacted to new material information, thereby supporting market efficiency under *Cammer* 5. Defendants offer no contrary evidence. Dr. Torous did not perform an event study or conduct his own analysis

of *Cammer* 5, offers no alternative results, and does not opine that the market for Vale ADRs was inefficient. Defendants utterly fail to rebut the presumption of reliance by a preponderance of the evidence, as they are required to do. *See id.* at *18; *Halliburton II*, 134 S. Ct. at 2408.

Dr. Torous levels three criticisms towards Dr. Tabak's event study, none of which have merit. *See* Tabak Rbtl. ¶¶8-21. First, Dr. Torous faults Dr. Tabak for failing to evaluate the directionality of the excess returns. Torous Rpt. ¶25. But the Second Circuit recently held that *Cammer* factor 5 does not require such "directional" evidence. *See Petrobras*, 862 F. 3d at 277-78. Such evidence entails inherent subjectivity in classifying news as either positive or negative. Tabak Rbtl. ¶9. For example, if a company announces lower earnings for the current quarter, but higher guidance for the future, one must make a subjective determination as to whether that news is positive or negative. *Id.* (quoting transcript of Dr. Tabak).

Second, Dr. Torous suggests Dr. Tabak's event study is flawed because it does not control for industry-specific factors. Torous Rpt. ¶28. Dr. Torous is wrong. Not accounting for industry-specific factors actually biased the test ***against*** market efficiency and strengthens Dr. Tabak's conclusions. Tabak Rbtl. ¶14. Moreover, Vale is one of the largest metals and mining companies in the world and may have some degree of power to influence prices in commodities markets. Thus, if Vale announced a reduction in output to increase iron prices, the result would increase prices for all iron ore producing companies, raising their stock prices and the level of a particular index, thereby muting or even potentially eliminating any measured "industry-adjusted" price gain in Vale ADRs even though those gains were in response to Vale-specific news.

Finally, Dr. Torous suggests that Dr. Tabak's failure to consider the heightened volatility of Vale ADR prices during the Class Period *may* lead to finding a greater number of days with statistically significant excess returns. Torous Rpt. ¶31. Critically, Dr. Torous did not perform

any such analysis and offers no opinion on whether or not it actually does. Regardless, because heightened volatility occurs on both news days and non-news days, the "noise" spreads out the distribution of price movements (potentially leading to more statistically significant price movements on both news days and non-news days), making it harder to distinguish the two statistically. Tabak Rbtl. ¶18. In other words, the additional "noise" Dr. Torous references actually made it more difficult for the statistical analysis to distinguish between news days and non-news days and to provide evidence in favor of market efficiency. That Dr. Tabak's analysis overcame those difficulties provides even more compelling evidence for his conclusions. *Id.* ¶19.

### B. Damages Can And Will Be Calculated Using A Common Methodology

Dr. Tabak's damages methodology is consistent with Lead Plaintiffs' theory of liability and would calculate only the harm Defendants' false statements caused using event studies (one for Common ADRs and one for Preferred ADRs, *see* Tabak Rbtl. ¶62) to isolate price movements in Vale ADRs on the dates of alleged corrective disclosures, controlling for market and industry-specific effects, and disaggregating confounding news unrelated to the allegations in the Complaint. Tabak Rpt. ¶¶61-63. Dr. Tabak further explains that his model can account for potential different findings on the probability of the Dam collapsing. *Id.* ¶63. This methodology would then be applied to each class member's transactions to calculate individual damages. *Id.* ¶61. Lead Plaintiffs' damages model complies with *Comcast* and is virtually identical to one the Second Circuit recently endorsed. *See Barclays*, 2017 WL 5077355, at *19.

In their opposition, Defendants raise several factual challenges to certain aspects of Dr. Tabak's methodology and complain that he has not actually calculated damages. Such complaints are easily rejected at this stage. *See Petrobras*, 312 F.R.D. at 372 ("It is not necessary, however, to resolve the detailed disputes over plaintiffs' damages model at the class certification stage. Indeed, plaintiffs do not even have a burden to produce a classwide damages model at this time.").

First, Defendants again improperly attempt to rewrite Lead Plaintiffs' Complaint by complaining that Dr. Tabak's model fails to differentiate the supposedly two distinct theories of alleged misrepresentations. This challenge is easily rejected, as this was a single orchestrated fraud to conceal the condition and safety of Vale's tailings facilities, which included the Fundão Dam, and Vale's responsibility for such failures.[2] That Defendants will present an alternate theory does not mean that individualized issues will predominate or that Dr. Tabak's model is inconsistent with Lead Plaintiffs' theory.

As detailed in Dr. Tabak's rebuttal report, the remaining criticisms of his methodology are likewise easily refuted. In/out investors will be treated the same as any other investors through application of the class-wide inflation measure to their actual transactions. Tabak Rbtl. ¶55. "Passive investors" were similarly harmed by purchasing Vale ADRs at prices inflated by Defendants' false statements. That is the premise behind the *Basic* presumption. *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price."); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 281 (S.D.N.Y. 2003) (index purchases rely on market price); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 602 (C.D. Cal. 2009) (same). *See also* Tabak Rbtl. ¶¶43-48. And there is no need to account for any supposed differences in investor risk tolerances because Dr. Tabak's model uses an out-of-pocket damages measure, not a materialization-of the risk theory. *See id.* ¶¶35-42; *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105-06 (2016) (out-of-pocket damages theory did not create individualized damages issues that defeat predominance).

---

[2] The suggestion that Defendant Pires' false statement was an "Antitrust Response" is preposterous. The entire purpose of the November 16, 2015 conference call was to publicly address the Dam collapse and answer analysts' questions about the extent of Vale's responsibility. *See* Joralemon Decl., Ex. 3.

Dated:  November 17, 2017

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP

*/s/ Timothy A. DeLange*

Blair A. Nicholas (*Pro hac vice*)
Timothy A. DeLange (*Pro hac vice*)
Richard D. Gluck (*Pro hac vice)*
Jenny E. Barbosa (*Pro hac vice)*
Robert S. Trisotto
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323
blairn@blbglaw.com
timothyd@blbglaw.com
rich.gluck@blbglaw.com
jenny.barbosa@blbglaw.com
robert.trisotto@blbglaw.com

-and-

Gerald H. Silk
Avi Josefson
BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
1251 Avenue of the Americas, 44th Fl.
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Lead Plaintiffs Alameda County Employees' Retirement Association and Orange County Employees Retirement System and Lead Counsel for the Class*