**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
                                 :

In re Vale S.A. Securities Litigation     :
                                 :   No. 15 Civ. 9539 (GHW)
                                 :
                                 :   **<u>ORAL ARGUMENT REQUESTED</u>**
                                 :
                                 :
--------------------------------------------------------x

 

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION**
**TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND**
**<u>APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL</u>**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

DISCUSSION ........................................................................................................................... 4

I.    LEAD PLAINTIFFS CANNOT SATISFY RULE 23(A)'S COMMONALITY,
      TYPICALITY, AND ADEQUACY REQUIREMENTS ................................................. 5

      A.    A Classwide Proceeding Would Not Generate Common Answers
            Apt to Drive Resolution of this Litigation ................................................ 5

      B.    Lead Plaintiffs are Not "Typical" Members of the Class They
            Purport to Represent ................................................................................ 7

      C.    Lead Plaintiffs Cannot Adequately Represent the Proposed Class ........... 8

II.   THE PROPOSED CLASS DOES NOT SATISFY THE PREDOMINANCE
      REQUIREMENTS OF RULE 23(B) ............................................................................ 13

      A.    Lead Plaintiffs Are Not Entitled to the *Basic* Presumption of
            Reliance ................................................................................................... 13

      B.    Lead Plaintiffs Are Not Entitled to a Presumption of Reliance
            Under *Affiliated Ute* ............................................................................... 15

      C.    Lead Plaintiffs Have Failed to Establish that Damages Can Be
            Calculated on a Classwide Basis ............................................................. 15

CONCLUSION ...................................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Affiliated Ute Citizens of Utah v. U. S.*,
  406 U.S. 128 (1972)......................................................................................15

*Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*,
  222 F.3d 52 (2d Cir. 2000)............................................................................9

*In re Barclays Liquidity Cross and High Frequency Trading Litig.*,
  126 F. Supp. 3d 342 (S.D.N.Y. 2015).........................................................15

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)......................................................................................13

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)......................................................................................4

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ...............................................................14

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013).......................................................................4, 13, 15, 16

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013).........................................................................................4

*Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co., Inc.*,
  800 F.2d 177 (7th Cir. 1986) ......................................................................12

*Cuevas v. Citizens Fin. Grp., Inc.*,
  526 F. App'x 19 (2d Cir. 2013) ....................................................................5

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)............................................................................8

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176 (2d Cir. 1990)..........................................................................7

*Gen. Telephone Co. of Southwest v. Falcon*,
  457 U.S. 147 (1982)......................................................................................5

*George v. China Automotive Sys., Inc.*,
    2013 WL 3357170 (S.D.N.Y. July 3, 2013) ....................................................................9

*Hom v. Vale, S.A.*,
    2006 WL 880201 (S.D.N.Y. Mar. 7, 2016) (Woods, J.) ...........................................10

*In re Lehman Bros. Sec. and ERISA Litig.*,
    2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013) .........................................................15

*Levitt v. J.P. Morgan Sec., Inc.*,
    710 F.3d 454 (2d Cir. 2013).......................................................................................5

*Loritz v. Exide Technologies*,
    2015 WL 6790247 (C.D. Cal. July 21, 2015) ...........................................................7

*Microsoft Corp. v. Baker*,
    137 S. Ct. 1702 (2017) ...............................................................................................7

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) ..............................................................8, 9, 12, 13

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017)........................................................................................4

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ...........................................................................15, 16

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013)........................................................................................4

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...........................................................................................4, 5, 6

**Other Authorities**

David Tabak, *Implications for Market Efficiency and Damages Analyses of
    Plaintiff Interpretations of Halliburton II's Statement That "Market Efficiency
    Is A Matter of Degree,"* 46 Loy. U. Chi. L.J. 467, 479–80 (2015) ...........................9

**Rules**

Fed. R. Civ. P. 23(a)(4)...................................................................................................8

Fed. R. Civ. P. 23(b) ...............................................................................................4, 13

Defendants Vale S.A. ("Vale" or the "Company"), Luciano Siani Pires, and Gerd Peter Poppinga (collectively, "Defendants") respectfully submit this memorandum of law in opposition to the motion for class certification and appointment of class representatives and class counsel (the "Motion") filed by Lead Plaintiffs' Alameda County Employees' Retirement Association ("ACERA") and Orange County Employees Retirement System ("OCERS") (together, "Lead Plaintiffs'").

