**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| In re: Vale S.A. Securities Litigation |

Case No. 15 Civ. 09539 (GHW)

Consolidated with Case No. 16 Civ. 00658 (GHW)

<u>CLASS ACTION</u>

**LEAD PLAINTIFFS' RESPONSE TO DEFENDANTS' SUR-REPLY MEMORANDUM
OF LAW IN FURTHER OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND
CLASS COUNSEL**

BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP

Timothy A. DeLange (*Pro hac vice*)
Richard D. Gluck (*Pro hac vice*)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130

     -and-

Gerald H. Silk
Avi Josefson
BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP
1251 Avenue of the Americas, 44th Fl.
New York, NY 10020

*Counsel for Lead Plaintiffs Alameda County
Employees' Retirement Association and
Orange County Employees Retirement
System and Lead Counsel for the Class*

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................ 1

II.     DEFENDANTS'   "NEW"   EVIDENCE   DOES   NOT   DEFEAT
        TYPICALITY ...................................................................................................... 2

III.    THE   COURT   SHOULD   NOT   CONSIDER   THE   UNTIMELY
        SUPPLEMENTAL TOROUS REPORT ............................................................ 6

IV.     DR. TOROUS' BIASED ANALYSIS DOES NOT UNDERMINE DR.
        TABAK'S OPINION ON MARKET EFFICIENCY ..................................... 7

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................................................3, 5, 6

*Bowling v. Johnson & Johnson*,
    2019 WL 1760162 (S.D.N.Y. Apr. 22, 2019)...........................................................5

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011)..............................................................................................3

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
    2007 WL 2230177 (S.D.N.Y. July 27, 2007) ...........................................................2

*Goldstein v. Puda Cola, Inc.*,
    827 F. Supp. 2d 348 (S.D.N.Y. 2011).......................................................................2

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)..................................................................................................3

*Hom v. Vale S.A.*,
    2016 WL 880201 (S.D.N.Y. March 7, 2016) ...........................................................2

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) ..............................................................................5

*In re NYSE Specialists Secs. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) ................................................................................5

*In re Parmalat Secs. Litig.*,
    2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)..........................................................5

*In re Petrobras Sec. Litig.*,
    862 F. 3d 250 (2d Cir. 2017).....................................................................................2

*In re Pfizer Inc. Securities Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ................................................................................6

*Ret. Sys. v. Wyeth*,
    284 F.R.D. 173 (S.D.N.Y. 2012) ..............................................................................3

*Rocco v. Nam Tai Electronics, Inc.*,
    245 F.R.D. 131 (S.D.N.Y.2007) ...............................................................................6

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)....................................................................5, 6

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)..............................................................................................5, 6

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)..................................................................................................2

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(a) ...........................................................................................................2

Fed. R. Civ. P. 23(b)(3)........................................................................................................2

## I.      <u>INTRODUCTION</u>

Desperate to evade liability for the harm they caused Vale investors with false and misleading statements about the safety of the Company's operations and their responsibility for the deadly collapse of the Fundão Dam, Defendants resort to an untimely and meritless mulligan on their opposition to class certification.  Nearly two years after briefing closed, and despite ample opportunity to take discovery and timely present evidence and expert opinion, Defendants belatedly submit a sur-reply founded on: (i) irrelevant testimony from a third party witness (Bruno Rodrigues); and (ii) a flawed supplemental expert analysis that again fails to analyze nine of the ten factors relevant to assessing market efficiency and does not opine that the market for Vale ADRs was inefficient.

Neither of Defendants' "new" assertions defeat class certification.  ***First***, Defendants cherry-pick testimony from a third-party analyst in an attempt to challenge Lead Plaintiffs' typicality.  But Defendants' sur-reply fails to inform the Court of key testimony from Rodrigues that undermines their position: Rodrigues did not make the purchases of Vale ADRs for Lead Plaintiffs and he testified that his views on Vale were his personal views and not the investment manager's "house views."  His testimony is therefore irrelevant to the adequacy or typicality of Lead Plaintiffs.  Moreover, Rodrigues confirmed that he, like Lead Plaintiffs and other members of the Class, was unaware of Defendants' fraud, and would have sold Vale securities if he knew the Fundão Dam was going to collapse.

***Second***, Defendants' supplemental expert report does not rebut Lead Plaintiffs' overwhelming evidence of market efficiency.  Defendants were required to submit evidence in support of their opposition to class certification in October 2017 and they never requested nor received permission to file a supplemental expert report.  Substantively, Defendants' expert (i) still concedes that 9 of the 10 relevant factors that Plaintiffs' expert (Dr. Tabak) analyzed support

market efficiency, (ii) uses a flawed analysis of *Cammer* factor 5 that is biased against a finding of market efficiency, and (iii) still does not opine that the market for Vale ADRs was inefficient.

As detailed in Lead Plaintiffs' opening and reply memorandum, this securities class action is perfectly suited for class certification under Fed. R. Civ. P. 23(a) and (b)(3).  Defendants' new submission still does not undermine the overwhelming showing that Lead Plaintiffs are adequate representatives, have interests aligned with the Class, raise numerous common questions, and that Vale ADRs traded in efficient markets.  Securities class actions similar to this action are routinely certified in this Circuit and Lead Plaintiffs' motion should likewise be granted.  *See, e.g., Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017); *In re Petrobras Sec. Litig.*, 862 F. 3d 250 (2d Cir. 2017).

