UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
:
:
IN RE: VALE S.A. SECURITIES LITIGATION     :          1:15-cv-9539-GHW
:
:                    ORDER
:
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/27/2019

GREGORY H. WOODS, United States District Judge:

This lawsuit arises from the November 5, 2015 collapse of the Fundão Dam in the Brazilian state of Minas Gerais.  The dam was owned and operated by Samarco Mineração, S.A., which was partially owned by Defendant Vale, S.A.  Before the dam collapsed, Vale claimed that it had a set of policies and procedures that reduced the risk of its dams collapsing.  After the dam collapsed, Vale's Chief Financial Officer claimed that Samarco's management was "independent" of Vale's.  The Alameda County Employees' Retirement Association ("ACERA") and the Orange County Employees Retirement System ("OCERS" and, together with ACERA, the "Lead Plaintiffs"), each of which purchased shares before the dam collapsed, allege that both sets of statements were false or misleading in violation of the Securities Exchange Act of 1934.

Lead Plaintiffs' proposed class is beset by a fundamental tension.  Lead Plaintiffs argue that reasonable investors believed that Vale *was* responsible for the operation of the Fundão Dam before the collapse.  Yet Lead Plaintiffs also argue that the Chief Financial Officer's post-collapse statement led reasonable investors to believe that Vale was *not* responsible for the operation of the Fundão Dam.  Lead Plaintiffs are unable to overcome this conflict because they have not carried their burden to demonstrate that pre- and post-collapse investors were defrauded as part of a common scheme.  They have therefore failed to show that their claims are typical of, or that they are adequate

representatives of, post-collapse investors.  Accordingly, Lead Plaintiffs' motion to certify is DENIED without prejudice.

## I.      BACKGROUND

Before the Court is Lead Plaintiffs' motion to certify the proposed class under Federal Rule of Civil Procedure 23, to appoint ACERA and OCERS as class representatives, and to appoint Bernstein Litowitz Berger & Grossmann LLP as lead class counsel.  Lead Plaintiffs bring this lawsuit on behalf of themselves and a proposed class of purchasers of the common or preferred American Depository Receipts of Vale, S.A. (the "Common ADRs" and the "Preferred ADRs"), between November 7, 2013 and November 30, 2015 (the "Class Period") under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934[1] and Rule 10b-5.[2]  The Court described the background of this case in its previous opinion.  Motion to Dismiss Opinion, Dkt No. 92.  Therefore, the Court provides only a brief overview of the relevant facts.

Vale is a mining company incorporated and headquartered in Brazil.  Am. Compl., Dkt No. 58, ¶ 20.  It is the world's largest producer of iron ore and iron ore pellets and the second largest producer of nickel.  Id. ¶ 25.  Vale owns mines in Brazil and operates additional mines through Samarco Mineração, S.A., a privately held joint venture between Vale and an affiliate of BHP Billiton, an Australian mining conglomerate.  Id. ¶ 26.  Samarco owned and operated the Fundão Dam, in which Vale and Samarco stored waste from their mining operations.  Id. ¶ 26, 47-48.  On November 5, 2015, the Fundão Dam began to leak and eventually collapsed.  Id. ¶ 84.  Lead Plaintiffs filed this lawsuit on December 7, 2015, Dkt No. 1, and subsequently filed an amended complaint, Dkt No. 58.  In the amended complaint, Lead Plaintiffs named as defendants Vale, Vale's

---

[1] See 15 U.S.C. § 78j(b) ("It shall be unlawful . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe.").

[2] See 17 C.F.R. § 250.10b-5(b) ("It shall be unlawful . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.").

Chief Executive Officer Murilo Pinto de Oliveira Ferreira, Vale's Chief Financial Officer Luciano Siani Pires, and Vale's Executive Director, Ferrous Minerals, Gerd Peter Poppinga. *Id.* ¶ 20-23. Defendants subsequently moved to dismiss the amended complaint. Dkt No. 79.

The Court dismissed many of Lead Plaintiffs' claims in its Motion to Dismiss Opinion. However, the Court held that Lead Plaintiffs pleaded a claim under § 10(b) and Rule 10b-5 against Poppinga, Pires, and Vale based on two sets of allegedly false statements.

First, the Court held that Lead Plaintiffs had stated a plausible claim for relief based on Vale's pre-collapse statements about its risk mitigation plans, policies, and procedures in its 2013 Sustainability Report (the "Pre-Collapse Statements"). *Id.* at 42-43. The Court specifically identified the following nine statements:

- "We have health, safety and environmental standards and risk management systems and processes in place to mitigate the risk of [health, safety and environmental] incidents."

- "We mitigate operational risk with new controls and improvement of existing ones."

- "[T]he company implements actions and measures to prevent, control or compensate for impacts."

- "[W]e have a set of policies, systemic requirements and procedures designed to prevent and minimize risks and protect lives."

- "In its management of environmental risks, Vale uses technical and operational procedures, control devices, qualified teams, specialist consultancies and periodic audits in order to identify, control and minimize the risks of its operations, and maintain tolerable levels[.]"

- "Operations are planned and conducted so as to cause the lease possible environmental impact."

- "Our commitment to environmental and social issues is . . . reflected in the way we manage specific kinds of waste in the production process."

- "Vale has . . . invested in processes, systems and tools for the automation of dams monitoring[.]"

- "Vale dams are constructed and operated following strict safety standards and

> audited periodically to monitor and reduce all potential risks, including structural failures."

*Id.* The Court concluded that Lead Plaintiffs plausibly alleged that Vale did not have a set of risk mitigation policies and procedures in place at its dams. Thus, according to the complaint, these statements were false or misleading. The Court also noted that "[t]he Sustainability Reports [did not] . . . exclude Samarco from their representations[.]" *Id.* at 41. Defendants argued that Samarco was "an independent company that was actually responsible for maintaining the Fundão Dam." Dkt No. 80, at 2. However, the Court held that a reasonable investor could have believed the statements in Vale's Sustainability Reports applied to the Fundão Dam. *Cf.* Motion to Dismiss Opinion at 41 (noting that "[t]he drafters of the [Vale] annual reports expressly limited their statements to Vale and its subsidiaries" while the drafters of the Sustainability Reports did not).

