**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: VALE S.A. SECURITIES LITIGATION | Case No. 15 Civ. 09539 (GHW)<br><br>Consolidated with Case No. 16 Civ. 00658 (GHW) |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS'**
**MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION**

**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**
John C. Browne
Gerald H. Silk
Avi Josefson
1251 Avenue of the Americas, 44th Floor
New York, NY 10020

-and-

Richard D. Gluck (*Pro hac vice*)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130

*Counsel for Lead Plaintiffs and Lead*
*Counsel for the Settlement Class*

Dated:  May 6, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ...................................................................................................................... 5

I.     THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL .......................... 5

     A.    Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class .............................................................................................. 7

     B.    The Settlement Was Reached After Arm's-Length Negotiations with the Assistance of an Experienced Mediator and Following Full Discovery ................. 8

     C.    The Relief that the Settlement Provides for the Settlement Class is Adequate, Taking into Account the Costs and Risks of Further Litigation and All Other Relevant Factors .............................................................. 11

          1.    The Risks of Establishing Liability and Damages Support Approval of the Settlement ........................................................ 12

               (a)    Risks To Proving Liability ................................................. 12

               (b)    Risks To Proving Loss Causation and Damages .......................... 15

          2.    The Settlement Represents a Substantial Percentage of Likely Recoverable Damages ................................................................. 17

          3.    The Costs and Delays of Continued Litigation Support Approval of the Settlement ............................................................ 18

          4.    All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement ........................................................ 19

     D.    The Settlement Treats Class Members Equitably Relative to Each Other ............ 21

     E.    The Reaction of the Settlement Class to the Settlement ....................................... 21

II.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED .................................................................................... 22

III.   THE SETTLEMENT CLASS SHOULD BE CERTIFIED ........................................... 24

IV.   NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS ........................................................................... 24

CONCLUSION..............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Advanced Battery Techs.*,
  298 F.R.D. 171 (S.D.N.Y. 2014); ..................................................................25

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) .....................................................................................7

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ....................................................................7

*In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012) ................................................9, 21, 22

*In re Canadian Superior Sec. Litig.*,
  2011 WL 5830110 (S.D.N.Y. Nov. 16, 2011) ...............................................18

*In re China Sunergy Sec. Litig.*,
  2011 WL 1899715 (S.D.N.Y. May 13, 2011) ...............................................18

*In re Citigroup Inc. Sec. Litig.*,
  2014 WL 2112136 (S.D.N.Y. May 20, 2014) .................................................5

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)...............................................................6, 8, 11

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)...........................................................................8

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)...................................................................................15

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)...................................................................................24

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015),
  *aff'd*, 674 F. App'x 37 (2d Cir. 2016).................................................8, 9, 17

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
  2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)........................................11, 21, 22

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)....................................................................15, 16

*Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*,
   615 F. Supp. 2d 218 (S.D.N.Y. 2009)..................................................................15

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
   279 F.R.D. 151 (S.D.N.Y. 2011) ....................................................................9, 22

*In re Gilat Satellite Networks, Ltd.*,
   2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ........................................................18

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000)....................................................................................6

*Hefler v. Wells Fargo & Co.*,
   2018 WL 6619983 (N.D. Cal. Dec. 18, 2018)......................................................20

*In re IMAX Sec. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) .........................................................................22

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009)..................................................................22

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
   233 F.R.D. 306 (E.D.N.Y. 2006) .........................................................................11

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   2007 WL 313474 (S.D.N.Y. Feb. 1, 2007)...........................................................18

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) .........................................................................11

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   330 F.R.D. 11 (E.D.N.Y. 2019) ............................................................................7

*Shapiro v. JPMorgan Chase & Co.*,
   2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ......................................................10

*Singh v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019)............................................................................13, 14

*In re Veeco Instruments Inc. Sec. Litig.*,
   2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)............................................10, 17, 21

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005)..........................................................................5, 6, 9, 24

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982)...................................................................................8

**RULES**

Fed. R. Civ. P. 23(c)(2)(B) ...........................................................................................24, 25

Fed. R. Civ. P. 23(e) ............................................................................................... *passim*

In accordance with Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs Alameda County Employees' Retirement Association ("ACERA") and Orange County Employees Retirement System ("OCERS"), on behalf of themselves and the Settlement Class, respectfully submit this memorandum of law in support of their motion for final approval of: (1) the proposed settlement resolving the Action for the payment of $25 million in cash for the benefit of the Settlement Class (the "Settlement"), and (2) the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation").[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiffs have agreed to settle the Action in exchange for a cash payment of $25 million, which has been deposited into an escrow account.  Lead Plaintiffs respectfully submit that the proposed Settlement is fair, reasonable, and adequate and satisfies all the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure.  As detailed in the accompanying Gluck Declaration and summarized below, the Settlement was reached only after four years of vigorous litigation, complete fact and expert discovery, and prolonged settlement negotiations, including mediation with an experienced class-action mediator.[2]

---

[1] Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated February 5, 2020 (ECF No. 183-1) as amended on February 20, 2020 (ECF No. 188-2) (the "Stipulation"), or in the Declaration of Richard D. Gluck in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Gluck Declaration" or "Gluck Decl."), filed herewith.  In this memorandum, citations to "¶ __" refer to paragraphs in the Gluck Declaration and citations to "Ex. __" refer to exhibits to the Gluck Declaration.

