## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Vale S.A. Securities Litigation | Case No. 15 Civ. 09539 (GHW) |
| | Consolidated with Case No. 16 Civ. 00658 (GHW) |
| | <u>CLASS ACTION</u> |

## DECLARATION OF RICHARD D. GLUCK IN SUPPORT OF
## (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP

Richard D. Gluck (*Pro hac vice*)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130

       -and-

John C. Browne
Gerald H. Silk
Avi Josefson
BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
1251 Avenue of the Americas, 44th Fl.
New York, NY 10020

*Counsel for Lead Plaintiffs Alameda County Employees' Retirement Association and Orange County Employees Retirement System and Lead Counsel for the Settlement Class*

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    HISTORY OF THE ACTION ................................................................. 4

    A.    Background ................................................................................ 4

    B.    Commencement of the Action and the Appointment of Lead
           Plaintiffs and Lead Counsel ...................................................... 6

    C.    The Investigation and Filing of the Complaint ............................ 7

    D.    Defendants' Motion to Dismiss ................................................. 8

    E.    The Parties Conduct Discovery ................................................. 10

          1.    Document Discovery ...................................................... 12

          2.    Depositions ................................................................... 14

          3.    Expert Reports and Discovery ......................................... 16

              a)    Lead Plaintiffs' Experts ....................................... 17

              b)    Defendants' Experts ............................................. 19

          4.    Interrogatories and Requests for Admission ...................... 21

    F.    Lead Plaintiffs' Motion for Class Certification ........................... 22

    G.    The Parties Settle the Action .................................................... 25

    H.    The Court Grants Preliminary Approval to the Settlement ........... 27

III.   RISKS OF CONTINUED LITIGATION .................................................. 28

    A.    Risks Concerning Liability ....................................................... 28

          1.    Falsity ......................................................................... 28

          2.    Scienter ....................................................................... 30

    B.    Risks Related to Loss Causation and Damages .......................... 31

    C.    The Settlement Amount Compared to Likely Damages that Could
           be Proved at Trial .................................................................. 33

IV.   LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S
      PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF
      NOTICE ............................................................................................ 34

V.      ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT .................................. 36

VI.     THE FEE AND EXPENSE APPLICATION .................................................................. 39

        A.      The Fee Application.......................................................................................... 40

                1.      Lead Plaintiffs Have Authorized and Support the Fee
                        Application.............................................................................................. 40

                2.      The Work and Experience of Lead Counsel ............................................ 41

                3.      Standing and Caliber of Defendants' Counsel......................................... 43

                4.      The Risks of Litigation and the Need to Ensure the
                        Availability of Competent Counsel in High-Risk
                        Contingent Cases .................................................................................... 43

                5.      The Reaction of the Settlement Class to the Fee
                        Application.............................................................................................. 45

        B.      The Litigation Expense Application .................................................................. 46

VII.    CONCLUSION............................................................................................................ 50

I, RICHARD D. GLUCK, declare as follows:

1.       I am senior counsel with the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), counsel for Lead Plaintiffs Alameda County Employees' Retirement Association ("ACERA") and Orange County Employees Retirement System ("OCERS" and, together with ACERA, "Lead Plaintiffs") and Lead Counsel for the Settlement Class in this action (the "Action").[1]  I submit this declaration in support of Lead Plaintiffs' motion, under Federal Rule of Civil Procedure 23(e), for final approval of the proposed Settlement and the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation") and Lead Counsel's motion for an award of attorneys' fees and litigation expenses (the "Fee and Expense Application").  Based on my active participation in all aspects of the prosecution and settlement of the Action, I have personal knowledge of the matters set forth in this declaration and could and would competently testify to them if called as a witness.

## I.       PRELIMINARY STATEMENT

2.       On February 22, 2020, the Court granted preliminary approval of the proposed $25 million cash settlement.  *See* Order Preliminarily Approving Proposed Settlement and Authorizing Dissemination of Notice of Settlement ("Preliminary Approval Order," ECF No. 192). Since then, the funds have been deposited into an Escrow Account, and the Claims Administrator has notified potential Settlement Class Members of the Settlement by mail in accordance with the

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated February 5, 2020 (ECF No. 183-1) as amended on February 20, 2020 (ECF No. 188-2) (the "Stipulation").  The Stipulation was entered into by and among (i) Lead Plaintiffs, on behalf of themselves and the Settlement Class, and (ii) defendants Vale S.A. ("Vale" or the "Company") and certain of Vale's officers, Murilo Pinto de Oliveira Ferreira, Luciano Siani Pires, and Gerd Peter Poppinga (collectively, the "Individual Defendants," and, together with Vale, "Defendants").

Preliminary Approval Order.  Summary Notice also was published in *The Wall Street Journal* and over the *PR Newswire*.

3.      This declaration does not detail every event that has occurred during the 4½-year litigation.  Rather, it provides highlights of the litigation, the events leading to the Settlement, and the bases upon which Lead Plaintiffs and Lead Counsel recommend its approval.

4.      Throughout the litigation, the risks have been substantial and the battles hard-fought.  The Settlement was reached only after Lead Plaintiffs conducted an extensive investigation, filed a comprehensive consolidated complaint, opposed Defendants' motion to dismiss, completed extensive fact and expert discovery that included large document productions and 21 depositions, briefed Lead Plaintiffs' class certification motion, and worked with and consulted experts on several complex issues.

5.      The proposed Settlement is the result of extensive efforts by Lead Plaintiffs and Lead Counsel, which included, among other things detailed below: (i) conducting an extensive investigation into the alleged fraud, including a thorough review of SEC filings, analyst reports, conference call transcripts, press releases, company presentations, sworn testimony of numerous witnesses taken by Brazilian prosecutors investigating the tragic collapse of the Fundão Dam, media reports about the collapse, and other public information; contacting numerous potential witnesses; and consultation with experts; (ii) drafting an initial complaint and a detailed amended complaint based on this investigation; (iii) successfully defeating Defendants' motion to dismiss; (iv) undertaking substantial fact discovery, including serving document requests on Defendants, obtaining through letters rogatory documents and testimony from five third-parties in Brazil, obtaining and reviewing more than 1.3 million pages of documents produced by Defendants and non-parties as a result of these efforts, and taking the depositions of 10 current or former Vale

officers, directors, or employees; (v) consulting extensively throughout the litigation with a variety of experts and consultants, including experts in financial economics, geotechnical engineering, corporate governance, and Brazilian antitrust law; and (vi) engaging in months of arm's-length settlement negotiations to achieve the Settlement, including an all-day mediation session and many follow-up calls with former District Court Judge Layn Phillips.

6.      Through these efforts, Lead Plaintiffs and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they reached the proposed Settlement.  The Settlement was achieved only after extended arm's-length negotiations between the Parties with the assistance of Judge Phillips, who is an experienced mediator of securities class actions like this one.  Lead Plaintiffs and Lead Counsel believe that the Settlement represents a very favorable outcome for the Settlement Class and that its approval would be in the best interests of the Settlement Class.

7.      The Court-appointed Lead Plaintiffs, ACERA and OCERS, are both sophisticated institutional investors who closely supervised Lead Counsel, actively participated in all aspects of the litigation, and remained informed throughout the settlement negotiations.  *See* Declaration of Susan L. Weiss on behalf of ACERA ("Weiss Decl."), attached hereto as Exhibit 1, at ¶¶ 3-7; Declaration of Gina M. Ratto on behalf of OCERS ("Ratto Decl."), attached hereto as Exhibit 2, at ¶¶ 3-7.  Both Lead Plaintiffs strongly support the approval of the Settlement.  *See* Weiss Decl. ¶ 8; Ratto Decl. ¶ 8.

8.      In connection with the Settlement, Lead Plaintiffs propose a Plan of Allocation to equitably distribute the Net Settlement Fund consistent with Lead Plaintiffs' theory of damages and the Court's rulings.  Lead Counsel developed the Plan of Allocation in consultation with Lead Plaintiffs' expert, who conducted an event study using a well-accepted methodology to estimate

the amount of alleged artificial inflation in Vale ADRs during the Class Period and the corrective disclosures that caused that artificial inflation to dissipate.

9.      For its efforts in achieving the Settlement, Lead Counsel requests a fee award of 17% of the Settlement Fund, net of Litigation Expenses (or $3,938,004.97, plus interest earned at the same rate as the Settlement Fund).  The requested 17% fee is based on retainer agreements entered into with Lead Plaintiffs at the outset of the litigation, and, as discussed in the Fee Memorandum, is well within the range of percentage awards granted by courts in this Circuit and elsewhere in similarly sized class action settlements.  Moreover, the requested fee represents a negative multiplier of 0.5 of Lead Counsel's lodestar, which is at the very low end typically awarded in class actions with significant contingency risks such as this one, and thus, the lodestar cross-check strongly supports the reasonableness of the fee.  Lead Counsel respectfully submits that the fee request is fair and reasonable given the result achieved in the Action, the efforts of Lead Counsel, and the risks and complexity of the litigation.

10.      This Declaration describes: (a) the efforts undertaken by Lead Counsel to prosecute the Action (Section II); (b) the events leading up to the Settlement, the terms of the Settlement, and the risks that Lead Plaintiffs and Lead Counsel considered in determining that the Settlement provides an outstanding recovery for the Settlement Class (Sections II.H and III); (c) the Notice to members of the Settlement Class (Section IV); (d) the proposed Plan of Allocation for the Settlement (Section V); and (e) Lead Counsel's fee and expense application (Section VI).

## II.      HISTORY OF THE ACTION

### A.      Background

11.      This securities class action followed in the aftermath of the collapse of the Fundão Dam, widely considered one of the worst environmental disasters in Brazil's history.  Defendant Vale is the world's largest producer of iron ore.  Vale operates mines throughout Brazil, both in

its own name and through controlled entities and joint ventures.  Samarco Mineração, S.A. ("Samarco") is one of those controlled entities.  Samarco operates as a joint venture between Vale and BHP Billiton, with each owning a controlling 50% interest.  The Fundão Dam was one of three interconnected tailings dams that Vale and Samarco used to store wastes (known as tailings) from their mining operations.