## PRELIMINARY STATEMENT

On March 23, 2017, the Court issued a Memorandum Opinion and Order (the "Order") (Dkt. No. 92) granting in large part Defendants' motion to dismiss Lead Plaintiffs' Consolidated Amended Class Action Complaint (the "Complaint") (Dkt. No. 58).  In rendering its ruling, the Court largely saw through Lead Plaintiffs' attempt to parlay a terrible accident at a single, non-party Brazilian dam into U.S. federal securities law claims premised on non-actionable statements involving everything from Vale's global cost-cutting efforts to the Company's guiding values to out-of-context snippets plucked from the haze of the dam's collapse.  *Id.*  The Court properly rejected every aspect of Lead Plaintiffs' case save a limited portion of their Section 10(b) claim premised on two narrow categories of alleged misstatements:

- Eight incomplete phrases concerning "risk mitigation" lifted by Lead Plaintiffs from among the 174 pages of Vale's 2013 Sustainability Report (published nearly 18 months before the dam accident) (the "Risk Mitigation Excerpts") (Ex. 2;[1] Compl. ¶ 101); and

- A single statement offered by Vale's Chief Financial Officer Luciano Siani Pires during a November 16, 2015 conference call with analysts (eleven days after the dam collapse) in response to a question about how "the relationship between Vale and BHP and Samarco" is "affected by potential anti-trust issues" (the "Antitrust Response").  Ex. 3; Compl. ¶ 108.

---

[1]  Citations to "Ex. __" are to the accompanying Declaration of Christopher M. Joralemon.

According to Lead Plaintiffs, the Risk Mitigation Excerpts, made long before the Fundão Dam accident, falsely reassured Vale's investors that Vale was properly maintaining the Fundão Dam.  *See* Compl. ¶¶ 101-02.  Thus, a fundamental premise of Lead Plaintiffs' claim based on the Risk Mitigation Excerpts is that investors—at the time such statements were published—understood and believed that Vale was responsible for the operation and maintenance of the Fundão Dam.  Of course, the initial purported "corrective disclosure" or realization of the allegedly concealed risk occurred on November 5, 2015, when the Fundão Dam collapsed, ostensibly revealing that Vale had not done enough to prevent the accident.  *See* Compl. ¶ 84; Memorandum of Law in Support of Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (Dkt. No. 113) (the "Motion") at 3-4.

The Antitrust Response, on the other hand, occurred eleven days *after* the dam collapsed. According to Lead Plaintiffs, the Antitrust Response somehow falsely assured investors that Vale was not responsible for the operation and maintenance of the Fundão Dam, and therefore would not be held accountable for the accident.  *See* Compl. ¶¶ 108-09.  The initial "corrective disclosure" for this alleged misrepresentation allegedly occurred on November 27, 2015, when Brazilian Government officials announced that they intended to bring civil charges under Brazilian law against Vale and others based on the dam accident.  *See id*. ¶ 86; Motion at 4-5.

As the foregoing alone makes clear, Lead Plaintiffs cannot satisfy the requirement of commonality necessary to certify a class under Rule 23(a) of the Federal Rules of Civil Procedure.  The questions presented here will result in different—and conflicting—answers, inapplicable to the entire class, based on different evidence and different potential remedies.  Put simply, the proposed class includes investors who, based on the alleged misstatements,

purportedly either believed—or did not believe—that Vale was responsible for the operation and maintenance of Samarco's dam.

Lead Plaintiffs' additional failures to establish the requisite typicality or adequacy under Rule 23(a) also prove fatal to their Motion.  First, Lead Plaintiffs' complete lack of any trading *at all* in Vale American Depository Receipts ("ADRs") after the dam collapse confirms that they never could be a "typical" class member who purportedly relied on the allegedly misleading Antitrust Response.  Second, Lead Plaintiff ACERA sold *all* of its Vale common ADRs over a year before any alleged corrective disclosures concerning the Risk Mitigation Excerpts, and thus they plainly are atypical as compared to any absent class member who purchased Vale common ADRs after May 8, 2014 and continued to hold those investments at the time of the dam collapse.

Lead Plaintiffs also cannot adequately represent the interests of the proposed class given several fundamental conflicts of interest.  Indeed, the views espoused by Lead Plaintiffs immediately following the proposed class period—through their shared investment manager who, at all relevant times, had absolute discretion to execute Lead Plaintiffs' transactions in Vale ADRs—directly refute the allegations advanced on behalf of the proposed class here. As discussed in detail below, Lead Plaintiffs' observations concerning Vale ADRs and the potential impact of the Fundão Dam accident in no way support the notion that Lead Plaintiffs somehow were "defrauded" by the Risk Mitigation Excerpts or the Antitrust Response.  This fatal conflict between Lead Plaintiffs and absent class members raises numerous defenses unique to Lead Plaintiffs' claims, which will be a focus of this litigation, rendering Lead Plaintiffs incapable of adequately representing the proposed class.