## II.   DEFENDANTS' "NEW" EVIDENCE DOES NOT DEFEAT TYPICALITY

Courts in this District have repeatedly "emphasized that the typicality requirement is not demanding."  *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *13 (S.D.N.Y. July 27, 2007).  In securities cases, "[t]he typicality threshold is satisfied where," as in this case, "the claims arise from the same conduct from which the other class members' claims and injuries arise.'"  *Hom v. Vale S.A.*, 2016 WL 880201, at *6 (S.D.N.Y. March 7, 2016) (citing *Goldstein v. Puda Cola, Inc.*, 827 F. Supp. 2d 348, 354 (S.D.N.Y. 2011)).  Defendants do not and cannot dispute that Lead Plaintiffs' claims arise from the same alleged course of conduct as the rest of the proposed class.

Instead, Defendants' renewed attack relies on snippets of testimony from Bruno Rodrigues, a former Vale employee now working as an analyst for The Capital Group, Lead Plaintiffs' outside investment manager that purchased the Vale ADRs at issue in this action.  Importantly, Rodrigues ***did not*** make the purchases of Vale ADRs for Lead Plaintiffs and testified that any views he had were his personal views and not the "house views" of The Capital Group.  Rodrigues Tr. (Exhibit

2 to DeLange Decl.) at 140:16-19. He further testified that often none of the "forty-odd portfolio managers that could buy the stock I recommend" followed his recommendation and purchased the stock. *Id.* at 140:13-141:7. Indeed, after the Fundão Dam collapsed, the relevant portfolio managers did not follow his recommendations to purchase additional Vale shares. *Id.* at 191:5-194:4. There is no connection between Rodrigues and the Lead Plaintiffs' purchases of Vale ADRs, rendering his testimony irrelevant to the typicality and adequacy of the Lead Plaintiffs.

For that reason, Defendants' reliance on Rodrigues' testimony that he never read the Sustainability Report is equally misplaced. The Supreme Court made plain that investors need ***not*** demonstrate that they read or relied upon the misstatements to prevail on a claim: "[T]o indirectly rely on a misstatement in the sense relevant for the *Basic* presumption, [the investor] need only trade stock based on the belief that the market price will incorporate public information within a reasonable period." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273-74 (2014). "Under *Basic*'s fraud-on-the-market doctrine, an investor presumptively relies on a defendant's misrepresentation if that 'information is reflected in [the] market price' of the stock at the time of the relevant transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988)). "Misleading statements will therefore defraud purchasers of stock ***even if the purchasers do not directly rely on the misstatements***." *Basic*, 485 U.S. at 241-42. *See also City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 179 (S.D.N.Y. 2012) (finding plaintiffs typical despite citation to "evidence that [plaintiff] and its investment managers did not rely on the stock's market price or on [defendants'] alleged misstatements and omissions").

Here, Rodrigues testified that the current market price ***was*** a factor in his analysis, and that he ***was not*** indifferent to the market price, further supporting the *Basic* presumption of reliance:

Q. And so market price is a factor that you consider in your analysis?

A. Market price is a factor that I consider in my analysis, yes.  . . .

Q. You're certainly not indifferent to price — the market price, correct?

A. Am I — no, I'm not indifferent to market price. Well, particularly at the time —

at the time of buying certainly not, you know. . . .

Rodrigues Tr. at 165:14-166:1.

Finally, unlike in the cases Defendants cite, there is no evidence that Rodrigues, The Capital Group, or Lead Plaintiffs knew the truth or any of the omitted facts about Vale. There also is no evidence that the portfolio managers who purchased Vale ADRs on Lead Plaintiffs' behalf would have purchased the securities had they known about the fraud.  To the contrary, Rodrigues testified that he was *not* privy to any of the undisclosed, non-public information about Vale, including that (i) Vale was using the Dam to deposit its own wastes; (ii) Vale was contractually obligated to share in the environmental costs stemming from its use of the Dam; (iii) the Dam almost collapsed in 2009; (iv) there was no system in place to warn residents in nearby towns of an emergency at the Dam; (v) Vale and Samarco were warned in early 2014 that the Dam's drainage was insufficient; and (vi) Vale would have to take a $1 billion provision for environmental liabilities stemming from the collapse.  Rodrigues Tr. at 146:3-147:6, 147:17-23, 149:9-150:2, 151:9-13, 157:1-8, 160:16-161:8, and 170:18-23.  He testified further that had he known Vale would have to take a $1 billion provision for environmental liabilities stemming from the collapse he **would** have factored it into his analysis.[1]

---

[1] *Id.* at 190:19-191:4. Defendants point to other testimony in which Rodrigues explained that with the benefit of hindsight a $1 billion liability would have affected his personal opinion of the intrinsic value of Vale by only a small amount. Three questions later, Rodrigues admitted that if he knew the Dam was going to collapse he would have sold the stock and repurchased it after the