Second, the Court held that Lead Plaintiffs had stated a plausible claim for relief based on Defendant Pires' statements about Vale's responsibility for the Fundão Dam collapse during a November 16, 2015 conference call (the "Post-Collapse Statements"). Pires stated that:

> With regards to the relationship between Vale . . . and Samarco, let's remember that Vale . . . compete[s] with Samarco. So, in compliance with applicable Brazilian and international competition regulations, we are prohibited to directly interfere in Samarco's management[.]
>
> So therefore, Samarco had an independent management. And unlike other . . . affiliates, there were no resources shared between Vale and Samarco . . . whatsoever. So we did not share systems. We did not share support functions. We did not share, not even in Mariana, where Vale and Samarco were neighbors, we did not share any type of operations crews, or let's say, safety technicians or communications people or community relations people. No, they were all completely independent.

*Id.* The Court held that Lead Plaintiffs had plausibly alleged that these statements were false or misleading.

Lead Plaintiffs allege that the "[t]he truth behind Defendants' various false statements and omissions was gradually revealed to the market in a series of corrective disclosures." Am. Compl. ¶ 135. The corrective disclosure for the Pre-Collapse Statements occurred when the Fundão Dam

collapsed on November 5, 2015. Lead Plaintiffs allege two corrective disclosures for the Post-Collapse Statements. First, Brazilian prosecutors announced that they were going to sue Vale, BHP, and Samarco for $5.2 billion to "pay for the environmental damage they had caused and to compensate victims of the tragedy" on November 27, 2015. *Id.* ¶ 86. Second, a Brazilian court "ordered Vale (along with BHP and Samarco) to fund a comprehensive recovery plan to remediate the environmental and societal harm the collapse caused, and froze Vale's Brazilian mining assets to ensure that it complied with its obligations" on December 5, 2015. *Id.* Shortly thereafter, the three companies agreed to pay an estimated $6 billion for those purposes. *Id.*

Defendants subsequently moved for clarification and reconsideration of the Court's opinion on the motion to dismiss. Dkt No. 94. In response to that motion, the Court clarified that "(1) all claims against Defendant Pires based on pre-accident statements have been dismissed and all claims against Defendant Poppinga based on post-accident statements have been dismissed, and that (2) no claims based on statements in Vale's 2014 Sustainability Report or its 2013 and 2014 annual reports have survived." Dkt No. 103, at 1. The Court denied Defendants' motion in all other respects, and Defendants thereafter filed an answer to the complaint. Dkt No. 104.

Lead Plaintiffs filed this motion for class certification, appointment of ACERA and OCERS as class representatives, and for appointment of class counsel under Federal Rule of Civil Procedure 23(b)(3) (the "Motion"). Dkt. No. 112. The proposed class consists of "[a]ll persons or entities who purchased or otherwise acquired Defendant Vale S.A. . . . common or preferred American Depository Receipts ('ADRs') between November 7, 2013 and November 30, 2015, inclusive . . . and were damaged thereby." *Id.* at 1. Defendants filed an opposition (the "Opposition"), Dkt. No. 121, and Lead Plaintiffs submitted a reply (the "Reply"). Dkt. No. 124. Defendants subsequently requested and received leave to file a sur-reply (the "Sur-Reply"). Dkt No. 165. Lead Plaintiffs then requested and received leave to file a response to the Sur-Reply (the "Response"). Dkt No. 170.

## II.     CLASS CERTIFICATION

### A.  Standard

"A plaintiff seeking certification of a Rule 23(b)(3) class action bears the burden of satisfying the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well as Rule 23(b)(3)'s requirements:  (1) that 'the questions of law or fact common to class members predominate over any questions affecting only individual members' (the 'predominance' requirement); and (2) that 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy' (the 'superiority' requirement)."  *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (citations omitted).  The Second Circuit "has also recognized an implied requirement of ascertainability in Rule 23, which demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."  *Id.* (citations and quotation marks omitted).

"Rule 23 is not a 'mere pleading standard'; rather, 'a party seeking class certification must affirmatively demonstrate his compliance with the Rule.'"  *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 43 (S.D.N.Y. 2012) (quoting *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).  Accordingly, a district court should "assess all of the relevant evidence admitted at the class certification stage."  *Id.*

Class "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  *Wal–Mart*, 564 U.S. at 350-51 (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161 (1982)).  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim."  *Id.*  However, the Court must "assure that a class certification motion does not become a pretext for a partial trial of the merits."  *Teamsters Local 445*, 546 F.3d at 204 (citation omitted).  Thus, the "only question at class certification is

whether plaintiffs may pursue [their] claims on behalf of a class of similarly situated persons, or whether they must do so as individuals." *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 281 F.R.D. 134, 141 (S.D.N.Y. 2012) (citation, quotation marks, and brackets omitted).

### B.  Discussion

#### 1.  Rule 23(a)'s Requirements

##### a.  Numerosity

To satisfy Rule 23(a)'s numerosity requirement, the proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Numerosity is presumed for classes larger than forty members in the Second Circuit.  *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014).  The proposed class has more than forty members. *See* Expert Report of David I. Tabak, Ph.D., Exs. 5a & 5b, Dkt No. 114-1 ("Tabak Report"). Defendants do not contest that numerosity is satisfied.  Thus, the Lead Plaintiffs have met their burden to demonstrate numerosity.

##### b.  Commonality

Rule 23 requires that there must be "questions of law or fact common to the class" to support certification.  Fed. R. Civ. P. 23(a)(2).  To show commonality, a plaintiff must "demonstrate that the class members 'have suffered the same injury.'"  *Wal-Mart*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 157).  Rule 23 requires at least one "issue[] whose resolution will affect all or a significant number of the putative class members."  *Johnson v. Nextel Comm'ns Inc.*, 780 F.3d 128, 137-38 (2d Cir. 2015) (citation and quotation marks omitted).  "[A]n issue is common to the class when it is susceptible to generalized, class-wide proof."  *In re Nassau County Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006).  In *Wal–Mart*, the Supreme Court clarified that "[w]hat matters to class certification" is not the "raising of common questions" but rather "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  564 U.S. at 350.