[2] The Gluck Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, among other things: the history of the Action (¶¶ 11-69); the nature of the claims asserted (¶¶ 12-14, 19); the negotiations leading to the Settlement (¶¶ 61-65); the risks and uncertainties of continued litigation (¶¶ 70-86); and the terms of the Plan of Allocation for the Settlement proceeds (¶¶ 93-102).

The development of the case over four years of vigorous litigation strongly supports approval of the Settlement. At the time the agreement to settle was reached, Lead Plaintiffs and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the Action. Before the Settlement was agreed to, Lead Counsel had (i) conducted an extensive investigation into the claims asserted, including through a detailed review of public documents, interviews with possible witnesses, and consultation with experts; (ii) researched and drafted a detailed consolidated complaint; (iii) researched and briefed Lead Plaintiffs' opposition to Defendants' motion to dismiss; (iv) prepared and filed Lead Plaintiffs' motion for class certification; (v) completed far-reaching fact and expert discovery, including serving document requests on Defendants, serving Letters Rogatory and document subpoenas on non-parties, obtaining and reviewing more than 1.3 million pages of documents produced by Defendants and non-parties as a result of these efforts, and taking, defending, or participating in 21 depositions; (vi) consulted extensively throughout the litigation with a variety of experts and consultants, including experts in financial economics, geotechnical engineering, corporate governance, and Brazilian antitrust law; and (vii) engaged in extensive arm's-length settlement negotiations over many months to achieve the Settlement. ¶¶ 5, 17-65.

The $25 million Settlement is particularly favorable given the substantial risks of continued litigation. This was not a case with clearly false or restated financial statements or a parallel government enforcement action alleging securities fraud to support Lead Plaintiffs' claims. On the contrary, the Action presented many significant risks to establishing both liability and damages through continued litigation. To survive summary judgment and succeed at trial, Lead Plaintiffs would have had to prove that statements in Vale's 2013 Sustainability Report about the safety of Vale's dams and operations and about the Company's risk-mitigation policies and procedures were

actionable false statements, rather than unactionable puffery, and that these statements applied to Samarco, the Vale joint venture that operated the Fundão Dam, which collapsed on November 5, 2015.  Lead Plaintiffs would also have to prove that Defendants made the alleged false statements with intent to mislead investors or were reckless in making the statements.  Proving these elements would have presented challenges in light of Second Circuit law and factual arguments Defendants could make about their lack of access to information contradicting the statements in the Sustainability Report and the existence of other documents they received that supported the accuracy of the statements and gave them a reasonable basis to accept them as true.

Even if Lead Plaintiffs succeeded in establishing the falsity of the statements and Defendants' scienter, they would have faced very serious challenges in establishing that the disclosure of the alleged misstatements caused investors' losses ("loss causation") and in proving damages.  There were major challenges in connecting investor's losses to the pre-collapse alleged misstatements about Vale's safety and risk-management procedures because the decline in the price of Vale ADRs immediately after the collapse of the Fundão Dam was not statistically significant, when adjusted for market and industry factors.  The price of Vale ADRs dropped more significantly after two additional alleged corrective disclosures – when Brazilian prosecutors announced they had filed a lawsuit against Vale for its role in the collapse of the Dam and when a Brazilian court later found that Vale likely was liable for the environmental harm because of its use of the Fundão Dam and its control of Samarco – but Lead Plaintiffs would have faced challenges in proving that the price declines on those days resulted from new revelations of the falsity of the pre-collapse statements at issue, rather than other factors.  Defendants would have argued strongly that neither of those alleged corrective disclosures revealed new information about the pre-collapse fraud that Lead Plaintiffs alleged.  In short, there were several significant risks

that could have resulted in the Settlement Class obtaining no recovery or a lesser recovery as a result of continued litigation.

Absent the Settlement, the Parties faced the prospect of protracted litigation through summary judgment, pre-trial motion practice, a complex trial, post-trial motion practice, individual class member loss causation and damages challenges, and likely ensuing appeals.  The Settlement avoids these risks and delays while providing a substantial, certain, and immediate benefit to the Settlement Class in the form of a $25 million cash payment.

The Settlement reflects the Court's finding that Lead Plaintiffs' claim based on the alleged falsity of Defendants' November 16, 2015 (post-collapse) statements about the relationship between Vale and Samarco constituted a separate fraud from their claim based on pre-collapse statements and could not be adequately asserted by Lead Plaintiffs, who had only purchased Vale ADRs before the Dam collapsed.  ECF No. 176.  The proposed Settlement recognizes the Court's decision by limiting the Settlement Class to "persons and entities that purchased or otherwise acquired Vale common or preferred ADRs during the Class Period and were damaged as a result of declines in the prices of Vale ADRs allegedly caused by the revelation of the truth of alleged false statements made by Vale before the collapse of the Fundão Dam on November 5, 2015 concerning the safety of its mining operations and dams, including, in particular, various representations concerning Vale's risk mitigation plans, policies and procedures."  Stipulation ¶ 1(nn).  Similarly, the scope of the Settlement Class's release is limited to claims based on facts, allegations, or representations in the Complaint "which occurred prior to the collapse of the Fundão Dam on November 5, 2015."  Amendment to Stipulation (ECF No. 188-2), at ¶ 1.