12.     During the Class Period, Defendants repeatedly assured investors that the dams Vale used to dispose of its mining wastes, which included the Fundão Dam, were constructed and operated following strict safety standards, and were audited and monitored to reduce potential risks, including structural failures.  Complaint (ECF No. 58) ¶ 101.  Defendants further represented that Vale had "policies, systematic requirements and procedures designed to *prevent* and *minimize* risks and protect lives," such as "technical and operational procedures, control devices, qualified teams, specialist consultancies and periodic audits."  *Id.* (emphasis added).

13.     Lead Plaintiffs allege that these statements were false and misleading and that, in truth, (i) Defendants were aware of and ignored known structural problems with the Fundão Dam, while dramatically increasing production without appropriately fortifying tailings storage facilities needed to store the increase in tailings waste; (ii) Vale and its senior executives approved expanding the Fundão Dam in a manner inconsistent with expert recommendations, even after sensors used to monitor the Dam's stability indicated "emergency" levels of pressure and stress; and (iii) Defendants failed to implement an emergency action plan, install alarms or sirens to warn people in the surrounding communities in the event of an emergency, and ignored expert recommendations calling for a contingency plan in case of accidents.  Complaint ¶¶ 71-74, 77.  In short, Lead Plaintiffs allege that holders of Vale ADRs were falsely comforted about purported

plans and procedures in place if one of the tailings dams in which Vale disposed of its waste collapsed, even though no such plans existed.

14.     On November 5, 2015, the Fundão Dam burst, unleashing a torrent of mud and debris hurtling toward the villages below.  Within minutes, the deluge swamped the town of Bento Rodrigues below the Dam, destroying virtually everything in its path.  Complaint ¶ 84.  With no warning system in place, residents had little time to flee, and in the end, 19 people lost their lives, and hundreds lost their homes and all their possessions.  *Id*.  Both common and preferred Vale ADRs fell significantly thereafter as the public began to learn the truth about Vale's use of the Dam, the Dam's serious structural deficiencies that existed before it collapsed, and the failure to implement appropriate measures to protect against the Fundão Dam's collapse.

**B.      Commencement of the Action and the Appointment of Lead Plaintiffs and Lead Counsel**

15.     A month after the collapse, investors filed a securities class-action complaint in the United States District Court for the Southern District of New York (the "Court"), styled *Ming Hom v. Vale, S.A., et al.*, Case No. 1:15-cv-9539.  Seven weeks later, a second class-action complaint was filed, styled *Valli T. Chin v. Vale, S.A., et al.*, 1:16-cv-658.

16.     On February 5, 2016, ACERA and OCERS jointly moved for appointment as lead plaintiffs and for approval of their counsel, BLB&G, as Lead Counsel.  (ECF Nos. 31-33.)  In an order dated March 7, 2016, the Court appointed OCERS and ACERA Lead Plaintiffs and approved their selection of BLB&G as Lead Counsel for the class.  (ECF No. 51.)  The Court also ordered all existing cases consolidated under the caption *In re: Vale S.A. Securities Litigation,* 1:15-cv-9539-GHW (the "Action") and that any subsequently filed, removed, or transferred actions related to the claims asserted in the Action be consolidated for all purposes.

C.      **The Investigation and Filing of the Complaint**

17.      Before filing the Consolidated Amended Complaint, Lead Counsel conducted an extensive investigation into the allegations and the facts surrounding the alleged fraud. This investigation included a thorough review and analysis of:  (a) Vale's public filings with the SEC; (b) public reports and news articles related to Vale and the collapse of the Fundão Dam; (c) research reports by securities and financial analysts; (d) written transcripts of Vale's investor conference calls; (e) written evidence and sworn testimony of dozens of Vale and Samarco employees and former employees obtained by Brazilian prosecutors investigating the collapse; (f) economic analyses of the movement of and pricing data associated with Vale's common and preferred American Depository Receipts ("ADRs"); and (g) other publicly available material and data.  Lead Counsel and its in-house investigators also contacted dozens of potential witnesses, including numerous former Vale and Samarco employees and individuals from other companies who were believed to potentially possess information relevant to the claims.  Lead Counsel included information obtained from these individuals in the Consolidated Amended Complaint.

18.      Lead Counsel also retained and consulted with several relevant experts in connection with the preparation of the Complaint, including experts in dam safety and engineering, loss causation, and damages to understand the complex geotechnical issues at play and the impact Defendants' alleged misstatements and omissions had on the market price of Vale's common and preferred ADRs, and the damages suffered by Vale shareholders.

19.      On April 29, 2016, Lead Plaintiffs filed and served their Amended Complaint (the "Complaint") asserting claims against Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  (ECF No. 58.)  The Complaint alleges that, during the Class Period, Defendants made materially false and misleading statements about: (i) Vale's risk-mitigation plans, policies, and procedures and

(ii) responsibility for the collapse of the Dam and the resultant environmental liabilities. Specifically, the Complaint alleged that Defendants falsely assured investors that (i) Vale had in place policies, plans, and procedures to prevent and minimize risks and protect lives, (ii) Vale planned and conducted its operations to cause the least possible environmental impact, (iii) Vale used technical and operational procedures, specialist consultants, and periodic audits to identify, control, and minimize the risks of its operations, and (iv) Vale's dams were constructed and operated following strict safety standards and audited periodically to monitor and reduce all potential risks, including structural failures. The Complaint alleges that the price of Vale common and preferred ADRs was artificially inflated during the Class Period as a result of Defendants' allegedly false and misleading statements and declined when the truth was revealed.

### D.    Defendants' Motion to Dismiss

20.    Defendants filed and served a motion to dismiss the Complaint on July 25, 2016. (ECF No. 79.)  Defendants argued that the Complaint failed to adequately plead actionable misstatements because many of the alleged misstatements were not objectively false when made or were the type of aspirational or generic assertions about policies and procedures that constitute unactionable puffery, or were forward-looking statements protected under the PSLRA's safe-harbor provisions.  Defendants argued further that the Complaint failed to allege facts giving rise to a strong inference of scienter and failed to adequately plead loss causation.

21.    Lead Plaintiffs filed their opposition to Defendants' motion to dismiss on August 29, 2016. (ECF No. 88.)  Among other things, Lead Plaintiffs argued that Defendants' statements about the safety of Vale's dams and operations and about the Company's risk-mitigation plans, policies and procedures were (i) false and misleading given the long-standing and serious structural and drainage deficiencies that had plagued the Fundão Dam since its inception; (ii) specific and concrete representations of existing fact that could be objectively verified; and (iii) not protected

by the PSLRA's "safe harbor" because they were material misstatements or omissions of present or historical facts and because the accompanying boilerplate cautionary language was too general or generic to be meaningful.

22.      Lead Plaintiffs argued further that the Complaint alleged facts giving rise to a strong inference of scienter by alleging that (i) Defendants' statements about the safety of Vale's dams and operations and the Company's risk-mitigation plans, policies, and procedures were contradicted by contemporaneous reports, presentations, and written warnings about the serious drainage and structural problems at the Dam that Defendants received or had access to; (ii) the alleged misstatements concerned the most important issues facing Vale during the Class Period; and (iii) the pervasiveness and long-standing nature of the Dam's structural deficiencies.

23.      Finally, Lead Plaintiffs argued that the Complaint adequately pled loss causation by alleging that the price of Vale common and preferred ADRs dropped significantly on several days when news partially revealing the falsity of Defendants' statements was revealed.

24.      On September 12, 2016, Defendants filed and served their reply papers in further support of their motion to dismiss.  (ECF Nos. 91.)

25.      The Court issued its Memorandum Opinion and Order on March 23, 2017 (ECF No. 92), denying in part and granting in part Defendants' motion to dismiss.  The Court found that the Complaint (i) adequately alleged a number of actionable false and misleading statements about Vale's risk-management plans, policies, and procedures and responsibility for the Fundão Dam's collapse, (ii) sufficiently pled facts giving rise to a strong inference that Defendants made those statements with the requisite scienter, and (iii) adequately pleaded that Defendants' alleged misstatements caused the losses that investors in Vale ADRs suffered.  (ECF No. 92.)

26.     On April 6, 2017, Defendants moved for reconsideration of portions of the Court's Memorandum Opinion and Order.  (ECF No. 94.)  Specifically, Defendants requested that the Court reconsider its finding that claims for certain alleged misstatements were not barred by the PSLRA's safe-harbor provision and clarify that certain other claims were dismissed.  On May 26, 2017, the Court issued its Order granting in part and denying in part Defendants' motion for reconsideration.  The Court denied Defendants' request to reconsider the Court's decision on the applicability of the PSLRA's safe-harbor and clarified that certain other claims against Defendants were dismissed.

27.     On July 7, 2017, Defendants filed and served their Answer to the Complaint.  (ECF No. 104.)  In their Answer, Defendants denied that any of the statements at issue were materially false or misleading, or made with scienter, and asserted twenty-two affirmative defenses including that their statements were protected by the PSLRA safe harbor and that the alleged misrepresentations and omissions did not affect the market price of Vale's common and preferred ADRs.