3

As if the foregoing were not enough to deny class certification (and it is more than enough), Lead Plaintiffs also have failed to demonstrate that questions of law or fact common to the proposed class members would predominate over any questions affecting only individual members. *See* Fed. R. Civ. P. 23(b).  In particular, Lead Plaintiffs are not entitled to a fraud-on-the-market presumption of reliance because the market for Vale ADRs was not efficient.  Also, Lead Plaintiffs have failed to establish that damages (if any) are capable of measurement on a classwide basis.

For each—or any—of the foregoing reasons, Defendants respectfully request that the Court deny Lead Plaintiffs' motion for class certification.

## DISCUSSION

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual[ly] named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)).  To take advantage of that exception, Lead Plaintiffs "must affirmatively demonstrate [their] compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores*, 564 U.S. at 350).  Lead Plaintiffs "must not only be prepared to prove that there are *in fact* sufficient numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a).  [Plaintiffs] must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.*

"To certify a class, a district court must . . . find that each [Rule 23] requirement is 'established by at least a preponderance of the evidence.'" *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013)).  "In evaluating a motion for class certification, the district court is required to make a

definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, and must resolve material factual disputes relevant to each Rule 23 requirement." *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 464–65 (2d Cir. 2013).

## I.   LEAD PLAINTIFFS CANNOT SATISFY RULE 23(A)'S COMMONALITY, TYPICALITY, AND ADEQUACY REQUIREMENTS

Rule 23(a) "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.  The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively 'limit the class claims to those fairly encompassed by the named plaintiffs' claims.'" *Wal-Mart Stores*, 564 U.S. at 349 (citing *Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)).  "The Supreme Court repeatedly has made clear that a district court must undertake a 'rigorous analysis' in determining 'that the prerequisites of Rule 23(a) have been satisfied.'" *Cuevas v. Citizens Fin. Grp., Inc.*, 526 F. App'x 19, 21 (2d Cir. 2013) (citing *Wal-Mart Stores*, 564 U.S. at 351).

### A.   A Classwide Proceeding Would Not Generate Common Answers Apt to Drive Resolution of this Litigation

While Rule 23(a)(2) requires the existence of "questions of law or fact common to the class," the Supreme Court has cautioned that "[w]hat matters to class certification . . . is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart Stores*, 564 U.S. at 350.

Here, there is no commonality, as central questions raised by the alleged claims undoubtedly will yield conflicting answers that will inhibit, not facilitate, resolution of this case. As noted above, the Risk Mitigation Excerpts drawn from the 2013 Sustainability Report purportedly led investors to believe that Vale was taking various steps to ensure—*and thus*

5

*necessarily was responsible for*—the safe operation and maintenance of the Fundão Dam.  In contrast, the post-collapse Antitrust Response during the November 16, 2015 conference call allegedly led investors to believe that Vale had *no responsibility* for the safe operation and maintenance of the Fundão Dam.  Put simply, the proposed class cannot have it both ways.  In fact, various class members will have to advance conflicting arguments and develop entirely different evidence in support of their respective claims, depending on when they purchased Vale ADRs and what they purportedly believed about the relationship—if any—between Vale and Samarco's Fundão Dam.

Lead Plaintiffs' motion for class certification completely ignores this inherent conflict in the proposed class, and instead simply cites a handful of inapplicable cases to argue that proving commonality is a "low hurdle."  Motion at 8-9.  Indeed, Lead Plaintiffs are attempting to frame this purported class action in the most generic terms possible by parroting the basic elements of a Rule 10b-5 claim as the "common" questions presented here.  *Id.* at 9.  If the commonality requirement could be satisfied that easily, there would be no need for any inquiry at all.

Lead Plaintiffs in *Wal-Mart* attempted a similar tactic, which the Supreme Court rejected. *See Wal-Mart Stores*, 564 U.S. at 345 (class representatives contending that common question was whether Wal-Mart unlawfully discriminated against its female employees).  As the Supreme Court observed, the circumstances of the alleged discrimination of each employee would differ, and require different evidence for each proposed class member.  *Id.* at 352.