Even if Rodrigues' testimony somehow could undermine the *Basic* presumption here – and it does not for reasons detailed above – it still does not create a unique defense that defeats typicality.  In this Circuit, "it is beyond reasonable dispute that a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members."  *In re Parmalat Secs. Litig.*, 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008); *In re NYSE Specialists Secs. Litig.*, 260 F.R.D. 55, 72 (S.D.N.Y. 2009) (same).  Indeed, the so-called "unique defense" limitation to typicality "is not rigidly applied in this Circuit,'" with courts in this District warning that it should not be used "to shield defendants from a potentially meritorious suit." *Id*. at 71.  Issues particular to the class representative and class members are properly addressed after a trial on the common issues in the case.  *See, e.g., In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 584-85, 585 n.63 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig*., 838 F.3d 223 (2d Cir. 2016) (collecting cases and finding that courts in securities class actions have "consistently recognized" that individualized issues "can and should be addressed after a class-wide trial").  Here, myriad predominating common liability issues (falsity, scienter, loss causation) need to be litigated, and there is no risk that the supposedly unique reliance defense will threaten to become the focus of the litigation "because it does not go to the heart of Plaintiffs' case and will not require considerable time and effort to rebut." *Lapin v. Goldman Sachs & Co.* 254 F.R.D. 168, 180 (S.D.N.Y. 2008).

Defendants' reliance on *Bowling v. Johnson & Johnson*, 2019 WL 1760162, at *4 (S.D.N.Y. Apr. 22, 2019) for a contrary view is puzzling.  First, *Bowling* is not a securities class

---

collapse given that the price was $6 before the collapse and dropped to $4 afterwards. *Id.* at 198:4-16.

action.  Second, the party seeking to serve as lead plaintiff had executed a covenant not to sue the defendants for the conduct at the heart of the case, making her obviously atypical and ineligible to serve as class representative.  No similar defense exists here.  *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y.2007) is likewise inapposite.  As courts have explained in distinguishing *Rocco*, "[t]here, the primary typicality issue" was that the plaintiff sought to represent a class concerning an alleged fraud "about which that putative class representative had non-public information at the time of his purchases." *In re Pfizer Inc. Securities Litig.*, 282 F.R.D. 38, 46–47 (S.D.N.Y. 2012) (finding *Rocco* "inapposite" and particular to its facts).  Here, there is no evidence or suggestion that Lead Plaintiffs or their investment advisor knew about the fraud at the time of the purchases.

*Vivendi* and *Gamco* are equally unavailing.   In *Vivendi*, the Court **granted** class certification, with individual questions of class members' reliance to be addressed during individualized trials following a class-wide verdict on common issues.  As the *Vivendi* court explained, "sorting out individual reliance issues in the context of *class certification* would spell the end of class action fraud lawsuits." *Gamco* was one of those subsequent individualized trials. There, defendants successfully rebutted the *Basic* presumption through the testimony of plaintiff's chief investment officer that plaintiff would have purchased even if it were aware of the fraud. Here, there is no evidence the Lead Plaintiffs or the portfolio managers who made the purchases would have purchased Vale ADRs even if they were aware of the fraud.

## III.     THE COURT SHOULD NOT CONSIDER THE UNTIMELY SUPPLEMENTAL TOROUS REPORT

Defendants and Dr. Torous could have – but chose not to – perform the analysis in his Supplemental Report in support of Defendants' opposition to class certification in October 2017. Defendants "request [for] leave to file a sur-reply of no more than ten pages" did not seek leave to

file, or even mention, a supplemental expert report.  Defendants' tactics should be rejected and the Court should strike and refuse to consider Dr. Torous' supplemental report.  *See In re Electronic Books Antitrust Litig.*, 2014 WL 1282293, at *8 (S.D.N.Y. March 28, 2014) (striking portions of sur-reply memorandum and sur-reply expert declarations that went well beyond addressing new opinions offered in reply papers that could not have been anticipated by defendant's experts).

## IV.   DR. TOROUS' BIASED ANALYSIS DOES NOT UNDERMINE DR. TABAK'S OPINION ON MARKET EFFICIENCY

Dr. Torous' supplemental opinions are unconvincing.  Notably, Dr. Torous again fails to challenge Dr. Tabak's conclusions on nine of the ten factors courts consider when analyzing market efficiency.  Tabak Rpt. (ECF No. 114-1) at ¶58 (finding all ten factors strongly support market efficiency for Vale ADRs).  Dr. Tabak's unrebutted conclusions on those nine factors alone are enough to prove market efficiency.  *See Waggoner v. Barclays*, *supra,* 875 F.3d at 98 (holding that it was unnecessary to reach a conclusion on *Cammer* factor 5 because all the other factors weighed so clearly in favor of market efficiency that defendants did not even challenge them).

More significantly, Dr. Torous again does not submit an expert opinion that the market for Vale ADRs was inefficient.  Rather, Dr. Torous suggests that Dr. Tabak's market model should have utilized a different estimation period due in part to the volatility in Vale's ADRs and should have controlled for industry-specific factors.  Neither of these suggestions undermines Dr. Tabak's conclusions that the market for Vale ADRs was efficient during the Class Period.

First, with respect to the use of a different estimation period, Dr. Tabak's rebuttal report previously addressed this criticism, noting that the finding of statistically significant returns despite the higher volatility made the finding in favor of efficiency even stronger.  Tabak Rebuttal (ECF No. 125-1) at ¶14 (explaining that the higher volatility made it more difficult to distinguish statistically between price movements on days with company-specific news and days without and

that the "noise" the increased volatility created makes the evidence in favor of efficiency even stronger).