Lead Plaintiffs contend that the two remaining sets of allegedly false or misleading statements at issue—Vale's pre-collapse statements in its 2013 and 2014 sustainability reports and Pires' post-collapse statements during the November 16, 2015 conference call—present five common questions of fact and law sufficient to satisfy the commonality requirement. These questions are: (1) "[w]hether Defendants' statements were false and misleading," (2) "[w]hether Defendants omitted material facts necessary to make their statements not misleading," (3) "[w]hether Defendants' statements were made with the requisite scienter," (4) "[w]hether the members of the Class sustained damages when the artificial inflation in Vale ADRs was eliminated," and (5) "[w]hether Defendants violated the federal securities laws." Motion at 8-9. Defendants respond that Lead Plaintiffs "attempt[] to frame" the proposed class "in the most generic terms possible by parroting the basic elements of a Rule 10b-5 claim as the 'common' questions presented here." Opposition at 6.

Defendants are correct that the common questions proposed by Lead Plaintiffs are insufficient to satisfy the commonality requirement because they are framed at too high a level of abstraction. As Defendants correctly note, Lead Plaintiffs' "common questions" are simply the elements of Rule 10b-5. For that reason, if Lead Plaintiffs' proposed questions satisfied the commonality requirement, no competently crafted class complaint alleging violations of Rule 10b-5 could ever fail to meet it.

It is true, as Lead Plaintiffs note, that courts in this District have concluded that the commonality requirement is a "low hurdle easily surmounted . . . particularly in securities fraud litigation." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04-cv-8144-CM, 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009). But that is because a typical securities fraud case involves the aggregation of claims that investors were defrauded by the same misstatement, or misstatements that

were part of the same course of conduct.[3]  Consider, as an example, the investors allegedly defrauded by the Pre-Collapse Statements in this case.  The truth or falsity of the Pre-Collapse Statements is a common issue for all pre-collapse investors; it is not a common issue for all post-collapse investors.  However, Lead Plaintiffs have chosen to seek certification of a single class for both the Pre- and Post-Collapse Statements.  Thus, general statements of law about the ease with which the various requirements of Rule 23 can be met in securities fraud litigation are inapposite to the present case.  For the same reasons, cases cited by Plaintiff in their opening motion are not persuasive in this context.  *See* Motion at 9 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 158 (S.D.N.Y. 2007), *aff'd in part, vacated in part*, 574 F.3d 29 (2d Cir. 2009)); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014)).  There is nothing analogous to the disconnect between the Pre- and Post-Collapse statements in those cases.

Although Lead Plaintiffs' proposed common questions are insufficient, the Court has concluded that Lead Plaintiffs' allegations can be viewed to present a common question:  Would a reasonable investor have believed that Samarco was independent of Vale?  Pre- and post-collapse investors will both need to prove Samarco's lack of independence from Vale—but for different purposes.  Pre-collapse investors must prove that a reasonable investor would have believed that the Pre-Collapse Statements, such as that "Vale dams are constructed and operated following strict safety standards," applied to the Fundão Dam.  In other words, pre-collapse investors will have to prove that a reasonable investor would have believed that the Fundão Dam *was* a "Vale dam[]."  Otherwise, statements in Vale's Sustainability Reports would have been irrelevant to the Fundão Dam's risk of collapse.  Of course, pre-collapse investors will also have to prove other facts, such as that Vale did not, in fact, apply "strict safety standards" to the Fundão Dam.  But proof of Samarco's relationship with Vale will be one key link in the evidentiary chain of liability.

---

[3] The Court discusses whether the Pre- and Post-Collapse statements can reasonably be characterized as part of the same "course of conduct" in its discussion of typicality, below.

For their part, post-collapse investors will have to prove that Samarco was not independent of Vale to prove the falsity of Pires' statement that, for example, "Samarco had an independent management." Stated simply, pre-collapse investors will need to prove that a reasonable investor would have believed that Vale controlled Samarco to prove relevance, while post-collapse investors will rely on many of the same facts to prove falsity. For the same reasons, Vale would likely argue that Samarco was an independent company as a defense to liability against the claims of pre- and post-collapse investors.

Pre- and post-collapse investors will thus rely on "generalized, class-wide proof" to prove a relationship between Vale and Samarco. *In re Nassau County Strip Search Cases*, 461 F.3d at 227. In addition, unlike Lead Plaintiffs' proposed common issues, this common question is framed at a level of abstraction that does not imply that any competently drafted class action complaint would satisfy the commonality requirement. The question of whether Samarco was independent of Vale is thus a question that will "generate common *answers* apt to drive resolution of the litigation." *Wal–Mart*, 564 U.S. at 350. Accordingly, the commonality requirement is satisfied.

### c. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement is satisfied "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented[.]" *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993). Thus, typicality requires that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Flag Telecom*, 574 F.3d at 35 (citation omitted); *cf. In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 275 (S.D.N.Y. 2008) (using the phrase "common course of conduct" instead of "same course of events"); *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 87 (S.D.N.Y. 2007) (using the phrase "sustained

course of conduct"); *Robbins v. Moore Med. Corp.*, 788 F. Supp. 179, 187 (S.D.N.Y. 1992) (using the phrase "common scheme to defraud").

This standard raises the question of whether the Pre- and Post-Collapse Statements were part of the "same course of events." *Flag Telecom*, 574 F.3d at 35. Equivalently, the question is whether Defendants' conduct, as alleged by Lead Plaintiffs, is part of a single scheme to defraud investors or is better characterized as two distinct frauds, one based on the Pre-Collapse Statements and the other on the Post-Collapse Statements.