The Settlement has the full support of the Court-appointed Lead Plaintiffs, both of which are sophisticated institutional investors that took an active role in supervising the litigation and

participated directly in settlement negotiations.  Further, although the deadline to request exclusion from the Settlement Class or object to the Settlement has not yet passed, to date, no Settlement Class Members have objected to the Settlement and only three have requested exclusion.[3]

Given these considerations and the other factors discussed below, Lead Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court.  Additionally, Lead Plaintiffs request that the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Settlement Class Members.  The Plan of Allocation, which Lead Counsel developed in consultation with Lead Plaintiffs' damages expert, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims based on damages they suffered on purchases of Vale ADRs that were attributable to the alleged fraud.

## ARGUMENT

## I.  THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims.  *See* Fed. R. Civ. P. 23(e).  A class-action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Second Circuit has recognized that public policy favors the settlement of disputed claims among private litigants, particularly in class actions.  *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("*Visa*") ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'") (citation omitted).  In ruling on final approval of a class settlement, the court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms.  *See Visa*, 396 F.3d at 116; *In re*

---

[3] The deadline is May 20, 2020.  Lead Plaintiffs will address all requests for exclusion and any objections received in their reply papers, which will be filed on June 3, 2020.

*Citigroup Inc. Sec. Litig.*, 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014).

Rule 23(e)(2), as amended on December 1, 2018, provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  As discussed below, all of these factors strongly support approval of the Settlement here.

Historically, the Second Circuit has held that district courts should consider following factors set forth in *City of Detroit v. Grinnell Corp.* in evaluating a class-action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), *see also Visa*, 396 F.3d at 117.

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."  Advisory Committee Notes to 2018 Amendments.

Accordingly, Lead Plaintiffs will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four factors set forth in Rule 23(e)(2), but will also discuss the application of relevant, non-duplicative *Grinnell* factors. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019) ("The Court understands the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors.").

### A. Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class

In determining whether to approve a class-action settlement, the court should consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A); *see generally In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) (noting that "the adequacy requirement 'entails inquiry as to whether: 1) plaintiffs' interests are antagonistic to the interest of other members of the class and 2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation'").

First, there is no antagonism or conflict between Lead Plaintiffs and the proposed Settlement Class. Lead Plaintiffs and Settlement Class Members purchased Vale ADRs during the Class Period and were all injured by the same alleged pre-collapse false statements. If Lead Plaintiffs were to prove their claims at trial, they would also prove the Settlement Class's claims. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions). The Settlement, its definition of the Settlement Class, and scope of its Release address the Court's decision that Lead Plaintiffs may not adequately represent investors asserting claims for Defendants' post-collapse statements by (i) limiting the Settlement Class to investors who were harmed by revelation of the falsity of Defendants' pre-collapse statements, *see* Stipulation (ECF

No. 183-1) ¶ 1(nn); and (ii) limiting the Settlement Class's release to claims arising from the pre-collapse statements, *see* Amendment to Stipulation (ECF No. 188-2) ¶ 1.

Lead Plaintiffs and Lead Counsel have adequately represented the Settlement Class in both their vigorous prosecution of the Action for four years and in the negotiation and achievement of the Settlement.  In addition, Court-appointed Lead Counsel is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. 5 to the Gluck Declaration) and was able to successfully conduct the litigation against skilled opposing counsel.  Accordingly, Lead Plaintiffs and Lead Counsel have adequately represented the Settlement Class.

**B.    The Settlement Was Reached After Arm's-Length Negotiations with the Assistance of an Experienced Mediator and Following Full Discovery**

In weighing approval of a class-action settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).  Courts have traditionally considered other related circumstances in determining the "procedural" fairness of a settlement, including (i) counsel's understanding of the strengths and weakness of the case based on factors such as "the stage of the proceedings and the amount of discovery completed,"[4] (ii) the absence of any indicia of collusion;[5] and (iii) the involvement of a mediator.[6]  All of these circumstances strongly support the approval of the Settlement here.

---

[4] *See Grinnell*, 495 F.2d at 463 (third factor); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *4 (S.D.N.Y. Nov. 9, 2015) ("the question is whether the parties had adequate information about their claims, such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement"), *aff'd*, 674 F. App'x 37 (2d Cir. 2016).

[5] *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) ("the absence of any indication of collusion, the protracted settlement negotiations, the ability and experience of plaintiffs' counsel, [and] the extensive discovery preceding settlement . . . are important indicia of the propriety of settlement negotiations").

[6] *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a mediator's involvement in settlement negotiations "helps to ensure that the proceedings were free of collusion and undue pressure").

The Settlement was reached only after months of arm's-length negotiations between experienced counsel, which included a full-day mediation session with former Judge Layn Phillips, an experienced mediator of securities class actions and other complex litigation.  ¶¶ 61-65.  *See In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding a settlement fair where the parties engaged in "arm's length negotiations," including mediation before "retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases"); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (a settlement was entitled to a presumption of fairness where it was the product of "arms-length negotiation" facilitated by Judge Phillips, "a respected mediator")

Indeed, the Settlement merits a presumption of fairness because it was achieved after extensive arm's-length negotiations between experienced counsel after full discovery.  *See Visa*, 396 F.3d at 116 (a class action settlement is entitled to a "presumption of fairness, adequacy, and reasonableness" when "reached in arms' length negotiations between experienced, capable counsel after meaningful discovery"); *Facebook*, 2015 WL 6971424, at *3 (same).