### E.     The Parties Conduct Discovery

28.     Following the Court's ruling on the motion to dismiss, the Parties participated in a telephonic Rule 26(f) conference at which they discussed, among other things, a proposed case management plan, the need for a protective order and a protocol for discovery of electronically stored information, and a proposed briefing schedule for Lead Plaintiffs' motion for class certification.  After the conference, the parties exchanged drafts of a proposed Civil Case Management Plan and Scheduling Order in accordance with the Court's Individual Rules of Practice in Civil Cases. (ECF No. 105.)  The Parties were able to agree on all terms of the proposed plan and submitted it to the Court for approval.  The Court entered the Civil Case Management

Plan and Scheduling Order on April 14, 2017.  (ECF No. 98.)  The deadlines set forth in that order included the following:

| Initial Disclosures | April 28, 2017 |
|---|---|
| Initial Requests for Production of Documents | April 28, 2017 |
| Last Day to Serve Interrogatories | March 16, 2018 |
| Last Day to Serve Requests for Admission | March 16, 2018 |
| Last Day to Complete Depositions | April 16, 2018 |
| Last Day to Complete All Fact Discovery | April 16, 2018 |
| Initial expert reports served | May 18 2018 |
| Rebuttal export reports served | June 29, 2018 |
| Last Day to Complete Expert Discovery | July 27, 2018 |
| Deadline for motions for summary judgment | August 31, 2018 |
| Class-Certification Motion Due | September 15, 2017 |
| Class-Certification Opposition Due | October 27, 2017 |
| Class-Certification Reply Due | November 17, 2017 |

29.     The Parties also negotiated the terms of a protective order governing the treatment of confidential information produced in discovery and the terms of an ESI protocol for governing production of electronically stored information.  Lead Plaintiffs submitted the proposed protective order to the Court on August 18, 2017.  (ECF No. 110.)  The Court entered the stipulated protective order on August 22, 2017.  (ECF No. 111.).

30.     In accordance with the Scheduling Order, the Parties exchanged Rule 26 initial disclosures on April 28, 2017.

### 1.    Document Discovery

31.    Lead Plaintiffs served their first requests for production of documents on Defendants on April 28, 2017.  Defendants' served their Responses and Objections to those requests on May 30, 2017.  Lead Counsel then met and conferred several times with Defendants' counsel over Defendants' objections and the scope of their search for and production of responsive documents, including the selection of appropriate custodians whose ESI would be collected and searched as well as the search terms to be used in those searches.  The Parties eventually agreed on search terms and custodians and Defendants began their search for and collection of responsive documents.  Defendants' collection and search for responsive documents was made more difficult by the fact that most of the documents were in Portuguese and Vale had switched email servers at some point and had archived information from the old servers.  The time needed to restore and search those archived files, coupled with Defendants' need to enlist external vendors and translators to assist in identifying potentially responsive materials, slowed the production of responsive documents greatly.  Eventually, however, Defendants produced more than 1.1 million pages of documents, the bulk of which were in Portuguese.

32.    The language barrier likewise significantly slowed Lead Counsel's ability to review and use the documents that Defendants produced.  Lead Counsel initially retained a vendor to provide machine translations on a bulk basis, but after translating one production it became apparent that machine translation rendered the documents virtually unreadable, as the process stripped all formatting from the documents.  As a result, Lead Counsel's review required two steps. First, we employed attorneys fluent in Portuguese to review the documents to make an initial determination if the documents were sufficiently relevant and important to justify translation into English.  Then, the documents were sent to an outside vendor to manually translate the documents

12

so that other members of the litigation team could review and analyze them and they could be used in these proceedings at deposition, trial, or in court filings.

33.     The delays these logistical difficulties caused, coupled with difficulties scheduling the depositions of current and former Vale employees living in Brazil, eventually led the Parties to jointly request on March 6, 2018 that Court extend the pretrial schedule by roughly five months. (ECF No. 136.)  The Court granted that request and issued a written order on March 8, 2018 modifying the Civil Case Management Plan and Scheduling Order.  (ECF No. 137.)

34.     As part of its extensive efforts to conduct non-party discovery, Lead Plaintiffs also successfully applied for letters rogatory to obtain documents and testimony from six Brazilian entities (Pimenta de Ávila Consultoria Ltda.; VogBR Recursos Hídricos & Geotecnia Ltda.; Vix Logistica S.A.; Nouh Engenharia Ltda.; RTI – Rescue Training International – Editora Randal Fonseca Ltda.; and Samarco Mineração S.A.) that designed, maintained, or constructed the Fundão Dam, investigated the long-standing structural and drainage problems at the Dam, or developed or implemented a plan to remediate those problems. After the Court issued the Letters Rogatory on February 2, 2018, Lead Counsel, with the assistance of counsel in Brazil, presented the Letters to the Brazilian courts.  The lower courts in Brazil accepted the Letters and, over objections from each of the six entities from whom Lead Plaintiffs sought evidence, ordered the six entities to produce documents and testimony.  After unsuccessful appeals from some of those entities, Lead Counsel obtained documents and testimony from five of the six entities, and was scheduled to obtain documents and testimony from the sixth when the settlement of this Action was reached.

35.     Lead Counsel also served a subpoena and obtained key documents from a member of the Independent Review Panel that Vale, Samarco, and BHP jointly retained to investigate and report on the causes of the Fundão Dam collapse.  The materials we received included important

documents, presentations, and contemporaneous reports chronicling the myriad structural and drainage problems that plagued the Dam and the ineffectual measures taken to temporarily fix the problems.  All totaled, we obtained more than 1,350,000 pages of documents from Defendants and third-parties in response to the requests for production of documents, subpoenas, and letters rogatory.  Lead Counsel reviewed, analyzed, and coded those documents and had the most relevant ones translated for use in the action.  In reviewing the documents, the attorneys were tasked with making several analytical determinations as to the documents' importance and relevance.  Specifically, they determined whether the documents were "hot," "relevant," or "not relevant."  They also assessed which specific issues the documents concerned and determined the identities of the Vale employees or other potential deponents to whom the documents related so that the documents could be easily retrieved when preparing for depositions.  The attorneys also reviewed literature on geotechnical issues and worked with a well-respected geotechnical expert in connection with document analysis, and work on targeted document collection projects supporting deposition preparation, expert analysis, and mediation.  Lead Counsel conducted regular team meetings of the attorneys involved in the document discovery to discuss the key documents obtained and to map out litigation strategies and theories.

36.     Lead Plaintiffs also searched for and gathered documents that were responsive to Defendants' requests for production of documents, which documents were then reviewed by Lead Counsel.  In total, Lead Plaintiffs produced over 18,000 pages of documents to Defendants in response to their requests.

### 2.     Depositions

37.     Long before reaching the agreement in principle to settle this action, Lead Counsel noticed and took the depositions of ten current or former Vale executives:

- **Defendant Luciano Siani Pires**, Vale's CFO and Executive Director of Finance;

14

- **Defendant Gerd Peter Poppinga**, Vale's Executive Director of Iron Ore and a member of the Samarco board of directors;

- **Vania Somavilla**, Vale's former Executive Director of Human Resources, Health and Safety, Sustainability, and Energy;

- **Stephen Potter**, Vale's Global Director of Strategy and member of Samarco's board of directors;

- **Rodrigo Gomes de Melo**, Executive Manager of Vale's Mariana mining complex;

- **Rodrigo Dutra Amaral**, Vale's Director of Environmental Licensing;

- **Rogerio Nogueira**, Vale's Director of Investor Relations and former member of Samarco's board of directors;

- **Paulo Bandeira**, Vale's Director of Mine Planning and a member of Samarco's Operations Committee;

- **Luciano Torres Sequeira**, a Vale engineer and supervisor, and member at various times of the Samarco Operations and Performance Management Committees; and

- **Washington Pirete**, a Vale engineer at the Mariana mining complex.

38.     The preparation for each of these depositions was extensive.  For each deponent, a team of attorneys searched for and analyzed relevant documents, prepared a detailed memo about the deponent, and put together a comprehensive set of proposed exhibits.  The lead attorney taking the deposition then met with that team to review the potential exhibits and discuss strategy for the deposition and whether there were any additional documents that we might be able to use as exhibits.  The lead attorney then prepared a detailed examination outline and finalized the exhibits.

39.     Each fact witness was represented by multiple attorneys from Vale's counsel, Gibson, Dunn & Crutcher, and by one or more in-house counsel from Vale.  Witnesses spent

multiple days with counsel preparing for the depositions and were aggressively defended by their counsel during their deposition.  Given the complexity of the case, the volume of documents pertinent to each witness, and the fact that many of the depositions would constitute trial testimony for witnesses outside the Court's jurisdiction, many depositions spanned almost a full day of testimony.

40.     We believe that testimony elicited during the ten fact depositions was supportive of Lead Plaintiffs' claims.  We recognize, however, that there also was information elicited that a jury could view as supportive of Defendants' positions.

41.     As noted above, Lead Plaintiffs also obtained sworn testimony from five Brazilian third-parties through Letters Rogatory.  Those witnesses provided helpful testimony that corroborated documentary evidence about the dangerous condition of the Fundão Dam in the years leading up to the collapse as well as the factual accounts recited in the report issued by the Fundão Dam Independent Review Panel.  Once again, however, some of those witnesses also provided testimony that could be viewed as favorable to certain of Defendants' positions.

42.     For their part, Defendants took a Rule 30(b)(6) deposition of each Lead Plaintiff. Lead Counsel met with and prepared a representative of each Lead Plaintiff to testify on each of the 17 topics in the 30(b)(6) notice, and then defended the depositions.  Defendants also took the deposition of a London-based financial analyst working for Lead Plaintiffs' independent investment advisor.  Lead Counsel attended the deposition and obtained favorable testimony on cross-examination that the Court cited in its order on Lead Plaintiffs' class-certification motion.

### 3.     Expert Reports and Discovery

43.     At every stage of the litigation, Lead Counsel consulted extensively with experts in the fields of financial economics, geotechnical engineering, and corporate governance and Brazilian and EU antitrust law.  Their work was critical to the prosecution of this action and the

successful result obtained.   Each of Lead Plaintiffs' experts submitted an extensive report containing their opinions and the factual and evidentiary bases for them.

### a) Lead Plaintiffs' Experts

**David Tabak, Ph.D.**

44.     Dr. Tabak received his Bachelor of Science degrees in Physics and Economics from the Massachusetts Institute of Technology and a Master of Science degree and a Ph.D. in Economics from Harvard University.  For the last 24 years, he has worked for NERA, a company that provides consulting on economic matters to parties for their internal use, to parties in litigation, and to governmental and regulatory authorities.  Dr. Tabak currently is a senior vice president in NERA's securities and finance practice.  He regularly consults for parties in litigation and non-litigation settings.  In this matter, Dr. Tabak opined that the Vale ADRs at issue traded in an efficient market during the Class Period.  Dr. Tabak submitted an opening report, a rebuttal report, and a report responding to a supplemental expert report submitted by Defendants' economics expert, Walter Torous.