In sum, Lead Plaintiffs' proposed class falls short under the guidance in *Wal-Mart*: the questions presented will result in different—and conflicting—answers, inapplicable to the entire class, based on different evidence and requiring different remedies.  The fundamental nature of the two alleged misrepresentations guarantee such an outcome, as no reasonable investor could

6

believe that Vale both was—and was not—responsible for the operation and maintenance of Samarco's dam.  The competing statements and accompanying corrective disclosures are entirely distinct, with likely different market responses (if any), confounding factors, and potential remedies (if Lead Plaintiffs even could prove loss causation).

### B.      Lead Plaintiffs are Not "Typical" Members of the Class They Purport to Represent

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Loritz v. Exide Technologies*, 2015 WL 6790247, at *5 (C.D. Cal. July 21, 2015).  "A named plaintiff's claim is atypical where he is 'subject to unique defenses which threaten to become the focus of litigation.'"  *Id.* (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017)).

To avoid the consequences of their pleading, Lead Plaintiffs once again seek refuge in platitudes.  According to their Motion, typicality is satisfied merely because "Lead Plaintiffs allege that Defendants violated the Exchange Act by issuing public statements that misrepresented or omitted material facts to all investors."  Motion at 10.  What Lead Plaintiffs fail to acknowledge, however, is that their pattern of trading in Vale ADRs, considered in the context of the alleged misstatements and corresponding corrective disclosures at issue, renders their alleged claims anything but typical.

First, as shown by Defendants' expert, Dr. Walter Torous, neither Lead Plaintiff engaged in any Vale ADR transactions *at all*: (1) after the dam collapse; (2) after the Antitrust Response offered during the November 16, 2015 conference call; or (3) through the end of the proposed

class period.  *See* Ex. 1 (Expert Report of Dr. Walter Torous ("Torous Report")) ¶ 10; Dkt. 33

(Exhibit A: Certifications of ACERA and OCERS).  Plainly, therefore, Lead Plaintiffs' claims

have nothing to do with class members who purportedly were misled by the Antitrust Response

and allegedly suffered investment losses following the announcement of charges in Brazil.

Second, Lead Plaintiff ACERA sold *all* of its Vale common ADRs over a year *before* any

alleged corrective disclosures concerning the Risk Mitigation Excerpts.  *Id.*  Thus, as an "in-out"

investor who suffered no cognizable losses under the securities laws, ACERA simply cannot be

considered a typical investor in Vale common ADRs who purchased after May 8, 2014 and

continued to hold its investments at the time of the dam collapse.[2]

Despite these disqualifying facts, Lead Plaintiffs seek to represent all investors who

purchased Vale ADRs "between May 8, 2014 and November 27, 2015" following public

disclosure of either the Risk Mitigation Excerpts or the Antitrust Response.

### C.    Lead Plaintiffs Cannot Adequately Represent the Proposed Class

Lead Plaintiffs also fail to demonstrate that "the representative parties will fairly and

adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In considering whether

the Rule 23(a)(4) requirement is satisfied, courts examine, *inter alia*, whether "plaintiff's

interests are antagonistic to the interest of other members of the class."  *See In re Moody's Corp.*

*Sec. Litig.*, 274 F.R.D. 480, 486 (S.D.N.Y. 2011).  "The focus of [this inquiry] is 'on uncovering

conflicts of interest between named parties and the class they seek to represent.'"  *Id.* (quoting *In*

*re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).  "A conflict is

fundamental" and thus sufficient to defeat a class certification motion "when it 'threatens to

---

[2]    While ACERA did own Vale preferred ADRs, Lead Plaintiffs' own expert concedes that
such securities—given their distinct benefits and associated rights—would have responded
differently to market information. Ex. 12 (Deposition of Lead Plaintiffs' Expert David I.
Tabak ("Tabak Dep.")) at 42:4-43:22; 46:3-47:5.

become the focus of the litigation' and there is danger that absent class members will suffer if their representative is preoccupied with defenses unique to [them]." *Id*. (quoting *Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52, 61 (2d Cir. 2000)); *see, e.g.*, *George v. China Automotive Sys., Inc.*, 2013 WL 3357170, at *6-7 (S.D.N.Y. July 3, 2013) (finding proposed class representatives were "neither typical nor adequate" based on timing of securities purchases).