Contrary to Defendants' suggestion otherwise, Lead Plaintiffs' damages expert, Dr. John Finnerty, did not identify Dr. Tabak's use of different estimation period as a "fatal flaw."  In performing his damages analysis, Dr. Finnerty used a market model with a different estimation period than the model Dr. Tabak used so that he could precisely measure the abnormal returns in Vale's ADRs on specific days caused by Defendants' fraud.  *See* Declaration of John D. Finnerty at ¶6. Dr. Finnerty neither opined on market efficiency nor criticized Dr. Tabak's analysis. *Id.*  In fact, nowhere does Dr. Finnerty criticize or challenge Dr. Tabak's market model or use of the different estimation period *for the entirely distinct purpose of analyzing market efficiency across all days in the Class Period*. *Id.*

Second, Dr. Torous suggests that Dr. Tabak's event study should have controlled for industry-specific factors, as Dr. Finnerty did in his event study for his damages report.  Torous Supp. Rpt. ¶28.  As Dr. Tabak explains in his rebuttal report and again in his Supplemental Expert Report, not controlling for industry-specific factors biased his test *against* market efficiency, thereby strengthening his conclusions.  Tabak Rbtl. ¶14, Tabak Supplemental Report ("Tabak Supp. Rpt."). ¶16.  Because Vale is a large market force in the metals and mining industry, Vale-specific news would also likely cause the industry index to move.  For example, if Vale announced a reduction in output to increase iron prices, the result would increase prices for all iron ore producing companies, raising the level of a particular index and muting or eliminating any "industry-adjusted" price gain in Vale ADRs.  Dr. Finnerty's market model that controls for industry-specific news is designed for the purpose of analyzing loss causation and estimating damages by testing Vale ADR price movements on specific days in response to each corrective

disclosure. Finnerty Decl. at ¶7. Dr. Tabak's model is designed for the different purpose of testing more broadly the Vale ADR price reactions to news across the entire Class Period.

Finally, Dr. Torous' new analysis is flawed and biased. He excluded from his analysis 29 "news" days that were likely to experience price movements. Doing so biased the analysis against a finding of market efficiency. Tabak Supp. Rpt. ¶9. Dr. Finnerty's model does not, as Dr. Torous suggests, confirm the propriety of removing those dates from a market efficiency analysis. Dr. Finnerty was modeling and measuring the price movements of Vale's ADRs on specific days in the absence of potentially large news events related to the allegations in this case. *Id.* at ¶13. Thus, it was appropriate and necessary for his analysis to exclude dates with such events from his market model. But when analyzing whether a security responds to news, excluding days where there is likely to be news and a price response biases the analysis against finding instances of price responses to news. *Id.*

Notably, in another matter Dr. Torous criticized an opposing damages expert for doing precisely what Dr. Torous now does here – biasing his analysis by arbitrarily excluding dates from consideration: "Dr. Torous claim[ed that the opposing expert] arbitrarily removed dates from consideration, resulting in a bias in favor of finding that SeaWorld's stock price reaction on an event day was statistically significant. *See Baker v. SeaWorld Entertainment, Inc.,* 2017 WL 5885543, at *10 (S.D. Cal. Nov. 29, 2017). Here, removing 29 news days from his analysis resulted in a bias in favor of finding that Vale's ADR price reactions were not statistically significant.

At best, Dr. Torous' supplemental report shows only that eliminating 29 news days from the analysis and controlling for industry effects may cause a different result. It is important to note, however, that Dr. Torous' biased analysis still generally found that Vale ADR prices were

more likely to react on news days, just not to a statistically significant degree. Tabak Supp. Rpt. ¶10. As Dr. Tabak explains, even if you accept that both approaches are valid, there is a reliable statistical method to reconcile the results. Both Dr. Tabak and Dr. Torous tested for statistical significance at the 5% confidence level, meaning that there is at most a 5% chance of seeing results as strong or stronger than those actually observed if there were no true effect (i.e., a false positive). *Id.* at ¶22. Performing two sets of tests creates a greater likelihood of finding strong results purely by chance. The standard adjustment for that is a "multiple-comparisons" adjustment.[2] *Id.* The most stringent adjustment would require that a test be statistically significant at the 2.5% level (i.e., the 5% chance of a false positive is split between the two tests). *Id.* All six tests Dr. Tabak performed meet that heightened threshold, and thus remain statistically significant evidence that Vale ADRs reacted to news during the Class Period. *Id.*

Dated: August 22, 2019                                Respectfully submitted,


                                                      BERNSTEIN LITOWITZ BERGER
                                                         & GROSSMANN LLP

                                                      */s/ Timothy A. DeLange*
                                                      _____

                                                      Timothy A. DeLange (*Pro hac vice*)
                                                      Richard D. Gluck (*Pro hac vice)*
                                                      12481 High Bluff Drive, Suite 300
                                                      San Diego, CA 92130
                                                      Telephone: (858) 793-0070
                                                      Facsimile: (858) 793-0323
                                                      timothyd@blbglaw.com

_____

[2] Dr. Torous recognizes a similar issue in footnote 169 of the Torous Damages Report ("… the researcher is implicitly relying on comparisons of multiple subsets of the data, which increases the odds of false positives"). Dr. Torous' analysis there relies on using a more stringent test to find which result "is the most appropriate to use from a statistical perspective." (Torous Damages Report, ¶90.) The Torous Damages Report notes that the "most appropriate" statistic is the one "with the largest *F*-statistic[.]" (Torous Damages Report, ¶90.) Similarly, here, the most appropriate test is the one in the Tabak Report, which has the largest z-statistic and which passes the threshold for statistical significance after making the correction for multiple comparisons.