The parties dispute this point. Lead Plaintiffs argue that Defendants' course of conduct was to "violate[] the Exchange Act by issuing public statements that misrepresented or omitted material facts to all investors." Motion at 10. Defendants again argue that Lead Plaintiffs' argument is framed at an excessively high level of generality. Opposition at 7. Defendants also note an "inherent conflict" in Lead Plaintiffs' theory. Lead Plaintiffs argue that the Pre-Collapse Statements "purportedly led investors to believe that Vale was taking various steps to ensure—and thus necessarily was responsible for—the safe operation and maintenance of the Fundão Dam." *Id.* at 5-6 (emphasis omitted). On the other hand, the post-collapse statements "allegedly led investors to believe that Vale had no responsibility for the safe operation and maintenance of the Fundão Dam." *Id.* at 6 (emphasis omitted). Defendants argue that class members will thus "have to advance conflicting arguments . . . depending on when they purchased Vale ADRs and what they purportedly believed about the relationship—if any—between Vale and Samarco's Fundão Dam." *Id.*[4] Lead Plaintiffs reply that on their view, the Pre- and Post-Collapse Statements were "a common scheme to mislead investors" and reject the argument that they have "allege[d] two distinct . . . theories." *Id.*

---

[4] Defendants raise these arguments with respect to the commonality requirement. However, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge" because "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart*, 564 U.S. at 350 n.5 (quoting *Falcon*, 457 U.S. at 157 n.13). Thus, Defendants' arguments on this point apply equally to typicality.

To support their single-course-of-conduct theory, Lead Plaintiffs cite cases in which courts have certified classes in which, as here, plaintiffs have asserted injury based on multiple allegedly false statements. *See* Reply at 6 (citing *Flag Telecom*, 245 F.R.D. at 158; *Alstom*, 253 F.R.D. at 275-76). Those cases are distinguishable because they alleged fraudulent misstatements that were more readily construed as part of a common scheme to defraud. In *Flag Telecom*, the plaintiffs asserted multiple causes of action based on different allegedly false statements. But all the statements identified by the plaintiffs were allegedly made to conceal the fact that demand for Flag Telecom's services was declining throughout the class period. 245 F.R.D. at 151-55. Similarly, in *Alstom*, all the statements identified by the plaintiffs allegedly "portrayed Alstom as a company with greater financial and market prospects than it had in actuality." 253 F.R.D. at 277. Thus, neither *Flag Telecom* nor *Alstom* presented facts in which, as here, the plaintiffs alleged a single fraudulent scheme that allegedly reversed its objective midcourse.

The Court finds *In re Imax Sec. Litig.* more analogous to the present case. 272 F.R.D. 138 (S.D.N.Y. 2010). That case centered on an allegation that IMAX had committed fraud by changing the manner in which it recognized theater system revenue. In rejecting a proposed lead plaintiff's claim that it satisfied typicality, the *Imax* court acknowledged that all the claims in the case "involve[d] alleged fraud relating to IMAX's recognition of theater system revenue, and thus there [was] a common thread throughout the allegations in the Complaint." *Id.* at 153. But this "common thread" was insufficient to meet the threshold to characterize the defendant's behavior as a "'sustained course of conduct' or 'common scheme to defraud,' to the limited extent that those terms are generally used to justify the appointment of a class representative who purchased prior to the end of the class period." *Id.* Because "the application of IMAX's revenue recognition policy changed throughout the class period," the proposed lead plaintiff's claim was not typical of other class members who had purchased after an initial corrective disclosure. Similarly here, there is a "common thread" running through Lead Plaintiffs' allegations because all of those allegations relate

to the collapse of the Fundão Dam.  But that is not enough for Defendants' behavior to be characterized as a single "course of conduct."

Lead Plaintiffs have failed to carry their burden to show that the injuries they allege from the Pre- and Post-Collapse Statements "arise[] from the same course of events."  *Flag Telecom*, 574 F.3d at 35.  The Court agrees with Defendants that Lead Plaintiffs' allegations of a single "scheme to defraud" only makes sense at an excessively high level of abstraction.  When considered at a more appropriate level of generality, Lead Plaintiffs' attempt to shoehorn the Pre- and Post-Collapse Statements into a single "common scheme" pushes that concept past its breaking point.  For that reason, Lead Plaintiffs have failed to establish the requisite typicality for the Court to certify a class.[5]

### d.        Adequacy

#### i.   Conflict of Interest

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Adequacy 'entails inquiry as to whether:  1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'"  *Flag Telecom*, 574 F.3d at 35 (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).  A conflict must be "fundamental" to "defeat class certification."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

---

[5] The Court takes no position on whether it would be appropriate to certify subclasses of pre- and post-collapse investors in this case.  Although a district court has the power to certify subclasses even when the parties do not argue the issue, "[i]t is not the District Court that is to bear the burden of constructing subclasses" and the Court "has no *sua sponte* obligation" to do so.  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980).

Defendants argue that Lead Plaintiffs are subject to a conflict of interest because they did not transact in Vale ADRs after the Post-Collapse Statements.  Opposition at 9.  Defendants argue that this renders Lead Plaintiffs inadequate in two respects.  First, Defendants argue that Lead Plaintiffs cannot seek damages for artificial inflation attributable to the Post-Collapse Statements because they cannot have relied on those statements.  *Id.* at 8.  Lead Plaintiffs concede that they made no purchases after the Post-Collapse Statements but respond that courts in this district have concluded that typicality can be "satisfied even" where a "class representative did not purchase shares after each false statement and through the end of the class period."  Reply at 2 (citing *Vivendi*, 242 F.R.D. at 87).

*Vivendi*, the case cited by Lead Plaintiffs, is inapposite.  The *Vivendi* court's conclusion relied on the premise that the defendant's multiple misstatements in that case were part of a "sustained course of conduct that propped up defendant's stock price throughout the class period."  242 F.R.D. at 87; *see also id.* ("[C]lass representatives [are] entitled to assert Section 10(b) claims 'arising from statements made both before and after the purchase date *if the statements allegedly were made in furtherance of a common scheme to defraud.*'" (quoting *Robbins*, 788 F. Supp. at 187 (emphasis added)).