As noted above, the Parties and their counsel were extremely well informed about the strengths and weaknesses of the case before reaching the agreement to settle.  Lead Counsel conducted a detailed substantive investigation before filing the Complaint by, among other things, reviewing SEC filings, analyst research reports, investor conference calls, press releases, media reports, sworn testimony and documentary evidence obtained by Brazilian prosecutors, and other public material; consulting with several experts; and contacting dozens of potential witnesses. ¶¶ 17-18.  Lead Counsel also performed extensive legal research in preparing the Complaint and the briefing in opposition to Defendants' motion to dismiss.  ¶¶ 17, 19-23.  After the motion to dismiss was denied, Lead Counsel obtained and reviewed an enormous amount of documentary

and testimonial evidence, including 1.3 million pages of documents produced by Defendants and non-parties, deposition testimony from 10 current and former Vale executives, and testimony from five Brazilian entities that designed, maintained, or worked on the Fundão Dam.  ¶¶ 28-41.  Lead Counsel also consulted extensively with experts in financial economics, geotechnical engineering, corporate governance, and Brazilian antitrust law throughout the litigation to enhance their understanding of the complex subject matter involved in the Action, and engaged in complete expert discovery, including exchanging numerous expert reports and taking or defending eight expert depositions.  ¶¶ 43-52.  Finally, the Parties engaged in prolonged settlement negotiations, including a mediation session, before which the Parties exchanged detailed mediation statements—all of which further informed the Parties of the strengths and weaknesses of each side's case.  ¶¶ 61-65.

Thus, the conclusion of Lead Plaintiffs and Lead Counsel that the Settlement is fair and reasonable and in the best interests of the Settlement Class strongly supports its approval.  Lead Plaintiffs are both sophisticated institutional investors that took an active role in supervising this litigation, as envisioned by the PSLRA, and they have strongly endorsed the Settlement.  *See* Declaration of Susan L. Weiss on behalf of ACERA (Ex. 1) ("Weiss Decl.") at ¶¶ 2-8; Declaration of Gina M. Ratto on behalf of OCERS (Ex. 2) ("Ratto Decl.") at ¶¶ 2-8.  A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness.'"  *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007).

In addition, the judgment of Lead Counsel, who are highly experienced in securities class-action litigation, that the Settlement is in the best interests of the Settlement Class is entitled to "great weight."  *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *2 (S.D.N.Y. Mar.

24, 2014); *accord In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts have consistently given "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation").

>   **C.    The Relief that the Settlement Provides for
>   the Settlement Class is Adequate, Taking into Account the Costs
>   and Risks of Further Litigation and All Other Relevant Factors**

In determining whether a class action settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" as well as other relevant factors.  Fed. R. Civ. P. 23(e)(2)(C).  In most cases, this will be the most important factor for the Court to consider in its analysis of the proposed settlement.  *See Grinnell*, 495 F.2d at 455 ("The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.").[7]

"[I]n evaluating the settlement of a securities class action, federal courts, including this Court, 'have long recognized that such litigation is notably difficult and notoriously uncertain.'" *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010) (citation omitted).  Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."  *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).  This case was no exception.

---

[7] Indeed, this factor under Rule 23(e)(2)(C) essentially encompasses at least six of the nine factors of the traditional *Grinnell* analysis.  *See Grinnell*, 495 F.2d at 463 ("(1) the complexity, expense and likely duration of the litigation; . . . (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; . . . (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation") (citations omitted).

As discussed in detail in the Gluck Declaration and below, continued litigation of the Action presented a number of significant risks that Lead Plaintiffs would be unable to establish liability, loss causation, or damages.  ¶¶ 70-82.   In addition, continuing the litigation through trial and appeals would impose substantial additional costs on the Settlement Class and would result in extended delays before any recovery could be achieved.   ¶¶ 85, 116.   The Settlement, which provides a $25 million cash payment for the benefit of the Settlement Class, avoids those further costs and delays.   Moreover, the Settlement represents approximately 11% to 16% of the likely recoverable damages that could be established at trial (assuming Lead Plaintiffs prevailed on liability issues), and thus represents a favorable outcome given the litigation risks.  ¶¶ 83-84.

**1.    The Risks of Establishing Liability and
Damages Support Approval of the Settlement**

While Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize that this Action presented several substantial risks to establishing both liability and damages.

**(a)    Risks To Proving Liability**

For the purposes of this Settlement, Lead Plaintiffs' claims are premised ***only*** on the pre-collapse statements in Vale's 2013 Sustainability Report about the safety of Vale's operations and about Vale's risk-mitigation plans, policies and procedures.[8]   Defendants had vigorously contested and would have continued to argue that their challenged statements in the Sustainability Report were not false or misleading, were not actionable, and were not made with scienter.   While these arguments were not successful at the motion-to-dismiss stage, Defendants could have succeeded in these arguments at subsequent stages of the litigation when allegations in the

---

[8] As discussed above, the Stipulation, as amended, does not release any claims related to allegedly false statements made after the collapse of the Fundão Dam on November 5, 2015.  *See* ECF No. 188-2.