**Iraj Noorany, Ph.D**

45.     Dr. Noorany received his Bachelor of Science in Civil Engineering from the University of Tehran and a Master of Science and Ph.D. in Civil Engineering from the University of California, Berkley**.**  He is a Professional Civil Engineer and Licensed Geotechnical Engineer in the State of California.  His long and distinguished academic career included long stints as the Chairman of the Department of Civil Engineering and Director of the Soil Mechanics Laboratory at San Diego State University.  Dr. Noorany has more than 40 years of experience consulting in the fields of civil engineering, soils mechanics, and geotechnical engineering.  Dr. Noorany submitted a detailed 36-page expert report (not counting numerous appendices and figures) opining on the mechanics and causes of the collapse of the Fundão Dam.  Dr. Noorany also

prepared for Lead Counsel's use a detailed response to the opinions of Defendants' geotechnical engineering and soils mechanics expert (Timothy Stark). Dr. Noorany's expertise was invaluable in helping Lead Counsel understand the complicated geotechnical and soils mechanics issues in this case and in preparing Lead Counsel for the deposition of Professor Stark.

**John Finnerty, Ph.D.**

46. Dr. Finnerty received a Ph.D. in Operations Research from the Naval Postgraduate School, an M.A. in Economics from Cambridge University, where he was a Marshall Scholar, and a B.A. in Mathematics from Williams College. He is a Professor of Finance at Fordham University's Gabelli School of Business, where he was the founding Director of the school's Master of Science in Quantitative Finance Program. Dr. Finnerty is an Academic Affiliate at AlixPartners, LLP, a financial and operational consulting firm, where he previously was a Managing Director. Dr. Finnerty regularly provides consulting and litigation support, including serving as an expert witness, in matters involving securities fraud, breach of contract, commercial disputes, valuation disputes, solvency, fairness, and breach of fiduciary duty. He has testified as an expert in numerous securities and other financial matters in federal and state court and in arbitration and mediation proceedings. In his expert report and deposition testimony in this matter, Dr. Finnerty opined that certain alleged corrective disclosures were followed by statistically significant price drops after controlling for market and industry effects and the removal of non-fraud related news. He then calculated the amount of daily inflation in Vale ADRs caused by the Defendants' alleged false statements. Dr. Finnerty also prepared the proposed Plan of Allocation based on his economic analysis. Dr. Finnerty also helped Lead Counsel prepare for the deposition of Dr. Torous, Defendants' damages and loss-causation expert.

18

**Professor Calixto Salomão Filho**

47.     Professor Calixto is a Full Professor of Commercial Law at the University of São Paulo Law School in Brazil and is the former head of the Department of Commercial Law at the University of São Paulo Law School.  He has been a visiting professor of law at Yale Law School and the Institut de Sciences Politiques de Paris (Sciences Po), France.  He has written several books on antitrust law and policy, and published many articles on corporate law, antitrust, and other related topics.  He received his undergraduate degree from the Economics School of the University of São Paulo, an LL.B. and Post-Doctoral Degree from the University of São Paulo Law School, and a Ph.D. in Comparative Commercial Law from the University of Rome.  He has frequently served as an expert witness or a consultant in various cases or arbitrations on issues of competition, corporate governance, corporate structure, mergers and acquisitions, disclosure, transaction structure and terms, and other related topics.  Professor Calixto submitted a rebuttal expert report responding to the opinions expressed by Defendants' two separate experts on antitrust and corporate governance issues under Brazilian and EU law.  Professor Calixto also helped Lead Counsel prepare for the depositions of Defendants' opposing experts and sat for a nearly full-day deposition.

**b)  Defendants' Experts**

**Walter Torous, Ph.D.**

48.     Dr. Torous is a Senior Lecturer at the Massachusetts Institute of Technology with a joint position at the Sloan School of Management and the Center for Real Estate. He also is a Professor Emeritus and the former Lee and Seymour Graff Endowed Professor at the John E. Anderson School of Management at the University of California at Los Angeles. He received his Ph.D. in Economics from the University of Pennsylvania. Dr. Torous frequently consults or serves as an expert witness in securities litigations. Dr. Torous submitted rebuttal reports responding to

the expert reports of Dr. Tabak and Dr. Finnerty, and a supplement report in support of Defendants' sur-reply in opposition to Lead Plaintiffs' motion for class certification.

**Timothy Stark, Ph.D.**

49.     Dr. Stark is the Vice President of Stark Consultants, Incorporated and a Professor of Civil and Environmental Engineering (CEE) at the University of Illinois at Urbana-Champaign. Has been teaching, conducting research, and providing consulting services on the static and seismic stability of earth dams, levees, embankments, naturals slopes, and other earth retaining structures for thirty years.  He has consulted on or served as an expert witness on a number of dam, levee, and earthquake related projects.  He received his Ph.D. in Geotechnical Engineering from Virginia Polytechnic Institute & State University, his Masters in Geotechnical Engineering from the University of California, Berkeley, and his Bachelor of Science in Civil Engineering from the University of Delaware.   Dr. Stark submitted a rebuttal expert report responding to the expert report and opinions submitted by Dr. Noorany.

**Ángel R. Oquendo, Ph.D., J.D.**

50.     Professor Oquendo is the George J. and Helen M. England Professor of Law at the University of Connecticut School of Law.  He has held visiting professorships at national and international institutions, such as Berkeley Law, the Georgetown Law Center, the Free University of Berlin, the University of Hamburg, the University of Aix-en-Provence, and the Federal & State Universities of Rio de Janeiro.  He received his Ph.D. in Philosophy from Harvard University, his J.D. from Yale Law School, and his B.A. in Economics and Philosophy from Harvard University. For twenty-six years he has been a law professor and scholar, specializing in procedural, civil, constitutional, antitrust, and business law in the United States, Europe, and Latin America. He has served as an expert witness or consultant on issues of corporate, commercial, constitutional,

civil, and international law.  In this case, Professor Oquendo submitted a 44-page expert report in which he opined on the legal restrictions that Brazilian and EU antitrust laws imposed on Vale's relationship with Samarco and on other related corporate governance issues.

**Michael Klausner**

51.      Professor Klausner is the Nancy and Charles Munger Professor of Business and Professor of Law at Stanford Law School, where he formerly served as Associate Dean for Academic Affairs.  Before that he was on the faculty of New York University School of Law. He teaches courses in corporations and corporate governance.  Professor Klausner received his B.A. from the University of Pennsylvania and his J.D. and M.A. in economics from Yale University. Professor Klausner has served as an expert witness or a consultant in numerous cases involving issues of corporate governance, corporate structure, mergers and acquisitions, disclosure, transaction structure and terms, and other related topics.   In this matter, Professor Klausner submitted an expert report in which he opined on Samarco's governance structure and extent of Vale's involvement in Samarco's operations.

52.      Lead Counsel deposed each of Defendants' experts in the fall of 2019, working with Lead Plaintiffs' own experts to develop examination outlines and topics.  Lead Counsel obtained testimony at the depositions they would have used at trial to try to undermine the opinions and credibility and of Defendants' experts.

### 4.      Interrogatories and Requests for Admission

53.      Lead Plaintiffs prepared and propounded a comprehensive set of interrogatories and detailed requests for admission designed to elicit admissions that would narrow the factual issues to be proven at trial.  Among other things, Lead Plaintiffs' requests for admission asked Defendants to admit (i) that, before they published Vale's 2013 Sustainability Report, they were aware of the dangerous condition of the Fundão Dam, (ii) that Vale used the Fundão Dam to store its own

mining wastes and that the amount of wastes Vale stored greatly exceeded the limit contained in the agreement to use the Dam; (iii) that Vale was responsible for installing, monitoring, and maintaining the pipelines that transported its tailings to the Fundão Dam; (iv) that Vale had approved the modification of the Fundão Dam's alignment, a change that the Independent Panel of Experts found was a precipitating cause of the Dam's collapse; and (v) that the risk-management plans, policies, and procedures Defendants represented were in place to protect the safety of the Company's operations, dams, and mining facilities did not make them aware of the problems at the Dam.  In addition, Lead Plaintiffs' interrogatories requested that Defendants, among other things, identify the facts and documents supporting certain of their affirmative defenses.

54.     Defendants likewise served on Lead Plaintiffs sets of interrogatories and requests for admission that required Lead Plaintiffs to identify every statement they allege was false, the reasons why such statements were false, and the facts supporting the allegation that Defendants' knew the statements were false when made.  Defendants interrogatories also requested that Lead Plaintiffs detail how the alleged false statements caused the investor losses they are seeking to recover and to identify all facts and documents supporting Lead Plaintiffs' allegations. Responding to Defendants' interrogatories and requests for admission was an enormous undertaking, requiring attorneys to pore over the thousands of potentially relevant documents and comb through more than a dozen deposition transcripts to compile the evidence needed to respond appropriately to Defendants interrogatories and requests for admission.  Lead Plaintiffs had completed much of that work and had prepared draft responses when the parties reached the proposed settlement of the action.

### F.     Lead Plaintiffs' Motion for Class Certification

55.     Lead Plaintiffs filed and served their motion for class certification on September 15, 2017.  (ECF Nos. 112-114.)  The motion was supported by a memorandum of law (ECF No.

113) and an expert report from Lead Plaintiffs' market efficiency expert, Dr. Tabak, opining that the markets for Vale common and preferred ADRs were efficient and that damages for Class Members could be calculated on a class-wide basis through a common methodology (ECF No. 114-1).