Here, Lead Plaintiffs have a number of fundamental conflicts of interest with class members, any one of which is fatal to class certification.  For example, as discussed above, Lead Plaintiffs do not even have standing to pursue one of the two alleged misrepresentations at issue. *See* Section I.B., *supra*.  Indeed, as Lead Plaintiffs' own offered expert, Dr. David Tabak, explained in a 2015 law review article, "in a situation where some investors purchased after one alleged misrepresentation but before a second one," a dispute could "arise among plaintiffs," as "the early purchasers would have a financial interest in attributing as much as possible of the price decline following a corrective disclosure to the alleged misrepresentation before their purchase (i.e., the statement they could have relied upon)."  Ex. 4 (David Tabak, *Implications for Market Efficiency and Damages Analyses of Plaintiff Interpretations of Halliburton II's Statement That "Market Efficiency Is A Matter of Degree*," 46 Loy. U. Chi. L.J. 467, 479–80 (2015)).  In contrast, later purchasers want to "allocat[e] a disproportionate share of the price decline following a corrective disclosure to the alleged misrepresentation for which they are more likely to recover."  *Id*. at 480.

In addition to the obvious conflict of interest presented by Lead Plaintiffs' Vale ADR trading activity that—from their perspective—renders half of the remaining alleged misrepresentations irrelevant, Lead Plaintiffs also cannot adequately protect the interests of the

proposed class given Lead Plaintiffs' relationship with an entity known as Capital Group, an external investment manager for both ACERA and OCERS throughout the relevant period. Specifically, this relationship renders Lead Plaintiffs' claims vulnerable to several unique defenses.

Notwithstanding their nominal role in this matter,[3] Lead Plaintiffs in fact made *absolutely no decisions* concerning whether or when to purchase or sell Vale ADRs during the proposed class period. Instead, Capital Group had complete control over Lead Plaintiffs' investments. Ex. 5 (Deposition of ACERA Investment Officer Tom Taylor ("Taylor Dep.")) 60:13-16; 82:11-18 (ACERA "delegated all purchase and sale authority to" Capital Group, whose investment decisions were "fully discretionary"); Ex. 6 (Deposition of OCERS Director of Investment Operations Shanta Chary ("Chary Dep.")) 48:4-20; ("Capital Group didn't have to consult with OCERS before making an investment in Vale ADRs."); *see also* Ex. 7 (ACERA Investment Management Agreement) at 3, Section IV.A. (outlining Capital Group's authority "(i) to determine which securities are to be bought or sold, (ii) to determine the time and manner in which such securities are to be brought or sold, and (iii), to execute such transactions as [Capital Group] deems necessary or desirable for ACERA without the necessity of first obtaining the consent of, or giving prior notice to, or consulting with, ACERA"); Ex. 8 (OCERS Investment Advisory Contract) at 2 ("The [investment] manager shall have sole discretion with respect to said investments as to purchases and sales without prior consultation.").

Discovery provided by Capital Group has revealed several critical facts that undermine— and in some instances *directly refute*—the allegations advanced by Lead Plaintiffs on behalf of

---

[3]   The Court appointed ACERA and OCERS Lead Plaintiffs over a year *before* rejecting most of the purported misrepresentations alleged in the Complaint. *Hom v. Vale, S.A.*, 2006 WL 880201 (S.D.N.Y. Mar. 7, 2016) (Woods, J.).

the proposed class.  For example, in a research report for a December 21, 2015 internal

investment group call, the main analyst at Capital Group responsible for covering Vale (Bruno

Rodrigues) continued to echo the view that Vale would *not* be held responsible for the dam

accident given the nature of its relationship with Samarco.  Specifically, Rodrigues noted that

"Vale foresees no liabilities to themselves in regards to the accident.  Vale and BHP have never

been directly involved in Samarco's operations; condition imposed by the European Commission

to approve Vale buying into Samarco back in 2001."  Ex. 9 (Capital Group Research Report of

Bruno Rodrigues, *Vale: What Went Wrong; Where We Are Now and Why It Remains a High*

*Conviction Idea*, December 21, 2015) ("December 21, 2015 Research Report") at CRMC-6873.

Capital Group offered this observation—which mirrors Vale's Antitrust Response

"misrepresentation" made during the November 16, 2015 conference call—*nearly a month after*

the purported "corrective disclosures" from Brazilian authorities cited by Lead Plaintiffs in their

Motion.  *See* Compl. ¶ 86; Motion at 4-5.