rich.gluck@blbglaw.com

-and-

Gerald H. Silk
Avi Josefson
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
1251 Avenue of the Americas, 44th Fl.
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Lead Plaintiffs Alameda County
Employees' Retirement Association and
Orange County Employees Retirement
System and Lead Counsel for the Class*

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   DEFENDANTS' "NEW" EVIDENCE DOES NOT DEFEAT
      TYPICALITY ....................................................................................................... 2

III.  THE COURT SHOULD NOT CONSIDER THE UNTIMELY
      SUPPLEMENTAL TOROUS REPORT .......................................................... 6

IV.   DR. TOROUS' BIASED ANALYSIS DOES NOT UNDERMINE DR.
      TABAK'S OPINION ON MARKET EFFICIENCY ...................................... 7

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................................................................3, 5, 6

*Bowling v. Johnson & Johnson*,
    2019 WL 1760162 (S.D.N.Y. Apr. 22, 2019).........................................................................5

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011).............................................................................................................3

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
    2007 WL 2230177 (S.D.N.Y. July 27, 2007) ..........................................................................2

*Goldstein v. Puda Cola, Inc.*,
    827 F. Supp. 2d 348 (S.D.N.Y. 2011)......................................................................................2

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).................................................................................................................3

*Hom v. Vale S.A.*,
    2016 WL 880201 (S.D.N.Y. March 7, 2016) ..........................................................................2

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) .............................................................................................5

*In re NYSE Specialists Secs. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) ...............................................................................................5

*In re Parmalat Secs. Litig.*,
    2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008).........................................................................5

*In re Petrobras Sec. Litig.*,
    862 F. 3d 250 (2d Cir. 2017)....................................................................................................2

*In re Pfizer Inc. Securities Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ...............................................................................................6

*Ret. Sys. v. Wyeth*,
    284 F.R.D. 173 (S.D.N.Y. 2012) .............................................................................................3

*Rocco v. Nam Tai Electronics, Inc.*,
    245 F.R.D. 131 (S.D.N.Y.2007) ..............................................................................................6

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)...................................................................................5, 6

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)................................................................................................5, 6

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)....................................................................................................2

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(a) ..............................................................................................................2

Fed. R. Civ. P. 23(b)(3)..........................................................................................................2

## I.     <u>INTRODUCTION</u>

Desperate to evade liability for the harm they caused Vale investors with false and misleading statements about the safety of the Company's operations and their responsibility for the deadly collapse of the Fundão Dam, Defendants resort to an untimely and meritless mulligan on their opposition to class certification.  Nearly two years after briefing closed, and despite ample opportunity to take discovery and timely present evidence and expert opinion, Defendants belatedly submit a sur-reply founded on: (i) irrelevant testimony from a third party witness (Bruno Rodrigues); and (ii) a flawed supplemental expert analysis that again fails to analyze nine of the ten factors relevant to assessing market efficiency and does not opine that the market for Vale ADRs was inefficient.

Neither of Defendants' "new" assertions defeat class certification.  ***First***, Defendants cherry-pick testimony from a third-party analyst in an attempt to challenge Lead Plaintiffs' typicality.  But Defendants' sur-reply fails to inform the Court of key testimony from Rodrigues that undermines their position: Rodrigues did not make the purchases of Vale ADRs for Lead Plaintiffs and he testified that his views on Vale were his personal views and not the investment manager's "house views."  His testimony is therefore irrelevant to the adequacy or typicality of Lead Plaintiffs.  Moreover, Rodrigues confirmed that he, like Lead Plaintiffs and other members of the Class, was unaware of Defendants' fraud, and would have sold Vale securities if he knew the Fundão Dam was going to collapse.

***Second***, Defendants' supplemental expert report does not rebut Lead Plaintiffs' overwhelming evidence of market efficiency.  Defendants were required to submit evidence in support of their opposition to class certification in October 2017 and they never requested nor received permission to file a supplemental expert report.  Substantively, Defendants' expert (i) still concedes that 9 of the 10 relevant factors that Plaintiffs' expert (Dr. Tabak) analyzed support

market efficiency, (ii) uses a flawed analysis of *Cammer* factor 5 that is biased against a finding of market efficiency, and (iii) still does not opine that the market for Vale ADRs was inefficient.

As detailed in Lead Plaintiffs' opening and reply memorandum, this securities class action is perfectly suited for class certification under Fed. R. Civ. P. 23(a) and (b)(3).  Defendants' new submission still does not undermine the overwhelming showing that Lead Plaintiffs are adequate representatives, have interests aligned with the Class, raise numerous common questions, and that Vale ADRs traded in efficient markets.  Securities class actions similar to this action are routinely certified in this Circuit and Lead Plaintiffs' motion should likewise be granted.  *See, e.g., Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017); *In re Petrobras Sec. Litig.*, 862 F. 3d 250 (2d Cir. 2017).