Thus, the critical issue is whether the Pre- and Post-Collapse Statements were made in furtherance of a common scheme to defraud.  The Court concluded above that Lead Plaintiffs have effectively alleged two separate frauds in this case.  Hence, Lead Plaintiffs' claims are not typical of investors who purportedly relied on the Post-Collapse Statements, and Lead Plaintiffs cannot satisfy the adequacy requirement.

Second, Defendants contend that Lead Plaintiffs have a conflict of interest with class members who purchased after the Post-Collapse Statements because Lead Plaintiffs will attempt to maximize the price inflation attributable to the Pre-Collapse Statements.  *Id.* at 9.  But, as Lead Plaintiffs correctly note, the potential for a conflict of this kind is "inherent in any case involving multiple false statements and corrective disclosures."  Reply at 4.  The Second Circuit has affirmed

class certifications based on multiple misrepresentations despite the potential for this kind of conflict. *See, e.g.*, *Petrobras*, 862 F.3d at 258. Hence, if the Court had concluded that Defendants' misstatements were part of a sustained course of conduct, this would not have been a fundamental conflict sufficient to defeat class certification on its own.[6]

Defendants also argue that ACERA cannot satisfy the adequacy requirement with respect to the Common ADRs because it sold all of its Common ADRs before both the Pre- and Post-Collapse Statements. Opposition at 8. Lead Plaintiffs concede that ACERA sold its Common ADRs before the events at issue in this case. However, Lead Plaintiffs respond that ACERA continued to hold its Preferred ADRs and "holders of one type of security may represent holders of other securities if the same alleged misconduct drives the claims." Reply at 3 n.1 (citing *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 361 (S.D.N.Y. 2016), *aff'd in part, vacated in part on other grounds*, 862 F.3d 250 (2d Cir. 2017)). Lead Plaintiffs also note that Preferred and Common ADRs "responded in similar patterns to publicly available information." *Id.*; *see also* Rebuttal Expert Report of David I. Tabak, Ph.D., Dkt No. 125-1 ¶ 57 ("Tabak Rebuttal Report") (noting a correlation coefficient of 0.97 between Common and Preferred ADRs).

Lead Plaintiffs are correct. Where "the same alleged misconduct drives plaintiffs' claims, regardless of whether they arise from purchases of Notes, common ADS, or preferred ADS, the interests of" class members are aligned. *In re: Petrobras*, 312 F.R.D. at 361 (citing *In re Enron Sec. Litig.*, 206 F.R.D. 427, 445-46 (S.D. Tex. 2002) (collecting cases)). Here, the claims of holders of both Common and Preferred ADRs arise from the same allegedly false misstatements. Therefore, ACERA's divestment of its Common ADRs does not defeat its adequacy to serve as a class representative.

### ii. Unique Defenses

---

[6] Defendants do not challenge that Lead Plaintiffs' counsel is "qualified, experienced and able to conduct the litigation," *Flag Telecom*, 574 F.3d at 35, and the Court concludes that this prong of the adequacy requirement is satisfied.

In addition to the requirements for adequacy discussed above, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990), *abrogated on other grounds*, *Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017)).[7]  A class cannot be certified if there are issues that "risk dominating the class representatives' attention during litigation" so that the class representatives "may not also be protecting the interests of the class" by "defending their own interests." *Brown v. Kelly*, 609 F.3d 467, 480 (2d Cir. 2010) (citation omitted).

In their Opposition and Sur-Reply, Defendants raise several arguments related to Lead Plaintiffs' relationship with the Capital Group, an external investment manager, which they claim subject Lead Plaintiffs to unique defenses.  These arguments are unconvincing, and the Court only briefly addresses two of the major problems with Defendants' arguments.  First, none of the evidence proffered by Defendants suggests that the Capital Group's portfolio managers—who were responsible for its investment decisions—were indifferent to the market price of Vale ADRs.  As Lead Plaintiffs correctly note, Bruno Rodrigues, the Capital Group's analyst dedicated to covering Vale, testified that he was "certainly not" indifferent to the market price.  Excerpts of Deposition of Bruno Rodrigues, Dkt No. 171-2, at 165:14-166:01.  Thus, to the extent that the Pre-Collapse and Post-Collapse Statements are presumed to be factored into the market price, those statements were material to the Capital Group's investment decisions.

Second, even if Defendants' evidence suggested that the Capital Group had a "house view" on investment decisions and even if that "house view" was that Vale ADRs were a good investment after the corrective disclosures, that is irrelevant.  Lead Plaintiffs' theory is that the corrective

---

[7] Arguments that a Lead Plaintiff is subject to unique defenses are sometimes housed within typicality.  But it is immaterial to the Court's analysis "whether the issue is framed in terms of the typicality of the representative's claims or the adequacy of its representation[.]"  *Gary Plastic*, 903 F.2d at 180 (citations omitted).

disclosure caused the market price to decline.  The relevant question is thus whether the Capital Group's portfolio managers would have chosen to buy and hold Vale ADRs had they known the information contained in the corrective disclosures *before* it became public and was factored into the market price.  The only testimony relevant to this point came from Mr. Rodrigues who testified that he would have recommended that Capital Group portfolio managers sell their ADRs if he had known that the Fundão Dam would collapse and that the Brazilian government would find Vale partially liable for the collapse.  *Id.* at 198:04-16.

### 2.  Rule 23(b)(3) Requirements

In addition to satisfying Rule 23(a)'s requirements, the proposed class must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Here, Lead Plaintiffs seek certification under Rule 23(b)(3), which requires both that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  As with Rule 23(a)'s requirements, the plaintiff bears the burden of demonstrating predominance and superiority "by at least a preponderance of the evidence."  *Brown*, 609 F.3d at 476.