Complaint would need to be supported by admissible evidence. ¶¶ 71, 73, 76.

*Falsity.* Defendants would have argued at summary judgment and at trial—as they had previously—that these alleged misstatements in the Sustainability Report about the safety of Vale's operations and the Company's risk-mitigation policies and procedures were too vague and indefinite to support a fraud claim. ¶ 73. Defendants would have argued that the positive statements in the Sustainability Report about Vale's safety policies and procedures were precisely the type of "simple and generic assertions about having 'policies and procedures'" that are inactionable puffery under Second Circuit law. *See Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019). Although the Court rejected Defendants' puffery argument in denying the motion to dismiss, the Court's decision came before the Second Circuit's decision in *Singh.* Thus, while Lead Plaintiffs and Lead Counsel believe that the *Singh* decision is distinguishable and that Defendants' statements were, as the Court found previously, concrete assertions of fact, there is a risk that the Court could revisit its prior decision and reach a different conclusion. ¶ 74. Such a decision would be fatal to Lead Plaintiffs' claims. *Id*.

Defendants would also have argued that the statements are not actionable for the independent reason that the 2013 Sustainability Report expressly carved out Samarco facilities (like the Fundão Dam) from its scope. ¶ 75. The Court accepted a similar argument about statements in Vale's Annual Reports in its ruling on the motion to dismiss. *Id*. Although Lead Plaintiffs vigorously disagree with Defendants' reading of the Sustainability Report's scope, this argument, which had not previously made to the Court, also posed some risk. *Id*.

*Scienter.* Even if Lead Plaintiffs succeeded in proving that Defendants' statements were actionably false, Lead Plaintiffs would have faced additional challenges in proving that Defendants made the statements with the intent to mislead investors or were reckless in doing so. ¶¶ 76-78.

The Court found in its order on Defendants' motion to dismiss that Lead Plaintiffs had sufficiently pled scienter for the alleged false statements in the 2013 Sustainability Report by pleading that Defendant Poppinga, as a Samarco Board member, had access to Board minutes and other documents that contradicted the statements in the Sustainability Report.   ¶ 76.   However, Defendants had indicated that they would move for summary judgment on the ground that Poppinga was not yet on the Samarco Board in April 2014, when the 2013 Sustainability Report was published, and there was no evidence suggesting that he had access to information concerning the Fundão Dam before he joined the Board in January 2015.   *Id*.

In response, Lead Plaintiffs would have provided evidence, including testimony from Defendant Poppinga himself, that he had access to information about the problems at the Fundão Dam before the publication of the Sustainability Report, including a 2010 audit report and several more recent reports from Samarco's Independent Tailings Review Board ("ITRB").   ¶ 77.   Lead Plaintiffs also would have submitted evidence that other Vale senior executives who attested to the accuracy of the statements in the Sustainability Report were aware of, had received, or had access to information that contradicted the Company's statements.   *Id*.

Nonetheless, Defendants would have pointed to other presentations and documents in which the ITRB and other consultants attested to the safety and structural integrity of the Dam in the months leading up to publication of the 2013 Sustainability Report.   ¶ 78.   Defendants would have asserted that those documents show that they reasonably believed the statements in the Sustainability Report, negating any inference that they acted with the requisite scienter.   *Id*.   While Lead Plaintiffs and Lead Counsel believe there were genuine issues of material fact that would preclude summary judgment, there is significant risk that the Court would disagree.   And, even if Lead Plaintiffs were able to survive summary judgment, it is difficult—if not impossible—to

predict how a jury would decide this factual issue at trial. A decision in Defendants' favor, at either summary judgment or trial, would be fatal to the claims of Lead Plaintiffs and the Settlement Class.

In short, it was far from certain that Lead Plaintiffs would be able to prove the falsity of Defendants' statements and Defendants' scienter through summary judgment and at trial.

### (b) Risks To Proving Loss Causation and Damages

Even if Lead Plaintiffs were able to prove falsity and scienter at trial, they still faced significant risks in proving loss causation and damages. Those issues played a very important role in determining the reasonable value for the Settlement. ¶ 80.

As the Court is aware, Lead Plaintiffs bear the burden of establishing loss causation – that is, that "plaintiff's losses were caused by the disclosure of the truth that Defendants had previously allegedly misrepresented." *Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009); *see, e.g.*, *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005); *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009).

Defendants would argue that the declines in the price of Vale ADRs identified by Lead Plaintiffs were not caused by the alleged misstatements because the disclosures that caused these price declines did not directly reveal that the alleged misstatements were false. ¶¶ 80-81. Defendants would argue that the analysis of Lead Plaintiffs' own loss causation expert establishes that no artificial price inflation was introduced into the price of Vale's ADRs following the alleged misstatements (*i.e.*, the price of Vale ADRs did not increase following the publication of the 2013 Sustainability Report). ¶ 81.

Further, Defendants would argue that Lead Plaintiffs' expert did not dispute that the decline in the price of Vale's ADRs (adjusted for market and industry factors) on November 6, 2015, immediately after the collapse of the Fundão Dam was not statistically significant. ¶ 81.