56.     Defendants filed and served their opposition to Lead Plaintiffs' motion on November 3, 2017.  (ECF No. 121.)  Defendants' opposition was supported by a memorandum of law and a rebuttal expert report from Dr. Torous.  (ECF No. 122-1.)  Among other things, Dr. Torous criticized Dr. Tabak's analysis of the extent to which the price of Vale's ADRs reacted to material news (*Cammer* factor 5) and his proposed methodology for calculating damages on a class-wide basis.  (ECF No. 122-1.)  Defendants argued in their opposition that because Lead Plaintiffs had not purchased Vale ADRs after Defendants' post-collapse statements denying responsibility for the Dam's collapse, Lead Plaintiffs' claims were not typical of the class's and Lead Plaintiffs were not adequate class representatives. Defendants argued further that Lead Plaintiffs were subject to unique defenses because an analyst working for Capital Group, the investment manager that purchased Vale ADRs on behalf of Lead Plaintiffs, had views that supposedly conflicted with Lead Plaintiffs' theory of the case.

57.     Lead Plaintiffs filed and served their reply in support of their class-certification motion on November 17, 2017.  (ECF No. 124.)  Lead Plaintiffs' reply was accompanied by a rebuttal expert report from Dr. Tabak in which he responded to Dr. Torous's criticisms and analyses.  Lead Plaintiffs explained in their reply that Defendants' challenges to market efficiency were unavailing and that they were entitled to rely on the *Basic* presumption of reliance.  Lead Plaintiffs also responded to Defendants' challenges to Lead Plaintiffs typicality and adequacy.

58.     On August 7, 2019, Defendants requested permission to file a sur-reply and supplemental expert report from Dr. Torous in further opposition to Lead Plaintiffs' class-certification motion, which the Court granted the following day.  (ECF Nos. 163, 164.)  Defendants filed their sur-reply and supplemental Torous report on August 15, 2019.  (ECF Nos. 165, 166.)  Defendants argued that Lead Plaintiffs' expert's report on damages (Dr. Finnerty) had confirmed a "fatal flaw" in Dr. Tabak's market-efficiency analysis.  Defendants argued further that the deposition testimony of the Capital Group analyst (Bruno Rodrigues) had confirmed that Lead Plaintiffs' claims were not typical and that Lead Plaintiffs were inadequate class representatives because Mr. Rodrigues testified that he never read or relied on any of the false statements and they were "immaterial to his investment thesis."

59.     On August 16, 2019, Lead Plaintiffs sought and obtained permission to file a response to Defendants' sur-reply, (ECF No. 168), which they filed on August 22, 2019 (ECF No. 170).  Lead Plaintiffs submitted with their response a supplemental expert report from Dr. Tabak. (ECF No.171-1.)  Lead Plaintiffs rebutted Defendants' argument that Lead Plaintiffs were subject to unique defenses with testimony from Mr. Rodrigues in which he admitted that he was not indifferent to the price of Vale ADRs and that he would have recommended that Capital Group portfolio managers sell Vale ADRs if he had known that the Fundão Dam would collapse and that the Brazilian government would find Vale partially liable for the collapse.  Lead Plaintiffs, supported by Dr. Tabak's supplemental report, also showed that Dr. Torous's belated analysis of market efficiency (he had not initially analyzed the extent to which Vale ADR prices reacted to unexpected Company-specific news) was flawed.

60.     The Court issued its order denying without prejudice Lead Plaintiffs' motion for class certification in a written order dated September 27, 2019.  The Court found that Lead

Plaintiffs had satisfied Rule 23's numerosity, commonality, predominance, and superiority requirements.  In doing so, the expressly found that Lead Plaintiffs were entitled to *Basic*'s "fraud-on-the-market" presumption of reliance and Lead Plaintiffs had established that damages were capable of measurement on a class-wide basis.  The Court found, however, that Lead Plaintiffs had failed to establish the requisite typicality and adequacy because they effectively had alleged two different frauds, one stemming from Defendants' pre-collapse statements about Vale's risk-mitigation plans, policies, and procedures and the other from Defendants' post-collapse statements denying responsibility for the collapse and resulting environmental harm.

### G.    The Parties Settle the Action

61.    After fact discovery closed, the Parties discussed the possibility of resolving the litigation through settlement and agreed to mediation before the Honorable Layn R. Phillips, a former United States District Judge and one of the most well-respected and in-demand mediators in the country.  Judge Phillips has particular expertise and experience in mediating complex securities class actions like this one.  The Parties initially scheduled an in-person mediation session with Judge Phillips for February 1, 2019.  In advance of the scheduled mediation, the Parties prepared detailed mediation statements addressing liability and damages issues supported by numerous exhibits that they exchanged and submitted to Judge Phillips.  Unfortunately, shortly before the scheduled mediation, Vale was forced to postpone the session as it dealt with the aftermath of another deadly collapse of one of its tailings dams in Brazil.  The Parties eventually rescheduled the mediation for April 15, 2019.  At Judge Phillips' request, the Parties submitted supplemental mediation statements responding to the arguments raised in each other's respective opening statements. To accommodate that rescheduling, and in an effort to avoid potentially unnecessary legal fees and expenses, the Parties submitted to the Court a request to adjust the pretrial schedule by moving the deadline for exchanging expert reports and completing expert

25

discovery.  (ECF No. 159.)  The Court granted that request in a written order dated March 11, 2019.  (ECF No. 160.)

62.     At the April 15 mediation, the Parties engaged in vigorous settlement negotiations over the course of the day with the assistance of Judge Phillips and his colleague, David Murphy. The participants at the mediation included representatives of both Lead Plaintiffs, Lead Counsel, Defendants' in-house and outside counsel, and representatives from each of Vale's D&O carriers, including in-house and outside counsel.  Despite the Parties' and the mediators' best efforts, the Parties were unable to reach agreement.

63.     Following the mediation, Judge Phillips continued discussions with the Parties and their counsel and carriers to try to bridge the gap.  Unfortunately, after exchanging several additional settlement offers and demands, the Parties were unable to reach agreement.

64.     With the Parties at an impasse, they exchanged expert reports and completed all expert discovery over the next several months.  At the end of expert discovery, and after the Court issued its order on Lead Plaintiffs' class-certification motion, the Parties renewed discussions about the possibility of settlement.  The Parties once again exchanged several offers and demands before finally reaching a tentative agreement to settle all claims for $25 million, subject to formal approval from all carriers and the Parties' respective Boards.

65.     In the ensuing weeks, the Parties negotiated the terms of the Settlement and drafted the settlement agreement and related papers, such as notices to be provided to the Settlement Class. On February 5, 2020, the Parties executed the Stipulation and Agreement of Settlement (ECF No. 183-1) (the "Stipulation"), which sets forth the full terms of the Parties' agreement to settle all claims asserted in the Action for $25,000,000, subject to the approval of the Court.

### H.      The Court Grants Preliminary Approval to the Settlement

66.     On February 7, 2020, Lead Plaintiffs filed an unopposed motion for preliminary approval of the Settlement.  (ECF Nos. 183-185.)

67.     The Court held a telephonic conference with the Parties to discuss Lead Plaintiffs' motion on February 13, 2020.  During the conference, the Court requested clarification on the scope of the release contained in the Stipulation and requested additional information from Dr. Finnerty, who developed the proposed Plan of Allocation.  The Parties thereafter executed an amendment to the Stipulation that modified the terms of the Release to make clear that the Release is limited to claims based on facts, allegations, or representations in the Complaint that occurred before the collapse of the Fundão Dam on November 5, 2015, in accordance with the Court's ruling on Lead Plaintiffs' motion for class-certification.  Lead Plaintiffs submitted the amendment to the Stipulation and a declaration from Dr. Finnerty on February 20, 2020.  (ECF Nos. 188-189.)

68.     On February 24, 2020, the Court entered an Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement (ECF No. 192) (the "Preliminary Approval Order"), which, among other things: (i) preliminarily approved the Settlement; (ii) approved the form of Notice, Summary Notice, and Claim Form, and authorized notice to be given to Settlement Class Members through mailing of the Notice and Claim Form, posting of the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *The Wall Street Journal* and over *PR Newswire*; (iii) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, or the fee and expense application; and (iv) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense

Application.  The Preliminary Approval Order also set a Settlement Hearing for June 10, 2020 at 4:00 p.m. to determine, among other things, whether the Settlement should be finally approved.

69.     On April 22, 2020, the Court entered an Order confirming that the June 10, 2020 Settlement Hearing will be conducted by telephone, consistent with the Court's Emergency Individual Rules and Practices in Light of Covid-19.  (ECF No. 196.)

## III.    RISKS OF CONTINUED LITIGATION

70.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $25,000,000 cash payment that represents a significant portion of the realistic recoverable damages in the Action.  Lead Plaintiffs and Lead Counsel believe that the proposed Settlement is an excellent result for the Settlement Class given the risks of continued litigation. As explained below, Lead Plaintiffs faced substantial risks with respect to proving liability and establishing loss causation and damages in this case.

### A.    Risks Concerning Liability

71.     While Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize that this Action presented a number of substantial risks to establishing Defendants' liability.   Defendants had vigorously contested and would have continued to argue that their challenged statements were not false or misleading or were not actionable, and, in any event, that Defendants did not know that the statements were false or were not reckless in making them.

#### 1.    Falsity

72.     Lead Plaintiffs would have faced substantial challenges in proving that Defendants' statements were materially false and misleading when made.

73.     Following the Court's order on class certification finding that the Complaint alleges two distinct frauds, Lead Plaintiffs' claim is premised on only the pre-collapse statements in Vale's

2013 Sustainability Report about the safety of Vale's operations and about Vale's risk-mitigation policies and procedures.  Defendants argued in their motion to dismiss, argued again at the mediation, and indicated in their letter to the Court requesting a pre-motion conference that they intended to argue at summary judgment that most, if not all, of the alleged false statements that remain at issue were too vague and indefinite to support a fraud claim.  Relying on the Second Circuit's recent decision in *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019), defendants would have argued that Vale's pre-collapse statements in the 2013 Sustainability Report were the type of "simple and generic assertions about having 'policies and procedures'" that are inactionable puffery.