  Even more fatal to Lead Plaintiffs' liability theories here are Capital Group's views

concerning the class period market performance of Vale ADRs and the potential impact of the

accident.  For example, on December 21, 2015—again, after the end of the proposed class period

here—Capital Group concluded that the underperformance of Vale ADRs was directly

attributable to the following:  "[g]lobal steel production has turned south and as a result iron ore

prices have collapsed."  December 21, 2015 Research Report at CRMC-6870.  Capital Group

repeated that view a day later during an investment group call, during which Mr. Rodrigues

explained that what "went wrong" with the Vale ADR investments was that "[g]lobal steel

production fell in 2H2015 and consequently iron ore prices collapsed."  Ex. 10 (Capital Group

Meeting Research Call, *BAXR on Vale: What Went Wrong*, December 22, 2015) ("December 22, 2015 Meeting Research") at CRMC-6885-86.

In contrast, according to Capital Group, the dam collapse was merely "unhelpful," and simply "a source of noise" impacting "market sentiment." December 21, 2015 Research Report at CRMC-6873; December 22, 2015 Meeting Research at CRMC-6886. In any event, even after the accident at Samarco's Fundão Dam and subsequent developments at issue in this case, Capital Group continued to view Vale ADRs as a "high conviction buy idea." December 21, 2015 Research Report at CRMC-6870, 6883. Indeed, Capital Group went so far as to suggest that the dam collapse would "*benefit*" Vale as the second largest producer of global pellet supply, as the accident would remove a significant amount of iron ore from the market. Ex. 11 (Capital Group Meeting Research Call, *BAXR on Vale*, December 8, 2015) ("December 8, 2015 Meeting Research") at CRMC-6868; December 21, 2015 Research Report at CRMC-6874 ("More relevant for Vale the accident should improve pellet premiums.").

To reiterate, Capital Group, the entity solely responsible for all of Lead Plaintiffs' investment decisions in Vale ADRs, reached all of the foregoing conclusions **after** the proposed class period here and **after** the purported revelation of Vale's alleged misstatements. In short, these are not the observations of a "defrauded" investor. And unquestionably, Capital Group's expressed views raise a fundamental conflict with absent class members, they will be a "focus of the litigation," and Lead Plaintiffs will be "preoccupied with defenses unique to [them]." *See In re Moody's Corp. Sec. Litig.*, 274 F.R.D. at 486.[4]

---

[4]  We also note that some courts have held that "[i]nvestors who only passively participate in an investment by transferring full authority to make purchase decisions to an agent are not purchasers." *Id.* (citing *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co., Inc.*, 800 F.2d 177 (7th Cir. 1986)) (finding plaintiff could not maintain

## II.   THE PROPOSED CLASS DOES NOT SATISFY THE PREDOMINANCE REQUIREMENTS OF RULE 23(B)

The Court also should deny Lead Plaintiffs' motion for class certification because they have failed to demonstrate that questions of law or fact common to the proposed class members will predominate over any questions affecting only individual members.  *See* Fed. R. Civ. P. 23(b); *see also Comcast Corp.*, 569 U.S. at 34 ("Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)").  In particular, Lead Plaintiffs are not entitled to a fraud-on-the-market presumption of reliance, and they also have failed to establish that "damages are capable of measurement on a classwide basis."  *Id.* at 34-35 (further noting that plaintiffs must tie their method of proving damages to their specific theory of liability).

### A.   Lead Plaintiffs Are Not Entitled to the *Basic* Presumption of Reliance

Lead Plaintiffs contend they are entitled to the fraud-on-the-market presumption of reliance established by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  As conclusively established below, they are not.  "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."  *Id.* at 248.  "A successful rebuttal *defeats* class certification by defeating the Rule 23(b)(3) predominance requirement."  *In re Moody's*, 274 F.R.D. at 490.

The parties' respective expert reports submitted in connection with Lead Plaintiffs' motion for class certification collectively establish that the market for Vale's ADRs was not

---

securities fraud claim where it hired an investment manager and delegated complete authority to develop a portfolio for its retirement fund).  While district courts in this circuit have not yet adopted this view, this case presents the unique fact situation of a *complete* delegation of authority to another party, in which Lead Plaintiffs in no way were influenced by the alleged misrepresentations.  The delegation issue, unique to Lead Plaintiffs, implicates not only Lead Plaintiffs' reliance, but also their standing to bring these claims at all, a fundamental issue and distraction from the purported claims of absent class members.

13

efficient during the proposed class period, thus rebutting the presumption of classwide reliance. To assess whether the Vale ADRs traded in an efficient market, Lead Plaintiffs' proposed expert evaluated the factors enumerated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). While Lead Plaintiffs' expert explicitly acknowledges that the fifth *Cammer* factor ("whether a stock price responds to material, new unexpected information") "most directly tests market efficiency," his analysis of this factor suffers from at least three distinct flaws, any one of which alone renders his conclusions unreliable. *See* Expert Report of David I. Tabak (Dkt. No. 114-1) ("Tabak Report")) ¶ 31.