## II.   DEFENDANTS' "NEW" EVIDENCE DOES NOT DEFEAT TYPICALITY

Courts in this District have repeatedly "emphasized that the typicality requirement is not demanding."  *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *13 (S.D.N.Y. July 27, 2007).  In securities cases, "[t]he typicality threshold is satisfied where," as in this case, "the claims arise from the same conduct from which the other class members' claims and injuries arise.'"  *Hom v. Vale S.A.*, 2016 WL 880201, at *6 (S.D.N.Y. March 7, 2016) (citing *Goldstein v. Puda Cola, Inc.*, 827 F. Supp. 2d 348, 354 (S.D.N.Y. 2011)).  Defendants do not and cannot dispute that Lead Plaintiffs' claims arise from the same alleged course of conduct as the rest of the proposed class.

Instead, Defendants' renewed attack relies on snippets of testimony from Bruno Rodrigues, a former Vale employee now working as an analyst for The Capital Group, Lead Plaintiffs' outside investment manager that purchased the Vale ADRs at issue in this action.  Importantly, Rodrigues **did not** make the purchases of Vale ADRs for Lead Plaintiffs and testified that any views he had were his personal views and not the "house views" of The Capital Group.  Rodrigues Tr. (Exhibit

2 to DeLange Decl.) at 140:16-19. He further testified that often none of the "forty-odd portfolio managers that could buy the stock I recommend" followed his recommendation and purchased the stock. *Id.* at 140:13-141:7. Indeed, after the Fundão Dam collapsed, the relevant portfolio managers did not follow his recommendations to purchase additional Vale shares. *Id*. at 191:5-194:4. There is no connection between Rodrigues and the Lead Plaintiffs' purchases of Vale ADRs, rendering his testimony irrelevant to the typicality and adequacy of the Lead Plaintiffs.

For that reason, Defendants' reliance on Rodrigues' testimony that he never read the Sustainability Report is equally misplaced. The Supreme Court made plain that investors need ***not*** demonstrate that they read or relied upon the misstatements to prevail on a claim: "[T]o indirectly rely on a misstatement in the sense relevant for the *Basic* presumption, [the investor] need only trade stock based on the belief that the market price will incorporate public information within a reasonable period." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273-74 (2014). "Under *Basic*'s fraud-on-the-market doctrine, an investor presumptively relies on a defendant's misrepresentation if that 'information is reflected in [the] market price' of the stock at the time of the relevant transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988)). "Misleading statements will therefore defraud purchasers of stock ***even if the purchasers do not directly rely on the misstatements***." *Basic*, 485 U.S. at 241-42. *See also City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 179 (S.D.N.Y. 2012) (finding plaintiffs typical despite citation to "evidence that [plaintiff] and its investment managers did not rely on the stock's market price or on [defendants'] alleged misstatements and omissions").

Here, Rodrigues testified that the current market price ***was*** a factor in his analysis, and that he ***was not*** indifferent to the market price, further supporting the *Basic* presumption of reliance:

Q. And so market price is a factor that you consider in your analysis?

A. Market price is a factor that I consider in my analysis, yes. . . .

Q. You're certainly not indifferent to price — the market price, correct?

A. Am I — no, I'm not indifferent to market price. Well, particularly at the time —

at the time of buying certainly not, you know. . . .

Rodrigues Tr. at 165:14-166:1.

Finally, unlike in the cases Defendants cite, there is no evidence that Rodrigues, The Capital Group, or Lead Plaintiffs knew the truth or any of the omitted facts about Vale. There also is no evidence that the portfolio managers who purchased Vale ADRs on Lead Plaintiffs' behalf would have purchased the securities had they known about the fraud.  To the contrary, Rodrigues testified that he was *not* privy to any of the undisclosed, non-public information about Vale, including that (i) Vale was using the Dam to deposit its own wastes; (ii) Vale was contractually obligated to share in the environmental costs stemming from its use of the Dam; (iii) the Dam almost collapsed in 2009; (iv) there was no system in place to warn residents in nearby towns of an emergency at the Dam; (v) Vale and Samarco were warned in early 2014 that the Dam's drainage was insufficient; and (vi) Vale would have to take a $1 billion provision for environmental liabilities stemming from the collapse.  Rodrigues Tr. at 146:3-147:6, 147:17-23, 149:9-150:2, 151:9-13, 157:1-8, 160:16-161:8, and 170:18-23.  He testified further that had he known Vale would have to take a $1 billion provision for environmental liabilities stemming from the collapse he ***would*** have factored it into his analysis.[1]

---

[1] *Id.* at 190:19-191:4. Defendants point to other testimony in which Rodrigues explained that with the benefit of hindsight a $1 billion liability would have affected his personal opinion of the intrinsic value of Vale by only a small amount. Three questions later, Rodrigues admitted that if he knew the Dam was going to collapse he would have sold the stock and repurchased it after the

Even if Rodrigues' testimony somehow could undermine the *Basic* presumption here – and it does not for reasons detailed above – it still does not create a unique defense that defeats typicality.  In this Circuit, "it is beyond reasonable dispute that a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members." *In re Parmalat Secs. Litig.*, 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008); *In re NYSE Specialists Secs. Litig.*, 260 F.R.D. 55, 72 (S.D.N.Y. 2009) (same).  Indeed, the so-called "unique defense" limitation to typicality "is not rigidly applied in this Circuit,'" with courts in this District warning that it should not be used "to shield defendants from a potentially meritorious suit." *Id*. at 71.  Issues particular to the class representative and class members are properly addressed after a trial on the common issues in the case.  *See, e.g., In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 584-85, 585 n.63 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (collecting cases and finding that courts in securities class actions have "consistently recognized" that individualized issues "can and should be addressed after a class-wide trial").  Here, myriad predominating common liability issues (falsity, scienter, loss causation) need to be litigated, and there is no risk that the supposedly unique reliance defense will threaten to become the focus of the litigation "because it does not go to the heart of Plaintiffs' case and will not require considerable time and effort to rebut." *Lapin v. Goldman Sachs & Co.* 254 F.R.D. 168, 180 (S.D.N.Y. 2008).