Defendants argue that Lead Plaintiffs cannot meet Rule 23(b)(3)'s predominance requirement for two reasons.  First, Defendants argue that Lead Plaintiffs are not entitled to the "fraud-on-the-market" presumption of reliance established by the Supreme Court in *Basic v. Levinson*, 485 U.S. 224 (1988).  Second, Defendants argue that Lead Plaintiffs have "failed to establish that 'damages are capable of measurement on a classwide basis.'"  Opposition at 17 (quoting *Comcast*, 569 U.S. at 34-35).

### a.  *Basic* Presumption

To recover under Section 10(b) of the Exchange Act, Lead Plaintiffs and class members

must establish:  (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *see also* W*aggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (citation omitted) (discussing the reliance requirement).  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation."  *Waggoner*, 875 F.3d at 93 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*")).  "In *Basic*, the Supreme Court dispensed with the requirement that an investor must prove awareness of a particular misstatement and instead *presumed* reliance where there was a 'fraud on the market.'"  *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 181 (S.D.N.Y. 2012) (Sullivan, J.).  "[T]he *Basic* presumption . . . permits reliance to be presumed in cases based on misrepresentations if the plaintiff satisfies certain requirements."  *Id.* (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 277-78 (2014) ("*Halliburton II*")).

Originally, in order "to invoke the *Basic* presumption, a plaintiff [had to] prove that:  (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed."  *Halliburton II*, 573 U.S. at 277-78 (citing *Basic* at 248 n.27).  However, in *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, the Supreme Court clarified that "proof of materiality is not required to establish that a proposed class is 'sufficiently cohesive to warrant adjudication by representation'—the focus of the predominance inquiry under Rule 23(b)(3)."  568 U.S. 455, 469 (2013) (quoting *Windsor*, 521 U.S. at 623).

The parties' dispute in this case centers on *Basic*'s third prong:  Whether the market for Vale ADRs was efficient.  The Second Circuit recently affirmed that it "has not adopted a test for the market efficiency of stocks or bonds."  *Petrobras*, 862 F.3d at 276 (citation and quotation marks omitted).  Nevertheless, in *Petrobras*, the Second Circuit explained that district courts routinely apply

a test based on factors first delineated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1283-87 (D.N.J. 1989) (the "*Cammer* Factors"), to determine whether a market is efficient. *See Petrobras*, 862 F.3d at 276. The *Cammer* Factors are:  "(1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases." *McIntire*, 38 F. Supp. 3d at 431 (citation omitted).  District courts also frequently consider three additional factors articulated in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (the "*Krogman* Factors").  The *Krogman* Factors are:  "(1) the company's market capitalization; (2) the relative size of the bid-ask spread for the security; and (3) the company's float, or the degree to which shares of the security are held by the public, rather than insiders." *McIntire*, 38 F. Supp. 3d at 431 (citing *Krogman*, 202 F.R.D. at 477-78).

Lead Plaintiffs argue—and Defendants do not dispute—that Vale ADRs satisfied the first four *Cammer* Factors and all three *Krogman* Factors.  The Court agrees that those factors are satisfied and support a finding that the *Basic* presumption applies in this case.  The parties' arguments center on the fifth *Cammer* Factor—"evidence of share price response to unexpected news." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 79 (S.D.N.Y. 2015).  Under this factor, the Court looks for "the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price." *Waggoner*, 875 F.3d at 94.  "Plaintiffs generally attempt to satisfy *Cammer* 5 by submitting an event study." *Id.*

"An event study is an empirical statistical analysis by which experts may 'disentangle the effects of two types of information on stock prices—information that is specific to the firm under question and information that is likely to affect stock prices marketwide.'" *In re Barclays Bank PLC Securities Litig.*, 756 F. App'x 41, 48 (2d Cir. 2018) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016) (brackets and ellipsis omitted)).  "An event study is similar to a medical

experiment in which there is a control group and a treatment group.  The control group provides the benchmark against which the treatment group is compared to determine if the event being studied had any effect."  *Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 80 (quoting Michael J. Kaufman & John M. Wunderlich, *Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation*, 15 Stan. J. L. Bus. & Fin. 183, 190 (2009)).  "The difference between the stock price movement we actually observe and the movement we expected to observe (i.e. the difference between the treatment and the control group) that occurs upon the release of a particular piece of information is called the excess price movement of the stock at the time of the event."  *Id.* (citation omitted).  Any "excess price movement is tested for statistical significance to see whether the result is unusual or unlikely to be explained by the normal random variations of the stock price."  *Id.* (citation omitted).

Both parties have submitted event studies by experts that analyze the effect of unexpected news on the price of Vale ADRs.  Lead Plaintiffs' expert, Dr. Tabak, focuses on stock price activity on two different groups of dates:  those with news ("News Days"), and those without news ("Non-News Days").  Tabak Report ¶ 33.  Dr. Tabak's study compares the percentage of News Days within the Class Period that are associated with statistically significant market-adjusted[8] ADR price movements with the percentage of statistically significant market-adjusted price movements in the control group of Non-News Days for both Common and Preferred ADRs.  *See id.* ¶ 36; Exs. 8a1, 8a2.  Dr. Tabak determined the "normal" relationship between Vale ADRs and the market as a whole by calculating the relationship between the two from May 8, 2013 through May 7, 2014; this is known as the "estimation period."  Dr. Tabak concluded that the excess price movement of both Common and Preferred ADRs on News Days was statistically significant as compared to Non-News Days.  *Id.* ¶¶ 36-38.  This analysis supports a finding that the Vale ADRs traded in an efficient

---

[8] Dr. Tabak uses the S&P ADR Return Index as his measure of the broader market.  *See* Tabak Report, Exhibit 8b1.

market.  *See Petrobras*, 862 F.3d at 278 ("An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facia* evidence of the existence of such a causal relationship.")