Defendants would argue that the lack of a statistically significant price reaction after the Dam's collapse was fatal to Lead Plaintiffs' case because the collapse of the Dam itself was the quintessential corrective disclosure of the alleged misrepresentations concerning Vale's safety policies and risk mitigation practices. *Id*.

Defendants also would have argued that the two additional alleged corrective disclosures— on November 27, 2015, when Brazilian prosecutors announced they had filed a lawsuit against Vale for its role in the collapse of the Dam, and on December 18, 2015, when a Brazilian court found that Vale likely was liable for the environmental harm as both a direct and indirect polluter because of its use of the Fundão Dam and its control of Samarco—cannot support loss causation because neither of those alleged corrective disclosures revealed new information about the pre-collapse fraud. ¶ 81.

In response, Lead Plaintiffs would have submitted evidence, including testimony and an expert report from their financial economist, Dr. Finnerty, showing that the full truth of Defendants' false statements was not known until many weeks after the Fundão Dam collapsed when the Brazilian prosecutors' complaint and the court order finding Vale likely liable as a direct polluter revealed new information about Vale's use of the Dam, the extent of the long-standing problems at the Dam, and Vale's liability as a direct polluter. However, if the Court or the jury were to accept Defendants' arguments, Lead Plaintiffs would not be able to establish the requisite causal link between the pre-collapse false statements and the losses that the class suffered. ¶ 82.

These disputed issues regarding damages and loss causation would have presented the prototypical battle of the experts at trial. There simply is no way to predict with any degree of certainty which expert's opinions the jury would have accepted. Had the jury accepted some or all of Defendants' expert's views, damages would have been eliminated or significantly reduced.

The Settlement eliminates those risks and provides a certain recovery for the Settlement Class. *See Facebook*, 2015 WL 6971424, at *5 ("[D]amages would be subject to a battle of the experts, with the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount Plaintiffs' losses.  Under such circumstances, a settlement is generally favored over continued litigation."); *Veeco*, 2007 WL 4115809, at *9 ("a very lengthy and complex battle of the parties' experts likely would have ensued at trial, with unpredictable results.  These risks as to liability strongly militate in favor of the Settlement.").

In short, these risks posed a real possibility that Lead Plaintiffs and the Settlement Class would not be able to recover at all or would have recovered a lesser amount if the Action proceeded through summary judgment, trial, and appeals.  In view of these risks, Lead Plaintiffs and Lead Counsel respectfully submit that it is in the best interests of the Settlement Class to accept the immediate and substantial benefit conferred by the Settlement.

### 2.    The Settlement Represents a Substantial Percentage of Likely Recoverable Damages

Lead Plaintiffs submit that the $25 million Settlement is also a very favorable result when considered in relation to the likely amount of damages that could realistically be established at trial and the risks of the litigation.  Considering Defendants' arguments concerning damages and loss causation, Lead Counsel believes that the maximum damages that Lead Plaintiffs could realistically prove at trial would be $228 million (assuming, of course, they established liability, which was far from certain).  ¶ 84.  If Defendants succeeded on some or all of their loss causation and damages arguments, damages would be reduced substantially.  For example, if the Court or the jury were to find that the last corrective disclosure did not reveal any new information, and thus did not cause losses related to the fraud, then realistic potential damages would be reduced to at most $153 million.  *Id*.  Accordingly, the Settlement represents approximately 11% to 16% of

the realistic recoverable damages.   ¶¶ 83-84.  And, even if Lead Plaintiffs were successful at trial, Defendants could have challenged the damages of each large class member in post-trial proceedings, potentially substantially reducing any aggregate recovery.  ¶ 85.

This level of recovery is above the norm is securities fraud class actions and supports approval of the Settlement.  *See In re Canadian Superior Sec. Litig.*, 2011 WL 5830110, at *2 (S.D.N.Y. Nov. 16, 2011) (approving a settlement representing 8.5% of maximum damages, which the court noted "exceed[s] the average recovery in shareholder litigation"); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) ("the average settlement amounts in securities fraud class actions where investors sustained losses over the past decade . . . have ranged from 3% to 7% of the class members' estimated losses"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (a recovery of approximately 6.25% was "at the higher end of the range of reasonableness").

### 3.     The Costs and Delays of Continued Litigation Support Approval of the Settlement

The substantial costs and delays that would be required before any recovery could be obtained through litigation also strongly support approval of the Settlement.  Courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute."  *In re Gilat Satellite Networks, Ltd*., 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007).

While the Settlement was not reached until after the completion of fact and expert discovery and on the eve of summary judgment motions, achieving a litigated judgment in this Action would still have required substantial additional time and expense.  Absent the Settlement, achieving a recovery for the Settlement Class would have required (i) certification of a revised litigation class; (ii) briefing and ultimately defeating Defendants' motion for summary judgment; (iii) substantial pre-trial motion practice including *Daubert* motions and motions *in limine*; (iv) a

trial involving substantial fact and expert testimony; and (v) post-trial motions, including a contested individual claims procedure. Finally, whatever the outcome at trial, it is virtually certain that appeals would be taken from any verdict for plaintiffs. The foregoing would pose substantial expense for the Settlement Class and delay the Settlement Class's ability to recover – assuming, of course, that Lead Plaintiffs and the class were ultimately successful on their claims.