74.     Although the Court rejected this argument in denying Defendants' motion to dismiss, the Court's decision came before the Second Circuit's decision in *Singh.*  Thus, while Lead Plaintiffs and Lead Counsel believe that the *Singh* decision is readily distinguishable and that Defendants' statements were, as the Court found previously, concrete assertions of fact, there is a risk that the Court could revisit its prior decision and reach a different conclusion.  Such a decision would be fatal to Lead Plaintiffs' claims.

75.     Defendants also indicated their intention to argue at summary judgment that even if the statements are not considered puffery, many of them are not actionable for the separate reason that the 2013 Sustainability Report expressly carved out Samarco facilities like the Fundão Dam from its scope.  In dismissing certain of Lead Plaintiffs' claims on the pleadings, the Court accepted a similar argument about statements in Vale's Annual Reports but found that the Sustainability Report did not exclude Samarco from its scope.  Nonetheless Defendants' argument would have relied on different language in the Sustainability Report that they would have contended the Court did not consider (because Defendants did not raise it).  Though Lead Plaintiffs

29

disagree with Defendants' hypertextual and stinted reading of the Sustainability Report's scope, Defendants' argument posed some risk.  Acceptance of Defendants' argument would have halved the number of false statements at issue.

### 2.    Scienter

76.    Even if Lead Plaintiffs succeeded in proving that Defendants' statements were false and actionable, Lead Plaintiffs would have faced challenges in proving that Defendants made the alleged false statements with the intent to mislead investors or were reckless in making the statements.  The Court found in its order on Defendants' motion to dismiss that Lead Plaintiffs had sufficiently pled scienter for the alleged false statements in the 2013 Sustainability Report by pleading that Defendant Poppinga, as a Samarco Board member, had access to Board minutes and other documents that contradicted the statements in the Sustainability Report.  (ECF No. 92 at 56.) Defendants indicated in their request for a pre-motion conference that they would move for summary judgment on the ground that Poppinga was not on the Samarco Board in April 2014, when the 2013 Sustainability Report was published, and there was no evidence suggesting that he had access to information concerning the Fundão Dam before he joined the Board in January 2015.

77.    In response, Lead Plaintiffs would have provided evidence, including testimony from Defendant Poppinga himself, that despite his physical location in Canada when the Sustainability Report was published, he had access to information about the problems at the Fundão Dam, including a 2010 audit report and several more recent reports from Samarco's Independent Tailings Review Board ("ITRB").   Lead Plaintiffs also would have submitted evidence that other Vale senior executives who attested to the accuracy of the statements in the Sustainability Report were aware of, had received, or had access to information that contradicted the Company's statements.

30

78.     Defendants, on the other hand, would have pointed to other presentations and documents in which the ITRB and other consultants attested to the safety and structural integrity of the Dam in the months leading up to publication of the 2013 Sustainability Report.  Defendants would have asserted that those documents prove they reasonably believed the statements in the Sustainability Report, negating any inference that they acted with the requisite scienter.  While Lead Plaintiffs and Lead Counsel believe there were genuine issues of material fact that would preclude summary judgment, there is significant risk that the Court would disagree.  And, even if Lead Plaintiffs were able to survive summary judgment, it is difficult—if not impossible—to predict how a jury would decide the issue.  A decision in Defendants' favor, at either summary judgment or trial, would be fatal to the claims of Lead Plaintiffs and the Settlement Class.

79.     On all these issues, Lead Plaintiffs would have had to prevail at several stages; first on a motion for summary judgment and then at trial.  And even if they succeeded at summary judgment and trial, they likely would face years of lengthy appeals.  At each stage, there would be very significant risks attendant to the continued prosecution of the Action, as well as considerable delay.

**B.     Risks Related to Loss Causation and Damages**

80.     Even if Lead Plaintiffs overcame each of the above risks and successfully established liability, they would have confronted considerable additional challenges in establishing loss causation and damages.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'").  While Defendants raised the issue of loss causation in their motion to dismiss and the Court rejected that argument, the threshold for alleging loss causation at the pleading stage is not onerous, and these arguments could have been presented with much more force at summary judgment and trial, where Defendants' position would have been supported

31

by expert testimony opining that there was no loss causation and limited or no damages.  Risks related to loss causation and damages were an important driver of the settlement value of this case.

81.    Defendants argued in their request for a pre-motion conference that "the analysis and testimony provided by Plaintiffs' own purported loss causation expert conclusively establishes that: (1) no artificial price inflation was introduced into Vale's ADRs following any of the alleged misstatements; and (2) Vale's ADRs experienced no statistically significant abnormal price returns in the wake of the collapse of the Fundão Dam, the quintessential corrective disclosure of purported misrepresentations concerning risk mitigation practices."  (ECF No. 177 at 2.).  Defendants also would have argued that the two additional alleged corrective disclosures—when Brazilian prosecutors announced they had filed a lawsuit against Vale for its role in the collapse of the Dam and when a Court later found that Vale likely was liable for the environmental harm as both a direct and indirect polluter because of its use of the Fundão Dam and its control of Samarco— cannot support loss causation because neither of those alleged corrective disclosures revealed new information about the pre-collapse fraud.

82.    In response, Lead Plaintiffs would have submitted evidence, including testimony and an expert report from Dr. Finnerty, showing that the full truth of Defendants' pre-collapse false statements was not known until many weeks after the Fundão Dam collapsed when the Brazilian prosecutors' complaint and the court order finding Vale likely liable as a direct polluter revealed new information about Vale's use of the Dam, the extent of the long-standing problems at the Dam, and Vale's liability as a direct polluter.  If the Court or the jury were to accept Defendants' arguments, Lead Plaintiffs would not be able to establish the requisite causal link between the pre-collapse false statements and the losses Lead Plaintiffs and the class suffered.

C.     **The Settlement Amount Compared to Likely
Damages that Could be Proved at Trial**

83.     The $25 million Settlement is also a very favorable result when it is considered in
relation to the likely amount of damages that could be established at trial if Lead Plaintiffs were to
prevail all liability issues, such as falsity and scienter.  Assuming that Lead Plaintiffs prevailed on
liability issues at trial (which was far from certain), the Settlement Amount would be equal to
approximately 11% to 16% of the likely recoverable damages, depending on the outcome of
disputed loss causation and damages arguments.  This represents an excellent recovery for the
Settlement Class given other risks in the litigation, and the substantial additional costs and delays
that would result from continued litigation.

84.     As discussed above, this case presented many complex questions with respect to
determining the amount of damages that could be recovered and the range of possible damages
varied widely depending on assumptions and methodology adopted.  Considering Defendants'
arguments concerning damages and loss causation, Lead Counsel believes that the maximum
damages that Lead Plaintiffs could realistically prove at trial would be $228 million.  If Defendants
succeeded on even one of their loss-causation challenges, the maximum amount of recoverable
damages would be slashed substantially.  For example, if the Court or the jury were to find that
the last corrective disclosure did not reveal any new information, and thus did not cause losses
related to the fraud, then realistic potential damages would be reduced to at most $153 million.  If
Defendants succeeded on any of their other challenges, damages would be reduced further, even
potentially eliminated altogether.  Accordingly, the Settlement represents approximately 11% to
16% of the realistic recoverable damages here.  This level of recovery is quite good for a securities
fraud action, especially given all the particular risks of proving liability discussed above.

85.     When Lead Plaintiffs agreed to the Settlement, they (and the class) were facing the substantial burdens of opposing summary judgment and, if successful, a lengthy and complex trial that would, at best, substantially prolong the wait for any possible recovery and could, at worst, lead to a smaller recovery, or no recovery at all.  Even if Lead Plaintiffs were successful at trial, Defendants could have challenged the damages of each large class member in post-trial proceedings, substantially reducing any aggregate class recovery.  Finally, even if Lead Plaintiffs had succeeded in proving all elements of their case at trial and in post-trial proceedings, Defendants would almost certainly have appealed.  An appeal would not only have renewed all the risks faced by Lead Plaintiffs and the class, it also would have engendered significant additional delay and costs before Settlement Class Members could receive any recovery.

86.     Given these significant litigation risks, and the immediacy, certainty, and amount of the $25,000,000 recovery, Lead Plaintiffs and Lead Counsel believe that the Settlement is an excellent result, is fair, reasonable, and adequate, and is in the best interest of the Settlement Class.

## IV.   LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

87.     The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to potential members of the Settlement Class.  The Preliminary Approval Order also set a deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final approval hearing date of June 10, 2020.

88.     In accordance with the Preliminary Approval Order, Lead Counsel instructed JND Legal Administration ("JND"), the Court-approved Claims Administrator, to begin disseminating

copies of the Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 17% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $2,000,000.  To disseminate the Notice, JND obtained information from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members.  *See* Declaration of Luiggy Segura Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Segura Decl."), attached hereto as Exhibit 3, at ¶¶ 3-7.

89.    JND began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominee owners on March 11, 2020.  *See* Segura Decl. ¶¶ 3-5.  As of May 5, JND had disseminated a total of 230,008 Notice Packets to potential Settlement Class Members and nominees.  *Id.* ¶ 8.

90.    On March 30, 2020, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the *PR Newswire.  Id.* ¶ 9.

91.    Lead Counsel also caused JND to establish a dedicated settlement website, www.ValeSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and Complaint.  *See*

Segura Decl. ¶ 11.  That website became operational on March 11, 2020.  *Id*.  Lead Counsel also made copies of the Notice and Claim Form available on its own website, www.blbglaw.com.

92.     As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, and/or Fee and Expense Application, or to request exclusion from the Settlement Class is May 20, 2020.  To date, three requests for exclusion have been received.  *See* Segura Decl. ¶ 12.  No objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received to date.  Lead Counsel will file reply papers on or before June 3, 2020, that will address the requests for exclusion and any objections that may be received.