First, Dr. Tabak failed to assess whether abnormal returns detected by his model were directionally consistent (*i.e.*, positive or negative) with the news on that day. Torous Report ¶¶ 25-26. As Dr. Tabak himself conceded, if the results of his analysis are not directionally consistent with the news, the likely explanation, absent confounding information, "is that the market was not efficient." Tabak Dep. at 183:16-184:8.

Second, Dr. Tabak's model does not account for industry-specific factors during the proposed class period. Torous Report ¶¶ 28-29. Thus, he simply does not—and cannot—opine on whether any abnormal returns predicted by his model actually were caused by specific news or general industry trends. *Id.* In contrast, Lead Plaintiffs themselves can—and did—form an opinion with respect to this question, concluding that the *price of iron ore*, and not any Company-specific news, dictated the price of Vale ADRs during the class period. *See* Section I.C, *supra*. It appears as though Lead Plaintiffs were correct, as the performance of Vale ADRs mirrored the price of iron ore throughout the proposed class period. *Id*. at ¶ 33, Torous Exhibit 4.

Third, Dr. Tabak adopted an estimation period for his event study that does not support any inferences concerning the behavior of Vale ADRs during the proposed class period given the

14

substantially elevated volatility during the latter period as compared to the former.  *Id*. at ¶¶ 30-35.  In short, by using a lower volatility estimation period, Dr. Tabak effectively misleads the Court by overstating the number of days with excess returns attributable to Company-specific news.  *Id.*

### B. Lead Plaintiffs Are Not Entitled to a Presumption of Reliance Under *Affiliated Ute*

The presumption of reliance established in the Supreme Court's *Affiliated Ute Citizens of Utah v. U. S.*, 406 U.S. 128 (1972) decision "is not available where a plaintiff's theory is based entirely, or even primarily, on misrepresentations as opposed to omissions."  *In re Barclays Liquidity Cross and High Frequency Trading Litig.*, 126 F. Supp. 3d 342, 365 (S.D.N.Y. 2015).

Here, Lead Plaintiffs' Motion distorts the very nature of their alleged claims, which rest on purported *affirmative representations* contained in the Risk Mitigation Excerpts and the Antitrust Response.  "Every misrepresentation could be characterized as an omission if it were defined in terms of the absence of the information that would correct the misrepresentation."  *In re Lehman Bros. Sec. and ERISA Litig.*, 2013 WL 5730020, at *3 (S.D.N.Y. Oct. 22, 2013).  Put simply, "[t]he *Affiliated Ute* doctrine does not apply to cases where, as here, plaintiffs could—and indeed, did—plead reliance on certain of defendants' *statements*."  *Id.* (emphasis added).

### C. Lead Plaintiffs Have Failed to Establish that Damages Can Be Calculated on a Classwide Basis

To satisfy Rule 23(b)(3)'s predominance requirement, Lead Plaintiffs also must prove that "damages are capable of measurement on a classwide basis."  *Comcast Corp.*, 569 U.S. at 34; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013) ("Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury in fact.").  Lead Plaintiffs have failed utterly to meet their burden here.

Central to the Court's inquiry is the purported "model" offered by Lead Plaintiffs, which is supposed to confirm that a classwide calculation of damages is actually possible.  "[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Comcast Corp.*, 569 U.S. at 35 (internal quotation marks omitted).  "And for the purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so." *Id.* (internal quotation marks omitted).  "It is not enough to submit a questionable model whose unsubstantiated claims cannot be refuted through *a priori* analysis.  Otherwise, 'at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be.'"  *In re Rail Freight*, 725 F.3d at 254 (quoting *Comcast Corp.*, 569 U.S. at 36).  Indeed, "Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it." *Id.* at 255.  In sum, Lead Plaintiffs' expert's "models are essential to the plaintiffs' claim they can offer common evidence of classwide injury." *Id.* at 253.  "No damages model, no predominance, no class certification." *Id.*

As fully explained in Dr. Torous's expert report, the suggested "event study" outlined by Dr. Tabak suffers from multiple, fatal flaws.  Torous Report ¶¶ 20-35.  Dr. Tabak's hypothetical event study—which fails to account for the two distinct, conflicting alleged misrepresentations or any other critical facts at issue—falls far short of meeting the Rule 23(b)(3) standard.  For example, Dr. Tabak does not explain how he would account for the effects of economy or sector-wide events (which, as Dr. Torous demonstrates, were heavily influencing Vale ADR prices during the class period), or even which alleged misrepresentations or curative disclosures he would test, and how.  *See* Torous Report ¶¶ 19, 39.