Defendants' reliance on *Bowling v. Johnson & Johnson*, 2019 WL 1760162, at *4 (S.D.N.Y. Apr. 22, 2019) for a contrary view is puzzling.  First, *Bowling* is not a securities class

---

collapse given that the price was $6 before the collapse and dropped to $4 afterwards. *Id.* at 198:4-16.

action.  Second, the party seeking to serve as lead plaintiff had executed a covenant not to sue the defendants for the conduct at the heart of the case, making her obviously atypical and ineligible to serve as class representative.  No similar defense exists here.  *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y.2007) is likewise inapposite.   As courts have explained in distinguishing *Rocco*, "[t]here, the primary typicality issue" was that the plaintiff sought to represent a class concerning an alleged fraud "about which that putative class representative had non-public information at the time of his purchases."  *In re Pfizer Inc. Securities Litig.*, 282 F.R.D. 38, 46–47 (S.D.N.Y. 2012) (finding *Rocco* "inapposite" and particular to its facts).  Here, there is no evidence or suggestion that Lead Plaintiffs or their investment advisor knew about the fraud at the time of the purchases.

*Vivendi* and *Gamco* are equally unavailing.   In *Vivendi*, the Court **granted** class certification, with individual questions of class members' reliance to be addressed during individualized trials following a class-wide verdict on common issues.  As the *Vivendi* court explained, "sorting out individual reliance issues in the context of *class certification* would spell the end of class action fraud lawsuits."  *Gamco* was one of those subsequent individualized trials. There, defendants successfully rebutted the *Basic* presumption through the testimony of plaintiff's chief investment officer that plaintiff would have purchased even if it were aware of the fraud. Here, there is no evidence the Lead Plaintiffs or the portfolio managers who made the purchases would have purchased Vale ADRs even if they were aware of the fraud.

## III.   THE COURT SHOULD NOT CONSIDER THE UNTIMELY SUPPLEMENTAL TOROUS REPORT

Defendants and Dr. Torous could have – but chose not to – perform the analysis in his Supplemental Report in support of Defendants' opposition to class certification in October 2017. Defendants "request [for] leave to file a sur-reply of no more than ten pages" did not seek leave to

file, or even mention, a supplemental expert report.  Defendants' tactics should be rejected and the Court should strike and refuse to consider Dr. Torous' supplemental report.  *See In re Electronic Books Antitrust Litig.*, 2014 WL 1282293, at *8 (S.D.N.Y. March 28, 2014) (striking portions of sur-reply memorandum and sur-reply expert declarations that went well beyond addressing new opinions offered in reply papers that could not have been anticipated by defendant's experts).

## IV.   DR. TOROUS' BIASED ANALYSIS DOES NOT UNDERMINE DR. TABAK'S OPINION ON MARKET EFFICIENCY

Dr. Torous' supplemental opinions are unconvincing.  Notably, Dr. Torous again fails to challenge Dr. Tabak's conclusions on nine of the ten factors courts consider when analyzing market efficiency.  Tabak Rpt. (ECF No. 114-1) at ¶58 (finding all ten factors strongly support market efficiency for Vale ADRs).  Dr. Tabak's unrebutted conclusions on those nine factors alone are enough to prove market efficiency.  *See Waggoner v. Barclays*, *supra,* 875 F.3d at 98 (holding that it was unnecessary to reach a conclusion on *Cammer* factor 5 because all the other factors weighed so clearly in favor of market efficiency that defendants did not even challenge them).

More significantly, Dr. Torous again does not submit an expert opinion that the market for Vale ADRs was inefficient.  Rather, Dr. Torous suggests that Dr. Tabak's market model should have utilized a different estimation period due in part to the volatility in Vale's ADRs and should have controlled for industry-specific factors.  Neither of these suggestions undermines Dr. Tabak's conclusions that the market for Vale ADRs was efficient during the Class Period.

First, with respect to the use of a different estimation period, Dr. Tabak's rebuttal report previously addressed this criticism, noting that the finding of statistically significant returns despite the higher volatility made the finding in favor of efficiency even stronger.  Tabak Rebuttal (ECF No. 125-1) at ¶14 (explaining that the higher volatility made it more difficult to distinguish statistically between price movements on days with company-specific news and days without and

that the "noise" the increased volatility created makes the evidence in favor of efficiency even stronger).