Defendants' expert, Dr. Torous, identifies three purported deficiencies in Dr. Tabak's report. First, Dr. Torous faults Dr. Tabak for failing to assess whether there was directional consistency between the excess returns and the type of news observed.  Opposition at 14; Rebuttal Expert Report of Walter N. Torous, Ph.D., Dkt No. 122-1 ¶¶ 25-26 ("Torous Report").  For example, if a News Day featured positive news, then the price of the ADRs should have increased.  In a rebuttal report, Dr. Tabak responds that providing an "objective analysis of directionality" is infeasible because the person conducting the analysis must subjectively determine which direction the ADR price "should" move in response to news.  Tabak Rebuttal Report ¶ 10.  For example, Dr. Tabak notes that "[a] company . . . may announce lower earnings this quarter, but higher guidance for the future."  *Id.*  Furthermore, the Court notes that a test of directional consistency, if it were feasible, would only serve as an additional robustness check on Dr. Tabak's original event study.  In other words, a check for directional consistency might improve Dr. Tabak's study.  But the lack of a directional consistency check does not undermine his conclusions.[9]

Second, Defendants contend that Dr. Tabak's event study is flawed because it does not control for industry-specific factors.  Dr. Torous argues that, without controlling for those factors, Dr. Tabak's event study cannot demonstrate that observed excess price movements were the result of Vale-specific news, as opposed to general trends in the metals and mining industries.  Opposition at 14; Torous Report ¶¶ 27-28.  In his rebuttal report, Dr. Tabak argues that controlling for industry effects is inappropriate given Vale's market position.  Tabak Rebuttal Report ¶ 16 n.9.  Vale is "one

---

[9] The Second Circuit has explained that *Cammer* does not require directional evidence of price impact.  *See Waggoner*, 875 F.3d at 97; *see also Petrobras*, 862 F.3d at 277-78 (rejecting argument that the district court gave undue weight to an empirical test that measured the magnitude of responsive price changes without considering the direction of those changes).

of the largest metals and mining companies in the world" and "[l]arge companies often have some degree of power to influence prices in markets." *Id.* Therefore, for example, "if Vale announced that it was restricting output in order to increase prices and create a net benefit to itself, the price increase would also benefit other producers[.]" *Id.* Thus, "positive Vale-specific news could raise the level of an index and Vale's ADR prices might not move substantially relative to the index even though the news was highly material." *Id.*

Third, Dr. Torous argues that Dr. Tabak's event study does not support statistical inferences concerning the behavior of Vale ADRs during the Class Period because it relies on an estimation period with substantially lower volatility than occurred during the Class Period. *See* Torous Report at ¶¶ 30-35. Dr. Tabak responds that because increased volatility "occur[red] on both news days and non-news days . . . [t]he higher volatility is . . . a form of 'noise,'" which "makes it harder to distinguish the two statistically." Tabak Rebuttal Report ¶ 18. Therefore, according to Dr. Tabak, the use of an estimation period with lower volatility biases his analysis *against* a finding that Vale ADRs moved in response to news. In a supplemental expert report, Dr. Torous renews his argument that Dr. Tabak's report is flawed because it does not account for the fact that his estimation period demonstrated lower volatility. Supplemental Rebuttal Expert Report of Walter N. Torous, Ph.D., Dkt No. 166-3 ¶ 14-18 ("Torous Supplemental Report"). However, in his supplemental rebuttal expert report, Dr. Tabak again claims that this would tend to bias his study against a finding of market reaction to news and thus tend to cut against a finding of efficiency. Supplemental Rebuttal Expert Report of David I. Tabak, Ph.D., Dkt No. 171-1 ¶ 7 ("Tabak Supplemental Rebuttal Report").

The Court questions Dr. Tabak's response in light of arguments made in the expert report of Dr. John Finnerty. Expert Report of John D. Finnerty, Ph.D., Dkt No. 173 ("Finnerty Report"). Lead Plaintiffs retained Dr. Finnerty to construct a model to prove loss causation and damages. In his report, Dr. Finnerty states that "[w]hen there is a substantial increase in the variance of the

security's returns during the event window, using a non-event estimation period to estimate the variance will lead to biased test results because the variance will be understated.  The bias will result in excessive rejections of the null hypothesis that the excess return is equal to zero." *Id.* ¶ 40.  In other words, higher volatility in the baseline period—which serves as the control group against which price movements during the class period are evaluated—can lead to the incorrect inference that price movements during the class period are not the result of random chance.  Although Dr. Finnerty constructed his model to measure damages and not the responsiveness of the ADR price to news, it is not clear why his argument about volatility would not hold in both contexts.

In his supplemental expert report, Dr. Torous conducts his own event study based on the market model proposed by Dr. Finnerty.  Dr Torous' event study found a difference between ADR price movements on News and Non-News Days, but this difference was not statistically significant. Torous Supplemental Report ¶ 21.  Dr. Torous argues that this model is superior because its estimation period has lower volatility and thus "better accounts for [the] heightened volatility" of the Class Period.  *Id.*

Another important difference between Dr. Tabak's and Dr. Torous' dueling event studies is that Dr. Torous' study, following Dr. Finnerty, dropped 29 News Days from its analyses.  The dropped dates include those on which the alleged misrepresentations and corrective disclosures occurred in this case, which would be associated with relatively large declines in ADR price on Lead Plaintiffs' theory.  *See* Finnerty Expert Report ¶ 42.  Hence, Dr. Tabak's model examines 393 News Days, while Dr. Torous' report includes only 364.  The Court agrees that the exclusion of these dates is inappropriate in the context of a study designed to measure the effect of news on Vale ADRs.  As Dr. Tabak explains, "it made sense for [Dr. Finnerty] to exclude dates with . . . news events related to the allegations in this case . . . [b]ecause Dr. Finnerty was trying to model the price movements of Vale's ADRs in the absence of potentially large news events related to the allegations in this case."  Tabak Supplemental Rebuttal Report ¶ 9 n.3.  In other words, because the purpose of

Dr. Finnerty's model was to provide a baseline against which he could measure price movements associated with corrective disclosures, it was sensible to exclude the dates of corrective disclosures from the analysis.  However, excluding these dates from the analysis of whether the price of ADRs moves in response to news does not make sense.  Those are dates on which Lead Plaintiffs allege that important information was revealed to the market.  Consequently, the price movement associated with these dates may be some of the most relevant evidence for determining whether the price of Vale ADRs responds to news.  Moreover, Dr. Torous did not justify the exclusion of those dates from his analysis; he did so merely because Dr. Finnerty did so in an event study designed to study a different topic.