In contrast to this costly, lengthy, and uncertain litigation, the Settlement provides an immediate, significant, and certain recovery of $25 million for members of the Settlement Class.

### 4. All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors also supports approval of the Settlement or is neutral and does not suggest any basis for inadequacy of the Settlement.

First, the procedures for processing Settlement Class Members' claims and distributing the proceeds of the Settlement to eligible claimants are well-established, effective methods that have been widely used in securities class-action litigation. Here, the proceeds of the Settlement will be distributed to class members who submit eligible Claim Forms with required documentation to the Court-appointed Claims Administrator, JND Legal Administration ("JND"). JND, an independent company with extensive experience handling the administration of securities class actions, will review and process the claims under the supervision of Lead Counsel, will provide claimants with an opportunity to cure any deficiencies in their claims or request review of the denial of their claim by the Court, and will then mail or wire claimants their *pro rata* share of the Net Settlement Fund

upon approval of the Court.[9]  This type of claims processing is standard in securities class actions and has long been used and found to be effective.  Such claim filing and processing is necessary because neither Lead Plaintiffs nor Vale possess individual investors' trading data that would allow the Parties to create a "claims-free" process to distribute Settlement funds.

Second, the relief provided for the Settlement Class in the Settlement is also adequate when the terms of the proposed award of attorney's fees are taken into account.  As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 17% of the Settlement Fund, to be paid upon approval by the Court, are reasonable in light of the efforts of Lead Counsel and the risks in the litigation.  Most importantly with respect to the Court's consideration of the fairness of the Settlement, is the fact that approval of attorneys' fees are entirely separate from approval of the Settlement, and neither Lead Plaintiffs nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees.  *See* Stipulation ¶ 16.

Lastly, the amended Rule 23 asks the court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3).  *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).  Here, the only such agreement (other than the Stipulation itself) is the Parties' confidential Supplemental Agreement, which sets forth the conditions under which Defendants would be able to terminate the Settlement if the number of Settlement Class Members who request exclusion from the Settlement Class reaches a certain threshold.  This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement.  *See Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018).

---

[9] The Settlement is not a claims-made settlement.  If the Settlement is approved, Defendants will have no right to the return of any portion of Settlement based on the number or value of Claims submitted.  *See* Stipulation ¶ 13.

### D.      <u>The Settlement Treats Class Members Equitably Relative to Each Other</u>

The proposed Settlement treats members of the Settlement Class equitably relative to one another.  As discussed below in Part II, pursuant to the Plan of Allocation, eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on their transactions in Vale ADRs  Lead Plaintiffs will receive precisely the same level of *pro rata* recovery (based on the Recognized Claim as calculated under the Plan of Allocation) as all other Settlement Class Members.

### E.      <u>The Reaction of the Settlement Class to the Settlement</u>

One factor set forth in *Grinnell* but not included in Rule 23(e)(2) that should be considered is the reaction of the class to the proposed Settlement, which is an important factor to be weighed in considering its fairness and adequacy.  *See, e.g.*, *Bear Stearns*, 909 F. Supp. 2d at 266; *FLAG Telecom*, 2010 WL 4537550, at *16; *Veeco*, 2007 WL 4115809, at *7.

In accordance with the Preliminary Approval Order, JND began mailing copies of the Notice Packet (consisting of the Notice and Claim Form) to potential Settlement Class Members and nominees on March 11, 2020.  *See* Declaration of Luiggy Segura Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (Ex. 3), at ¶¶ 3-5.  As of May 5, 2020, JND had sent a total of 230,008 copies of the Notice Packet to potential Settlement Class Members and nominees.  *See id*. ¶ 8.  In addition, the Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire* on March 30, 2020.  *See id*. ¶ 9.  The Notice set out the essential terms of the Settlement and informed potential Settlement Class Members of, among other things, their right to opt out of the Settlement Class or object to any aspect of the Settlement, as well as the procedure for submitting Claim Forms.

While the deadline set by the Court for Settlement Class Members to exclude themselves or object to the Settlement has not yet passed, to date, no objections to the Settlement or the Plan of Allocation and three requests for exclusion have been received.  ¶ 92; Segura Decl. ¶ 12.  The deadline for submitting objections and requesting exclusion from the Settlement Class is May 20, 2020.  As provided in the Preliminary Approval Order, Lead Plaintiffs will file reply papers by June 3, 2020 addressing the requests for exclusion and any objections that may be received.

\*     \*     \*

In sum, all of factors to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

## II.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate.  *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012); *Bear Stearns*, 909 F. Supp. 2d at 270.  A plan of allocation is fair and reasonable as long as it has a "rational basis." *FLAG Telecom*, 2010 WL 4537550, at \*21; *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497 (S.D.N.Y. 2009).  Generally, a plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See IMAX*, 283 F.R.D. at 192.  In determining whether a plan of allocation is reasonable, courts give great weight to the opinion of experienced counsel.  *See Giant Interactive*, 279 F.R.D. at 163.