## V.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

93.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less any (a) Taxes, (b) Notice and Administration Costs, (c) Litigation Expenses awarded by the Court, (d) attorneys' fees awarded by the Court, and (e) any other costs or fees approved by the Court) must submit a valid Claim Form with all required information postmarked no later than July 14, 2020.  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

94.     Lead Counsel consulted with Lead Plaintiffs' damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation").  *See* Finnerty Decl. (ECF No. 189) ¶¶ 1-2.  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Complaint.

36

95.     The Plan of Allocation is set forth at pages 11 to 17 of the Notice.  *See* Segura Decl.,

Ex. A.  As described in the Notice, calculations under the Plan of Allocation are not intended to

be estimates of, nor indicative of, the amounts that Settlement Class Members might have been

able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants

pursuant to the Settlement.  Notice ¶ 48.  Instead, the calculations under the plan are only a method

to weigh the claims of Settlement Class Members against one another for the purposes of making

an equitable allocation of the Net Settlement Fund.  *Id*.

96.     In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated

the estimated amount of artificial inflation in Vale common and preferred ADRs during the Class

Period allegedly caused by Defendants' alleged false and misleading statements and material

omissions.  Finnerty Decl. ¶¶ 11-15.  In calculating the estimated artificial inflation, the damages

expert considered price changes in Vale ADRs in reaction to certain public announcements

allegedly revealing the truth concerning Defendants' alleged misrepresentations and material

omissions, adjusting for price changes on those days that were attributable to market or industry

forces.  *Id*. ¶ 12; Notice ¶ 49.

97.     In general, the Recognized Loss Amounts calculated under the Plan of Allocation

will be the lesser of:  (a) the difference between the amount of alleged artificial inflation in Vale

ADRs at the time of purchase or acquisition and the time of sale, or (b) the difference between the

purchase price and the sale price (if sold during the Class Period or afterwards through the period

90 days after the final corrective disclosure).  Notice ¶¶ 51, 53-56.

98.     Claimants who purchased and sold all their Vale ADRs before the first alleged

corrective disclosure on November 5, 2015, or who purchased and sold all their Vale ADRs

between two consecutive dates on which artificial inflation was allegedly removed from the price

of Vale ADRs (that is, they did not hold the ADRs over a date where artificial inflation was allegedly removed from the stock price), will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions because the level of artificial inflation is the same between the corrective disclosures, and any loss suffered on those sales would not be the result of the alleged misstatements in the Action.

99.     In accordance with the PSLRA, Recognized Loss Amounts for Vale ADRs sold during the 90-day period after final alleged corrective disclosure are further limited to the difference between the purchase price and the average closing price of the stock from the trading date after that final corrective disclosure to the date of sale.   Notice ¶¶ 53(d)(iii); 54(c)(iii); 55(d)(iii); 56(c)(iii).  Recognized Loss Amounts for Vale ADRs still held as of the close of trading on March 18, 2016, the end of the 90-day period, will be the lesser of (a) the amount of artificial inflation on the date of purchase or (b) the difference between the purchase price for the ADR and the average closing price for the ADR during that 90-day period (which was $2.99 for Vale Common ADRs and $2.23 for Vale Preferred ADRs).  Notice ¶¶ 53(e), 54(d), 55(e), 56(d).

100.     The sum of a Claimant's Recognized Loss Amounts for all their purchases of Vale ADRs during the Class Period is the Claimant's "Recognized Claim."  Notice ¶ 58.  The Plan of Allocation also limits Claimants based on whether they had an overall market loss in their transactions in Vale ADRs during the period from May 8, 2014 through March 18, 2016.  A Claimant's Recognized Claim will be limited to his, her, or its market loss in ADR transactions during that period.  Notice ¶¶ 64-65.  The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  Notice ¶ 66.

101.     In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they

suffered on purchases of Vale ADRs that were attributable to the misconduct alleged in the Complaint.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

102.    As noted above, as of May 5, 2020, more than 230,000 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, had been sent to potential Settlement Class Members and nominees.  S*ee* Segura Decl. ¶ 8.  To date, no objections to the proposed Plan of Allocation have been received.

## VI.    THE FEE AND EXPENSE APPLICATION

103.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees of 17% of the Settlement Fund net of the Litigation Expenses awarded by the Court (the "Fee Application").  If the Court grants the Litigation Expenses requested, this fee request would be equal to $3,938,004.97, plus interest earned on that amount at the same rate as the Settlement Fund.[2]  Lead Counsel also requests payment for litigation expenses that it incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $1,811,120.54.  Lead Counsel further requests reimbursement to Lead Plaintiffs ACERA and OCERS a total of $24,144.35 in costs and expenses that Lead Plaintiffs incurred directly related to their representation of the Settlement Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4).  The legal authorities supporting the

---

[2] Lead Counsel intends to compensate another law firm, Bottini & Bottini, Inc. (the "Bottini Firm") from the attorneys' fees that Lead Counsel receives in this Action, based on work that the Bottini Firm did at the outset of the litigation.  The payment to the Bottini Firm will be in an amount commensurate with that firm's efforts in this litigation.

requested fee and expenses are discussed in Lead Counsel's Fee Memorandum.  The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

104.    For its efforts on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Lead Plaintiffs and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances and taking into account the litigation risks faced in a class action.  Use of the percentage method has been recognized as appropriate by the Supreme Court and Second Circuit for cases of this nature.

105.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 17% fee award is fair and reasonable for attorneys' fees in common fund cases such as this and is within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

### 1.    Lead Plaintiffs Have Authorized and Support the Fee Application

106.    ACERA and OCERS are both sophisticated institutional investors that closely supervised and monitored the prosecution and settlement of the Action.  *See* Weiss Decl. (Ex. 1), at ¶¶ 2-7; Ratto Decl. (Ex. 2), at ¶¶ 2-7.  Lead Plaintiffs have evaluated the Fee Application and fully support the fee requested.  The fee requested is consistent with retainer agreements entered into between Lead Plaintiffs and Lead Counsel at the outset of the litigation.  Weiss Decl. ¶ 9; Ratto Decl. ¶ 9.  After the agreement to settle the Action was reached, Lead Plaintiffs again

reviewed the proposed fee and believe it is fair and reasonable in light of the result obtained for the Settlement Class, the substantial risks in the litigation, and the work performed by Lead Counsel.  Weiss Decl. ¶ 10; Ratto Decl. ¶ 10.  Lead Plaintiffs' endorsement of the fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2. The Work and Experience of Lead Counsel

107.    Attached hereto as Exhibit 4 is a schedule summarizing the amount of time spent by the attorneys and professional support staff employees of BLB&G who billed more than ten hours to the Action from its inception through February 5, 2020, and a lodestar calculation for those individuals.  As set forth in Exhibit 4, the number of hours expended by BLB&G on the Action from its inception through February 5, 2020 is 14,548.25, for a lodestar of $8,004,278.75.  The requested fee of 17% of the Settlement Fund, net of expenses, is $3,938,004.97 plus interest, and therefore represents *substantially less* than Lead Counsel's lodestar—in fact, it is one-half or 0.5.  Thus, Lead Counsel's requested fee is a negative or fractional multiplier of their total lodestar, which in other words represents a fee that is only approximately 50% of the total value of the time and effort that Lead Counsel devoted to the prosecution of this Action at their standard rates.  As discussed in further detail in the Fee Memorandum, this multiplier is significantly below the fee multipliers typically awarded in comparable securities class actions and in other class actions involving contingency fee risk, in this Circuit and elsewhere.

108.    The schedule set forth in Exhibit 4 was prepared from contemporaneous daily time records regularly prepared and maintained by BLB&G, which are available at the request of the Court.  As noted above, attorneys and support staff who billed fewer than ten hours to the Action have been removed from the schedule and no time expended in preparing the application for fees and expenses has been included.  The hourly rates for attorneys and paraprofessionals included in

the schedule are their current hourly rates, which are commensurate with the hourly rates charged by lawyers and paraprofessionals performing similar services in New York, New York. For personnel who are no longer employed by BLB&G, the lodestar calculation is based upon the hourly rates for such personnel in his or her final year of employment with the firm.

109.    As described above in greater detail, the work that Lead Counsel performed in this Action included: (i) conducting an extensive investigation into the claims asserted, including through a detailed review of public documents, interviews with possible witnesses, and consultation with experts; (ii) researching and drafting a detailed consolidated complaint; (iii) researching, briefing, and arguing Lead Plaintiffs' largely successful opposition to Defendants' motion to dismiss; (iv) preparing and filing Lead Plaintiffs' motion for class certification; (v) undertaking substantial fact and expert discovery efforts, including serving document requests on Defendants, serving Letters Rogatory and document subpoenas on non-parties, obtaining and reviewing more than 1.3 million pages of documents produced by Defendants and non-parties as a result of these efforts, and taking, defending, or participating in 21 depositions; (vi) consulting extensively throughout the litigation with a variety of experts and consultants, including experts in financial economics, geotechnical engineering, corporate governance, and Brazilian antitrust law, and working with them to prepare a total of six initial, reply, or rebuttal reports; and (vii) engaging in extensive arm's-length settlement negotiations to achieve the Settlement.

110.    As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action. I maintained control of and monitored the work performed by other lawyers at BLB&G. While I personally devoted substantial time to this case, and personally reviewed and edited all pleadings, court filings, and other correspondence prepared on behalf of

Lead Plaintiffs, other experienced attorneys at my firm were also involved in settlement negotiations and other matters.  More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level.  Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

111.    As demonstrated by the firm resume attached as Exhibit 5 hereto, Lead Counsel is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases.  BLB&G is consistently ranked among the top plaintiffs' firms in the country.  Further, BLB&G has taken complex cases such as this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions.  I believe this willingness and ability added valuable leverage in the settlement negotiations.

### 3.    Standing and Caliber of Defendants' Counsel

112.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of its opposition.  Defendants were represented by extremely able counsel—Gibson, Dunn & Crutcher LLP. In the face of this skillful and well-financed opposition, Lead Counsel was nonetheless able to develop a case that was sufficiently compelling to persuade Defendants and their counsel to settle the case on terms that will significantly benefit the Settlement Class.