Dr. Tabak further fails to offer any applicable figures, or any specific steps he would undertake to calculate them, leaving the Court with no indication as to whether Lead Plaintiffs' proposed methodology would even be workable given the specific facts of this case. *See* Tabak Dep. at 91:2-5 (conceding that he has "not determined how [the] input[s] necessarily would be calculated"). Nor has Dr. Tabak developed or described any actual formula to support a conclusion that damages could be calculated on a classwide basis here. *Id.* at 93:13-20.

Perhaps if Dr. Tabak had actually attempted to undertake any of these tasks, he would have discovered the numerous shortcomings of his proposed approach identified by Dr. Torous, including, for example:

- the failure to differentiate between the two distinct—and conflicting—theories of alleged misrepresentations resting on the Risk Mitigation Excerpts and the Antitrust Response, and instead treating the entire period between May 9, 2014 and November 28, 2015 as consisting of a uniform class of investors relying on the same alleged information (*see* Torous Report ¶¶ 36, 41, 46, 61-63);

- wrongly proposing to compensate shareholders who did not suffer any damages, as Dr. Tabak does not address whether or how to exclude, for example, in-out investors (such as Lead Plaintiff ACERA) who sold before the alleged corrective disclosures (*see id.* at ¶ 60);

- failing to account for the fact that the proposed class includes a material percentage of passive investors who did not actually rely on an public statements by Vale and instead simply tracked one or more of the 50+ indices of which Vale ADRs were a constituent (*see id.* ¶¶ 58-59);

- failing to address how the model would calculate different damages associated with preferred versus common ADRs (*see id.* ¶ 39);

- ignoring the significant differences in investor risk tolerances (*see id.* ¶¶ 19, 45, 52, 57);

- disregarding confounding factors—unrelated to any challenged statements by Defendants—that plainly impacted the market prices of Vale ADRs (*see id.* ¶¶ 38, 40-41, 51);

- assuming, without any support, that price inflation could be calculated in a common manner for all proposed class members (*see id.* ¶ 43);

- basing the proposed event study on an unspecified figure that Dr. Tabak fails even to explain how he would calculate:  the perceived probability of the dam collapse given hypothetical "proper disclosures" (*see id*. ¶ 64).

These and other fundamental flaws in Dr. Tabak's so-called event study, all of which are addressed in Dr. Torous's report, collectively make clear that Lead Plaintiffs have not established that any purported damages could be calculated on a classwide basis.  And while Defendants will refrain from reiterating here all of Dr. Torous's sound analysis, we highlight for the Court one observation concerning the Risk Mitigation Excerpts that truly puts the lie to Lead Plaintiffs' empty claim of market efficiency.

Dr. Torous reviewed more than 25 analyst reports concerning Vale issued in the month following publication of Vale's 2013 Sustainability Report.  *Id*. ¶ 42.  *Not a single one* even mentioned the Sustainability Report or the Risk Mitigation Excerpts now challenged by Lead Plaintiffs as false.  *Id.*  According to Dr. Tabak's own logic (*see* Tabak Report ¶¶ 19, 45), this lack of analyst discussion can only mean one of two things: (1) the information contained in the 2013 Sustainability Report—including the Risk Mitigation Excerpts—simply was not material to investors (a fact that alone would be fatal to Lead Plaintiffs' claims); or (2) the market for Vale ADRs was inefficient given that over 25 Vale analyst reports issued in May 2014 did not publicly address any piece of information contained in the 174-page Sustainability Report.  *Id*. ¶ 42.

## **<u>CONCLUSION</u>**

For each—or any—of the foregoing reasons, Defendants respectfully request that the

Court deny Lead Plaintiffs' motion for class certification and appointment of class

representatives and class counsel.

Dated: November 3, 2017          Respectfully submitted,
       New York, New York

                                   GIBSON, DUNN & CRUTCHER LLP

                             By:    */s/* Mark A. Kirsch
                                Randy M. Mastro
                                Mark A. Kirsch
                                Christopher M. Joralemon

                                200 Park Avenue
                                New York, NY  10166-0193
                                Telephone: 212.351.4000
                                Facsimile: 212.351.4035
                                mkirsch@gibsondunn.com

                                *Attorneys for Defendants Vale S.A., Luciano*
                                *Siani Pires, and Gerd Peter Poppinga*

19