Contrary to Defendants' suggestion otherwise, Lead Plaintiffs' damages expert, Dr. John Finnerty, did not identify Dr. Tabak's use of different estimation period as a "fatal flaw." In performing his damages analysis, Dr. Finnerty used a market model with a different estimation period than the model Dr. Tabak used so that he could precisely measure the abnormal returns in Vale's ADRs on specific days caused by Defendants' fraud. *See* Declaration of John D. Finnerty at ¶6. Dr. Finnerty neither opined on market efficiency nor criticized Dr. Tabak's analysis. *Id.* In fact, nowhere does Dr. Finnerty criticize or challenge Dr. Tabak's market model or use of the different estimation period *for the entirely distinct purpose of analyzing market efficiency across all days in the Class Period*. *Id.*

Second, Dr. Torous suggests that Dr. Tabak's event study should have controlled for industry-specific factors, as Dr. Finnerty did in his event study for his damages report. Torous Supp. Rpt. ¶28. As Dr. Tabak explains in his rebuttal report and again in his Supplemental Expert Report, not controlling for industry-specific factors biased his test *against* market efficiency, thereby strengthening his conclusions. Tabak Rbtl. ¶14, Tabak Supplemental Report ("Tabak Supp. Rpt."). ¶16. Because Vale is a large market force in the metals and mining industry, Vale-specific news would also likely cause the industry index to move. For example, if Vale announced a reduction in output to increase iron prices, the result would increase prices for all iron ore producing companies, raising the level of a particular index and muting or eliminating any "industry-adjusted" price gain in Vale ADRs. Dr. Finnerty's market model that controls for industry-specific news is designed for the purpose of analyzing loss causation and estimating damages by testing Vale ADR price movements on specific days in response to each corrective

disclosure. Finnerty Decl. at ¶7. Dr. Tabak's model is designed for the different purpose of testing more broadly the Vale ADR price reactions to news across the entire Class Period.

Finally, Dr. Torous' new analysis is flawed and biased.  He excluded from his analysis 29 "news" days that were likely to experience price movements.  Doing so biased the analysis against a finding of market efficiency.  Tabak Supp. Rpt. ¶9.  Dr. Finnerty's model does not, as Dr. Torous suggests, confirm the propriety of removing those dates from a market efficiency analysis.  Dr. Finnerty was modeling and measuring the price movements of Vale's ADRs on specific days in the absence of potentially large news events related to the allegations in this case. *Id.* at ¶13. Thus, it was appropriate and necessary for his analysis to exclude dates with such events from his market model.  But when analyzing whether a security responds to news, excluding days where there is likely to be news and a price response biases the analysis against finding instances of price responses to news.  *Id.*

Notably, in another matter Dr. Torous criticized an opposing damages expert for doing precisely what Dr. Torous now does here – biasing his analysis by arbitrarily excluding dates from consideration: "Dr. Torous claim[ed that the opposing expert] arbitrarily removed dates from consideration, resulting in a bias in favor of finding that SeaWorld's stock price reaction on an event day was statistically significant.  *See Baker v. SeaWorld Entertainment, Inc.,* 2017 WL 5885543, at *10 (S.D. Cal. Nov. 29, 2017).  Here, removing 29 news days from his analysis resulted in a bias in favor of finding that Vale's ADR price reactions were not statistically significant.

At best, Dr. Torous' supplemental report shows only that eliminating 29 news days from the analysis and controlling for industry effects may cause a different result.  It is important to note, however, that Dr. Torous' biased analysis still generally found that Vale ADR prices were

more likely to react on news days, just not to a statistically significant degree. Tabak Supp. Rpt. ¶10. As Dr. Tabak explains, even if you accept that both approaches are valid, there is a reliable statistical method to reconcile the results.  Both Dr. Tabak and Dr. Torous tested for statistical significance at the 5% confidence level, meaning that there is at most a 5% chance of seeing results as strong or stronger than those actually observed if there were no true effect (i.e., a false positive). *Id.* at ¶22.  Performing two sets of tests creates a greater likelihood of finding strong results purely by chance.  The standard adjustment for that is a "multiple-comparisons" adjustment.[2] *Id.* The most stringent adjustment would require that a test be statistically significant at the 2.5% level (i.e., the 5% chance of a false positive is split between the two tests). *Id.*  All six tests Dr. Tabak performed meet that heightened threshold, and thus remain statistically significant evidence that Vale ADRs reacted to news during the Class Period. *Id.*

Dated:  August 22, 2019

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP

*/s/ Timothy A. DeLange*

Timothy A. DeLange (*Pro hac vice*)
Richard D. Gluck (*Pro hac vice*)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323
timothyd@blbglaw.com

---

[2] Dr. Torous recognizes a similar issue in footnote 169 of the Torous Damages Report ("… the researcher is implicitly relying on comparisons of multiple subsets of the data, which increases the odds of false positives").  Dr. Torous' analysis there relies on using a more stringent test to find which result "is the most appropriate to use from a statistical perspective."  (Torous Damages Report, ¶90.)  The Torous Damages Report notes that the "most appropriate" statistic is the one "with the largest *F*-statistic[.]" (Torous Damages Report, ¶90.)  Similarly, here, the most appropriate test is the one in the Tabak Report, which has the largest z-statistic and which passes the threshold for statistical significance after making the correction for multiple comparisons.

rich.gluck@blbglaw.com

   -and-

Gerald H. Silk
Avi Josefson
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
1251 Avenue of the Americas, 44th Fl.
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Lead Plaintiffs Alameda County
Employees' Retirement Association and
Orange County Employees Retirement
System and Lead Counsel for the Class*