In response to Dr. Tourous' event study, Dr. Tabak raises two additional arguments.  First, Dr. Tabak notes that the use of "a poor market model" should "lead to more random results, not to ones in which the results align themselves so that news days are more likely to be associated with statistically significant price movements than non-news days are."  *Id.* ¶ 20.  Second, Dr. Tabak notes that "[i]f one accepts that both [event studies] . . . are valid, there is a statistical method to account for performing both tests," known as a "'multiple-comparisons' adjustment."  *Id.* ¶ 22.  Dr. Tabak notes that his event study found significance at the 2.5 percent level, which is the "most stringent assumption" that one could make in performing a multiple-comparisons adjustment.  Hence, even if the Court accepted Dr. Tabak's and Dr. Torous' assessments as equally valid, Dr. Tabak's study still supports a finding that the price of Vale ADRs exhibited a statistically significant reaction to news.

It is difficult to evaluate the strength of the parties' event studies because each of them is flawed in at least one respect.  On the one hand, Dr. Torous has noted that the heightened volatility of ADRs during the proposed class period is problematic for Dr. Tabak's event study.  On the other hand, Dr. Tabak is correct that the exclusion of twenty-nine highly relevant dates from Dr. Torous' analysis—although reasonable in the context of a damages model—is problematic in this context.

24

While the issue is close, the Court is convinced that Lead Plaintiffs have carried their burden to demonstrate that Vale ADRs responded to news as required by the fifth *Cammer* Factor.  In the Court's view, the multiple-comparisons adjustment suggested by Dr. Tabak is sufficient to tip the scales toward Lead Plaintiffs.

Even if Lead Plaintiffs had failed to satisfy the fifth *Cammer* Factor, the Court's conclusion that the market for Vale ADRs was efficient would remain unchanged.  The remaining four *Cammer* Factors and three *Krogman* Factors support a finding of market efficiency.  The Second Circuit explained that if these seven factors are satisfied, the fifth *Cammer* Factor is not necessary for a finding of market efficiency:

> [W]e conclude that a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies.  In so concluding, we do not imply that direct evidence of price impact under *Cammer* 5 is never important[.]  Direct evidence of an efficient market may be more critical, for example, in a situation in which the other four *Cammer* factors (and/or the *Krogman* factors) are less compelling in showing an efficient market[.]  The *Cammer* and *Krogman* factors are simply tools to help district courts analyze market efficiency in determining whether the *Basic* presumption of reliance applies in class certification decision-making.  But they are no more than tools in arriving at that conclusion, and certain factors will be more helpful than others in assessing particular securities and particular markets for efficiency.

*Waggoner*, 875 F.3d at 97-98.  Defendants have not challenged that the other four *Cammer* and the three *Krogman* Factors are satisfied in this case.  In particular, the Court emphasizes that Vale is a multi-billion-dollar company, and that its securities traded in a highly liquid market.  These facts strongly support a finding of market efficiency in this case.  Accordingly, Lead Plaintiffs are entitled to the *Basic* presumption.[10]

### b.  Damages

---

[10] In their opening Motion, Lead Plaintiffs also argue that they are entitled to the presumption of reliance established in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  Because Lead Plaintiffs "focus their claims on . . . affirmative misstatements," the *Affiliated Ute* presumption does not apply.  *Waggoner*, 875 F.3d at 96.

The parties' final dispute is about whether damages can be calculated classwide.  Lead Plaintiffs must prove that "damages are capable of measurement on a classwide basis" to satisfy Rule 23(b)(3)'s predominance requirement.  *Comcast*, 569 U.S. at 34.  In addition, "a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury."  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (citing *Comcast*, 569 U.S. at 34-35).  Defendants contend that Lead Plaintiffs cannot meet either of these requirements.  *See* Opposition at 15-18.

Lead Plaintiffs have submitted an expert report by Dr. John Finnerty, which opines that damages can be calculated on a classwide basis.  Dr. Finnerty's model calculates "[d]amages per ADR . . . based on the difference between the actual ADR prices during the damage period and the ADR prices that would have prevailed had the alleged fraud not occurred . . . and the number of shares exposed to the alleged fraud."  Finnerty Report ¶ 79.  "The abnormal returns net of all market-wide, industry-wide, and Vale-specific effects unrelated to the alleged fraud . . . represent the amount of damages per ADR attributable to the disclosure of the alleged fraud on each of the corrective [d]isclosure [d]ates."  *Id.* ¶ 84.  Dr. Finnerty's model computes artificial inflation for Common and Preferred ADRs on each of the disclosure dates.  *Id.* ¶ 87.  Dr. Finnerty's model answers the potential problems raised by Defendants.  Opposition at 17-18.  Hence, based on Dr. Finnerty's model, Lead Plaintiffs have carried their burden of showing that damages can be calculated on a classwide basis.  This computation of damages is also consistent with Lead Plaintiffs' theory of fraud.[11]

### III.    CONCLUSION

---

[11] Lead Plaintiffs must show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Defendants have not argued that Lead Plaintiffs have failed to meet the superiority requirement, and the Court finds that the requirement is met in this case.  Lead Plaintiffs must also show that the class is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."  *Petrobras*, 862 F.3d at 270.  Again, Defendants do not argue that Lead Plaintiffs have not met the ascertainability requirement, and the Court again concludes that this requirement is met here.

Because Lead Plaintiffs have not shown that the Pre- and Post-Collapse Statements were the result of a sustained course of conduct or a common scheme to defraud, they have failed to meet the adequacy and typicality requirements of Rule 23(a).  Therefore, the motion to certify the class is DENIED without prejudice.

The Clerk of Court is directed to terminate the motion pending at Dkt No. 112.

SO ORDERED.

Dated:  September 27, 2019
New York, New York

_____
GREGORY H. WOODS
United States District Judge