Here, the proposed plan of allocation (the "Plan of Allocation"), which was developed by Lead Counsel in consultation with Lead Plaintiffs' damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms.  In developing the Plan of Allocation, Lead Plaintiffs' expert calculated the amount of estimated artificial inflation in the price of common and preferred Vale ADRs which allegedly

was proximately caused by Defendants' alleged false and misleading statements by considering the price changes in Vale ADRs common stock in reaction to the alleged corrective disclosures, adjusting for price changes attributable to market and industry factors.  Notice ¶ 49.[10]

Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of a Vale ADR during the Class Period that is listed in the Claim Form and for which adequate documentation is provided.  Notice ¶ 52.  In general, the Recognized Loss Amount will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sales price, whichever is less.  *Id*. ¶ 51.  Claimants who purchased and sold all their Vale ADRs before the first alleged corrective disclosure on November 5, 2015, or who purchased and sold all their Vale ADRs between two consecutive disclosure dates, will have no Recognized Loss Amount under the Plan of Allocation for those transactions because any loss suffered on those sales would not be the result of the alleged misstatements.  *Id*.  The Plan of Allocation also limits Claimants based on whether they had an overall market loss in their transactions in Vale ADRs during the relevant time period.  *Id*. ¶¶ 64-65.

Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action.  ¶ 101.  Moreover, as noted above, as of May 5, 2020, more than 230,000 copies of the Notice, which contains the Plan of Allocation, and

---

[10] While the abnormal price decline in Vale ADRs on November 6, 2015 (the trading day following the collapse of the Dam) was not statistically significant, there was still a measurable abnormal return on that date when compared to market and industry returns.  Accordingly, Lead Plaintiffs' expert and Lead Counsel believe that it is appropriate to recognize the removal of artificial inflation on that date in the Plan of Allocation and allow investors who suffered losses by holding Vale ADRs over that decline to participate in the Settlement.

advises Settlement Class Members of their right to object to the Plan of Allocation, had been sent

to potential Settlement Class Members and their nominees.  *See* Segura Decl. ¶ 8.  To date, no

objections to the proposed Plan of Allocation have been received.  ¶ 102.

## III.   THE SETTLEMENT CLASS SHOULD BE CERTIFIED

In connection with the Settlement, the Parties have stipulated to the certification of the

Settlement Class for purposes of the Settlement.  As set forth in detail in Lead Plaintiffs' motion

for preliminary approval of the Settlement, the Settlement Class satisfies all the requirements of

Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.  See ECF No. 184 at 14-23.  None

of the facts regarding certification of the Settlement Class have changed since Lead Plaintiffs

submitted their motion for preliminary approval, and there has been no objection to certification.

Accordingly, Lead Plaintiffs respectfully request that the Court certify the Settlement Class under

Rules 23(a) and (b)(3) for the reasons set forth in its earlier motion.   See ECF No. 184 at 14-23.

## IV.   NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice to the Settlement Class satisfied the requirements of Rule 23(c)(2)(B), which

requires "the best notice that is practicable under the circumstances, including individual notice to

all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); *see*

*also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974).  The Notice also satisfied Rule

23(e)(1), which requires that notice of a settlement be "reasonable" – *i.e.*, it must "fairly apprise

the prospective members of the class of the terms of the proposed settlement and of the options

that are open to them in connection with the proceedings."  *Visa*, 396 F.3d at 114.

Both the substance of the Notice and the method of its dissemination to potential members

of the Settlement Class satisfied these standards.  The Court-approved Notice includes all the

information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C.

§ 78u-4(a)(7), including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition of the Class; (iii) the amount of the Settlement; (iv) a description of the Plan of Allocation; (v) an explanation of the reasons why the Parties are proposing the Settlement; (vi) a statement indicating the attorneys' fees and costs that will be sought; (vii) a description of Settlement Class Members' right to opt-out of the Settlement Class or to object to the Settlement, the Plan of Allocation or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Settlement Class Members.

As noted above, in accordance with the Court's Preliminary Approval Order, JND, the Court-approved Claims Administrator, began mailing copies of the Notice Packet to potential Class Members on March 11, 2020. *See* Segura Decl. ¶¶ 3-5. As of May 5, 2020, JND had disseminated over 230,000 copies of the Notice Packet to potential Settlement Class Members and nominees. *See id*. ¶ 8. In addition, Lead Counsel caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over the *PR Newswire* on March 30, 2020. *See id*. ¶ 9. Copies of the Notice, Claim Form, and Stipulation were made available on the settlement website maintained by JND beginning on March 11, 2020, and copies of the Notice and Claim Form were also made available on Lead Counsel's website. *See* Segura Decl. ¶ 11; Gluck Decl. ¶ 91. This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, transmitted over the newswire, and set forth on internet websites, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Advanced Battery Techs.*, 298 F.R.D. 171, 182-83 (S.D.N.Y. 2014).

## <u>CONCLUSION</u>

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

Dated:  May 6, 2020

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP

*/s/ John C. Browne*

John C. Browne
Gerald H. Silk
Avi Josefson
1251 Avenue of the Americas, 44th Fl.
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
jerry@blbglaw.com
avi@blbglaw.com

-and-

Richard D. Gluck (*Pro hac vice*)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323
Rich.Gluck@blbglaw.com

*Counsel for Lead Plaintiffs and Lead
Counsel for the Settlement Class*

#1376550