### 4.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

113.    The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above.  Those risks are relevant to the Court's evaluation of an award of

attorneys' fees.  Here, the risks assumed by Lead Counsel, and the time and expenses incurred by

Lead Counsel without any payment, were extensive.

114.    From the outset, Lead Counsel understood that it was embarking on a complex,

expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for

the substantial investment of time and the outlay of money that vigorous prosecution of the case

would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that

sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation,

and that Lead Counsel would further advance all of the costs necessary to pursue the case

vigorously on a fully contingent basis, including funds to compensate vendors and consultants and

to cover the considerable out-of-pocket costs that a case such as this typically demands.  Because

complex shareholder litigation generally proceeds for several years before reaching a conclusion,

the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an

ongoing basis.  Indeed, Lead Counsel has received no compensation during the course of this

Action and no reimbursement of out-of-pocket expenses, yet it has incurred more than $1.8 million

in expenses in prosecuting this Action for the benefit of Vale investors.

115.    Lead Counsel also bore the risk that no recovery would be achieved.  As discussed

above, from the outset this case presented a number of significant risks and uncertainties, including

challenges in proving the falsity of Defendants' statements, establishing scienter, and establishing

loss causation and damages.

116.    As noted above, the Settlement was reached only after Lead Counsel had completed

fact and expert discovery.  Had the Settlement not been reached when it was, Defendants would

have moved for summary judgment, which would have to be briefed and argued, a pre-trial order

would have to be prepared, proposed jury instructions would have to be submitted, and motions *in*

*limine* would have to be filed and argued.  Substantial time and expense would also need to be expended in preparing the case for trial.  The trial itself would be expensive and uncertain. Moreover, even if the jury returned a favorable verdict after trial, it is likely that any verdict would be the subject of post-trial motions, post-trial challenges to individual class members' damages, and appeals.

117.    Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class.  Given this recovery and Lead Counsel's investment of time and resources over the course of the litigation, Lead Counsel believes the requested attorneys' fee is fair and reasonable and should be approved.

### 5.    The Reaction of the Settlement Class to the Fee Application

118.    As noted above, as of May 5, 2020, over 230,000 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 17% of the Settlement Fund.  *See* Segura Decl. ¶ 8 and Ex. A (Notice ¶¶ 5, 71).  In addition, the Court-approved Summary Notice has been published in *The Wall Street Journal* and transmitted over the *PR Newswire*.  *Id.* ¶ 9.  To date, no objections to the request for attorneys' fees have been received.

119.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that the requested fee is fair and reasonable.

### B.    The Litigation Expense Application

120.    Lead Counsel also seeks payment from the Settlement Fund of $1,811,120.54 for litigation expenses that it reasonably incurred in connection with the prosecution of the Action (the "Expense Application").

121.    From the outset of the Action, Lead Counsel has been cognizant of the fact that it might not recover any of its expenses, and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years. Lead Counsel also understood that, even if the case ultimately was successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action.  Consequently, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

122.    As set forth in Exhibit 6 hereto, Lead Counsel has paid or incurred a total of $1,811,120.54 in unreimbursed litigation expenses in connection with the prosecution of the Action.  The expenses are summarized in Exhibit 6, which identifies each category of expense, *e.g.*, expert fees, deposition costs, on-line legal and factual research, travel costs, telephone, and photocopying expenses, and the amount incurred for each category.  These expenses are reflected on the books and records maintained by Lead Counsel, which are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. These expenses are submitted separately by Lead Counsel and are not duplicated by the firm's hourly rates.

123.    Of the total amount of expenses, $1,395,890.11, or approximately 77%, was expended for the retention of experts.  As discussed above, Lead Counsel consulted extensively with experts in loss causation and damages, geotechnical engineering, corporate governance, and

46

antitrust during its investigation and the preparation of the Complaint and during discovery.  In connection with Lead Plaintiffs' motion for class certification, Lead Plaintiff's market efficiency expert, Dr. Tabak, submitted a report on the efficiency of the market for Vale ADRs and the methodology for calculating class-wide damages.  Lead Counsel also consulted with and submitted expert reports of Professor Finnerty (loss causation and damages), Professor Calixto (corporate governance and Brazilian and EU antitrust law), and Dr. Noorany (geotechnical engineering).  In addition, Lead Counsel retained Brazilian counsel who assisted in specialized areas that required Brazilian attorneys, including submitting the Letters Rogatory to Brazilian courts and obtaining documents and testimony in response from Brazilian third-parties.  Each of these experts was instrumental in Lead Counsel's prosecution of the action and in bringing about the favorable result achieved.

124.    Another significant expense was the cost of translation of the vast number of Portuguese documents produced and used in the Action.   The translation costs came to $123,502.51, or approximately 7% of the total expenses

125.    Lead Counsel expended a total of $50,176.91, or 3% of the total expenses, on the costs of court reporters and transcript preparation in connection with the 21 depositions conducted in the Action.

126.    Lead Counsel seeks $53,603.64 for the costs associated with establishing and maintaining the internal document database that was used to process and review the more than 1.3 million pages of documents produced by Defendants and non-parties in this action.  BLB&G charges a rate of $3 per gigabyte of data per month and $15 per user to recover the costs associated with maintaining its document database management system, which includes the costs to BLB&G of necessary software licenses and hardware.  BLB&G has conducted a review of market rates

charged for the similar services performed by third-party document management vendors and found that its rate was 80% below the market rates charged by these vendors, resulting in a savings to the Settlement Class.

127.    Lead Plaintiffs' share of the mediation costs paid to Phillips ADR for the services of Judge Phillips was $72,061.25 or 4% of the total expenses.

128.    The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, travel costs, copying costs (in-house and through outside vendors), long distance telephone charges, and postage and delivery expenses.

129.    The expenses reflected in Exhibit 6 are the actual incurred expenses or reflect "caps" based on the application of the following criteria:

(a)        Out-of-Town Travel – airfare is capped at coach rates, hotel charges per night are capped at $350 for "high cost" cities and $250 for "low cost" cities; meals are capped at $20 per person for breakfast, $25 per person for lunch, and $50 per person for dinner.

(b)        Out-of-Office Meals – capped at $25 per person for lunch and $50 per person for dinner.

(c)        In-Office Working Meals – capped at $20 per person for lunch and $30 per person for dinner.

(d)        Internal Copying/Printing – charged at $0.10 per page.

(e)        On-Line Research – charges reflected are for out-of-pocket payments to the vendors for research done in connection with this litigation. On-line research is charged to each case based on actual time usage at a set charge by the vendor. There are no administrative charges included in these figures.

130.    In addition, Lead Plaintiffs seek reimbursement of the reasonable costs and expenses they incurred directly in connection with their representation of the Settlement Class. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum at 22-23.

131.    Lead Plaintiff ACERA seeks reimbursement of $9,360.90 based on a conservative estimate of the time expended in connection with the Action by ACERA personnel, who spent a substantial amount of time communicating with Lead Counsel, reviewing pleadings and motion papers, gathering and reviewing documents in response to discovery requests, sitting for deposition, and attending the mediation in New York.  *See* Weiss Decl. ¶¶ 6-7, 13.

132.    Likewise, Lead Plaintiff OCERS seeks reimbursement of $14,783.45 based on a conservative estimate of the time expended in connection with the Action by OCERS personnel, who spent a substantial amount of time communicating with Lead Counsel, reviewing pleadings and motion papers, gathering and reviewing documents in response to discovery requests, sitting for deposition, and attending the mediation in New York.  *See* Ratto Decl. ¶¶ 6-7, 13.

133.    The Notice informed potential Settlement Class Members that Lead Counsel would be seeking payment of Litigation Expenses in an amount not to exceed $2,000,000, which might include an application for the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Settlement Class.  Notice ¶¶ 5, 71.  The total amount requested, $1,835,264.89, which includes $1,811,120.54 for Lead Counsel's litigation expenses and $24,144.35 for costs and expenses incurred by Lead Plaintiffs, is significantly below the $2,000,000 that Settlement Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

134.     The expenses incurred by Lead Counsel and Lead Plaintiffs were reasonable and necessary to represent the Class and achieve the Settlement.   Accordingly, Lead Counsel respectfully submits that the application for payment of Litigation Expenses from the Settlement Fund should be approved.

135.     Attached hereto are true and correct copies of the following documents cited in the Fee Memorandum:

Exhibit 7:     *In re OSG Sec. Litig.,* No. 12-cv-07948-SAS, slip op. (S.D.N.Y. Dec. 2, 2015), ECF No. 261

Exhibit 8:     *In re Celestica Inc. Sec. Litig*., No. 07-cv-00312-GBD, slip op. (S.D.N.Y. July 28, 2015), ECF No. 267

Exhibit 9:     *Citiline Holdings, Inc. v. iStar Fin., Inc.*, No. 1:08-cv-03612-RJS, slip op. (S.D.N.Y. Apr. 5, 2013), ECF No. 127

Exhibit 10:     *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, No. 1:09-cv-08633-JFK, slip op. (S.D.N.Y. Mar. 14, 2013), ECF No. 23

Exhibit 11:     *In re L.G. Philips LCD Co. Sec. Litig.*, No. 1:07-cv-00909-RJS, slip op. (S.D.N.Y. Mar. 17, 2011), ECF No. 82

Exhibit 12:     *In re SunEdison, Inc. Sec. Litig.*, No. 1:16-md-2742-PKC, slip op. (S.D.N.Y. Oct. 25, 2019), ECF No. 672

Exhibit 13:     *In re Heartware Int'l, Inc. Sec. Litig.*, No. 1:16-cv-00520-RA, slip op. (S.D.N.Y. Apr. 12, 2019), ECF No. 85

## VII.     CONCLUSION

136.     For all the reasons set forth above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.   Lead Counsel further submits that the requested fee should be approved as fair and reasonable, and the request for payment of total litigation expenses in the amount of $1,835,264.89, which includes Lead Plaintiffs' costs and expenses, should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.  Executed May 6, 2020.

/s/ Richard D. Gluck
Richard D. Gluck